UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WATERFORD TOWNSHIP POLICE & FIRE ) RETIREMENT SYSTEM, Individually and on ) Behalf of All Others Similarly Situated, ) ) | No. |
| ) | <u>CLASS ACTION</u> |
| Plaintiff, ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. ) ) | |
| CVS HEALTH CORPORATION, LARRY J. ) MERLO, DAVID M. DENTON, EVA C. ) BORATTO, RICHARD M. BRACKEN, C. ) DAVID BROWN II, ALECIA A. ) DeCOUDREAUX, NANCY-ANN M. ) DePARLE, DAVID W. DORMAN, ANNE M. ) FINUCANE, JEAN-PIERRE MILLON, ) MARY L. SCHAPIRO, RICHARD J. SWIFT, ) WILLIAM C. WELDON, TONY L. WHITE, ) MARK T. BERTOLINI, FERNANDO ) AGUIRRE, FRANK M. CLARK, MOLLY J. ) COYE, ROGER N. FARAH, JEFFREY E. ) GARTEN, ELLEN M. HANCOCK, ) RICHARD J. HARRINGTON, EDWARD J. ) LUDWIG and OLYMPIA J. SNOWE, ) ) | |
| Defendants. ) ) | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Waterford Township Police & Fire Retirement System ("plaintiff"), by its undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to itself and upon information and belief based on the investigation of plaintiff's attorneys as to all other matters, which included, among other things, a review and analysis of CVS Health Corporation ("CVS" or the "Company") and Aetna Inc. ("Aetna") Securities and Exchange Commission ("SEC") filings, CVS/Aetna releases and conference calls, defendants' public statements, media reports, analyst reports, industry reports, other complaints filed against CVS, and other publicly available information. Plaintiff believes substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a securities class action on behalf of all former Aetna shareholders who acquired CVS shares in exchange for their Aetna shares in connection with CVS's acquisition of Aetna on November 28, 2018 (the "Acquisition"), seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act"). Since November 28, 2018, Aetna has been a subsidiary of CVS.

2.    The Acquisition was indicative of CVS's bold response to the expected entry by Amazon, Inc. into the pharmacy and healthcare space.[1] In sum, Aetna was a "must have" for CVS.

3.    To acquire Aetna, CVS would need to: (i) convince credit rating agencies that a $40 billion debt offering – to fund the Acquisition's cash consideration – would not overly burden CVS and jeopardize CVS's investment grade ratings, and (ii) convince Aetna's shareholders that the CVS stock consideration they would be receiving in the Acquisition was fairly and accurately priced.

---

[1]    In an October 2017 *New York Times* article, titled "Hearing Amazon's Footsteps, the Health Care Industry Shudders," an Amazon supply chain consultant familiar with Amazon's healthcare initiatives was quoted as saying "'[m]y advice is that executives at pharmaceutical companies should crush all assumptions when it comes to Amazon and their ability to enter, innovate and reimagine the pharmacy business and health care.'"

4.      To execute the CVS stock component of the Acquisition, defendants prepared and filed a Registration Statement on Form S-4 with the SEC that was declared effective on February 9, 2018 (the operative Form S-4 Registration Statement and its amendments, hereinafter the "Registration Statement," as well as defendants' joint proxy statement/prospectus on Form 424B3 filed with the SEC on February 9, 2018 (the "Prospectus"), are collectively referred to herein as the "Offering Documents").

5.      The Offering Documents contained materially false and/or misleading statements about CVS's compliance with Generally Accepted Accounting Principles ("GAAP"). In particular, CVS falsely represented in the Offering Documents provided to investors that it had properly accounted for its $6+ billion goodwill asset, as reported in the "LTC unit" associated with CVS's 2015 acquisition of long-term care ("LTC") pharmacies of Omnicare, Inc. ("Omnicare").

6.      Before the Offering Documents were issued to investors in February 2018 and before the Aetna shareholders voted in March 2018 to approve the Acquisition, the likelihood that the Omnicare-related goodwill was materially impaired was greater than 50% (*i.e.*, probable impairment), as evidenced by numerous factors, including defendants' efforts to hastily acquire LTC pharmacies throughout 2017 to prop up declining LTC business and/or mask the evident goodwill impairment in the LTC unit ahead of the Aetna acquisition.

7.      Despite these factors indicating probable impairment of goodwill in the LTC unit, defendants failed to take the next step required under GAAP: properly qualify and quantify the extent of the probable impairment. As a result, the Offering Documents gave investors the false and/or misleading impression that Omnicare was successfully integrated and performing reasonably, and that impairment of LTC-related goodwill was not evident or probable (*i.e.*, likelihood of impairment was <50%) and goodwill levels and earnings reported in the Offering Documents were accurate and not overstated.

8.     In March 2018, CVS raised $40 billion in debt securities to help fund the cash component to be paid to Aetna shareholders.   The balance of consideration due to Aetna shareholders would be paid in shares of CVS stock.   On March 13, 2018, Aetna shareholders approved the Acquisition (including the provisions whereby Aetna shareholders would exchange their Aetna shares for CVS shares) not knowing that CVS's reporting of its goodwill asset was not GAAP-compliant, that the Omnicare-related goodwill was materially impaired, and that the price of CVS shares was materially inflated.

9.     After the Aetna shareholders had approved the Acquisition, in August 2018, CVS shocked investors when it disclosed that "*we're clearly disappointed with our performance in the Omnicare business*" and that since the third quarter of 2017 CVS had been "*closely monitoring the performance of the [Omnicare] business for potential indicators of impairment.*"   As a result of that "disappointment" and "close monitoring" since 2017 that triggered belated "updated" forecasts, CVS announced a goodwill impairment charge of $3.9 billion to be recognized in the second quarter of 2018.

10.     CVS also disclosed that "*2/3 of the [$3.9 billion] charge resulted from lower-than-expected financial performance within the Omnicare business,*" a factor painfully evident to defendants no later than the third quarter of 2017, but not reflected in CVS's concurrent financial reporting nor disclosed to Aetna shareholders in the Offering Documents.

11.     On November 28, 2018, the defendants announced that the Acquisition was formally closed, with Aetna shareholders receiving CVS stock valued at $80 per share.

12.     However, the full extent of CVS's Omnicare woes had not been fully disclosed to the market.  In late February 2019, CVS announced a second multi-billion-dollar impairment charge to its Omnicare-related goodwill, this time a $2.2 billion impairment to be recognized in the fourth quarter of 2018.  CVS cited "*operational challenges*" as a basis for this second massive charge.

13.     Because it had been only six months since the previous $3.9 billion impairment charge, these "operational challenges" were unlikely the result of recent developments, and were far more likely evidence of challenges existing much earlier in time, including in February 2018 when CVS was "closely monitoring" "disappointing" Omnicare operations and the Offering Documents were issued to investors, including Aetna shareholders.

14.     As a shocked and dismayed market digested this second round of Omnicare-related bad news, the price of CVS shares slid to the mid-$50s, where the stock has traded continuously for the last five months, substantially lower than its peers.  For example, since February 20, 2019, CVS's share value has declined over 13% relative to healthcare-related funds XLV (Health Care Select Sector SPDR Fund) and VHT (Vanguard Healthcare ETF).

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act (15 U.S.C. §77v), as the claims asserted herein arise under and pursuant to §§11, 12(a)(2), and §15 of the 1933 Act (15 U.S.C. §77k, 77l(a)(2), and 77o).

16.     Venue is proper in this District pursuant to §22 of the 1933 Act and 28 U.S.C. §1391(b).  The acts and conduct complained of herein occurred, in substantial part, in this District. In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## PARTIES

**Plaintiff**

17.     Plaintiff Waterford Township Police & Fire Retirement System acquired CVS common stock pursuant to the Acquisition by exchanging its Aetna shares for CVS shares, as

detailed in the attached certification, and suffered damages as a result of defendants' alleged misconduct.

**CVS Defendants**

18.     Defendant CVS Health Corporation (previously known as CVS Corporation and CVS Caremark Corporation) is a Delaware corporation headquartered in Woonsocket, Rhode Island, that provides retail pharmacy and pharmacy benefit manager services nationwide.

19.     Defendant Larry J. Merlo ("Merlo") was, at the time of the Acquisition, CVS's President and Chief Executive Officer ("CEO").  Merlo signed the Registration Statement filed with the SEC in connection with the Acquisition.  Merlo also signed the joint letter to Aetna and CVS stockholders at the beginning of both the Registration Statement and the Prospectus filed with the SEC in connection with the Acquisition.

20.     Defendant David M. Denton ("Denton") was, at the time of the Acquisition, CVS's Executive Vice President and Chief Financial Officer ("CFO").  Denton signed the Registration Statement filed with the SEC in connection with the Acquisition on CVS's behalf, individually, and as Attorney-in-Fact for defendants Eva C. Boratto, Richard M. Bracken, C. David Brown II, Alecia A. DeCoudreaux, Nancy-Ann M. DeParle, David W. Dorman, Anne M. Finucane, Larry J. Merlo, Jean-Pierre Millon, Mary L. Schapiro, Richard J. Swift, William C. Weldon, and Tony L. White.

21.     Defendant Eva C. Boratto ("Boratto") was, at the time of the Acquisition, CVS's Executive Vice President – Controller and Chief Accounting Officer.  Boratto was a signatory to the Registration Statement filed with the SEC in connection with the Acquisition.

22.     Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Millon, Schapiro, Swift, Weldon, and White were all members of the CVS Board of Directors at the time of the Acquisition and signed the Registration Statement filed with the SEC in connection with the Acquisition.  As Chairman of the Board of CVS, Dorman also signed the joint letter to Aetna and

CVS stockholders at the beginning of both the Registration Statement and the Prospectus filed with the SEC in connection with the Acquisition.

23.     The individuals named in ¶¶19-22 are sometimes collectively referred to herein as the "CVS Individual Defendants."

**Aetna Defendants**

24.     Defendant Mark T. Bertolini ("Bertolini") was, at the time of the Acquisition, Aetna's CEO and the Chairman of its Board of Directors.  Bertolini signed the joint letter to Aetna and CVS stockholders at the beginning of both the Registration Statement and the Prospectus filed with the SEC in connection with the Acquisition.

25.     Defendants Fernando Aguirre, Frank M. Clark, Molly J. Coye, Roger N. Farah, Jeffrey E. Garten, Ellen M. Hancock, Richard J. Harrington, Edward J. Ludwig, and Olympia J. Snowe were all members of the Aetna Board of Directors at the time of the Acquisition.

26.     The defendants identified in ¶¶24-25 are sometimes collectively referred to herein as the "Aetna Director Defendants."

## SUBSTANTIVE ALLEGATIONS

**CVS and Its Acquisition and Integration of Omnicare**

27.     CVS and its subsidiaries comprise the largest integrated pharmacy health care provider in the United States based upon revenues and prescriptions filled.  At the time of the Acquisition, CVS had three reportable business segments: Pharmacy Services, Retail/LTC and Corporate.  Within CVS's Retail/LTC segment is the LTC unit (aka, "Long-Term Care unit"), largely comprising the former business of Omnicare.

28.     On May 20, 2015, CVS Pharmacy, Inc., a wholly owned subsidiary of CVS, entered into a merger agreement to acquire Omnicare, a provider of pharmaceuticals and related pharmacy services to LTC facilities (*e.g.*, assisted living, skilled nursing, and senior centers) and a provider of specialty pharmacy and commercialization services for the bio-pharmaceutical industry.

29.     On August 18, 2015, CVS acquired 100% of the outstanding common shares and voting interests of Omnicare for $98 per share for a total value of $9.6 billion and assumed long-term debt with a fair value of approximately $3.1 billion.[2]  CVS estimated that the fair value of the Omnicare assets it acquired included $9.1 billion of goodwill that CVS allocated entirely to its Retail/LTC segment.  Plaintiff estimates that within the Retail/LTC segment, CVS allocated to its LTC unit about two-thirds of the $9.1 billion purchase goodwill (*i.e.*, about $6 billion).  CVS would eventually write off $6.1 billion – nearly this entire amount of Omnicare-related (*i.e.*, LTC unit) goodwill – within a six-month period, from the second quarter of 2018 through the fourth quarter of 2018, even though CVS had failed to integrate Omnicare and had experienced declining Omnicare performance since its acquisition in 2015.

30.     CVS acquired Omnicare to expand its operations in dispensing prescription drugs to skilled nursing, assisted-living and other LTC facilities and to broaden its presence in the specialty pharmacy business as it sought to serve a larger percentage of the growing senior patient population in the United States.

31.     On May 21, 2015, CVS issued a press release characterizing the acquisition of Omnicare as a significant foothold with respect to expanding CVS's business throughout multiple markets related to pharmaceutical care.  The press release stated in part:

> With the acquisition of Omnicare, CVS Health will significantly expand its ability to dispense prescriptions in assisted living and long term care facilities, serving the senior patient population.  CVS Health will also expand its presence in the rapidly growing specialty pharmacy business.  Omnicare's complementary specialty pharmacy platform and clinical expertise will augment CVS Health's capabilities and enable CVS Health to continue to provide innovative and cost-effective solutions to patients and payors.

\*     \*     \*

---

[2]     Additionally, holders of Omnicare restricted stock units and performance-based restricted stock units received 738,765 CVS restricted stock awards with a fair value of approximately $80 million as replacement awards.

CVS Health expects to achieve significant purchasing and revenue synergies as well as operating efficiencies from this combination. The company expects the transaction to be approximately 20 cents accretive to Adjusted EPS in 2016, its first full year, excluding integration and any one-time transaction costs. It is expected to become increasingly accretive to Adjusted EPS in subsequent years. The company has secured $13 billion in fully committed unsecured bridge financing from Barclays and expects to put in place permanent financing in the form of senior notes and/or term loans prior to the closing of the transaction. CVS Health expects that it will continue to have a solid balance sheet and, with its strong free cash flow, is committed to returning to its targeted leverage ratio of 2.7 times adjusted debt-to-EBITDA.

*       *       *

Given the aging U.S. population, long term care is a growth segment of the health care system. More people are expected to use assisted living facilities and independent living communities in the coming decades, creating a substantial growth opportunity for those companies serving the health care needs of seniors.

In entering this new customer distribution channel, CVS Health will deliver meaningful benefits to consumers, patients, caregivers, and payors by providing highly coordinated clinical pharmacy care across multiple treatment settings from retail to long term care. CVS Health will help improve patient outcomes and provide enhanced continuity of care to patients and caregivers as they transition through the health care system.

32.     Additionally, according to the same press release, defendant Merlo, CVS's CEO, asserted that the acquisition of Omnicare would "'significantly'" expand CVS's business, stating in part:

"The acquisition of Omnicare significantly expands our business, providing CVS Health access into a new pharmacy dispensing channel . . . . It also creates new opportunities for us to extend our high-quality, innovative pharmacy programs to a broader population of seniors and chronic care patients as they transition across the care continuum. We have been impressed by the Omnicare team and what they have created for the patients they serve."

33.     Throughout 2016, CVS reassured investors that it was successfully integrating Omnicare's operations and that Omnicare was expected to perform well in the coming periods and contribute to CVS's earnings. For example, in August 2016, Merlo told investors: ***"Our long-term care pharmacy business through Omnicare continues to perform well, and in line with our expectations."*** Merlo went on to state that "*[o]ur integration efforts are progressing as planned*

*and we remain on track to complete the vast majority of the integration activities by year-end [2016].*"

34.    By early 2017, however, CVS and the CVS Individual Defendants knew internally that the Omnicare integration was off track and that Omnicare was performing badly and was expected to continue its poor performance into future periods.  Thus, these Omnicare problems caused CVS to project deteriorating cash flows at CVS's LTC unit in the coming periods, adversely impacting CVS's goodwill asset related to Omnicare.

**CVS Tells Investors Its Goodwill Accounting Is GAAP-Compliant**

35.    In connection with the Acquisition, the Registration Statement and the SEC filings incorporated therein by reference[3] each represented to investors that CVS's financial reports in those filings were presented in conformance with GAAP.

36.    By extension, CVS's representations to investors that its financial reports were presented in conformance with GAAP likewise represented that CVS had complied with Accounting Standards Update No. 2017-04 ("ASU 2017-04"), called *Simplifying the Test for Goodwill Impairment*.  CVS elected to early-adopt ASU 2017-04, representing to investors that it was in compliance with ASU 2017-04, commencing January 1, 2017.

37.    CVS's purported GAAP compliance with ASU 2017-04 beginning January 1, 2017 indicated to investors that CVS would test goodwill for impairment at least annually (CVS selected the third quarter for mandatory testing) and would test goodwill for impairment during the interim periods (*i.e.*, first, second or fourth quarters) if CVS experienced factors indicating that the goodwill asset was more likely than not impaired.  If either the annual or interim tests indicated that the

---

[3]    The Registration Statement incorporated by reference the following:  CVS Form 10-Ks for the years ended 2016 (filed February 9, 2017) and 2017 (filed February 14, 2018); CVS Proxy Statement dated March 31, 2017; CVS Form 10-Qs for the quarters ended March 31, 2017 (filed May 2, 2017), June 30, 2017 (filed August 8, 2017) and September 30, 2017 (filed November 6, 2017).

goodwill asset was probably (>50% likelihood) impaired, CVS was required to conduct quantitative tests to determine the extent of the impairment.

**CVS Fails to Report Omnicare-Related Goodwill**
**Impairment Is Probable by End of the Second Quarter of 2017**

38.    In early 2017, CVS was experiencing factors indicating that its Omnicare-related goodwill asset was probably impaired.  The Omnicare brand, its historically illegal and unethical practices, and its horrendous service were toxic to both existing customers and new business.  As a result, CVS was steadily losing LTC market share.  CVS responded to these negative factors indicating probable impairment of the LTC goodwill asset by targeting LTC pharmacies for acquisition, to prop up the LTC unit's business prospects and/or mask the evident goodwill impairment in the LTC unit ahead of the Aetna acquisition.

39.    Although the LTC unit's declining prospects triggered CVS's 2017 strategy to acquire LTC pharmacies in order to compensate for declining LTC business, CVS did not conduct and/or report an interim impairment test in either the first or second quarter of 2017 to determine whether or not the Omnicare-related goodwill asset was probably (>50% likelihood) impaired and by how much.

40.    It was evident to CVS and the CVS Individual Defendants by the end of the second quarter of 2017 that the LTC unit goodwill was probably impaired, because they responded to these adverse qualitative factors by causing Omnicare to acquire multiple LTC pharmacies.  These acquisitions served as a pretext for increasing projected LTC cash flows that would both prop up the goodwill levels in CVS's LTC unit (to avoid incurring and reporting an impairment charge) and mask the deteriorating Omnicare prospects from investors.

41.    For example, according to a November 2018 lawsuit filed by ModernHealth (a large Southern California LTC pharmacy), in early 2017 CVS/Omnicare agreed to pay $47 million to acquire ModernHealth at a time when ModernHealth serviced 150 LTC facilities, employed 140

people, and had over 10,000 beds under pharmacy supply contracts, generating over $70 million in sales annually.

42.     CVS knew going into the 2017 ModernHealth transaction that it could not expect to sustain the level of LTC business that ModernHealth had built.  For example, many ModernHealth customers were former Omnicare customers who had fled Omnicare due to its toxic brand and business, and would be expected to flee again.  In the third quarter of 2017, as the ModernHealth transaction approached closing, all but 25 people at the pharmacy were terminated by CVS/Omnicare, indicating CVS's intent to acquire the LTC pharmacy only as a pretext for projecting huge cost savings and increasing cash flows from thousands of new beds under contract.[4] With only a skeleton crew providing customer support, however, the LTC pharmacy customers fled the new Omnicare-acquired LTC pharmacy.  Within the first year, all but 6 of the original 150 LTC facilities (formerly serviced by ModernHealth) had terminated their contracts with Omnicare and the LTC beds under contract fell from over 10,000 to only 507.

43.     Similarly, in 2017 CVS acquired Pharmore Drugs, the largest independently owned LTC pharmacy in Illinois, located just outside Chicago.  Like the ModernHealth LTC pharmacy in Southern California, Pharmore serviced about 10,000 beds before being acquired by CVS, and like ModernHealth, promptly lost that business upon acquisition by CVS due to Omnicare's toxic brand and business.  There are indications Omnicare was involved in other LTC pharmacy acquisitions during 2017 that served the same pretext: ***to acquire LTC pharmacies for the purpose of propping up a failing LTC business and/or avoiding goodwill impairment in the LTC unit ahead of the Aetna acquisition***.

---

[4]     The faltering ModernHealth transaction was a further indication to CVS and the CVS Individual Defendants that CVS's LTC business was in free-fall, a factor triggering interim impairment testing under GAAP.

- 11 -

**CVS Fails to Report Extent of Omnicare-Related**
**Goodwill Impairment in the Third Quarter of 2017**

44.      In CVS's third quarter 2017 Form 10-Q, CVS falsely stated: "*The results of the impairment tests indicated that there was no impairment of goodwill. . . . The fair values of our LTC and RxC reporting units exceeded their carrying values by approximately 1% and 6%, respectively.*" CVS also gave false reasons for the 1% cushion at the LTC unit, stating:

> Our projected discounted cash flow model assumes future script growth from our senior living initiative *and the impact of acquisitions*.  Such projections also include *expected cost savings from labor productivity* and other initiatives.

45.      CVS's LTC unit goodwill was already impaired by the end of the third quarter of 2017 because Omnicare was not integrated with CVS and the LTC "*acquisitions*" were a pretext used by CVS for Omnicare to project increased cash flows to avoid reporting a goodwill impairment ahead of the possible Aetna merger.  Further, "*expected costs savings*" were not *bona fide*, but were based on wholesale reductions of personnel consistent with the pre-textual LTC unit "*acquisitions*." But for these false pretenses, which CVS undertook to prop up the failing LTC business and/or mask the LTC unit's impaired goodwill and Omnicare's ongoing poor performance, there was no 1% cushion at the LTC unit and, therefore, CVS was required to disclose and/or report the likelihood and amount of an impairment charge to its LTC goodwill asset no later than the filing of its third quarter 2017 Form 10-Q and no later than the filing of its 2017 Form 10-K (both issued before the shareholder vote on the Acquisition).

46.      After the Acquisition, CVS admitted that it had waited until June 2018 (after the March 2018 shareholder vote) to finally update its LTC unit forecasts (for 2018, 2019 and later) to reflect the sharply declining LTC business that CVS had been wrestling with since early 2017. Although the declining LTC business triggered CVS hastily acquiring LTC pharmacies beginning in early 2017, and the failing ModernHealth transaction indicated lousy LTC prospects, CVS failed to consider those same "triggers" to perform GAAP-required impairment testing over that same period.

By failing to timely disclose and properly report the likelihood and/or amounts of the LTC unit's impaired goodwill, CVS's share price was artificially inflated, which gave CVS the much needed currency to further integrate its operations by acquiring health insurance giant Aetna.

**CVS and Its Acquisition of Aetna**

47.     On December 3, 2017, CVS and Aetna announced the execution of a definitive merger agreement pursuant to which Aetna shareholders would receive $145.00 per share in cash and 0.8378 shares of CVS common stock for each share of Aetna stock. The transaction valued Aetna at approximately $207 per share or $77 billion, including $8 billion in net debt.

48.     On January 4, 2018, defendants filed a preliminary Registration Statement on Form S-4 with the SEC for the Acquisition, which was declared effective by the SEC on February 9, 2018 (the Registration Statement, together with all amendments thereto, as well as the Prospectus filed with the SEC on February 9, 2018, are collectively referred to herein as the "Offering Documents"). The Offering Documents stated that CVS's and Aetna's respective Boards of Directors had approved the proposed Acquisition, unanimously determined that the proposed Acquisition was advisable, fair to, and in the best interests of each company's stockholders, and recommended that each company's stockholders vote for "FOR" approval of the Acquisition.

(a)     Specifically, as to CVS stockholders, the Offering Documents stated, in bold:

> **CVS Health's board of directors unanimously determined that the merger agreement and the transactions contemplated by the merger agreement, including the merger and the issuance of shares of CVS Health common stock in the merger, are advisable, fair to and in the best interests of CVS Health and its stockholders and unanimously recommends that CVS Health stockholders vote (i) "FOR" the approval of the issuance of shares of CVS Health common stock in the merger . . . .**

(b)     Specifically, as to Aetna stockholders, the Offering Documents stated, in bold:

> **Aetna's board of directors unanimously determined that the merger agreement and the transactions contemplated by the merger agreement (including the merger) are fair to and in the best interests of Aetna and its shareholders and unanimously recommends that Aetna shareholders vote (i) "FOR" the approval and adoption of the merger agreement . . . .**

49.     In connection with the Acquisition, the Offering Documents informed investors that:

CVS Health expects to issue approximately 280 million shares of its common stock to Aetna shareholders in the merger. Based on the number of shares of CVS Health common stock outstanding as of February 5, 2018, and the number of Aetna common shares outstanding as of February 5, 2018, immediately following completion of the merger, CVS Health stockholders immediately prior to the merger are expected to own approximately 78% of the outstanding shares of CVS Health common stock and former Aetna shareholders are expected to own approximately 22% of the outstanding shares of CVS Health common stock.

50.     The Offering Documents also informed investors that the "SEC allows CVS Health and Aetna to 'incorporate by reference' information into this joint proxy statement/prospectus. This means that important information can be disclosed to you by referring you to another document filed separately with the SEC.  The information incorporated by reference is deemed to be part of this joint proxy statement/prospectus . . . ."

51.     The Offering Documents expressly incorporated by reference several SEC filings, including CVS's Annual Report on Form 10-K for the fiscal year ended December 31, 2016; CVS's quarterly reports on Form 10-Q for the fiscal quarters ended March 31, 2017, June 30, 2017, and September 30, 2017; and CVS's Proxy Statement on Schedule 14A filed on March 31, 2017.  The Registration Statement also expressly incorporated by reference all Form 10-Ks and 10-Qs filed "between the date of [the Registration Statement] and the respective dates of the Aetna and CVS . . . special meetings," which were held on March 13, 2018.  As such, CVS's Annual Report, filed with the SEC on Form 10-K on February 14, 2018, was also expressly incorporated by reference into the Registration Statement.

52.     As to the expressly incorporated information, the Offering Documents stated:

(a)     "We urge you to read carefully the accompanying joint proxy statement/prospectus (and any documents incorporated by reference into the accompanying joint proxy statement/prospectus)."

(b)     "You are urged to read carefully this joint proxy statement/prospectus, including all documents incorporated by reference into this joint proxy statement/prospectus, and its annexes, in their entirety because this section may not provide all of the information that is important to you with respect to the merger, the stock issuance, the Aetna adjournment proposal, the CVS Health adjournment proposal, the Aetna compensation advisory proposal and the special meetings. Additional important information is contained in the annexes to, and the documents incorporated by reference into, this joint proxy statement/prospectus."

(c)     "Carefully read and consider the information contained in and incorporated by reference into this joint proxy statement/prospectus, including its annexes. Then, please vote your Aetna common shares and/or shares of CVS Health common stock, as applicable . . . ."

53.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

54.     Concerning the purported value of the Omnicare acquisition to CVS, the Offering Documents stated, in pertinent part, as follows:

> Our acquisition of Omnicare broadened our base of pharmacy care to an additional dispensing channel, long-term care pharmacy. Omnicare's longterm care ("LTC") operations include the distribution of pharmaceuticals, related pharmacy consulting and other ancillary services to chronic care facilities and other care settings. Omnicare also provides commercialization services under the name RxCrossroads®. LTC is comprised of 152 spoke pharmacies that primarily handle new prescription orders, of which 32 are also hub pharmacies that use automation to support spoke pharmacies with refill prescriptions. LTC primarily operates under the Omnicare® and NeighborCare® names. ***With the addition of the LTC operations, we are continuing to enhance our service offerings to further address the needs of an aging population throughout the continuum of senior care***.

55.     As to the value of the goodwill then being carried on CVS's books from the Omnicare acquisition, which would be added to and carried on CVS's books in connection with the

Acquisition, the Offering Documents expressly stated that an impairment analysis had been performed during the fiscal year ended December 31, 2016, that CVS was then carrying approximately $38.2 billion in goodwill, approximately $6.4 billion of which was attributable to the 2015 acquisition of Omnicare, stating, in pertinent part, as follows:

**Goodwill and Intangible Assets**

Identifiable intangible assets consist primarily of trademarks, client contracts and relationships, favorable leases and covenants not to compete. These intangible assets arise primarily from the determination of their respective fair market values at the date of acquisition.

Amounts assigned to identifiable intangible assets, and their related useful lives, are derived from established valuation techniques and management estimates. Goodwill represents the excess of amounts paid for acquisitions over the fair value of the net identifiable assets acquired.

*        *        *

*Goodwill and indefinitely-lived intangible assets are subject to annual impairment reviews, or more frequent reviews if events or circumstances indicate that the carrying value may not be recoverable.*

*        *        *

*Goodwill is tested for impairment on a reporting unit basis using a two-step process. The first step of the impairment test is to identify potential impairment by comparing the reporting unit's fair value with its net book value (or carrying amount), including goodwill.* The fair value of our reporting units is estimated using a combination of the discounted cash flow valuation model and comparable market transaction models.  If the fair value of the reporting unit exceeds its carrying amount, the reporting unit's goodwill is not considered to be impaired and the second step of the impairment test is not performed.  If the carrying amount of the reporting unit exceeds its fair value, the second step of the impairment test is performed to measure the amount of impairment loss, if any.  The second step of the impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of the goodwill.  *If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of the goodwill, an impairment loss is recognized in an amount equal to that excess.*

The determination of the fair value of our reporting units requires the Company to make significant assumptions and estimates. These assumptions and estimates primarily include, but are not limited to, the selection of appropriate peer group companies; control premiums and valuation multiples appropriate for acquisitions in the industries in which the Company competes; discount rates, terminal growth rates; and forecasts of revenue, operating profit, depreciation and

amortization, capital expenditures and future working capital requirements. When determining these assumptions and preparing these estimates, we consider each reporting unit's historical results and current operating trends and our consolidated revenues, profitability and cash flow results, forecasts and industry trends. Our estimates can be affected by a number of factors including, but not limited to, general economic and regulatory conditions, our market capitalization, efforts of third party organizations to reduce their prescription drug costs and/or increase member co-payments, the continued efforts of competitors to gain market share and consumer spending patterns.

*The carrying value of goodwill and other intangible assets covered by this critical accounting policy was $38.2 billion* and $13.5 billion *as of December 31, 2016,* respectively. We did not record any impairment losses related to goodwill or other intangible assets during 2016, 2015 or 2014. *During the third quarter of 2016, we performed our required annual impairment tests of goodwill and indefinitely-lived trademarks.* The goodwill impairment tests resulted in the fair values of our Pharmacy Services and Retail Pharmacy reporting units exceeding their carrying values by significant margins. *The fair values of our LTC and RxCrossroads reporting units exceeded their carrying values by 7% and 12%, respectively. The balance of goodwill for our LTC and RxCrossroads reporting units at December 31, 2016 was approximately $6.4 billion* and $0.6 billion, respectively.

56.     Concerning the Company's accounting for goodwill, the Offering Documents stated,

in pertinent part, as follows:

**Goodwill and other indefinitely-lived assets** - Goodwill and other indefinitely-lived assets are not amortized, but are subject to impairment reviews annually, or more frequently if necessary. See Note 3 "Goodwill and Other Intangibles" for additional information on goodwill and other indefinitely-lived assets.

\*       \*       \*

**3. Goodwill and Other Intangibles**

*Goodwill and other indefinitely-lived assets are not amortized, but are subject to annual impairment reviews, or more frequent reviews if events or circumstances indicate an impairment may exist.*

When evaluating goodwill for potential impairment, the Company first compares the fair value of its reporting units to their respective carrying amounts. The Company estimates the fair value of its reporting units using a combination of a future discounted cash flow valuation model and a comparable market transaction model. If the estimated fair value of the reporting unit is less than its carrying amount, an impairment loss calculation is prepared. The impairment loss calculation compares the implied fair value of a reporting unit's goodwill with the carrying amount of its goodwill. *If the carrying amount of the goodwill exceeds the implied fair value, an impairment loss is recognized in an amount equal to the excess.*

- 17 -

*During the third quarter of 2016, the Company performed its required annual goodwill impairment tests. The Company concluded there were no goodwill impairments as of the testing date.*

Below is a summary of the changes in the carrying amount of goodwill by segment for the years ended December 31, 2016 and 2015:

| In millions | Pharmacy Services | | Retail/LTC | | Total | |
|---|---|---|---|---|---|---|
| Balance, December 31, 2014 | $ | 21,234 | $ | 6,908 | $ | 28,142 |
| Acquisitions | | 452 | | 9,554 | | 10,006 |
| Foreign currency translation adjustments | | — | | (40) | | (40) |
| Other | | (1) | | (1) | | (2) |
| Balance, December 31, 2015 | | 21,685 | | 16,421 | | 38,106 |
| Acquisitions | | — | | 126 | | 126 |
| Foreign currency translation adjustments | | — | | 17 | | 17 |
| Impairments | | (48) | | 48 | | — |
| Balance, December 31, 2016 | $ | 21,637 | $ | 16,612 | $ | 38,249 |

(Footnote omitted.)

57.     Just a week after the Offering Documents were filed, on February 14, 2018, CVS filed its Form 10-K for the fiscal year ended December 31, 2017, which contained representations similar to those in the 2016 Form 10-K and was also expressly incorporated into the Offering Documents:

> Our acquisition of Omnicare broadened our base of pharmacy care to an additional dispensing channel, long-term care pharmacy. Omnicare's LTC operations include the distribution of pharmaceuticals, related pharmacy consulting and other ancillary services to chronic care facilities and other care settings. Omnicare also provided commercialization services under the name RxCrossroads until January 2, 2018, when we completed the sale of RxCrossroads. LTC is comprised of 145 spoke pharmacies that primarily handle new prescription orders, of which 30 are also hub pharmacies that use automation to support spoke pharmacies with refill prescriptions. LTC primarily operates under the Omnicare® and NeighborCare® names. *With the addition of the LTC operations, we are continuing to enhance our service offerings to further address the needs of an aging population throughout the continuum of senior care.*

58.     As to the value of the goodwill then being carried on CVS's books from the Omnicare acquisition, which would be added to and carried on CVS's books in connection with the Acquisition, the Offering Documents expressly stated that an impairment analysis had been performed during the fiscal year ended December 31, 2017, that CVS was then carrying

approximately $38.5 billion in goodwill, approximately $6.5 billion of which was attributable to the

2015 acquisition of Omnicare, stating, in pertinent part, as follows:

**Goodwill and Intangible Assets**

Identifiable intangible assets consist primarily of trademarks, client contracts and relationships, favorable leases and covenants not to compete. These intangible assets arise primarily from the determination of their respective fair market values at the date of acquisition.

Amounts assigned to identifiable intangible assets, and their related useful lives, are derived from established valuation techniques and management estimates. Goodwill represents the excess of amounts paid for acquisitions over the fair value of the net identifiable assets acquired.

\*     \*     \*

***Goodwill and indefinitely-lived intangible assets are subject to annual impairment reviews, or more frequent reviews if events or circumstances indicate that the carrying value may not be recoverable.***

\*     \*     \*

***Goodwill is tested for impairment on a reporting unit basis. The impairment test is calculated by comparing the reporting unit's fair value with its net book value (or carrying amount), including goodwill.*** The fair value of our reporting units is estimated using a combination of a discounted cash flow method and a market multiple method. ***If the fair value of the reporting unit exceeds its carrying amount, the reporting unit's goodwill is considered to be impaired and an impairment is recognized in an amount equal to the excess.***

The determination of the fair value of our reporting units requires the Company to make significant assumptions and estimates. These assumptions and estimates primarily include, but are not limited to, the selection of appropriate peer group companies; control premiums and valuation multiples appropriate for acquisitions in the industries in which the Company competes; discount rates, terminal growth rates; and forecasts of revenue, operating profit, depreciation and amortization, capital expenditures and future working capital requirements. When determining these assumptions and preparing these estimates, we consider each reporting unit's historical results and current operating trends and our consolidated revenues, profitability and cash flow results, forecasts and industry trends. Our estimates can be affected by a number of factors including, but not limited to, general economic and regulatory conditions, our market capitalization, efforts of customers and payers to reduce costs including their prescription drug costs and/or increase member co-payments, the continued efforts of competitors to gain market share and consumer spending patterns.

*The carrying value of goodwill and other intangible assets covered by this critical accounting policy was $38.5 billion* and $13.5 billion *as of December 31, 2017*, respectively.  We recorded $181 million in goodwill impairments in 2017 related to our RxCrossroads reporting unit, see Note 3 "Goodwill and Other Intangibles" to our consolidated financial statements. We did not record any impairment losses related to goodwill or other intangible assets during 2016 or 2015. *During the third quarter of 2017, we performed our required annual impairment tests of goodwill and indefinitely-lived trademarks*. The goodwill impairment tests resulted in the fair values of our Pharmacy Services and Retail Pharmacy reporting units exceeding their carrying values by significant margins. *The fair values of our LTC and RxC reporting units exceeded their carrying values by approximately 1% and 6%, respectively.  The balance of goodwill for our LTC and RxCrossroads reporting units at December 31, 2017 was approximately $6.5 billion* and $0.4 billion, respectively. On January 2, 2018, we sold our RxCrossroads reporting unit to McKesson Corporation for $725 million.

59.     Concerning the Company's accounting for goodwill, the Offering Documents stated,

in pertinent part, as follows:

**Goodwill and other indefinitely-lived assets** – Goodwill and other indefinitely-lived assets are not amortized, but are subject to impairment reviews annually, or more frequently if necessary.   See Note 3 "Goodwill and Other Intangibles" for additional information on goodwill and other indefinitely-lived assets.

\*     \*     \*

**3. Goodwill and Other Intangibles**

*Goodwill and other indefinitely-lived assets are not amortized, but are subject to annual impairment reviews, or more frequent reviews if events or circumstances indicate an impairment may exist*.

When evaluating goodwill for potential impairment, the Company compares the fair value of its reporting units to their respective carrying amounts.  The Company estimates the fair value of its reporting units using a combination of a discounted cash flow method and a market multiple method. *If the carrying amount of a reporting unit exceeds its estimated fair value, an impairment loss is recognized in an amount equal to that excess*.

\*     \*     \*

*During the third quarter of 2017, the Company performed its required annual impairment tests of its reporting units and concluded there was no impairment of goodwill*.

\*     \*     \*

The Company has cumulative goodwill impairments of $181 million as of December 31, 2017.

Below is a summary of the changes in the carrying amount of goodwill by segment for the years ended December 31, 2017 and 2016:

| In millions | Pharmacy Services | Retail/LTC | Total |
|---|---|---|---|
| Balance, December 31, 2015 | $ 21,685 | $ 16,421 | $ 38,106 |
| Acquisitions | — | 126 | 126 |
| Foreign currency translation adjustments | — | 17 | 17 |
| Other | (48) | 48 | — |
| Balance, December 31, 2016 | 21,637 | 16,612 | 38,249 |
| Acquisitions | 182 | 203 | 385 |
| Foreign currency translation adjustments | — | (2) | (2) |
| Impairments | — | (181) | (181) |
| Balance, December 31, 2017 | $ 21,819 | $ 16,632 | $ 38,451 |

(Footnote omitted.)

60.     The statements identified in ¶¶54-59 were inaccurate statements of material fact because they failed to disclose the following facts that existed when the Offering Documents were filed with the SEC and disseminated to shareholders:

(a)     by the end of 2017, CVS's financial condition and expected earnings had deteriorated as a result of rising costs and poor results being experienced in the LTC unit associated with the 2015 acquisition of Omnicare;

(b)     in 2017, deteriorating conditions and prospects in CVS's LTC unit prompted CVS to undertake hasty acquisitions of LTC pharmacies to compensate for the declining LTC business and/or mask the expected LTC goodwill impairment ahead of the planned Acquisition;

(c)     although negative LTC performance factors prompted CVS and the CVS Individual Defendants to make hasty LTC pharmacy acquisitions in 2017, those same negative factors were being overlooked and ignored for purposes of undertaking, disclosing, and reporting the results of LTC goodwill impairment tests throughout 2017, in violation of GAAP;

(d)     the LTC goodwill being carried on CVS's books as a result of the Omnicare acquisition was being carried at inflated values that would require billions of dollars in impairment charges that would be charged against earnings; and

(e)     as a result of the foregoing, CVS's true business metrics and financial prospects were not as the Offering Documents represented.

61.     Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make an investment in . . . the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The Offering Documents' failure to disclose the facts identified above in ¶60 violated Item 303 because these undisclosed facts, which were known to management, would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations and the value of the goodwill being carried on its books. This failure also violated Item 105 of Regulation S-K, 17 C.F.R. §229.105, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in CVS common stock speculative or risky.

62.     In early March 2018, CVS was able to maintain investment grade ratings for its debt. On March 9, 2018, CVS closed the sale of its $40 billion offering of notes issued in connection with the Acquisition, one of the largest notes offerings in history.

63.     On March 13, 2018, CVS and Aetna shareholders approved the Acquisition.

64.     CVS revealed in August 2018 that its second quarter 2018 results reflected at *$3.9 billion charge* related to impaired goodwill for its LTC unit related to poor actual and projected

Omnicare performance.   Despite this negative news, CVS and the CVS Individual Defendants reassured the market that they had studied Omnicare's projections carefully and Omnicare was still a good business with good prospects.

65.     On November 28, 2018, the Acquisition was completed.   Under the terms of the merger agreement, each outstanding share of Aetna common stock was exchanged for $145.00 in cash and 0.8378 shares of CVS common stock. CVS did not issue any fractional shares in the transaction.   Instead, the total number of shares of CVS common stock that each Aetna shareholder was entitled to receive was rounded down to the nearest whole number, and each Aetna shareholder was entitled to receive cash for any fractional share of CVS common stock that the Aetna shareholder was otherwise entitled to receive.   Approximately $48.1 billion in cash and 274.4 million shares of CVS common stock were issued to the former shareholders of Aetna common stock.   CVS common stock closed at $80.27 per share on November 28, 2018, the day the Acquisition closed.

66.     In announcing the completion of the Acquisition, CVS announced that

> shareholders are expected to benefit from a number of outcomes, including enhanced competitive positioning; the delivery of more than $750 million in synergies in 2020; and a platform from which to accelerate growth. The roadmap for value creation over the longer term has the potential to deliver substantial incremental value through the development of products and services that provide the opportunity to generate significant new growth opportunities aimed at reducing medical costs, growing membership and enhancing revenues.

67.     On February 20, 2019 – *less than 90 days after it had closed the massive Aetna acquisition* – CVS issued a press release announcing its fourth quarter and full year 2018 results and providing 2019 full year guidance.   In doing so, CVS shocked investors by issuing earnings guidance significantly lower than expected due, in large part, to rising costs and poor results related to CVS's acquisition of Omnicare.   In the release, CVS admitted that it had "continued to experience" materially rising costs and poor financial results during the fourth quarter of 2018 as a

result of the Company's 2015 Omnicare acquisition, far beyond what CVS had budgeted for when it made the Omnicare acquisition, due to, among other things, "lower occupancy rates in skilled nursing facilities, significant deterioration in the financial health of numerous skilled nursing facility customers which resulted in a number of customer bankruptcies in 2018, and continued facility reimbursement pressures." As a result, in addition to the $3.9 billion impairment charge CVS had already taken on the LTC unit in the third quarter of 2018, CVS was being forced to take another *$2.2 billion* impairment charge on the Omnicare goodwill for its fourth quarter of 2018, ended December 31, 2018, the quarter during which the Acquisition had been completed.

68.    That same day, *Fortune* published an article, entitled "CVS Stock Plummets as 2019 Looks Like It Will Be a 'Major Disappointment' for Investors," which stated in part:

> The company announced a $2.2 billion writedown on its 2015 takeover of Omnicare, a $12.9 billion deal that was meant to build the company's business serving patients in nursing homes and long-term medical-care facilities.

*       *       *

> The $2.2 billion Omnicare charge follows an earlier, $3.9 billion writedown CVS took on the business in the second quarter. Together, they add up to half of what the company paid for Omnicare three years ago. The unit is predicting more challenges in the future, CVS said.

69.    The article also quoted Evercore ISI analyst Ross Muken, who noted that not only was the February 20, 2019 press release's 2019 guidance a "'major disappointment,'" it would also "'stoke fears'" that CVS's $68 billion purchase of insurer Aetna the year before "'was defensive in nature.'"

70.    In response, various analysts lowered or downgraded CVS's stock, with Wells Fargo Securities, for example, concluding:

> •    **We are downgrading CVS Health to Market Perform from Outperform**, based on its continued failure to stabilize its existing businesses, particularly the LTC (Long-term care) business. CVS has failed to improve operations after two years of pressure and continues to struggle with its Omnicare LTC acquisition, setting up 2019 as a weaker than expected year. CVS expects the ongoing business pressures to have an outsized impact on 2019 . . . .

71.     And as a March 4, 2019 *Seeking Alpha* article, entitled "Good Will Hunting: CVS Health Decline Explained," later explained: "CVS realized that it was extremely over optimistic about the growth rates and profitability in its long term care division i.e. LTC.  This does not come as a surprise to us as we have been documenting this drama within the senior housing and skilled nursing facilities space where challenges abound . . . ."

72.     CVS common stock is currently trading below $59 per share, representing a more than 27% decline from the approximately $80 per share CVS shares were trading at when exchanged for Aetna shares in the Acquisition completed on November 28, 2018.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action on behalf of all former Aetna shareholders who acquired CVS shares in exchange for their Aetna shares in connection with CVS's acquisition of Aetna on November 28, 2018 (the "Class").  Excluded from the Class are: CVS; Aetna; the CVS Individual Defendants and Aetna Director Defendants and their immediate family members, legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest; and CVS and Aetna's respective officers, directors, and affiliates, as well as any of their respective immediate family members, legal representatives, heirs, successors, or assigns, and any entity in which those officers, directors, and affiliates have or had a controlling interest.

74.     The members of the Class are so numerous that joinder of all members is impracticable.  Before the Acquisition, Aetna common stock was actively traded on the New York Stock Exchange.  Record owners and other members of the Class may be identified from records maintained by Aetna or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  While the exact number of Class members is unknown to plaintiff, Aetna reported 327.4 million shares of common

stock outstanding in its final Form 10-Q filed with the SEC for the quarter ended September 30, 2018.

75.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

76.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)     whether defendants violated the 1933 Act; and

    (b)     to what extent the Class members have sustained damages and the proper measure of damages.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against CVS and the CVS Individual Defendants

79.     Plaintiff repeats and realleges ¶¶1-78 by reference.

80.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against CVS and the CVS Individual Defendants.

81.     The Registration Statement for the Acquisition was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

82.     Defendant CVS is the registrant for shares issued in the Acquisition. The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

83.     As the issuer of the shares, CVS is strictly liable to plaintiff and the Class for the misstatements and omissions.

84.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

85.     By reason of the conduct alleged herein, each of these defendants violated, and/or controlled a person who violated, §11 of the 1933 Act.

86.     Plaintiff exchanged Aetna common stock for CVS common stock in connection with the Acquisition pursuant to the Registration Statement.

87.     Plaintiff and the Class have sustained damages. The value of CVS common stock has declined substantially subsequent to and due to defendants' violations.

88.     At the time of their acquisition of CVS common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that plaintiff filed this Complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this Complaint.

## COUNT II

### For Violation of §12(a)(2) of the 1933 Act
### Against All Defendants

89.    Plaintiff repeats and realleges ¶¶1-88 by reference.

90.    This Count is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against all defendants.

91.    By means of the defective Prospectus, defendants promoted and sold CVS common stock to plaintiff and other members of the Class for the benefit of themselves and their associates.

92.    The Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.  Defendants owed plaintiff and other members of the Class who acquired CVS common stock pursuant to the Prospectus in the Acquisition the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

93.    Plaintiff did not know, nor in the exercise of reasonable diligence could plaintiff have known, of the untruths and omissions contained in the Prospectus at the time plaintiff acquired CVS common stock.

94.    By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff and the other members of the Class who exchanged Aetna common stock for CVS common stock in the Acquisition pursuant to the Prospectus sustained substantial damages in connection therewith.  Accordingly, plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to

the defendants sued herein.  Class members who have sold their CVS common stock seek damages to the extent permitted by law.

## COUNT III

### For Violation of §15 of the 1933 Act
### Against Defendant CVS and the CVS Individual Defendants

95.    Plaintiff repeats and realleges ¶¶1-94 by reference.

96.    This Count is brought pursuant to §15 of the 1933 Act against defendant CVS and the CVS Individual Defendants.

97.    The CVS Individual Defendants each were control persons of CVS by virtue of their positions as directors and/or senior officers of CVS at the time of the Acquisition.  The CVS Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of CVS.  CVS controlled all the CVS Individual Defendants.

98.    These defendants were each a culpable participant in the violations of §11 and/or §12(a)(2) of the 1933 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the Acquisition to be successfully completed.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Determining this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Declaring that defendants are liable pursuant to the 1933 Act;

C.      Awarding compensatory damages in favor of plaintiff and the Class against defendants, jointly and severally, for damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding rescission or a rescissory measure of damages;

E.      Awarding plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs, and expenses incurred in this action; and

F.      Awarding such other relief as the Court may deem just and proper.

<strong>JURY DEMAND</strong>

Plaintiff hereby demands a trial by jury.

DATED:  August 13, 2019                          BARRY J. KUSINITZ

BARRY J. KUSINITZ   #1404

155 South Main Street, Suite 405
Providence, RI  02903
Telephone:  401/831-4200
401/831-7053 (fax)
bkusinitz@bdglawyers.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff