**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| IN RE CVS HEALTH CORPORATION SECURITIES ACT LITIGATION | Master File No. 1:19-cv-00434-MSM-LDA<br><br>CLASS ACTION<br>JURY TRIAL DEMANDED<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT .................................................................................. 2

II.  JURISDICTION AND VENUE .............................................................................. 8

III.  PARTIES ................................................................................................................ 9

    A.  Lead Plaintiff ................................................................................................. 9

    B.  Defendants .................................................................................................... 9

IV.  SUBSTANTIVE ALLEGATIONS ...................................................................... 12

    A.  Background .................................................................................................. 12

    B.  In 2015, CVS Acquired Omnicare, and Told Investors That the Acquisition Would Generate Substantial Value and Growth ............................ 13

    C.  CVS Recorded Almost $6.5 Billion in Long-Term Care Goodwill from the Omnicare Acquisition ................................................................................. 15

    D.  Under Pressure to Transform Its Business Through a Strategic Acquisition, CVS Announced the Aetna Acquisition .......................................... 19

    E.  To Ensure the Success of the Aetna Acquisition, It Was Critical That CVS Show Financial Strength ................................................................................. 24

    F.  Defendants Secured Aetna Shareholders' Approval by Making Positive Statements About Omnicare's Value and Performance .......................... 27

    G.  Unbeknownst to Investors, Defendants' Statements Were Materially Inaccurate and Omitted Material Facts ............................................................. 29

        1.  Brief Background on Goodwill Accounting Rules ................................... 30

        2.  Numerous Red Flags Demonstrated Significant Impairment in CVS's Long-Term Care Business ............................................................. 33

            a.  The Material Adverse Trends of Business Loss and Revenue Shortfalls Plagued the Long-Term Care Unit ............................... 33

                (1)  Following the Omnicare Acquisition, CVS's Long-Term Care Business Lost Significant Customers ............ 40

i

(2)     CVS Caused the Customer Losses by Failing to Adequately Perform the Core Long-Term Care Function of Timely Delivering Prescriptions ................... 49

(3)     CVS Slashed Its Long-Term Care Work Force, Further Impairing Its Ability to Operate Successfully ....................................................... 58

(4)     As Many of the Company's Largest Long-Term Care Customers Left, Several Took Their Business to Competitors Started by Former CVS/Omnicare Employees........................................................ 60

(5)     CVS Purchased Additional Long-Term Care Pharmacies, But Rapidly Lost Those Pharmacies' Customers ...................................................... 62

b.     Omnicare and CVS Engaged in Widespread Illegal "Rollover" Practices, Which Was Another Red Flag of Impairment.............. 68

c.     CVS's Long-Term Care Business Faced Significant Industry Headwinds, Which Further Indicated That the Omnicare Goodwill Was Impaired ................................................................ 79

d.     Macroeconomic Conditions Also Severely Threatened the Carrying Value of CVS's Long-Term Care Business.................. 87

H.     CVS Stock Declines Significantly as the True Facts Emerge, Damaging Former Aetna Shareholders ............................................................ 88

1.     August 8, 2018: CVS Reports a $3.9 Billion Impairment of the Omnicare Goodwill.................................................................... 88

2.     February 20, 2019: CVS Reports an Additional $2.2 Billion Impairment of the Omnicare Goodwill...................................... 92

V.     MATERIALLY INACCURATE STATEMENTS AND OMISSIONS.......................... 94

A.     Materially Untrue Statements Concerning the Value of CVS's Long-Term Care Business and Omnicare Goodwill ................................................ 96

B.     Materially Untrue Statements Concerning Compliance with U.S. Generally Accepted Accounting Principles........................................ 103

C.     Materially Untrue Statements Concerning Purported Risks to CVS's Long-Term Care Business ................................................................ 106

D.    Materially Inaccurate Omissions Under Items 105 and 303 ............................. 113

E.    Additional Materially Untrue Statements Made in Connection With Proxy Solicitations for Votes in Favor of the Aetna Acquisition .................................. 116

VI.    CLASS ACTION ALLEGATIONS ............................................................................. 118

VII.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ............................................................. 120

VIII.    CAUSES OF ACTION ................................................................................................. 121

COUNT I FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT (AGAINST CVS AND THE SECURITIES ACT INDIVIDUAL DEFENDANTS) ................................................................................................ 121

COUNT II FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT (AGAINST CVS AND THE SECURITIES ACT INDIVIDUAL DEFENDANTS) ................................................................................................ 123

COUNT III FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT (AGAINST THE SECURITIES ACT INDIVIDUAL DEFENDANTS) ...................... 124

COUNT IV FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT (AGAINST ALL DEFENDANTS) ............................................................... 125

COUNT V FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST ALL INDIVIDUAL DEFENDANTS) ....................................... 127

PRAYER FOR RELIEF ........................................................................................... 128

JURY DEMAND ....................................................................................................... 129

1.      Court-appointed Lead Plaintiff Los Angeles Fire and Police Pensions, by and through its undersigned attorneys, brings this action individually and on behalf of all former Aetna, Inc. ("Aetna") shareholders who (a) acquired shares of CVS Health Corporation ("CVS" or the "Company") common stock in exchange for their Aetna shares in connection with CVS's acquisition of Aetna on November 28, 2018 (the "Aetna acquisition"), or (b) held Aetna common stock as of the record date (February 5, 2018) and were entitled to vote on the Aetna acquisition, and (c) were damaged thereby (the "Class").

2.      Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based on, *inter alia*, the independent investigation of Court-appointed Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP. This investigation included a review and analysis of: (i) CVS's and Aetna's public filings with the Securities and Exchange Commission; (ii) research reports by securities and financial analysts; (iii) transcripts of investor conference calls; (iv) publicly available presentations by CVS and Aetna; (v) press releases and media reports; (vi) economic analyses of securities movement and pricing data; (vii) publicly available filings in other legal actions brought against CVS, Aetna, and Omnicare, Inc. ("Omnicare"), including *United States of America ex rel. Uri Bassan v. Omnicare, Inc.*, No. 1:15-cv-04179-CM (S.D.N.Y.); (viii) consultations with relevant experts; (ix) interviews with former Omnicare and CVS employees; and (x) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants named herein or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3.      As set forth further below, the claims asserted herein arise under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 promulgated thereunder. These claims are based solely on strict liability and negligence, do not arise from allegations of fraudulent intent by the Defendants, and do not sound in fraud.

I.      **PRELIMINARY STATEMENT**

4.      This securities class action arises from Defendants' materially inaccurate statements concerning CVS's Long-Term Care business. The Long-Term Care business provides pharmacy services to long-term care facilities such as nursing homes, assisted living facilities, and independent living facilities, and manages long-term care patients' medication and pharmacy benefits. Defendants made those inaccurate statements in connection with CVS's $77 billion acquisition of Aetna, which required the approval of Aetna shareholders.

5.      In advance of the shareholder vote on the Aetna acquisition, Defendants made a series of statements representing that CVS's Long-Term Care business was far more valuable and healthy than it actually was. Based on those representations, Aetna shareholders voted to approve the acquisition. In exchange for their Aetna shares, Aetna shareholders received 274.4 million shares of CVS stock and cash. After Aetna shareholders approved the merger, CVS belatedly disclosed that, in truth, the Long-Term Care business was severely impaired, worth $6.1 billion less than CVS had previously reported, and would negatively impact CVS's financial performance for the forthcoming year. Those disclosures caused the price of CVS stock to decline significantly, leaving former Aetna shareholders with far less consideration than they had agreed to accept for their Aetna shares.

6.      By way of background, CVS originally acquired its Long-Term Care business by purchasing Omnicare for approximately $12.7 billion in 2015 (the "Omnicare acquisition"). When

CVS announced that acquisition in May 2015, and subsequently, CVS represented that the Omnicare acquisition was a growth opportunity because it allowed the Company to enter the long-term care market, which would expand as the United States population grew older and required greater nursing home, assisted living, and independent living care. Defendant Merlo, CVS's Chief Executive Officer, told investors that the Omnicare acquisition "creat[ed] a substantial growth opportunity for us." Similarly, Defendant Denton, then CVS's Chief Financial Officer, stated that the Omnicare acquisition would be "increasingly accretive" to CVS's earnings.

7.     CVS recorded the substantial majority of the purchase price for Omnicare as goodwill assets on the Company's balance sheet, including approximately $6.4 billion of goodwill that CVS allocated to the long-term care reporting unit (the "Omnicare goodwill").

8.     By mid-2017, CVS faced several pressures that led it to seek a transformative strategic acquisition. Most importantly, Amazon's looming entry into the pharmacy business put CVS at severe risk of substantial business loss. Analysts and the financial press reported that the prospect of "direct competition" from Amazon in the pharmacy business sparked "concern[]" among CVS and its shareholders. This was because Amazon could capture market share from traditional brick-and-mortar pharmacy retailers like CVS by using its extraordinarily large customer base, distribution network, and other resources to negotiate favorable drug prices and rapidly deliver medicine nationwide.

9.     Acquiring Aetna, one of the country's largest health insurers, was key to CVS's ability to successfully defend its market share against Amazon and assure its investors that it could grow reliably into the future. The Aetna acquisition would allow CVS to increase its leverage to negotiate lower drug prices, while also opening up new markets among Aetna's insureds—just what CVS needed to calm its investors, solidify its market position, and expand its margins.

10.    On December 3, 2017, CVS and Aetna announced their execution of a definitive merger agreement under which CVS would acquire Aetna.  The merger agreement provided that Aetna shareholders would receive $145 in cash and 0.8378 shares of CVS common stock for each share of Aetna stock tendered.  That exchange rate was based on a then-prevailing price of $74.21 per share of CVS stock.  The market reacted positively to the proposed deal.  Analysts and the financial press reported that a CVS-Aetna combination "could drive incremental business to CVS," and that it was "critical" for CVS to close the deal in order to seriously compete with Amazon.

11.    Before CVS could close the acquisition, however, it had to obtain the approval of Aetna shareholders.  To secure that approval, it was imperative that CVS project financial strength.  CVS could not afford to generate concern among Aetna investors by taking large write-downs, reporting material negative business trends, or otherwise reporting a significant business impairment before the vote.  Such disclosures likely would have caused CVS's stock price to decline, thereby reducing the value of the consideration that Aetna shareholders would receive.  Some analysts had already questioned whether Aetna could have (and should have) obtained a better deal for its shareholders.  Any decline in CVS's share price would have deepened that concern and jeopardized approval of this critical acquisition.

12.    Thus, in the leadup to the shareholder vote, CVS represented that its financial condition was strong, and pointed to its Long-Term Care business as a source of strength.  For instance, CVS stated that the Omnicare goodwill had maintained its full value, representing that "[t]he fair value of our [Long-Term Care] . . . reporting unit[] at December 31, 2017 was approximately $6.5 billion."  CVS pointed to the Long-Term Care business as a primary driver of CVS's increase in net revenues from 2015 to 2016.  CVS also stated that a key "capability" it brought to the Aetna acquisition was its status as a "[l]eading provider of pharmacy services in

long-term care," and that it expected continued "revenue growth of 2.5% to 4%" for the Retail/LTC segment, "driven by new initiatives tailored toward assisted living facilities[.]"

13. Based on those representations, Aetna shareholders voted to approve the acquisition on March 13, 2018. Unfortunately, and contrary to Defendants' representations, CVS's Long-Term Care business was severely impaired. Unbeknownst to Aetna shareholders, CVS's Long-Term Care business suffered from multiple material adverse trends and was worth a small fraction of its reported value as of the time the Offering Documents became effective and the time that Aetna shareholders voted to approve Aetna's acquisition by CVS.

14. As detailed herein, CVS lost large numbers of its long-term care customers soon after acquiring Omnicare, thereby hobbling the Long-Term Care business. That loss of business was both severe and widely known within CVS. As a former CVS employee has reported, in "State of the Company" conference calls, the Company communicated that Omnicare as a whole lost 25%-33% of its business in the 2016-to-2017 timeframe. Another former employee painted an even bleaker picture, estimating that CVS lost almost half the Long-Term Care business by one year after the Omnicare acquisition. Numerous other former CVS employees similarly reported that, during the same 2016-2017 time period, CVS lost long-term care business "hand over foot," "left and right," and "every time we turned around." Those former employees described "extraordinary" levels of attrition during that time. A knowledgeable former CVS employee reported that, around Thanksgiving of 2016, the situation had grown so dire that CVS's senior executives held a "come to Jesus meeting" at CVS headquarters in Woonsocket, Rhode Island, where they discussed the severe attrition in the Long-Term Care business and the failure of that business to meet expectations. After that meeting, senior CVS executives implemented highly

aggressive, "pie in the sky" growth goals in an attempt to avoid reporting an impairment, but those goals were impossible to meet.

15.    Former CVS employees have widely reported that the Company lost its long-term care customers because it failed to perform a critical function: delivering medication on time and properly to a patient population that depended on it.  They reported that "the bottom fell out of the ship" in terms of service soon after CVS acquired Omnicare.  They further reported that CVS exacerbated that problem by terminating key legacy Omnicare executives.  The loss of key personnel deepened CVS's inability to properly service its customers, and led to the former Omnicare executives joining or starting competing long-term care businesses to which CVS's disappointed customers flocked, thus accelerating CVS's business loss.

16.    Faced with that downward spiral, CVS attempted to prop up its Long-Term Care business by acquiring smaller long-term care companies in the 2016-to-2017 timeframe.  As a former CVS executive stated, "It was communicated to us that we were losing so much business that they were trying to save grace, just trying to stop the bleed."  That strategy provided no relief, however, as CVS continued to lose more customers than it could add through acquisitions.  Former CVS employees reported that CVS often retained less than half—and sometimes as few as 10%—of the customers it acquired, and described the Company's acquisition strategy as "disastrous."

17.    While the Long-Term Care business suffered those material customer losses, it also engaged in an illegal practice that artificially inflated its performance and exposed it to serious liabilities.  Specifically, CVS's Omnicare unit booked a material amount of ill-gotten revenue by engaging in what the United States Department of Justice and numerous state attorneys general have described as illegal "rollover" prescription and billing practices.  After prescriptions expired

or refills were exhausted, Omnicare continued to dispense medication and bill the federal government for it, instead of obtaining new prescriptions as it was required to do.

18.    Those illegal practices were material in scope.    The rollover practices systematically impacted Omnicare's assisted living facilities, which represented 24% of Omnicare's prescription volume as of January 2017.  As one former employee reported, "there were over 1,500 assisted living communities that broke state and federal laws by refilling prescriptions without legitimate physician prescription orders and billed Medicare and Medicaid hundreds of millions of dollars."

19.    In a complaint against CVS and Omnicare for violations of the False Claims Act, which was unsealed in December 2019, the Department of Justice alleged that those illegal rollovers were stunningly widespread.  The illegal rollover practices affected at least 3,200 residential facilities that the Long-Term Care business serviced.  Moreover, the Department of Justice has alleged that, shortly after CVS agreed to acquire Omnicare in May 2015, CVS managers learned of the illegal rollover practices, yet failed to take timely corrective action, and did not end the practice until 2018.  Like the massive loss of business noted above, these widespread illegal rollover practices demonstrated that the value of the Omnicare goodwill was impaired by billions of dollars when the Offering Documents became effective and at the time of the shareholder vote.

20.    As noted above, Aetna investors did not learn the truth about the poor performance and impaired value of CVS's Long-Term Care business until well after they voted to approve the Aetna acquisition.  On August 8, 2018, as part of the Company's second-quarter 2018 earnings report, CVS announced a $3.9 billion impairment charge to the Omnicare goodwill—representing 59% of its value.  Nevertheless, Defendants assured investors that the Company's Long-Term Care

business was otherwise sound and no further impairment existed, leaving approximately $2.6 billion of goodwill intact.  The market credited Defendants' reassuring statements, with analysts reporting that they "continue[d] to see attractive value in the Omnicare business."

21.    Then, on February 20, 2019—less than 90 days after the Aetna acquisition closed— CVS reported a massive $2.2 billion write-down of the Omnicare goodwill, which caused CVS to report a quarterly loss of $421 million.  CVS also issued annual guidance that was far short of analysts' expectations due in significant part to the decayed financial performance of the Long-Term Care business.  Those disclosures surprised and disappointed the market.  Analysts called the announcements a "Major Disappointment," "the worst case scenario," and a signal that the Aetna acquisition was "aimed at plugging holes in a leaky CVS bucket."

22.    In response to those disclosures, CVS's stock price plummeted 8.8% in a single day, closing at $64.22 per share on February 20, 2019.  That was nearly $10 per share less than the price of CVS stock used to calculate the exchange rate on which Aetna shareholders voted to accept CVS's offer to acquire Aetna.  CVS's stock price collapsed even further in the ensuing days, falling to just $52.36 per share on March 7, 2019, deepening Aetna shareholders' losses. Lead Plaintiff brings this action to seek recovery for former Aetna shareholders harmed by Defendants' materially inaccurate statements and omissions.

## II.    JURISDICTION AND VENUE

23.    The claims asserted herein arise under (i) Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o; and (ii) Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), and 78t(a), and the rules and regulations promulgated thereunder, including Securities and Exchange Commission Rule 14a-9, 17 C.F.R. 240.14a-9 ("Rule 14a-9").

24.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

25.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b), (c), and (d).  The acts and conduct complained of herein occurred, in substantial part, in this District. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

III.    **PARTIES**

A.      **Lead Plaintiff**

26.     Lead Plaintiff Los Angeles Fire and Police Pensions is a public pension plan that administers the defined benefit retirement plan for all sworn employees of the City of Los Angeles, including its firefighters and police officers.  Lead Plaintiff currently serves 13,500 active members and 13,000 retirees and beneficiaries and, as of May 2022, had approximately $29.7 billion in assets under management.  Lead Plaintiff received over 76,000 CVS shares in exchange for Aetna shares in the Aetna acquisition.  Moreover, Lead Plaintiff held 46,327 Aetna shares as of the February 5, 2018 record date for eligibility to vote on the Aetna acquisition.

B.      **Defendants**

27.     Defendant CVS is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island.  CVS's common stock trades on the New York Stock Exchange under the ticker symbol "CVS."

28.     Defendant Larry J. Merlo ("Merlo") served as CVS's President and Chief Executive Officer at all relevant times.  Merlo served as CVS's President and Chief Executive Officer from March 2011 through February 2021.  Previously, Merlo was President and Chief Operating Officer of CVS from May 2010 through March 2011; President of CVS Pharmacy, Inc. from January 2007 through August 2011; Executive Vice President of CVS from January 2007 through May 2010; and has served as a director of CVS from May 2010 to the present.  Merlo signed the Registration Statement filed with the Securities and Exchange Commission in connection with the Aetna acquisition.  Merlo also signed the joint letter to Aetna and CVS stockholders at the beginning of both the Registration Statement and Joint Proxy/Prospectus filed with the Securities and Exchange Commission in connection with the Aetna acquisition.

29.     Defendant David M. Denton ("Denton") was CVS's Executive Vice President and Chief Financial Officer at all relevant times.  Denton was the Company's Executive Vice President and Chief Financial Officer from January 2010 to November 2018.  Prior to that, he was Senior Vice President and Controller/Chief Accounting Officer of CVS from March 2008 until December 2009.   Denton signed the Registration Statement filed with the Securities and Exchange Commission in connection with the Aetna acquisition on CVS's behalf, individually, and as Attorney-in-Fact for Defendants Eva C. Boratto, Richard M. Bracken, C. David Brown II, Alecia A. Decoudreaux, Nancy-Ann M. Deparle, David W. Dorman, Anne M. Finucane, Jean-Pierre Millon, Mary L. Schapiro, Richard J. Swift, William C. Weldon, Tony L. White.

30.     Defendant Eva C. Boratto ("Boratto") served as CVS's Executive Vice President and Chief Financial Officer from October 2018 through May 2021.  Boratto joined CVS Caremark in 2010 as Senior Vice President for pharmacy benefit management finance.  Boratto also served as Senior Vice President and Chief Accounting Officer for CVS Caremark (which became CVS

in 2014) from 2013 to 2017. Boratto signed the Registration Statement filed with the Securities and Exchange Commission in connection with the Aetna acquisition.

31.     Defendants Richard M. Bracken, C. David Brown II, Alecia A. Decoudreaux, Nancy-Ann M. Deparle, David W. Dorman, Anne M. Finucane, Jean-Pierre Millon, Mary L. Schapiro, Richard J. Swift, William C. Weldon, and Tony L. White were all members of the CVS Board of Directors at the time of the Aetna acquisition and signed the Registration Statement filed with the Securities and Exchange Commission in connection with the Aetna acquisition. Defendants Bracken, Brown, Decoudreaux, Deparle, Dorman, Finucane, Millon, Swift, Weldon, and White also served on the CVS Board of Directors at the time CVS acquired Omnicare.

32.     Defendant Mark T. Bertolini ("Bertolini") was, at the time of the Aetna acquisition, Aetna's Chief Executive Officer and the Chairman of Aetna's Board of Directors. Bertolini signed the joint letter to Aetna and CVS stockholders at the beginning of the Registration Statement and Joint Proxy/Prospectus filed with the Securities and Exchange Commission in connection with the Aetna acquisition. He also consented to being named in the Registration Statement and all amendments thereto as a person about to become a director of CVS, effective upon completion of the merger as described in the Registration Statement.

33.     Defendants Dorman and Bertolini, as Chairman of the CVS Board and as Chairman and Chief Executive Officer of Aetna, respectively, on behalf of the full boards of directors of CVS and Aetna, signed a joint letter to Aetna and CVS stockholders that was included in both the Registration Statement and the Joint Proxy/Prospectus filed with the Securities and Exchange Commission in connection with the Aetna acquisition, representing that the CVS and Aetna directors unanimously recommended that CVS and Aetna shareholders vote to approve the Aetna acquisition.

11

34.     The individuals named in ¶¶ 28-32 are sometimes collectively referred to herein as the "Securities Act Individual Defendants."

35.     Defendants Fernando Aguirre, Frank M. Clark, Molly J. Coye, Roger N. Farah, Jeffrey E. Garten, Ellen M. Hancock, Richard J. Harrington, Edward J. Ludwig, and Olympia J. Snowe were all members of the Aetna Board of Directors at the time of the Aetna acquisition.

36.     The individuals named in ¶ 35, together with the Securities Act Individual Defendants, are sometimes collectively referred to herein as the "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

37.     CVS and its subsidiaries constitute the largest integrated pharmacy health care provider in the United States based upon revenues and prescriptions filled.  At all times relevant to the allegations in this Complaint, CVS had three business segments: Pharmacy Services, Corporate, and Retail (which, following CVS's acquisition of Omnicare, became the "Retail/LTC" segment).

38.     The Pharmacy Services segment "provides a full range of pharmacy benefit management solutions [] to clients," including employers, insurance companies, unions, government employee groups, health plans, and individuals.

39.     The Corporate segment provides management and administrative services to support the overall operations of the Company.

40.     The Retail/LTC segment comprises two businesses: (1) Retail and (2) Long-Term Care.  The Retail business includes sales from pharmacy and convenience stores, such as prescription and over-the-counter drugs and a wide assortment of general merchandise.

41.     CVS obtained its Long-Term Care business when it acquired Omnicare in 2015. CVS added the Long-Term Care business to its Retail business to create the Retail/LTC segment.

12

The Long-Term Care business provides pharmacy services to long-term care facilities such as nursing homes, assisted living facilities, and independent living facilities.  In addition to delivering medications to those long-term care facilities, the Long-Term Care business also manages long-term care patients': (a) monthly medication drug therapies to assure compliance with state and federal regulations, and (b) drug benefits under corporate health care programs.

   **B.**    **In 2015, CVS Acquired Omnicare, and Told Investors That the Acquisition Would Generate Substantial Value and Growth**

   42.    On May 21, 2015, CVS announced that it had signed a definitive agreement to acquire Omnicare for approximately $12.7 billion (including assuming more than $3 billion in Omnicare debt).  Omnicare was a leading provider of pharmacy services to long-term care facilities.

   43.    On the same day, CVS hosted a conference call with investors and described the importance and purported value of the Omnicare acquisition.  Defendants told investors that the Omnicare acquisition would allow CVS to enter the long-term care market, which Defendants expected to grow significantly in the near future as the large "Baby Boomer" generation aged into retirement and the population of the United States grew older and required greater nursing home, assisted living, and independent living care.  For example, Defendant Merlo stated that "[t]he acquisition of Omnicare provides a new pharmacy dispensing channel for CVS Health, expanding our customer reach to a broader population of chronic care patients and seniors at an important time as our population ages," and that "with the population aging, more people are projected to use assisted living facilities and independent living communities in the coming decades creating a substantial growth opportunity for us."

   44.    The $12.7 billion consideration that CVS paid for Omnicare represented a substantial premium over both Omnicare's book value and its pre-acquisition "unaffected" stock

13

price.  As Credit Suisse reported on May 21, 2015, "at this valuation we would be somewhat surprised to see a bidding war emerging . . . with the $98 purchase price representing a 28% premium to the share price . . . ."

45.    To explain and justify the premium that CVS paid, Defendants assured investors that the Omnicare acquisition would benefit the Company by boosting the Company's earnings per share.  During the May 21, 2015 call discussed above, Defendant Denton stated that the transaction was expected to be "roughly $0.20 accretive to adjusted earnings per share in 2016 during its first full year," "more than $0.30 accretive to adjusted earnings per share in 2017," and "increasingly accretive to adjusted earnings per share in subsequent years."  Denton also highlighted that the Company expected "significant purchasing and revenue synergies" and "operating efficiencies" from the transaction, including because CVS could "improve Omnicare's current workflow," "make the delivery service more efficient," and "grow revenue by applying many of our best practices to the Omnicare model."  Accordingly, Denton told the market that the Omnicare acquisition had "positive financial implications for CVS Health in 2016 and well beyond into the future."

46.    Moreover, Defendants highlighted that they were taking a "disciplined" approach to ensure this "long-term strategic value."  For example, on the same call, Defendant Denton told investors that CVS was "making the appropriate investments that can drive long-term strategic value," and had "put that lens on this acquisition," which was "an opportunity for us to continue to grow and importantly financially it's an asset that together [with] the investments we are going to make here, we are going to have a nice return on them."

47.     Analysts and market commentators echoed Defendants' positive statements about the financial and strategic value of Omnicare to CVS.  For example, on May 22, 2015, *The New York Times* reported,

> As the American population gets older, pharmacies and other health care providers are increasingly positioning themselves to capitalize and serve the needs of this demographic.  This group often needs drugs for chronic conditions like diabetes and heart disease, as well as lifesaving medications for sudden conditions like infections or pneumonia.  To cater to that group, the CVS Health Corporation is acquiring the pharmacy services provider Omnicare, which distributes prescription drugs to nursing homes and assisted-living operations.

The article quoted the President of pharmaceutical consulting company Pembroke Consulting, Adam J. Fein, saying that the acquisition of Omnicare was "an excellent move by CVS" that "opens up a really great new market for them in long-term care and assisted living."

### C.     <u>CVS Recorded Almost $6.5 Billion in Long-Term Care Goodwill from the Omnicare Acquisition</u>

48.     The Omnicare acquisition closed on August 18, 2015.  In CVS's first periodic financial report after the deal closed (CVS's Form 10-Q for the third quarter of 2015), CVS reported paying $9.6 billion in total consideration for Omnicare (and assuming approximately $3 billion of Omnicare debt).  CVS recorded nearly all of that purchase price as a goodwill asset on its balance sheet.

49.     Goodwill is an asset that is created through the premium that one company pays for another company above the fair value of the acquired company's net assets.  U.S. Generally Accepted Accounting Principles ("GAAP") provide that goodwill is measured as the difference between the amount of the purchase price and the total fair value of the assets and liabilities of the acquired company.  ASC 805-30-30-1.  As such, goodwill represents the value of the intangible assets of an acquired company at the time of the acquisition, like its customer base, reputation, and synergies created through integration with the acquiring company.

50.     Here, Omnicare had assets valued at approximately $6 billion and liabilities totaling $5.4 billion, leaving a net book value of $600 million.  The $9.6 billion purchase price resulted in $9 billion in goodwill, which represented more than 94% of the purchase price.  This meant that, post-acquisition, the carrying value of Omnicare on CVS's balance sheet consisted almost entirely of the intangible assets related to Omnicare's existing customer base and reputation in the long-term care market, as well as the synergies created by combining Omnicare with CVS.  That intangible value was precisely what Defendants highlighted to investors as justifying the premium CVS paid for Omnicare.

51.     Because CVS merged the Omnicare Long-Term Care business into its Retail segment to create the Retail/LTC segment, the Company largely allocated the Omnicare goodwill to its Retail/LTC segment.  In the Form 10-Q for the third quarter of 2015, CVS reported that "[g]oodwill of $8.6 billion was allocated to the Retail/LTC Segment and the remaining goodwill of $0.4 billion was allocated to the Pharmacy Services Segment."

52.     In the Company's Form 10-Q for the third quarter of 2016, CVS further reported that, of the $8.6 billion of goodwill allocated to the Retail/LTC Segment, $6.3 billion was specifically allocated to the Omnicare Long-Term Care reporting unit.  Prior to this 10-Q, CVS had not broken out the Omnicare Long-Term Care reporting unit separately from the broader Retail/LTC segment, for which $8.6 billion of goodwill had been reported in prior periods.  The $6.3 billion of Omnicare Long-Term Care goodwill is the goodwill that is at issue in this case (defined above as the "Omnicare goodwill").

53.     In the opinion of the U.S. Court of Appeals for the First Circuit in the case captioned *City of Miami Fire Fighters' & Police Officers' Retirement Trust v. CVS Health Corp.*, Case No. 21-1479 (1st Cir.), that court wrote that the third-quarter 2016 10-Q reported "[t]he first negative

disclosure concerning the LTC business," apparently due to the difference between the $8.6 billion of goodwill previously allocated to the Retail/LTC segment and the $6.3 billion allocated specifically to the Omnicare Long-Term Care reporting unit.  46 F. 4th 22, 26-27 (1st Cir. 2022).

54.    Lead Plaintiff respectfully notes that the First Circuit's understanding of CVS's goodwill reporting in the third-quarter 2016 10-Q was mistaken.  The third-quarter 2016 10-Q did not report a write down of goodwill.  Rather than reporting a write-down of goodwill, the third-quarter 2016 10-Q expressly represented that the Company's annual impairment tests of goodwill "indicated that ***there was no impairment of goodwill***."  Further, the third-quarter 2016 10-Q reported that "[t]he fair value[] of our LTC . . . reporting unit[] ***exceeded*** [its] carrying value[] by 7%," and "[t]he Company's total goodwill was $38.2 billion and $38.1 billion as of September 30, 2016 and December 31, 2015, respectively."

55.    Thus, the Company's Omnicare-related goodwill was not decreased.  Rather, as noted above, a portion of the goodwill was simply re-allocated to a new reporting unit.  In the third quarter 2016 10-Q, for the first time, the Company specifically allocated $6.3 billion of goodwill to the Omnicare Long-Term Care reporting unit—a unit that was not previously reported separately from the broader Retail/LTC segment, for which $8.6 billion of goodwill had been reported in prior periods.  The difference of $2.3 billion in goodwill was not written off; it remained on Omnicare's books as part of the broader Retail/LTC segment.

56.    Because the Retail business was much larger than the Long-Term Care business, investors were unable to separately assess the performance of CVS's Long-Term Care business after the Omnicare acquisition.  For example, during the year ended December 31, 2014 (the last full year before the Omnicare acquisition), CVS reported approximately $68 billion in revenues from its Retail business.  That number greatly eclipsed Omnicare's $6.4 billion in revenues over

the same period.  Without CVS separately reporting the financial performance of the Omnicare Long-Term Care business, investors were unable to meaningfully assess the financial performance of that business, including whether the Omnicare goodwill should have been impaired.

57.     Further, Defendants often refused to release any financial metrics about the Long-Term Care business's financial performance, even when expressly asked about it by analysts during conference calls.  For example, on October 30, 2015, two months after closing the Omnicare acquisition, an analyst asked, "[A]ny possibility we get one last bed count or script count for the business before it is consolidated?"  Defendant Denton responded, "Probably not.  Good question, though."  On August 2, 2016, when a Morgan Stanley analyst asked, "what percent of the operating income growth per segment was from [the Omnicare and Target] acquisitions versus organic," Defendant Denton responded that CVS "hadn't broken that out" because "the integration of those businesses are pretty complete."

58.     The market thus had no alternative but to rely on Defendants' statements concerning the overall performance of the Long-Term Care business, and their purportedly proper testing and accurate reporting of the value of the Omnicare goodwill.  The accurate valuation of that goodwill asset was material to investors.  The asset was worth several billion dollars.  Any impairment to that massive asset would be charged against the Company's income, thus reducing its earnings.  Significantly, the sustained value of the asset represented the continued health of a business for which the Company had paid handsomely and upon which it had publicly represented it was relying to increase earnings per share and drive growth.

59.     As explained in greater detail below, under U.S. Generally Accepted Accounting Principles, CVS was required to test goodwill at least annually for impairment.  ASC 350-20-35-30.  CVS represented that it performed that annual goodwill impairment testing in the third quarter

of each year.  U.S. Generally Accepted Accounting Principles require that companies perform interim impairment testing when "circumstances change[] that would more likely than not reduce the fair value of a reporting unit below its carrying amount," such as "negative or declining cash flows," "changes in management, key personnel, strategy, or customers," and "industry and market considerations such as . . . an increased competitive environment . . . or a change in the market for an entity's products or services."  *Id.*; ASC 350-35-3C.  Whether as part of CVS's annual goodwill testing or any interim testing, CVS was required to assess whether the value of the Omnicare Long-Term Care business had fallen below its carrying amount and was therefore impaired, and then timely report that impairment to investors so that they could, in turn, accurately value CVS.

### D.     Under Pressure to Transform Its Business Through a Strategic Acquisition, CVS Announced the Aetna Acquisition

60.     Throughout 2016 and 2017, CVS faced a variety of mounting industry pressures that led CVS to seek out a transformative strategic acquisition.  The strategic transaction with Aetna fit the bill for several reasons.

61.     *First*, the health care industry was facing pressure to reduce the drug costs that it passed along to consumers.  As a Leerink analyst explained in an October 26, 2017 report, "generic prices have deflated and come under significant pressure," which squeezed pharmacy supply chains like CVS.  Specifically, health maintenance organizations ("HMOs"), managed care organizations, government entities, and other third parties—all clients of CVS's largest business segment, Pharmacy Services—were seeking to "decrease their prescription drug costs" and "increase their substitution of generic drugs for branded drugs."

62.     The Aetna acquisition promised to help CVS weather those pressures by lowering its costs.  Combining Aetna's tens of millions of members with CVS's pharmacy benefit management business and roughly 90 million plan members would allow the combined entity to

negotiate lower drug prices (thus increasing its margin) by boosting leverage against drug makers for volume-related discounts.

63.     *Second*, CVS's acquisition options were limited because it had limited ability to execute a typical "horizontal" merger, *i.e.*, buying another pharmacy conglomerate.  Instead, CVS was required to think outside of the box to find a "vertical" acquisition, *i.e.*, buying another company involved in a different stage of the supply chain.  Antitrust regulators had recently blocked major moves by similarly situated companies looking to overcome the same pressures with horizontal mergers in the sector.  For example, regulators had rejected Walgreens Boots Alliance Inc.'s proposed $9.4 billion acquisition of Rite Aid Corporation.

64.     In contrast, a vertical merger of two companies across segments within the health care sector, such as a CVS-Aetna combination, had a much better chance of surviving regulatory scrutiny.  J.P. Morgan analysts reported on October 27, 2017 that "[d]espite antitrust concerns with the larger horizontal health plan mergers that had been proposed in the past, we believe this vertical deal would have less FTC risk."  Oppenheimer shared that sentiment, reporting on December 4, 2017, "we believe CVS-AET combination will likely receive less push back from the anti-trust bodies."

65.     *Third*, CVS was under substantial pressure to expand its footprint, services, and revenues in response to Amazon's entrance into the health care industry.  The Aetna acquisition would accomplish those goals.  During CNBC's May 16, 2017 Squawk Box segment, anchors announced Amazon's steps to enter the pharmacy business to take on industry giants like CVS.  One anchor summed up Amazon's business endeavors ominously: "It's world domination they are going for and right now they are succeeding."

66.     Amazon threatened not only CVS's retail market share but also the biggest business, pharmacy benefit management services, within CVS's Pharmacy Services segment.  If Amazon integrated pharmaceuticals into its dominant mail delivery services, it could severely depress the demand for CVS's brick-and-mortar pharmacies.  In addition, the retail prescription-drug market had historically been dominated by large pharmacy chains like CVS, which rely on pharmacy benefit managers to act as the go-between for drug manufacturers and employers or health plans, negotiating drug prices and deciding which drugs are covered and which drugs are not.  News sources warned that Amazon had ample potential opportunities to compete with pharmacy benefit management giants like CVS given the volume of "lives" Amazon would potentially represent.

67.     As reports of Amazon's looming entry into the pharmacy business emerged, CVS accelerated its efforts to acquire Aetna.  According to the CVS-Aetna proxy materials, Aetna management met with Defendants Merlo and Denton to discuss the merger on May 23, 2017—one week after rumors swirled about Amazon—and CVS sent Aetna a draft mutual non-disclosure agreement on May 25, 2017.  The companies continued discussions between June and September of 2017.

68.     The *Wall Street Journal* first reported rumors that CVS was in talks to buy Aetna just before the market closed on October 26, 2017, explaining that the potential acquisition was coming as "the drugstore giant scrambles to fortify itself against looming competition from Amazon.com Inc. amid a continuing reordering of the health-care industry."  The next day, *The New York Times* reported that the Aetna acquisition was in the works "thanks in large part to moves by Jeff Bezos' e-commerce behemoth [*i.e.*, Amazon]."

69.     Throughout October 2017, there were increasing reports that Amazon had set its sights on conquering the prescription drug delivery business.  News outlets reported on October 27, 2017 that Amazon had acquired wholesale pharmacy licenses in a dozen states.  In the wake of that news, CVS's and other pharmacy chains' shares tumbled, with CVS's shares sliding almost 7%.

70.     On November 30, 2017, CNBC reported that Amazon was in talks with generic drug makers about a potential entry into the pharmacy space.  Securities analyst Leerink cautioned that Amazon's entrance remained a "topic of intense speculation on Wall Street" that had been putting pressure on pharmacies and pharmacy benefit managers.

71.     A week later, on December 3, 2017, CVS and Aetna announced the execution of a definitive merger agreement under which CVS would acquire Aetna in a transaction valued at $77 billion, including the assumption of debt.  For each share of Aetna stock, Aetna shareholders would receive 0.8378 shares of CVS common stock and $145.00.

72.     As CVS had hoped, financial commentators reported that the deal could favorably transform CVS, creating a new delivery system with nurses, pharmacists, and other service providers available in one place, thus lowering costs and significantly increasing revenues— exactly what CVS needed to compete with Amazon.  *The New York Times* reported on December 3, 2017 that the combination had "the potential to reshape the nation's health care industry." During a December 4, 2017 CNBC segment on Squawk Box, Defendant Merlo stated that it was "the perfect time to bring these companies together," and the deal would lower prices and "creat[e] a new front door to health care."  When asked whether pressure on CVS's retail business from industry disruptors like Amazon and pressure on the pharmacy benefit managers from those

looking to cut costs was driving the combination, Defendant Merlo confirmed that the goal was to "bend the cost curve" in the "health care economy."

73.    The business combination was also anticipated to grow CVS's revenues substantially, driving Aetna's 45 million medical members to use CVS's 9,700 retail pharmacies and 1,100 walk-in minute clinics while also dramatically increasing foot traffic to CVS's front-of-store retail business.  In an October 26, 2017 report, Leerink analysts wrote that "[a] CVS takeover of [Aetna] would immediately affect pharmacy volume and negotiating leverage favorably," because Aetna "could drive incremental business to CVS," and a stipulation for prescriptions to be filled at CVS pharmacies also "would yield additional benefit in ancillary front-of-store revenues from increased traffic."

74.    Following the December 3, 2017 announcement of the Aetna acquisition, market commentators again attributed the deal to CVS's attempts to stave off the competitive threat that Amazon posed.  On December 4, 2017, CNBC published an article titled "Amazon is 'scaring' CVS, says former Aetna CEO about Aetna-CVS deal."  Similarly, Quartz published an article on December 3, 2017 titled "The Bezos Effect: The CVS-Aetna deal is actually all about Amazon."

75.    After the announcement of the Aetna acquisition, pressure from Amazon continued to mount.  On January 30, 2018, Amazon, Berkshire Hathaway, and JPMorgan Chase & Co. announced that they were partnering to form an independent health care company for their United States employees.  The same day, Wolfe Research reported that the announcement further supported the view that "Amazon's entrance in the retail pharmacy business is not a question of if, but rather when they will enter," and that "[t]oday's announcement could pressure the equities of CVS."  CVS stock tumbled almost 6% on the news.

76.     In June 2018, Amazon announced a nearly $1 billion buyout of online pharmacy

startup PillPack, which already had pharmacy licenses in each state.  The acquisition was dubbed

Amazon's most aggressive move yet into the pharmacy space.  Upon that news, CVS stock

tumbled 7%.  A *New York Business Journal* article from July 2018 warned that "CVS shareholders

are reportedly concerned that [CVS] is losing market share to young, more innovative companies,"

including "the Jeff Bezos-led e-commerce giant [Amazon] in direct competition with the

traditional brick-and-mortar retailer."

77.     Throughout 2018, analysts and commentators noted that, given the threat from

Amazon, closing the Aetna acquisition was imperative for CVS.  For instance, on June 28, 2018,

Oppenheimer analysts reported, in a report titled, "No More a Secret – AMZN Enters Rx

Dispensing with PillPack; Vertical Integration Even More Critical for CVS" that "[w]ith this

backdrop, it is even more critical that the CVS-[Aetna] acquisition closes, so that CVS gains access

to a comprehensive end-to-end offering (plan design to care delivery) and is more defensible."

**E.     To Ensure the Success of the Aetna Acquisition, It Was Critical That CVS
Show Financial Strength**

78.     The Aetna acquisition required approval by CVS and Aetna shareholders, and the

shareholder votes were scheduled for March 13, 2018.  For the deal to be approved, it was

important that CVS report positive financial results for several reasons.

79.     *First*, had CVS disclosed significant write-downs prior to the vote, and the price of

CVS's shares had decreased, the risk that Aetna shareholders would reject the deal as unfairly

priced would have increased.  Aetna's shareholders were already at risk of being spooked.

Analysts were not unanimously positive when the financial terms were announced, and many

believed that at the agreed-upon exchange ratio, Aetna shareholders were being underpaid.  For

example, Piper Jaffray reported on December 3, 2017 that "we think AET shareholders could do

24

better than $207 offer price," "we do not see a lot of financial or strategic synergies from the combination," and "we are not alone based on our recent discussions with management teams from other insurers." Piper Jaffray also noted concerns about "potential issues with shareholder approval." J.P. Morgan analysts echoed that sentiment, reporting on December 3 that "the takeout price may be viewed as insufficient by some [Aetna] shareholders." Similarly, on December 5, 2017, Oppenheimer reported that "Aetna was in the driver's seat and should have received a higher premium."

80.    *Second*, the disclosure of significant write-downs by CVS may have made the Aetna acquisition prohibitively expensive. Part of the transaction consideration was a stock-for-stock exchange. Aetna's shareholders were to receive 0.8378 CVS shares for each Aetna share, based on the volume-weighted average price for the five consecutive trading days ending December 1, 2017 of $74.21 per CVS share. Had CVS reported significant write-downs and its stock price declined prior to the vote, the exchange ratio or cash component for the Aetna acquisition would have had to be adjusted to pay out more consideration to Aetna shareholders. That may have made the merger too dilutive, expensive, or otherwise impracticable.

81.    *Third*, by the time the Aetna acquisition was announced, the market's concern about CVS's ability to integrate Aetna was heightened. For instance, Jeffries analysts warned on December 5, 2017 in a report titled "AET Deal is Transformational But Carries Execution Risk" that "[g]iven the landscape-altering vision mgmt. has for the deal, execution risk is high." According to a March 6, 2018 *Bloomberg* article titled "CVS Borrows $40 Billion for Aetna in Third-Largest Bond Sale," a Moody's Investors Service analyst stated, "CVS has to integrate another company[, which] has not necessarily been done before between a retailer and an insurance company," adding, "There are elevated risks in terms of that execution." Analysts also noted that

CVS's prior successful integrations mitigated that risk.  For example, Macquarie Research issued a report on December 4, 2017 titled "CVS Health to Acquire Aetna 10[th] Amazon Freeze Out; Baby We Were Born to Run," stating that "CVS's institutionalized skillset will serve them well and should give management the benefit of the doubt (for the skeptics that will likely emerge)." Significant write-downs by CVS—particularly write-downs relating to prior acquisitions, such as Omnicare—would have shaken investor confidence in CVS's ability to successfully integrate Aetna, thereby undermining the likelihood of securing Aetna shareholder approval.

82.    *Fourth*, any downgrade to CVS's credit rating could have been fatal to CVS's ability to fund the Aetna acquisition.  Given the size of the deal, CVS turned to a massive $40 billion corporate bond issuance—the third largest corporate bond issuance ever—to finance the acquisition.  CVS could afford zero disruptions to its investment-grade credit rating prior to issuing those bonds.  As of December 3, 2017, the day the deal was announced, CVS had a BBB+ credit rating, only two notches above junk rating.  By early 2018, the corporate debt market was "off to its worst annual start in decades," according to a *Bloomberg News* report titled "CVS Borrows $40 Billion for Aetna in Third-Largest Bond Sale," in which *Bloomberg* reported that, "[w]ith the Federal Reserve hiking interest rates and withdrawing its unprecedented stimulus measures . . . yields on investment-grade debt have climbed to the highest levels in six years."  According to the financial press, CVS pushed ahead with the $40 billion bond offering, finalizing the transaction in March of 2018 "to get ahead of higher interest rates expected later in the year, which would make the takeover more expensive."

83.    The market was concerned by the amount of debt required to fund the deal.  The day after the deal was announced, securities analyst Cowen & Co. warned that a "key hurdle" would be how regulators and credit rating agencies viewed the combined companies' debt load.

Other commentators reinforced those concerns. Had CVS faced a credit downgrade due to substantial write-downs or poor performance, the bonds could have been too expensive to issue.

**F. Defendants Secured Aetna Shareholders' Approval by Making Positive Statements About Omnicare's Value and Performance**

84. As set forth above, on December 3, 2017, CVS and Aetna announced the execution of the merger agreement. To solicit votes in favor of the merger from CVS and Aetna shareholders, the next day, CVS and Aetna held a joint conference call, titled "CVS Health Corp to Acquire Aetna Inc Joint Conference Call," during which Defendants Denton, Merlo, and Bertolini spoke to investors about the Aetna acquisition. For example, Defendant Merlo stated that the "ongoing aging of America, with more than 10,000 baby boomers turning 65 every day"—*i.e.*, those entering the demographic most served by CVS's Long-Term Care business—would "enable [CVS and Aetna] to improve our quality metrics and become more competitive in this fast-growing segment of the market."

85. CVS also noted the strength of its Long-Term Care business in a slide presentation filed with the Securities and Exchange Commission on December 4, 2017 in connection with the Aetna acquisition, titled "CVS Health and Aetna Bring Unique and Differentiated Capabilities to the Combination." One of CVS's key "capabilities" that the Company touted was its Long-Term Care business and, specifically, that CVS was purportedly the "[l]eading provider of pharmacy services in long-term care." On the same day, Defendants Merlo and Bertolini appeared in a joint interview on CNBC to discuss the purported benefits of the merger.

86. To further solicit votes in favor of the merger from CVS and Aetna shareholders, on February 9, 2018, CVS filed its final registration statement with the Securities and Exchange Commission (the "Registration Statement"), which included the final joint proxy statement/prospectus ("Joint Proxy/Prospectus"), for the CVS common stock to be issued and

27

exchanged in the Aetna acquisition. The Securities and Exchange Commission declared the Registration Statement effective on February 9, 2018. Collectively, the Registration Statement and Joint Proxy/Prospectus are referred to herein as the "Offering Documents." As set forth below at Section V, the Offering Documents also incorporated by reference, and directed investors to, several other prior and forthcoming Securities and Exchange Commission filings.

87.    As further set forth below at Section V, the Offering Documents made a number of positive statements about CVS's Long-Term Care business and Omnicare goodwill. In general, the Offering Documents represented that:

    a.  CVS's Long-Term Care business was healthy and financially stable;

    b.  CVS's Omnicare goodwill was not impaired;

    c.  CVS's financial reporting complied with U.S. Generally Accepted Accounting Principles; and

    d.  There was no material negative trend occurring in the Long-Term Care business.

88.    For instance, in the Company's 2017 Annual Report on Form 10-K, which was incorporated into the Offering Documents, CVS stated that the Omnicare goodwill was not impaired and did not need to be written down. CVS stated that "[t]he fair value of our LTC . . . reporting unit[] exceeded [its] carrying value[] by 1%," "[t]he balance of goodwill for our LTC . . . reporting unit[] at December 31, 2017 was approximately $6.5 billion," and CVS believed it had "sufficient current and historical information available to us to test for impairment."

89.    The Offering Documents also stated that Omnicare was a driver of the Company's financial success. For example, in the Company's 2016 Annual Report on Form 10-K, which was also incorporated into the Offering Documents, CVS stated that for its Retail/LTC Segment, "[n]et revenues increased approximately $9.1 billion, or 12.6%, to $81.1 billion for the year ended

December 31, 2016, as compared to the prior year. . . . primarily driven by," among other things, "the acquisition of Omnicare's LTC operations."

90.    In additional communications to investors in the leadup to the Aetna acquisition, Defendants continued to represent the Long-Term Care business as a reliable growth driver.  For example, on January 4, 2018, Defendants held the "CVS Health 2018 Guidance Call" with securities analysts, during which Defendant Denton stated that the Company "expect[ed] solid script growth driven by new initiatives tailored toward assisted living facilities and benefits from acquisition activity.  As a result, for the entire Retail/Long-Term Care segment, we expect revenue growth of 2.5% to 4% . . . . All in, we expect operating profit growth again in the low single digits."

91.    On March 13, 2018, CVS and Aetna held special meetings of their shareholders to vote on the Aetna acquisition.  Based on the representations in the Offering Documents, Aetna and CVS shareholders approved the deal.  When the Aetna acquisition closed on November 28, 2018, each Aetna common share was automatically cancelled and converted into 0.8378 of a share of CVS common stock and $145 in cash.

### G.    Unbeknownst to Investors, Defendants' Statements Were Materially Inaccurate and Omitted Material Facts

92.    As explained below, the Offering Documents contained materially inaccurate statements and omissions, including the failure to accurately report the value of the Omnicare goodwill, and the failure to disclose material negative trends in CVS's Long-Term Care business.  By no later than September 30, 2017 (the end of third-quarter 2017, during which CVS conducted its annual goodwill impairment test)—and certainly by the time of the shareholder votes on the Aetna acquisition in March 2018—the Omnicare Long-Term Care business was materially impaired.  By September 30, 2017, the business had been experiencing adverse trends of material customer losses, illegal billing practices that were material in scope, severe financial distress of

many of its largest customers, a cratering long-term care industry, increasing costs, negative reimbursement pressures, and adverse macroeconomic conditions like skyrocketing interest rates that materially increased the cost of financing long-term care facilities. Nevertheless, the Offering Documents failed to disclose the Omnicare goodwill's impairment or the material adverse trends driving it.

### 1.    Brief Background on Goodwill Accounting Rules

93.    As noted above, an acquiring company records goodwill on its balance sheet as an asset when the price the acquiring company paid for the target is higher than the sum of the fair value of the net assets purchased. Goodwill represents the value of the economic benefits arising from the assets acquired in a business combination that are not individually identified and separately recognized elsewhere on the acquiring company's balance sheet.

94.    A large amount of goodwill demonstrates that a company attributed significant value and upside to the transaction. Post-closing, the ongoing status of goodwill indicates to the market how the target company's assets are performing, how the integration of those assets is progressing, and whether the acquiring company is recognizing the upside it initially expected in the transaction.

95.    As also noted above, U.S. Generally Accepted Accounting Principles require companies to review the value of goodwill at least annually to determine whether there is evidence that a reporting unit's fair value is below its carrying value. CVS stated that it performed that test as of the third quarter of each year. In addition, U.S. Generally Accepted Accounting Principles require companies to perform interim impairment testing in between annual tests if a triggering event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. If the acquiring company determines that there is such

evidence, the goodwill asset is "impaired," and the goodwill value recorded on the balance sheet must be written down.

96.    U.S. Generally Accepted Accounting Principles detail a methodology to test for goodwill impairment.  An entity first assesses qualitative factors to determine whether it is more likely than not (that is, a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, including goodwill.  The required qualitative assessment of goodwill involves consideration of "red flags," including:

- Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

- Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

- Macroeconomic conditions such as a deterioration in general economic conditions . . . .;

- Industry and market considerations such as deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples and metrics (in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development; and

- Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows.

ASC 350-20-35-3C.

97.    Under U.S. Generally Accepted Accounting Principles, if an assessment of those circumstances indicates that the fair value of a reporting unit may be less than its carrying amount, the company must perform a two-step goodwill impairment test to identify any goodwill impairment and measure its amount:

- Step 1: The first step of the goodwill impairment test compares the fair value of the reporting unit with its carrying amount, including goodwill.  If the fair value exceeds the carrying amount, goodwill is not impaired.  If the carrying

amount exceeds the fair value, the second step of the goodwill impairment test is performed to measure the amount of impairment loss.

- Step 2: The second step of the goodwill impairment test compares the implied fair value of the goodwill with the carrying amount of the goodwill. If the carrying amount of the goodwill exceeds the implied fair value of the goodwill, an impairment loss is recognized in an amount equal to that excess.

98.    Once a goodwill impairment loss is recognized, the amount of the impairment is charged dollar-for-dollar against the company's income in the period in which the impairment loss is recognized, and the company must also disclose the facts and circumstances leading to the impairment.

99.    CVS stated that it complied with the above-stated principles. For example, in its Form 10-Q for the first quarter of 2017, CVS disclosed that it had adopted new accounting standards incorporating those requirements:

> New Accounting Pronouncements Recently Adopted . . . In January 2017, the FASB [Financial Accounting Standards Board] issued ASU [Accounting Standards Update] 2017-04, *Simplifying the Test for Goodwill Impairment*, which amends ASC [Accounting Standards Codification] Topic 350, Intangibles – Goodwill and Other. This ASU requires the Company to perform its annual, or applicable interim, goodwill impairment test by comparing the fair value of each reporting unit with its carrying amount. An impairment charge must be recognized at the amount by which the carrying amount exceeds the fair value of the reporting unit; however, the charge recognized should not exceed the total amount of goodwill allocated to that reporting unit . . . . The guidance in ASU 2017-04 is effective for annual or interim goodwill impairment tests in fiscal years beginning after December 15, 2019. ***The Company elected to early adopt this standard as of January 1, 2017***. . . .

100.    As explained further below, had CVS complied with U.S. Generally Accepted Accounting Principles, it would have properly concluded that the Omnicare goodwill was impaired and should have been written down before the Offering Materials became effective.

### 2. Numerous Red Flags Demonstrated Significant Impairment in CVS's Long-Term Care Business

101.    By no later than the third quarter of 2017, numerous red flags, when viewed together, demonstrated that the Long-Term Care business was materially impaired.  Those red flags were widely known within CVS, and included (a) a trend of material customer losses and revenue shortfalls; (b) illegal billing practices that were material in scope; (c) significant industry headwinds that made it exceedingly difficult for the Long-Term Care business to remain profitable; and (d) negative macroeconomic conditions, including a significant increase in interest rates.

### a. The Material Adverse Trends of Business Loss and Revenue Shortfalls Plagued the Long-Term Care Unit

102.    Reports of former CVS employees demonstrate that, during 2016 and 2017, the Company's Long-Term Care business was experiencing a highly material loss of customers and significant revenue shortfalls.  Former Employee 1 worked at Omnicare and then CVS from August of 2014 to August of 2018.[1]  Former Employee 1 served as a Pricing Financial Analyst from August 2014 to August 2015; Senior Consultant of Senior Living from August 2015 to December 2016; and Manager of Senior Living Commercial Operations from January 2017 to August 2018.  Former Employee 1 reported that, in his earlier positions, he had been an executive-level analyst, and then was promoted to oversee the analytics and financials of the senior living department.  Former Employee 1 reported directly to Chip Patterson, who was a Senior Director of Business Development for Senior Living at CVS from 2017 to 2018, and before that was Senior Director of Sales at Omnicare from 2013 to 2017; and Jim Vett, a former senior director.  Former Employee 1 was also the primary analyst supporting Bill Deane and Jeremie Trochu, the Vice

---

[1] For ease of comprehension and readability, the Complaint uses the pronoun "he" and possessive "his" in connection with the Former Employees discussed herein.  However, this convention is not meant to identify the actual gender of any of the Former Employees.

President of Sales for Omnicare from 2015 to 2016 and then Vice President for Senior Living at CVS from 2016 to 2017.

103.    Former Employee 1 reported that there were two sides of the business, post-acute and senior living, and "we were losing business hand over foot on both sides of the business." Former Employee 1 recalled that there was a meeting right before Thanksgiving 2016 with the executives, and a lot of things changed significantly right after that meeting because CVS knew that there was going to be a huge gap in what it told people compared to what the Company was going to deliver.

104.    Former Employee 1 described that meeting as a "come to Jesus meeting," as the Company had noticed, "holy sh**," the business is declining.  Omnicare President Rocky Kraft was at that meeting, Former Employee 1 reported.  According to Former Employee 1, the Company knew business was not going to grow and that revenue was probably going to decline. Consequently, they put initiatives in place to fill holes.

105.    For example, the Company started pursuing the senior living business as a result of that meeting right before Thanksgiving 2016.[2]  CVS had planned to lower pricing in an attempt to win more business.  They wanted to "race to the bottom" because they had purchasing power over the competitors.  The senior living side of the business had huge growth goals in the attempt to fill the holes that would be left because the Company knew that revenues in long-term care were declining.

---

[2] According to a December 15, 2016 presentation made publicly available by CVS, as of October 2016, 76% of Omnicare's prescriptions were from skilled nursing facilities and 24% were from assisted living and other communities.  CVS launched initiatives to accelerate senior living growth like "[b]ringing CVS Pharmacy expertise to accelerate growth" in assisted living facilities and "[r]olling out independent living pharmacy offering" for independent living facilities.

106.    Former Employee 1 reported that Jeremie Trochu had been at CVS headquarters in Woonsocket, Rhode Island for that meeting, and when Trochu returned to Cincinnati, Former Employee 1 was bombarded with emails and questions that were very unusual.  The executives were asking very specific questions about what the senior living market could provide in terms of growth.  The goals the Company set for senior living were far higher than what Former Employee 1 believed was possible, and the executives knew it.  Former Employee 1's understanding was that the decisions to make the goals that high came from very, very high up at the C-level suite at CVS, not from someone at Omnicare.  A CVS executive told him that the initiatives were an attempt to head off goodwill impairment.  The goals were impossible; "it was a pie in the sky goal."  For example, senior living was supposed to add approximately 45,000 beds a year when, in reality, it was bringing in about 10,000-13,000.  In total, the overall Omnicare growth budget was probably 30% inflated, Former Employee 1 estimated.

107.    When asked if CVS should have taken more of a write-down earlier with respect to the Long-Term Care business, Former Employee 1 said, "Yeah, they should have; they knew."  When asked if the Long-Term Care business was impaired by the third quarter of 2017, Former Employee 1 said, "God yeah."  Former Employee 1 stated that CVS bought the Omnicare business for more than what it was actually worth: CVS bought "a Cavalier at a Cadillac price," Former Employee 1 stated.  CVS did not care because it had to show Wall Street that it was going to grow, and acquisitions are how you grow when you are a huge company.

108.    Former Employee 1 also reported that CVS suffered from issues with client retention rates, which was an issue of CVS's own making.  Former Employee 1 confirmed that CVS's declining client retention rates stemmed from service issues, such as cutting staff, and medications not being delivered in a timely manner or correctly.  Former Employee 1 said, "they

gutted our pharmacies," "gutted them all for this purpose of goodwill heading off," and called it driving synergies.

109.    Former Employee 1 highlighted the business leaving CVS/Omnicare and "bed losses" at the Company—i.e., a decline in the number of beds at the Company's long-term care facilities, which in turn represented the number of potential patients for whom the Company could provide long-term care services.  The Company was losing over 100,000 beds a year and, after the acquisition by CVS, it was certainly losing more beds than it gained.

110.    The service model was absolutely poor, and they knew they were going to lose business, Former Employee 1 reported.  CVS/Omnicare always exceeded its loss budget while Former Employee 1 was there, even pre-acquisition.  However, there was no talk about modifying projections as a result.

111.    "No, the budget is what the budget is," Former Employee 1 reported.  Omnicare would put a budget proposal together, and that proposal would go up to the "mothership."  CVS would say that it was not enough and that they had to increase their forecast; there was no negotiation.  An email from CVS would come to Former Employee 1's bosses, saying to increase the numbers.  Former Employee 1 stated that CVS's Executive Vice President and Chief Operating Officer, John Roberts, was the one who was driving this.

112.    Former Employee 2's report also demonstrates that Omnicare suffered material customer losses after CVS acquired it.  Former Employee 2 worked for Omnicare and then CVS from October 2001 to September 2018.  As a regional clinical manager, Former Employee 2, a registered pharmacist, was in charge of overseeing the daily performance of long-term care consultant pharmacists in five states (Texas, New Mexico, Arizona, Utah, and Nevada).  The

number of consultant pharmacists under Former Employee 2 varied, but at one time there were 47. Former Employee 2 reported to Alan Bell, the senior clinical director.

113.    Former Employee 2 reported that there was absolutely customer loss, and at a regional level Former Employee 2 would be involved in those types of calls. Former Employee 2 had never in his entire career had to lay people off until the last year he was with Omnicare. During the last year of his tenure, he had to lay off pharmacists because of a loss of business.

114.    Former Employee 2 stated that it was reported internally that Omnicare as a whole had lost 25%-33% of its business. That percentage started being reported in the 2016-to-2017 timeframe. Former Employee 2 received those reports via email and via company phone calls, called "State of the Company" conference calls. Some of those conference calls would be company-wide calls, but others would not. Who led the calls varied. Sometimes the president of Omnicare would lead them; sometimes the Vice President of Clinical Services, Gary Erwin, would lead them. The emails were sent to middle and upper management. Former Employee 2 could not recall if the report had a name, but there was a spreadsheet that showed potential new business, potential loss of business, facilities at risk, and loss of business. Former Employee 2 stated that the report was detailed.

115.    Former Employee 2 also reported that there was definitely a service change with the acquisition, which was why Former Employee 2 left. After CVS acquired Omnicare, it decreased the number of deliveries per day to the communities. Within the first six months of the acquisition, there was a huge reduction in workforce. Those cost cutting measures happened almost immediately, and impacted their ability to deliver medications to the facilities. Former Employee 2 said that absolutely a lot of customers were threatening to leave. For example, Brookdale started leaving in 2016 to 2017. The Brookdale facilities did not leave all at once; the

company started pulling its contracts at a regional level.  Also, some of the Life Care facilities left after they were acquired by different companies.  Those acquiring companies would see the poor service being provided and leave.  Some of the Genesis communities left as well.  Those departures all happened within the same time period, around 2016 to 2017, Former Employee 2 reported.

116.    By way of background, Brookdale Senior Living Inc. was the United States' largest long-term care provider and one of CVS's largest customers.  Life Care Centers of America is currently the largest privately held long-term elderly care company in the United States.  And Genesis HealthCare is one of the nation's largest post-acute care providers.

117.    Facts reported by Former Employee 21 corroborated these accounts and confirmed that it was known within CVS that the Long-Term Care business had been losing substantial business and was in distress by 2016-2017 at the latest.  Former Employee 21 worked at Omnicare (and subsequently CVS) from September 2011 through November 2020, serving as a Manager of Long-Term Care Strategy.  As part of his duties, Former Employee 21 was the business owner for the Salesforce platform for Omnicare.  All of Omnicare's facilities were housed on the platform, along with details relevant to those facilities.  The details included each facility's risk forecast, loss reporting, revenue, script counts, and bed counts.  Over the course of his employment, Former Employee 21 managed a team that entered risk forecast-related data into the Salesforce platform.  Former Employee 21's team recorded which Omnicare facilities were at risk of leaving and calculated what that would mean for Omnicare in terms of revenue loss, bed loss, and script loss.  The reports detailed revenue and bed loss for each Omnicare facility.  Historical losses dating back to 2013 or 2014, when Omnicare first implemented Salesforce, were also included on the reports.  His team closed the books each month and reported what facilities had been lost, along with the other described data (i.e., risk forecast, loss reporting, revenue, script counts, and bed counts).

There were several reasons Omnicare lost facilities such as: the facilities did not like the service, the facilities weren't paying bills, so they were going to be cut off anyway, or new ownership came in who did not want Omnicare (or only wanted PharMerica). According to Former Employee 21, there were multiple loss reasons, and each one was categorized in the reports.

118.    Former Employee 21 reported that his team's reports went "all the way to the top of house," as they helped to show the status of the business. The data were presented in reports via Excel spreadsheets, though sometimes they used Tableau products as well. The reports were widely available and disseminated weekly; executives at least as senior as the Vice Presidents of Account Management and Sales were included on the distribution lists. There was, Former Employee 21 reported, "no way" Omnicare executives did not see the reports.

119.    Former Employee 21 reported that Omnicare serviced between 800,000 and 900,000 beds a year and that, though the number of beds fluctuated somewhat, the struggle of losing more beds than it brought on applied to Former Employee 21's entire tenure, and the Company always harped on becoming "net bed positive." Former Employee 21 reported that Omnicare's price was "drastically inflated" when CVS purchased the Company.

120.    Former Employee 21 gave a specific example of significant business loss shortly after the CVS acquisition. He explained that, prior to the acquisition, Omnicare received a large book of business from a long-term care group facility called Kindred Healthcare ("Kindred"). Kindred was onboarded in 2012 or 2013, it owned 70 or 80 facilities and made "Omnicare's financials look healthy." Former Employee 21 explained that Kindred was a huge infusion of beds and prescriptions for Omnicare prior to the 2015 CVS acquisition.

121.    However, Omnicare would not hold on to the Kindred business for long. By November 21, 2016, according to an article in *Senior Housing News*, Kindred had announced that

it would "exit the skilled nursing space entirely." Former Employee 21 confirmed that, by the time he left in 2020, the Company serviced only one Kindred facility.

122. Numerous other former executives described in detail the material business losses Omnicare suffered after CVS acquired it. As set forth below, those executives explained that (a) CVS rapidly lost significant long-term care customers after acquiring Omnicare; (b) the customers departed because CVS failed to perform basic long-term care functions, such as delivering medication on time; (c) CVS exacerbated that problem by laying off important Omnicare staff, which further compromised CVS's ability to properly and timely deliver medications; (d) former Omnicare executives who left the Company often started competing businesses, deepening the customer losses; and (e) CVS attempted to compensate for that poor performance and show revenue growth by acquiring other long-term care pharmacies, but that strategy failed. In sum, while the Offering Documents portrayed the Long-Term Care business as stable, the undisclosed reality was that the Long-Term Care business was severely impaired.

### (1) Following the Omnicare Acquisition, CVS's Long-Term Care Business Lost Significant Customers

123. The reports of several other former employees demonstrate that the Long-Term Care business was losing clients, and that this trend occurred at a rapid and increasing rate. Multiple former CVS employees confirmed that CVS lost its contracts with some of the largest long-term care providers in the country following the Omnicare acquisition. Former Employee 3 worked for Omnicare and then CVS from 2000 to 2017. Former Employee 3 served as the General Manager and Area Manager in Illinois initially; then as an Area Director in Florida overseeing six long-term care pharmacies; then as a National Operations Director/Senior Director, Operations for the Southeast Division responsible for overseeing 33 pharmacies in 9 states on the East Coast; and then as a Regional Service Area Director responsible for all long-term care pharmacies in North

and South Carolina.  Most recently, at the time of the Omnicare acquisition and thereafter, Former Employee 3 served as the Operations/General Manager responsible for all long-term care pharmacy operations in Florida, from the spring of 2015 up until he left the Company.  Former Employee 3 reported most recently to Tom Schleigh, who served as a Regional Vice President on the Omnicare side.

124.    In his most recent role, Former Employee 3 had day-to-day responsibility for profit and loss for all the Omnicare pharmacies in Florida.  Those customers were all institutional businesses, meaning nursing home and assisted living facilities.  According to Former Employee 3, Omnicare had approximately $350 million of business in Florida.  Former Employee 3 confirmed that, during Former Employee 3's time in Florida, in 2016 and 2017, revenue was declining.  Former Employee 3 saw a lot of business loss.  Former Employee 3 estimated that $20 million in business was lost annually before he left.  A lot of extremely large customers were lost, he explained.  At a certain point, probably a year or year and a half after CVS acquired Omnicare, the Company brought CVS people in to oversee operations, and implemented changes that according to Former Employee 3 led to customer loss and dissatisfaction.  Former Employee 3 "saw some pretty extraordinary attrition in the business."  Former Employee 3 observed attrition of service and attrition of relationships with the customers.

125.    In regard to CVS's claim that it would improve patient outcomes and provide enhanced continuity of care, Former Employee 3 said that the Company would talk about its ability to leverage retail and other areas, "but to be perfectly honest, none of that ever came to fruition."  Former Employee 3 never saw an advantage in the field of being owned by CVS.  In addition, Former Employee 3 thought that the attrition and issues were pretty universal across the Company and not unique to Florida, and specifically mentioned a long-term care acquisition by CVS in

41

California before Former Employee 3 left that was poor and lost customers as well (described further below).

126.    Former Employee 4, a district manager over the St. Louis area and Southern California from 2015 to May 2018, confirmed that CVS started losing Brookdale business in the latter part of 2017, when Brookdale decided to no longer have CVS be its exclusive provider. Former Employee 4 reported to Tom Schleigh, the Vice President on the Omnicare side of the business, and at another time to Mike Meyer, the Vice President of Operations.  Former Employee 4 also recounted that the Company lost one of its best customers, HSI out of Osage Beach, Missouri, with business worth well over $50 million annually and the largest customer in the St. Louis market, which included Kansas, Missouri, southern Illinois, Iowa, and Nebraska.  Former Employee 4 attended a quarterly sales meeting with HSI in the third or fourth quarter of 2017, during which HSI walked in and said they were leaving.  HSI said they would leave over the course of the year and give 90 days' notice on each building.  HSI also gave them a list of the first buildings to go right away, which was about 12 buildings.

127.    Former Employee 4 also stated that from the day he started working at CVS/Omnicare, customers were leaving.  Former Employee 4 explained that the profit and loss statement that he got for his book of business included sales, beds, the current year versus the past year, the profits and losses for each pharmacy, and payroll.  He could see every pharmacy under him individually.  These were distributed every month and he would get them between the 10th and 15th of every month.  The reports came from the Chief Financial Officer's office.  That office would typically be part of the review.  The profit and loss statements would help Former Employee 4 and his colleagues work out how many prescriptions or people it would cost them if they were losing beds.

128.    Former Employee 5 was a Department Manager at CVS/Omnicare in Connecticut between 2002 and June 2017.  Former Employee 5 oversaw the medication delivery program for long-term care pharmacies covering all of Connecticut.  Before CVS purchased Omnicare, his department handled all aspects of delivering medication to clients in the state of Connecticut.  He reported to Mike Gemma, his pharmacy manager, who is gone from the Company and has since joined one of CVS's competitors.  Former Employee 5 reported that across Connecticut, Genesis Healthcare, Spectrum, and Harborside Health left after CVS acquired Omnicare.  Genesis was one of the largest senior housing providers in the country with more than 400 centers across 26 states. Former Employee 5 confirmed that the Company lost homes of many various sizes—some homes had hundreds of residents and some had thirty.  Former Employee 5 recalled that in Omnicare's heyday, it had approximately 30,000 residents across the state.  The facilities were all different types: long-term care, assisted living, independent living, and group homes.  When he left in June 2017, Former Employee 5 estimated that CVS had lost approximately 10,000 beds.

129.    Former Employee 6 was an Account Executive at Omnicare and then Omnicare/CVS in Washington, DC from 2014 to 2019 who managed approximately 70 facilities that were a combination of nursing homes, assisted living, and group homes.  Former Employee 6 reported that Genesis pulled half of its business around 2015.  The three Genesis accounts that Former Employee 6 handled personally were worth about $5 million in annual revenue.  Another larger long-term care provider for which Former Employee 6 was managing some of the accounts, Future Care, similarly pulled its accounts with CVS the same year as the Omnicare acquisition. Former Employee 6 and another account executive each handled half of the approximately 22 Future Care accounts in their region, with each responsible for a total of approximately $25-26 million in annual revenue.  The other account executive's position was eliminated when Future

43

Care left CVS.  He knew about those accounts leaving because in his role, he was the point of contact for anything business-related with the customer.  He explained that the bread and butter of Omnicare was keeping those large chain customers, but they were not satisfied with the level of service they were receiving from CVS.

130.    Former Employee 7, a Sales Coordinator in Ohio from 2013 to July 2018, confirmed that by August 2016, the Company was "losing customers left and right," and the loss of customers was a clear issue.  As a sales coordinator, Former Employee 7 would coordinate with the pricing department, credit department, and legal team to help package everything for the salesperson to present to potential new clients.  Prior to the Omnicare acquisition, there were 30 to 50 new clients per day.  The Company might not win all that business it targeted, but there was a lot coming in, which is why the sales coordinator position was created.  The amount of new business coming in after the Omnicare acquisition was "dramatically different," Former Employee 7 said.  The Company used a client database to store client information called Salesforce.  From there, employees could pull a report to show how much new business was coming in.  Within a year after the Omnicare acquisition, Former Employee 7 said that there was dramatically less new business coming in, and he started working on national accounts coming up for renewal. Specifically, after the Omnicare acquisition, Former Employee 7 worked with Vice President of Business Development Jeremy Colvin and Jeremie Trochu.  Colvin handled all of the national accounts and dealt with all of the larger businesses that were customers of Omnicare.

131.    The prescriptions were also dramatically lower than they had been in three or four years, and revenue was down.  Former Employee 7 recalled that right after the Omnicare acquisition, CVS lost about one-quarter of the Omnicare business and then started losing larger accounts.  By a year after, CVS lost almost half of the business.

132.    Former Employee 7 reported that this was discussed on a weekly and monthly basis with the executive team, including Michael Morgan (Senior Manager of Client Reporting and Analytics), Tim Knoll (Senior Manager, Strategy, Market Intelligence), Jeremy Colvin (Vice President Of Business Development from 2015 to 2018 and Vice President of Sales from 2012 to 2015), Shawn Madden (Senior Director of Sales from 2015 to 2019), Ken Krusling (Director of Operations Finance Corporate Pricing Department), and Paul Brodnicki (Senior Corporate Counsel), as well as all of the sales managers across the country and all the senior sales people in each division.  It was a regular conversation that was had on a weekly basis, said Former Employee 7.  Former Employee 7 also described that during those weekly conversations, the employees drilled down by different regions and national accounts to go over everything that was happening.  He also worked with Ken Krusling, the pricing manager, to figure out why the Company was slashing prices.  He learned that to keep business, the Company was slashing prices all the way to the floor of average wholesale pricing and trying to go as low as possible to keep customers happy, keep customers on, and add business.

133.    Former Employee 8, who worked at the Company for five years, also described the decline in CVS's Long-Term Care business.  He was the Director of Strategic Accounts, a national role, for about six months, until April 2020.  Prior to that, he was the Director of Account Management for about two years for the central region, which included 14 states in the Midwest from Texas up to Minnesota.  Before that, he was the Regional Manager of Senior Living for the West across 2016 and 2017.  And before that, he was a Senior Living Specialist in 2015 and part of 2016.  During his five years, Former Employee 8 reported that he had five managers.  Most recently, he reported to Beth Coryea, the Senior Director of Strategic Accounts.  Prior to that, he reported to Tony Caskey, Vice President of Senior Living for Omnicare from March 2018 to the

present, Vice President of Operations for Omnicare from January 2018 to the present, and an Area Vice President at CVS since June 2015.

134.    Former Employee 8 always held a customer-facing role.  As a "boots on the ground" director-level employee, Former Employee 8 was involved in the collaborative process to figure out how to achieve goals that had been set by CVS corporate, the realization of the total upside, and understanding where CVS had a line of sight.  He was always focused on the senior living business and how to grow the assisted living side of the business.

135.    Former Employee 8 reported that by late 2017, the senior living business went from providing medication to about 160,000 unique residents to about 125,000 residents.  According to Former Employee 8, that decline started in 2016, but it became much more evident in 2017 and remained on a steady decline.  He explained that the senior living business lost customers' business in approximately 1,000-bed chunks.

136.    Former Employee 8 further reported that CVS's skilled nursing facility business lost about 100,000 beds per year for about 4 to 5 years, on average terms.  He thinks the bed loss had to be about 100,000, and that only about 50,000 were added in a year, and therefore CVS was likely negative approximately 50,000 beds year-over-year on the skilled nursing facility side of the long-term care business.  Former Employee 8 stated that the only positive year that he could recall was 2015.

137.    According to Former Employee 8, during Former Employee 8's time at the Company, reports came out weekly at the Company that were accessible by all director-level employees and above, and that were broadcast out to the organization.  The reports were on a SharePoint slide and provided to the C-Suite.  The weekly reports were called a "quarterly outlook," said Former Employee 8, and were updated weekly.  CVS Executive Vice President and

Chief Operating Officer John Roberts would also "definitely" see them. Former Employee 8 described that there were also monthly volume reports and financial impact reports. All of the numbers were in red or had parentheses around them. Furthermore, during his tenure, the Company had "Risk Calls" to address loss forecast over time, including estimations of bed loss. Those calls were happening in 2017, and Former Employee 8 became directly involved in the calls in early 2018. Former Employee 8 reported that he had a call with all of the account executives during which they would go through their entire loss pipeline.

138.    Former Employee 22 reported that Omnicare was experiencing substantial bed loss long before the CVS acquisition, and CVS just made it worse. Former Employee 22 first worked at Omnicare in the early 2000s before leaving in 2004 for a position at one of Omnicare's biggest pharmacy customers; he returned to Omnicare in 2007 when Omnicare purchased the pharmacy. When that occurred, he was promoted to Senior Director of Account Management (and later became Senior Director of Assisted Living), and was placed in charge of key account managers who, in turn, managed Omnicare's assisted living customers. He remained at Omnicare/CVS until April 2018, when he left the Company, feeling that the post-CVS acquisition environment was "toxic."

139.    Former Employee 22 reported that bed loss had always been an issue, but it did improve for a short time during which Omnicare lost only 80,000-90,000 beds a year. Bed loss "creeped back up" (above the 80,000-90,000 bed annual level) following the 2015 CVS acquisition, and subsequently got worse. Former Employee 22 was aware of the continued bed loss because of his role in managing the key accounts for Omnicare's assisted living business.

140.    Former Employee 22 reported a conference call that occurred before the CVS acquisition. Amit Jain, who was the Senior Vice President, Head of Business Operations at

Omnicare from June 2011 through August 2015, held a "punishing" conference call before the transaction was announced; the purpose of this call was to establish a new department to use technology and "other instruments" to get a better sense of the bed loss, including the reasons for bed loss and how big of a risk it was. Omnicare wanted to get a "microscope on bed loss" to "mitigate risk." The blame was placed on customer service as opposed to operational issues, like lack of service and deliveries, which were the real reasons for the bed loss. On the call, Omnicare executives were trying to stop the bed loss. At present, Former Employee 22 believes that Jain and Sahney were questioning how they could sell Omnicare for $12 billion when they were losing beds.

141.    Following that conference call, Omnicare instituted a policy of weekly action plans. All Omnicare facilities were rated by risk of loss on a scale of one to five, with the goal being to have all customers categorized as a one, the lowest risk. In reality, that was not the case. Any facility that "bubbled up" had to be spotlighted, and they had to develop an action plan and report weekly on the progress of the facility. There was a weekly call to go through the action plans for each region and what account managers were doing to mitigate that risk. Former Employee 22 reported that the calls were "very punitive" and were more about assigning blame than actually fixing the customers' concerns because, in reality, the concerns stemmed from poor service. Paul Jacquez, a Vice President of CVS Health/Omnicare who headed the new department designed to address bed loss, received the action plans.

142.    Former Employee 22 knew by the summer of 2017 that the situation at Omnicare was "really going south." Former Employee 22 reported that CVS was not as forthcoming as previous regimes with the bed loss reporting information, it wanted to protect its own and "sanitized the information," although Former Employee 22 was aware of the continued bed loss

48

because of his role in managing the key accounts for Omnicare's assisted living business. The methods CVS chose to fix the bed loss were more about punishing Omnicare than fixing the actual issues at the service level (such as pricing and offerings).

> **(2)    CVS Caused the Customer Losses by Failing to Adequately Perform the Core Long-Term Care Function of Timely Delivering Prescriptions**

143.    The reason CVS suffered significant customer losses was simple: CVS repeatedly failed to perform one of its core functions in the Long-Term Care business—delivering prescriptions to customers in a timely and accurate fashion. Governing regulations generally require that prescriptions be timely delivered to long-term care customers, with the industry practice for emergency deliveries approximately within two to four hours of the placement of the order, as many long-term care patients—including patients with terminal illnesses—depend on their medication schedules and may require refills suddenly or at odd times. Because CVS was used to having customers come to their brick-and-mortar locations in its retail pharmacy business, however, it was unprepared to properly manage the task of delivering prescriptions, sometimes hours away from the nearest CVS pharmacy, and failed to timely deliver prescriptions to long-term care customers on a material scale.

144.    Former Employee 9 was a Back-End Pharmacy Manager of CVS/Omnicare from September 2003 to August 2017 for a hub pharmacy in Missouri that serviced long-term care pharmacies throughout Illinois and Missouri. His pharmacy serviced at least 200 to 300 long-term care facilities. He oversaw technicians who were filling orders, shipping orders, and doing cycle fills. Former Employee 9 reported that substantial staffing reductions caused significant delays in delivering new orders. Former Employee 9 reported that about six months to a year after the Omnicare acquisition, CVS decreased staffing. He explained that, consequently, CVS was seeing a lot more errors, people were rushing and overworked, and there were fewer and fewer

pharmacists; therefore, their workload was more than triple what it normally was. Former Employee 9 saw delays of up to about 7 days to get a new order out to a patient. As a pharmacy manager, he carried a phone 24 hours a day, seven days a week, and would get phone calls and complaints from customers. Because he was at a hub pharmacy, Former Employee 9 had direct relationships with the pharmacy managers at the spoke pharmacies, and he was always trying to brainstorm with them about how to address and correct those issues caused by cuts in staffing.

145.    Former Employee 10, a customer service and assisted living facility manager with a CVS/Omnicare long-term care pharmacy in Maryland from 2016 to July 2018, also reported that medications were not leaving on time. He reported to the General Manager of Pharmacy Operations, a role that changed hands during his tenure. Former Employee 10's pharmacy serviced over 200 senior living facilities and assisted living facilities. Former Employee 10 dealt with the incoming calls that were made to the pharmacy and supervised the call center. Most of the time, those calls were complaints about where the medications were, that they had not arrived within a certain timeframe, or that they were incorrect when they did arrive. He recalled that the biggest complaint was medication not going out on time. "We were flooded with calls because medications were not coming out or they were getting there extremely late," Former Employee 10 said.

146.    The majority of complaint calls were from nursing assistants or nurses at the facility, explained Former Employee 10, but doctors would also call at times to complain, especially when narcotic medications were not going out. Narcotics not going out was a big issue because those are pain medications for people in extreme pain and at the end stage of life. CVS would run out of narcotic medications and just never had enough people at pharmacies to fill the orders.

147.    Former Employee 23 likewise reported that long-term care institutions were not satisfied with the services being provided by CVS, as medications often did not arrive on time. Former Employee 23 worked at Omnicare and subsequently CVS from September 1994 through February 2022, including as a Regional Account Manager from May 2012 to March 2017, and as a Director of Account Management from March 2017 until leaving the Company.  As part of his responsibilities, Former Employee 23 oversaw 40 account managers in 10 states that included California, Nevada, New Mexico, Texas, Nebraska, South Dakota, Indiana, Minnesota, and Kansas.  His team was the go-between between customers and pharmacy services, and handled contract renewals and issue management.  Concerning the failure to timely deliver medication, Former Employee 23 reported, for example, that you could have a patient at an acute hospital and medications would not arrive within the four-hour window or the next day, and refills were not getting to the facility within three days.  These issues were present at Omnicare before the CVS acquisition, and increased afterwards when CVS cut staff.

148.    Not only were medications not being delivered to customers on time, but the medications that were being delivered were highly inaccurate.  According to Former Employee 10, the accuracy of medications delivered worsened over the course of his tenure because employees were being pressured to rush to perform, and to get things out.  By the time he left in July 2018, they would get out, being "generous," 65% of their prescriptions per day accurately. "It was a nightmare," said Former Employee 10.

149.    Former Employee 10 recalled seeing calls about that issue as well.  The majority of the calls were "where is the medication," but the other percentage of calls was that the order was wrong, either the wrong quantity or the wrong medication altogether.  The bottle would say one thing, but there would be a totally different medication inside of it.  The worst issue, in terms of

frequency, was wrong instructions, then wrong strength, and finally wrong drug, based on the calls he received.

150.    Former Employee 10 was also aware that CVS was losing business and customers as a result of those issues, and reported losing between 10 and 15 customers during Former Employee 10's tenure, some of which were chains.  As a manager, he was kept relatively abreast of that because it would fall on the managers if business was lost and a facility terminated its business with the pharmacy.  Moreover, the customer would call Former Employee 10 to cancel. Former Employee 10 explained that CVS would lose chains with multiple locations because a lot of times, the customer would have an assisted living side of a facility and then also have the actual senior living side.  CVS employees would get feedback that they lost business because the medications were not coming and "sadly the patients were suffering," Former Employee 10 explained.  The patients would be waiting days for their medications.  Former Employee 10 reported that over the course of his time, the loss seemed significant.  They were losing facilities pretty regularly.  "Every time we turned around, it was, 'We lost this facility,'" Former Employee 10 said.  "They were dropping like flies there for the last 6-8 months I was the manager," Former Employee 10 recalled.  For the last 6-8 months of his tenure, "we just plummeted," explained Former Employee 10.

151.    As for whether CVS's claim that it would improve patient outcomes and provide enhanced continuity of care to patients and caregivers was true, Former Employee 10 said, "No, absolutely not, that's a lie."  Former Employee 10 reported that he received multiple emails from family members of patients stating that CVS's delay in delivering medications caused further medical complications as patients' original medical needs, like infections requiring antibiotics,

went untreated and spread, especially for elderly patients who were more susceptible to complications.

152.    Former Employee 11 was an Operations Manager, Long-Term Care Logistics from 2016 to 2017, and an Operations Manager at CVS/Omnicare from 2008 to 2016. Former Employee 11 had been in the distribution business for thirty-two years, and said that the low accuracy in filling prescriptions began right after CVS acquired Omnicare. Former Employee 11 explained that immediately after CVS bought Omnicare, it moved to shut down a Toledo, Ohio distribution center and that the distribution center was closed by December 2015. That distribution center had serviced 150 pharmacies that Omnicare had owned. Those pharmacies were transitioned to CVS's distribution centers in Orlando, Florida and Patterson, California. Former Employee 11's responsibilities included helping the various pharmacies that had been served previously from Omnicare's Toledo distribution center deal with the transition and adjustment to the new processes.

153.    Former Employee 11 explained the difficulties that he and the customers encountered. He explained that when dealing with health care facilities like nursing homes, patients check in at night or during all different times, and sometimes their health changes at a moment's notice. Because of that, Former Employee 11 reported that prior to the acquisition, Omnicare had a business agreement where customers could go to a local pharmacy if a patient had an immediate need and the distribution center did not have the medication. Around December 2016, CVS put a stop to that, and customers were no longer able to get that medication from a non-CVS source, like Walgreens or a local pharmacy.

154.    However, CVS's distribution centers were not accurate. The Company claimed to have almost 100% accuracy, but Former Employee 11 found that the accuracy rate was "very low,"

53

sometimes "less than 70%" in 2016 to 2017. Former Employee 11 explained that the lack of accuracy was rooted in CVS's Patterson, California and Orlando, Florida distribution centers, which he described as the "big box" that shipped medications to the "smaller box" distributing facilities, which then shipped the medications to the pharmacies. Former Employee 11 recounted that Miami, Fort Wayne, and another "smaller box" distributing facility in Florida received improper medications through those inaccurate deliveries. He knew because he performed audits on those facilities and attended meetings all the time to discuss the audit findings. Reading from notes from a September 20, 2016 meeting, Former Employee 11 said those facilities received "partial volumes" or "half of what they needed." Under CVS's changed policy, patients with immediate needs could not go elsewhere when CVS's distribution centers sent inaccurate medications to the pharmacies.

155.    Similarly, Former Employee 12, a Pharmacy Manager for Omnicare in Massachusetts from July 2014 to May 2017, recounted that the Company routinely failed to deliver prescriptions on time, and that was unacceptable service for the population they served.

156.    About 90% of the customers Former Employee 12's pharmacy served were skilled long-term care patients. A lot of those patients needed things right away and it would take days to get a prescription refilled. Former Employee 12 explained that one of the main reasons service was so poor was that CVS did not have enough people to do data entry. CVS was famous for cutting hours, Former Employee 12 said. According to Former Employee 12, after CVS took over and started to do more hands-on management, CVS started to change things like the courier and document imaging system that Omnicare had previously used. That resulted in computer issues and delays. At that time, the pharmacies were not allowed to hire any more technicians, so the data entry staff was slim, which meant the work was not getting done, resulting in major delays.

157.    Former Employee 12 explained that as a result of customer service being really bad, long-term care facilities started making inquiries into the length of their contracts and how to get out of their contracts as early as March 2017.  Upper management knew they were losing business, according to Former Employee 12, because there were national accounts, including Genesis and Brookdale, that would skip him and the General Manager and go right to Omnicare corporate. Former Employee 12 recalled that spring 2017 was when things got really bad.  Before that "bleeding" began, his pharmacy serviced 155 facilities.  By the time Former Employee 12 left, in May 2017, he estimated that CVS had lost 25% of the business.

158.    Former Employee 8 also described that CVS was losing customers due to service issues.  Customer loss is always due to a service issue, explained Former Employee 8.  A change in pharmacy is difficult; thus, customers do not leave on a whim.  They leave because they cannot get their medications.  He explained that CVS butchered the payroll in 2017, resulting in fewer pharmacists and pharmacy technicians, and also cut pharmacists' hours.  CVS brought the staffing levels down to what a retail pharmacy looked like, according to Former Employee 8.

159.    When asked if CVS was adequately prepared to oversee the newly formed long-term care operation, Former Employee 8 replied, "God no"; "absolutely not."  The Company could not get the medications out the door.

160.    Former Employee 7 also reported that many customers complained about drug delays caused by lack of staffing and not enough staff in the field.  He started hearing about that issue in spring 2016, and he would get on calls and interface with account management, sales teams, and customers.  By winter 2016, there had been many price cuts and customer losses.  He provided examples of delays, including when customers would ask for stat delivery, which was

supposed to arrive within 1 to 2 hours and would take 3 to 5 hours, or a service that offered 24-hour turnaround would take longer.

161.    And Former Employee 13, a General Manager for the Company in Maryland from 2014 to August 2017, recounted that by 2017, "it started to become really intense and we were losing more customers than we had been previously."  Former Employee 13 first reported to Bill Deane (Vice President, Pharmacy Operations, 2012 to 2018) who in turn reported to Rocky Kraft, and then Former Employee 13 reported to Hill Hopper (General Manager, Maryland and Virginia) who in turn reported to Deane.

162.    During his time as General Manager, Former Employee 13 noticed an increase in unsatisfied customers.  Concerns from customers were "always service-related," he explained. There were not enough people available to do the volume of work.  As a result, customers were not getting their medications when they were accustomed to or when they believed they should be. He explained that there were cutoff times by which to place the orders to get a certain delivery slot.  For instance, if there were a cutoff time of noon for the 8:00 PM delivery slot, the 8:00 PM delivery would get to a customer at a certain time, depending on their location along the delivery route and such.  If customer A was used to receiving that 8:00 PM delivery around 10:00 to 11:00 PM, as things started to "spiral," that customer may not receive that same delivery until 8:00 AM the next day.  The delays in customers receiving medication could be anywhere from 12 to 24 hours, depending on when the order was sent in.  Former Employee 13 said that there were always conversations with management about the need to increase their staffing.

163.    Former Employee 13 reported that in Annapolis Junction specifically, there was a period of stability and then a period where "it seemed like the bottom fell out of the ship," which

according to Former Employee 13 was caused by a failure of the Company at a larger scale to understand the staffing needs of the pharmacy.

164.    Former Employee 13 further confirmed that, along with the bottom falling out of the ship in 2017, there was a new increase in the frequency of conference calls, and increased reporting tied to finances and expenses of staffing, particularly from May 2017 until he left in August 2017.  He was informed of that increased reporting on a conference call led by Deane (who was filling in for Hopper), which included all of the General Managers, whoever reported to Deane, and the direct reports to those who reported to Deane.  As part of this increased reporting, Former Employee 13 had to report new business and note if he was expecting any "terms," meaning either a contract coming up for renewal, or any concerns that a contract would not be renewed or that customers were unsatisfied and may "term" early, every week instead of maybe once every two weeks.

165.    Former Employee 13 knew that the Company was losing more customers than it had been losing previously by the level of intensity in the meetings and at the Company at that time.  When they ramped up the frequency of the calls about whether they thought they were going to lose any customers, the Company had more people participate in the calls than had previously. The account specialist people became part of the calls, whereas previously it had been just the finance person, the General Manager, and the person to whom the General Manager reported. "The level of intensity was just so great," explained Former Employee 13.  By May 2017, there was "a nonstop sense of intensity" and a "sense of impending doom that was coming all the time," said Former Employee 13.

166.    Finally, Former Employee 5 also confirmed that many customer losses in Connecticut were caused by customer service issues.  Former Employee 5 explained that facilities

were frustrated because they were dealing with a lesser amount of service from CVS than had been provided by Omnicare.  He recalled that CVS was using a third-party courier to make the deliveries and that the third-party courier was not as invested in providing the kind of customer service that Omnicare had previously provided.  Former Employee 5 confirmed that deliveries were getting there later than what was needed.  "All the elements of good customer service were slowly disappearing," said Former Employee 5.

(3)    **CVS Slashed Its Long-Term Care Work Force, Further Impairing Its Ability to Operate Successfully**

167.    After acquiring Omnicare, CVS made massive changes in personnel that contributed to the service problems noted above.  For example, NBC 10 reported on November 3, 2016 that CVS had a "massive layoff," cutting 600 positions in Rhode Island, Illinois, and Arizona, including the accounts payable department, risk department, I-Team, and general management positions at Omnicare.  The report also noted that CVS had cut 230 employees from Omnicare's corporate headquarters in Cincinnati in late 2015.  By late 2015 and into early 2016, CVS had gutted the entire Omnicare management team and other personnel, including Omnicare's President and CEO, Nitin Sahney, who left the Company in August 2015.  By early 2017, many of the legacy Omnicare management team founded a new company, PharmaCord LLC.

168.    Part of the turnover in Omnicare's legacy management team was Rocky Kraft, Omnicare's President, who was removed in September 2017.  For the three years leading up to the Omnicare acquisition, Kraft had been the Senior Vice President and Chief Financial Officer of Omnicare and then stayed on at CVS as an Executive Vice President and the President of CVS's long-term care group (Omnicare).

169.    Former employees corroborated that between the Omnicare acquisition and the Aetna acquisition, CVS significantly reduced its long-term care workforce in order to save costs

and appear more profitable, while the Company's ability to successfully operate its long-term care business dwindled.  For example, as detailed above, Former Employee 1 said, "they gutted our pharmacies" and "gutted them all for this purpose of goodwill heading off," and called it driving synergies.  And Former Employee 2 reported that CVS had a massive layoff of Omnicare employees within six months of the acquisition, causing CVS to lose the Omnicare knowledge base in the Long-Term Care business.  Former Employee 2 further reported that by the last year of his tenure, mid-2017 to 2018, he had to lay off pharmacists because of a loss of business.

170.    Similarly, Former Employee 7 said that after the Omnicare acquisition took place, hundreds of employees lost their jobs.  He said that CVS wiped out the account management team after the acquisition, reducing the account management team from around 300 people to about 50. The company lost customers left and right because the account management team was completely gone, said Former Employee 7.  The account executives who remained had their territories vastly expanded to different geographic regions, yet the Company expected them to keep business, which was "absurd," according to Former Employee 7.  The people who remained could not physically keep up with all the facilities.

171.    Former Employee 14, a CVS/Omnicare Strategic Account Executive in South Carolina between September 2012 and June 2018, likewise recalled that, sometime in 2016, CVS started downsizing account executives.  He was on a call during which CVS announced that it had just terminated another group of employees of around 100 to 150 people.

172.    And Former Employee 7 also worked with a lot of the senior salespeople and senior executives and was shocked to see a lot of them leaving.  Every couple of months a new executive would leave the Company.  In addition, nearly the entire senior executive team had left the Company by the end of 2016.  He recalled that in May 2016, Jeremie Trochu hosted a huge sales

meeting in Denver, Colorado, which had never been done before, and everyone across the country was there.  The Company was trying to rally everyone to do better, win accounts, and try harder with community outreach.  Three months later, however, as Former Employee 7 explained, Trochu and many people on his team left the Company, too.  The entire executive team was gone within months of that meeting, recalled Former Employee 7.  Reporting then funneled to CVS's upper management.

> ### (4)   As Many of the Company's Largest Long-Term Care Customers Left, Several Took Their Business to Competitors Started by Former CVS/Omnicare Employees

173.   The largescale departure of seasoned Omnicare executives not only harmed CVS's ability to properly service its long-term care customers, but also exacerbated that customer flight in other ways.  CVS's lost long-term care customers were quick to enter into business relationships with competitors spearheaded by former senior Omnicare executives who left the Company before and after the Omnicare acquisition.  For example, Former Employee 3 reported that a lot of former Omnicare employees left CVS and went to competitors.  Especially in Florida, those former Omnicare employees at competitors took customers from CVS/Omnicare.  Former Employee 3 recalled that Polaris RX was a strong competitor that was opened by the former district director/general manager of two of Omnicare's biggest pharmacies.  Polaris had taken a pretty large chunk of business from CVS/Omnicare.  Former Employee 3 said that most of the competitors in the area were all "refugees from Omnicare," including ex-employees with relationships and a lot of credibility with those customers.

174.   Former Employee 3 noted that at least five people at the Polaris RX pharmacy in Florida had at one point been the senior management for Omnicare—the CEO, two VPs, a pharmacy manager, and a regional compliance manager.  Former Employee 3 also recalled that

there had been a "continued effort to go after the business that Omnicare had" after the acquisition; in fact, maybe even more so after the acquisition because Polaris RX sensed that Omnicare was vulnerable.

175.    Former Employee 3 recalled specific accounts lost to those competitors. Omnicare lost the business of Hebrew Homes in South Florida, which Former Employee 3 reported owned four to five large nursing homes. Ultimately, Hebrew Homes went to Polaris; in fact, it was the basis of Polaris's business initially. Omnicare also lost a lot of business from Brookdale Senior Living, a large assisted living company, in the 2016-to-2017 time period. According to Former Employee 3, Omnicare lost a lot of smaller chains in Florida that had 200-300 bed nursing homes.

176.    Former Employee 8 also explained that former Omnicare employees started competing businesses and took customers. Former Employee 8 reported that this issue started in 2016 and got significantly worse over time. Part of it was that customers had a relationship with the former CVS employees, so the customers went with the employees, explained Former Employee 8.

177.    Former Employee 8 further explained that Remedi, a company of former Omnicare employees, got a lot of the Omnicare business; "they are just killing Omnicare," noted Former Employee 8. Nearly the entire PharMerica executive team was former Omnicare employees, and Guardian Pharmacy was "covered with Omnicare," said Former Employee 8. He recalled that both of those competitors took business. CVS got "out-serviced," explained Former Employee 8. Former Employee 8 said that CVS would fire and lay off people who were tenured and who knew the business, and then bring in people from CVS who had no clue about long-term care. That practice started picking up speed in 2017. "I would say there was a fundamental shift occurring through 2017," said Former Employee 8, whereas previously, in 2015 and 2016, CVS was "really

hands off" and just let the Omnicare business run.  As a result, all the relationships left and all of the knowledge to run the business left.

> **(5)    CVS  Purchased  Additional  Long-Term  Care Pharmacies, But Rapidly Lost Those Pharmacies' Customers**

178.    To compensate for the significant loss of customers and resulting revenue erosion, CVS sought to purchase additional long-term care pharmacies to maintain its market share and the appearance of present and future growth.  Former Employee 15, a Consultant Pharmacist at the Company in Utah from December 2016 to March 2018, reported that the Company was acquiring long-term care pharmacies because it wanted a larger market share and fewer competitors, but the acquisitions were not successful the whole time he was with the Company.  In his role, Former Employee 15 reported to Former Employee 2 and visited several facilities every month, covering 300 miles from St. George to Salt Lake City, including skilled nursing facilities and assisted living facilities.

179.    Former Employee 15 reported that CVS purchased the pharmacy for which he had worked around November 2016 as part of a $50 million acquisition from Senior Care Pharmacy, which was based out of Alabama but had pharmacies in Utah, California, and other states.  Within six to eight months of purchasing the Senior Care pharmacies, around May 2017, the Company bought another pharmacy, Pioneer Pharmacy, for he believes between $40-50 million based on its size.  Former Employee 15 said that the Company lost between 70% to 80% of the Pioneer Pharmacy businesses within a year of buying them.  The only customer that stayed with Senior Care was Avalon.  In fact, Former Employee 15 was told that he would also be going to four different facilities from the Pioneer Pharmacy purchase; however, he never ended up going to any of them because the Company lost the business.  His two counterparts had similar situations with Pioneer Pharmacies.  "They were just bleeding out almost as quickly as they were coming in," said

Former Employee 15 in reference to customers defaulting on contracts. From Former Employee 15's perspective, the acquisitions allowed the Company to show growth, but that growth was not sustainable in any way.

180.    Other former CVS employees have corroborated Former Employee 15's account, reporting both that CVS rapidly acquired smaller, local long-term care pharmacies after its acquisition of Omnicare, and that those pharmacies often lost a majority of their pre-CVS customer base soon after CVS acquired them. For example, Former Employee 16 reported that CVS was trying to grow the Long-Term Care business via acquisitions but was having issues retaining customers. Former Employee 16 was a Pricing Specialist at CVS/Omnicare from 2014 to 2016 and then a Senior Pricing Reporting Coordinator at CVS/Omnicare in Ohio from 2017 to 2019. He reported to the director of the department, Ken Krusling. After the Omnicare acquisition, Former Employee 16 personally managed CVS's acquisition process from a pricing perspective when CVS was looking at acquiring other long-term care pharmacies, including reviewing and analyzing contracts that CVS would receive as part of the acquisitions. Former Employee 16 worked with the Company's legal team, deal team, acquisition team, and pricing analysis team on close to 15 to 20 acquisitions, which Former Employee 16 believes was the majority of the long-term care acquisitions that occurred after CVS's acquisition of Omnicare. Former Employee 16 said that with some of the deals, the retention was 20% or 30%, while CVS was expecting it to be around 75%, 80%, 90%.

181.    Former Employee 16 also recalled specific acquisitions in 2017, listing one in July, three in September, and one in October in California, "which was a mess," according to Former Employee 16. The acquisition in California was expensive and one of the worst deals CVS did, and the retention for that acquisition was 10% to 15%, "if not lower," said Former Employee 16.

Former Employee 16 further explained that with the California acquisition, CVS used so many of its resources that it actually took away from the existing business and led to retention issues with existing customers.  He described it as "a double whammy."

182.    Similarly, Former Employee 2 reported that, about 1.5 years after the Omnicare acquisition, CVS, realizing it was losing customers and money, went into acquisition mode and started buying long-term care pharmacies.  Former Employee 2 recalled that CVS purchased a huge pharmacy in California but lost 80% of the contracts within six months.  Former Employee 2 was on calls where "the word disaster was used" to describe that "disastrous acquisition."  The acquisition was part of Former Employee 2's regional team even though it was not under Former Employee 2's responsibility.  Former Employee 2 thinks CVS purchased that pharmacy in the first half of 2017.  There was another acquisition at the tail end of 2017, again not in one of Former Employee 2's states but part of Former Employee 2's region.  That pharmacy had locations in Oklahoma and Louisiana.  CVS probably lost 50% of that pharmacy's business within the first six months or so of purchasing it.

183.    The calls that Former Employee 2 was on discussing those acquisitions were led by Alan Bell, the senior clinical director.  Periodically, Former Employee 2 and all of the regional clinical managers and senior clinical directors would be on a call with Gary Erwin.  Erwin would give them a business update and bring up the poor retention rates.  As for why the Company continued to acquire pharmacies when the acquisitions were not successful, Former Employee 2 said, "It was communicated to us that we were losing so much business that they were trying to save grace, just trying to stop the bleed."  Bell told them that, Former Employee 2 reported.

184.    Former Employee 17 was an accounting analyst at CVS's headquarters in Rhode Island from March 2016 to November 2019.  Former Employee 17 worked in the revenue

department, tracked gross margin and revenue for all of the separate acquisitions Omnicare made, and specifically dealt with long-term care companies that could not pay their accounts receivable. Former Employee 17 stated that when looking at the accounts receivable once CVS acquired those pharmacies, a lot of the accounts receivable were uncollectible, and consequently a lot of adjustments had to be booked. He described, for example, that Martin Pharmacy had $5 million of uncollectible receivables, and Merwin had $2 million in uncollectible receivables. When Former Employee 17 left the Company, CVS still had not collected those receivables. Martin and Merwin were each valued at about $9-10 million in revenue.

185.    Former Employee 18, a CVS/Omnicare Long-Term Care Pharmacist Consultant from 2007 to July 2018, reported a similar story. He was part of a team of pharmacists that went out into the long-term care facilities, including nursing homes, assisted living, and group homes, to service them and help them stay in compliance. His team would also do clinical reviews of the patients' medicine and help out if patients were falling, losing weight, or having side effects. He was essentially a clinical person provided by the pharmacy to the long-term care facility. Former Employee 18 specifically worked with around 15 facilities at a time, and he probably worked with close to 30 different facilities over the course of his tenure. Former Employee 18 reported that the Company bought a facility in the north Chicago suburbs and took over all of their patients in either 2016 or 2017. That pharmacy serviced a really big customer, Aperion Care, which left. Within a few months of the acquisition, CVS had lost all of the Aperion Care patients, which represented around 9,000 beds. CVS had the customer for only about a quarter, Former Employee 18 recalled.

186.    And Former Employee 3 recalled that CVS did a lot of acquisitions of long-term care pharmacies in the first year or two after CVS acquired Omnicare. Most of those were poor acquisitions, and Omnicare employees knew that the Company was not going to retain the

business.  Specifically, Former Employee 3 discussed three pharmacies that the Company acquired after CVS bought Omnicare, and how 90% of that business ultimately went away.  There was one pharmacy in particular that CVS acquired that Former Employee 3 told his supervisors was going to be a poor acquisition, and that they would lose 85% to 90% of that business.  Former Employee 3 told the person in charge of acquisitions at Omnicare, Adam Waltzer, and his boss at the time, Bill Deane, Vice President of Pharmacy Operations, that the business would not stay.  Former Employee 3 explained that he sent Deane a spreadsheet that said, these are the relationships and these are the ones we are likely to lose.  Former Employee 3 reported that his boss, Deane, agreed with his expressed concerns.  However, CVS bought the pharmacy anyway in 2017.  Former Employee 3's prediction came to fruition, as the Company lost about 90% of the business within the first three to six months.

187.    Former Employee 3 also described a poor acquisition in California.  He said it was a very similar situation to Florida.  CVS purchased the pharmacy and had attrition "very, very quickly."

188.    Former Employee 19 was a General Manager for Omnicare in Florida from March 2011 to November 2018.  Omnicare acquired American Pharmacy in 2002, at which Former Employee 19 had worked, and eventually, after several combinations with other pharmacies, Former Employee 19 began running the hub for the state of Florida for Omnicare.  According to Former Employee 19, of the pharmacies the Company acquired, it kept probably less than 10% of the business.  A friend of Former Employee 19's who was a CVS/Omnicare Vice President in California told Former Employee 19 that the Company bought a long-term care pharmacy there and lost 90% of the business.  Like Former Employee 15, Former Employee 19 identified Senior Care Pharmacy as one pharmacy that CVS bought and did not keep almost any of the business.

66

189.    Former Employee 19 also recalled that Cross Homes was an acquisition in the second half of 2017, and Former Employee 19 believes CVS lost roughly six homes with around 100 beds total on day one.  CVS lost around 13 or 14 Greystone facilities after acquiring Greystone in 2017.  Sarasota Pines was another acquisition in late 2016 or early 2017 in which CVS lost all the business immediately.

190.    Former Employee 19 also said that CVS did most of the acquisitions on an accelerated time schedule because it wanted those beds to show on its books.  CVS would pay six times the earnings of the pharmacy, and then only be able to keep the customers for 60 or 90 days before the customers canceled.  He recalled that in 2016 or 2017, CVS decided to move Vanguard Pharmacy, which serviced around 185 assisted living facilities, to the Tampa operation at the same time it acquired either Senior Care or Rxperts.  According to Former Employee 19, there was no way CVS was going to be able to do both transactions at the same time.  The timing was based on the end of a reporting quarter.  CVS always did the acquisitions in a manner to make sure that executives could get on the call with shareholders and say that CVS was making that line of business more profitable, said Former Employee 19.  Former Employee 19 confirmed that these acquisitions were happening at an accelerated pace in 2016 to 2017, and then within 60 to 90 days of the acquisition most of the customers would leave.

191.    As explained directly below, while customers were leaving Omnicare/CVS in droves, it was simultaneously mired in government scrutiny into illegal "rollover" billing practices.  Those practices existed at Omnicare before CVS's acquisition, and persisted after the acquisition despite an ongoing government investigation.  Those illegal billing practices represented a material portion of long-term care revenue, and their cessation—which the law required—was certain to have a material negative impact on the business.

67

**b.** **Omnicare and CVS Engaged in Widespread Illegal "Rollover" Practices, Which Was Another Red Flag of Impairment**

192.    The United States Department of Justice and numerous state attorneys general have alleged that, before and after CVS's acquisition of Omnicare, Omnicare engaged in improper billing to Medicare, Medicaid, and TRICARE (the United States' military's health care system). Specifically, Omnicare regularly disbursed (and sought reimbursement for) medications to thousands of residential long-term care facilities, including assisted living and skilled nursing facilities, without valid prescriptions from an overseeing medical professional.

193.    On June 1, 2015, 29 states and the District of Columbia, alongside relator (and former Omnicare pharmacist) Uri Bassan, sued Omnicare in a *qui tam* action for violating the Federal False Claims Act, and state and local false claims acts, by seeking reimbursement for drugs illegally delivered to patients in Omnicare's assisted living and skilled nursing facility clients.  On December 13, 2019, the original complaint was unsealed, and four days later, on December 17, 2019, the Department of Justice intervened in the matter on behalf of the United States and filed its complaint (the "*Bassan* complaint") under the False Claims Act.

194.    Both complaints allege that between 2010 and 2018, Omnicare illegally billed federal health care programs for drug sales not authorized by a medical professional, which violated federal and state regulations.  Based on an investigation, the Department of Justice and the state attorneys general allege that, rather than obtaining a new prescription after an old one had expired or run out of refills, Omnicare would assign a new number to the old prescription and keep on dispensing the medication as if a new prescription had been obtained.  That illegal process is called a "rollover."

195.    By way of background, the *Bassan* complaint alleges that Omnicare used two different computer systems to record and track information on prescriptions and dispensations,

OmniDX and Oasis, with approximately 60% of Omnicare pharmacies using the OmniDX dispensing system, and the remainder using the Oasis dispensing system. Improper rollovers occurred from both systems. In addition, Omnicare had two different dispensing protocols: (1) "demand" dispensing, under which a pharmacy would refill a prescription only upon request from a facility, and (2) a "cycle fill system," under which dispensations would be scheduled to occur on a regular, predetermined timetable, at which point the pharmacy would refill all drugs for multiple residents of a facility, all on the same day. Most of the facilities that received medications via the cycle fill program were assisted living communities.

196.    Omnicare's rollover practice (and its impact on the performance of the Long-Term Care business) was substantial and occurred in numerous states. According to the *Bassan* complaint, those illegal rollovers affected at least 3,200 residential facilities that Omnicare/CVS serviced. The *Bassan* complaint includes attachments listing 1,256 assisted living and other residential facilities across 33 different states and Washington, D.C. that had those illegal rollovers through OmniDX; 510 unskilled residential facilities across 15 different states that had illegal rollovers through Oasis; and 1,476 assisted living facilities that received illegal rollovers through the cycle fill system on OmniDX. Those lists were provided by Omnicare to the government. The *Bassan* complaint also attached exhibits detailing over 4,000 specific false claims submitted from various Omnicare facilities.

197.    As the *Bassan* complaint details, the practice was long-lasting and exposed Omnicare to financial risks for many years. Indeed, in 2012, Omnicare paid $50 million to settle Department of Justice claims that Omnicare's pharmacies had dispensed controlled substances to long-term care patients across the country without proper prescriptions. The *Bassan* complaint also lists eight other lawsuits and government investigations under the False Claims Act for

unlawful pharmacy practices (some broader than the illegal rollover practices) that resulted in major fines, totaling $337,270,000 in settlements that Omnicare paid between 2006 and 2017.

198.    In addition, years before CVS's Omnicare acquisition, several state regulatory authorities notified Omnicare of its non-compliance with governing Medicaid and Medicare reimbursement regulations due to the rollover issue.  There have been investigations by the Utah Division of Occupational and Professional Licensing in 2012; Missouri Board of Pharmacy in 2014; Ohio Board of Pharmacy in 2014; and New Mexico Board of Pharmacy in 2015.

199.    Omnicare's compliance team was aware of the magnitude and risk posed by the rollover issue as early as 2012, according to the *Bassan* complaint.  The *Bassan* complaint alleges that internal audits found that Omnicare pharmacies often lacked valid prescriptions to support drug dispensations.  For example, as detailed in the *Bassan* complaint, a 2012 draft report summarizing an Omnicare audit of pharmacy processes and controls in South Carolina reported a "recurring issue" identified in multiple operational audits that year: "Renewal physician orders are not consistently obtained due to the lack of an automated process to prevent the pharmacy from dispensing an order beyond 12 months."  That draft report was circulated to several compliance officers, including Omnicare's Chief Compliance Officer, who did not correct the problem.  The *Bassan* complaint details similar internal audit reports with the same findings in Pennsylvania in 2012 and 2013, the results of which were forwarded by Omnicare's Chief Audit Officer to the Chief Compliance Officer.

200.    That information was known by CVS by the time the Company issued the Offering Documents.  CVS represented that it performed due diligence in connection with the Omnicare acquisition, through which it would have had access to information about the numerous investigations into illegal billing practices and any related actual or potential claims that Omnicare

faced.  For example, in Omnicare's 2015 Definitive Proxy issued in connection with the Omnicare

acquisition, the Company stated that Omnicare had "granted [CVS] access to preliminary

information regarding Omnicare's business, management and prospects and to a virtual data room

that contained non-public legal, financial and operations-related due diligence materials of

Omnicare.  Throughout the strategic alternatives review process until the execution of the merger

agreement, the virtual data room was continually updated with new information, including

information requested by CVS and the other parties."

201.    Further, as the *Bassan* complaint alleges, shortly after CVS agreed to acquire

Omnicare in May 2015, CVS managers became aware that Omnicare pharmacies were "rolling

over" prescriptions without valid authorization.  CVS assumed control over Omnicare's

Operations and Compliance departments, overseeing Omnicare pharmacy dispensing practices,

policies, and systems.  CVS was notified that Omnicare pharmacies were dispensing drugs to

residents of assisted living facilities and other residential facilities without valid prescriptions.

202.    *First*, as the *Bassan* complaint alleges, CVS and Omnicare Operations and

Compliance managers discussed Omnicare's practice of "rolling over" prescriptions for drugs

dispensed to residents of assisted living and other residential facilities.  For example, the *Bassan*

complaint describes an October 2015 email in which Omnicare's Senior Director of Operations

circulated a list of "OPS and Compliance Priorities," including the need to modify Oasis to ensure

that "orders assigned to [assisted living facility] patients" did not roll over "[w]hen refilling an

order that has reached the RX # expiration days."  Still later, in a February 2016 draft sales

memorandum sent to Omnicare and CVS operations managers to identify "Rx Renewal

Improvements Supporting [Assisted Living Facility] Growth," Omnicare management again

acknowledged that "both OmniDX and OASIS have significant gaps in automatically detecting

and reviewing expiring [prescriptions] in the variety of processing areas where the last fill can be detected."

203.    *Second*, Omnicare staff alerted management that Omnicare's computer systems "rolled over" prescription drugs dispensed to residents of assisted living and other residential facilities, as alleged in the *Bassan* complaint.  For example, in October 2015 (after the Omnicare acquisition), a Maryland pharmacy manager alerted a Senior Manager in Omnicare's Operations Department that "refills [for assisted living facility residents] are going through without available refills and the [internal prescription number] is changed."  The pharmacy manager gave as an example an assisted living facility resident with a prescription for medication for glaucoma and hypertension in the eye "with zero refills," but noted that "[t]he facility attempted a refill and the refill went through but generated a new [prescription number]."  In response, after learning that the entire assisted living facility was set up not to require refills, the Senior Manager in Omnicare's Operations Department wrote, "I imagine the scope of [the rollover issue] is huge."

204.    *Third*, the *Bassan* complaint details that residential facilities alerted Omnicare that its pharmacies dispensed drugs without valid prescriptions.  For example, in February 2016 (after CVS acquired Omnicare), an assisted living facility in Utah complained when it learned that, every month, Omnicare of Salt Lake City was dispensing approximately 200 drugs using the cycle fill program even though the prescriptions for the 200 drugs had expired.  When a pharmacy technician asked how that happened, his supervisor acknowledged that Omnicare's computer systems did not track prescription expiration dates, and instead "rolled over" prescriptions so the pharmacy could continue dispensing.  The pharmacy technician suggested querying the OmniDX system to identify other prescriptions that were being filled based on stale prescriptions, but pharmacy management refused to do so.

205.    *Fourth*, the *Bassan* complaint further describes several third-party audits of Omnicare's operations that showed that a significant percentage of the prescriptions Omnicare filled in its assisted living facilities failed to provide adequate authorization.  Omnicare Operations and Compliance managers were copied on the audit findings.  For example, almost 55% of Medicare D claims made by Omnicare of Albuquerque from August 2014 to August 2015 were found to contain deficiencies.  In July 2015, Omnicare of Atlanta was found to have "failed to provide valid, signed Physician Orders for 43% of the claims requested in the sample," according to the *Bassan* complaint.  Finally, in December 2015, Omnicare of Nacogdoches (Texas) was found to have "failed to provide valid, signed Physician Orders for 52% of the claims requested in the sample," according to the *Bassan* complaint.

206.    *Fifth*, the *Bassan* complaint also alleges that, in 2017, CVS conducted an audit of Omnicare's revenue process, which identified instances where the signed cycle fill authorization form had not been obtained by pharmacies.  As a result of that audit, CVS's Chief Audit Executive directed management to "design and implement a monitoring program to assess pharmacy compliance with required refill authorizations."

207.    Despite the severity of the issue and the information available to CVS about it, the *Bassan* complaint alleges that Defendants did not begin to take appropriate corrective actions until the Company became aware of the government's investigation (after the Omnicare acquisition).  In late 2015 and into 2016, the Company finally revised its OmniDX drug tracking software to "turn[] off" rollovers at assisted living facilities, and significantly increased its oversight of OmniDX; in May 2016, Omnicare finally changed OmniDX to prevent cycle fill medications from rolling over for retirement facilities; and in December 2016, the Company altered OmniDX to stop rollovers from being the default at unskilled facilities.

208.    The Company did not reconfigure its other Omnicare prescription tracking software, Oasis, until early 2018.  The fact that Oasis was still allowing illegal rollovers was known by CVS before the Offering Documents were issued and before the shareholder vote on the Aetna acquisition in March 2018.  The *Bassan* complaint alleges that in a September 2017 email, CVS's Senior Director of Internal Operations-Long-Term Care sent an internal email to an Information Technology Director that asked, "What will it take to repeat the process" of preventing assisted living facility rollovers for Oasis.  Moreover, in early 2018, Omnicare conducted a survey of all Oasis pharmacies to determine how often unskilled facilities were set up correctly according to state regulations governing prescriptions for unskilled facilities.  A January 2018 email describing the internal review reported that "[a]udits have identified facility set up issues which are allowing orders to continue in perpetuity," according to allegations in the *Bassan* complaint.

209.    Based on the responses provided by Omnicare's own pharmacists, the *Bassan* complaint alleges that the Company concluded in early 2018 that the 510 unskilled facilities identified in the *Bassan* complaint had been set up in the Oasis system "to not track refills/total prescribed quantity for hundreds of Residential Facilities," evidence that "Omnicare's own head pharmacists acknowledged that its computerized dispensing system" was set up to allow prescriptions to be refilled "in perpetuity."

210.    On March 19, 2021, the U.S. District Court for the Southern District of New York denied Omnicare's and CVS's motions to dismiss both complaints, and discovery in the action is underway.  *See United States ex rel. Bassan v. Omnicare, Inc.*, 2021 WL 1063784 (S.D.N.Y. Mar. 19, 2021).  Among other things, that court concluded that the *Bassan* complaint "outlines specific conduct observed by Omnicare employees, including how Omnicare consistently failed to distinguish between [skilled nursing facilities] and unskilled facilities in processing orders at

74

pharmacies using both the Oasis and OmniDX systems, and how the 'cycle fill' option was abused at specific locations." *Id*. at \*10.  Further, the court rejected defendants' argument that the *Bassan* complaint failed to plead that defendants "knowingly" submitted false claims for reimbursement, as:

> The complaint states numerous times that Omnicare and CVS executives knew that they could not dispense drugs without valid prescriptions, that they knew many of their facilities did so anyways, [and] that this conduct continued even after they were alerted to that fact.  Omnicare officials would have been informed about these violations as a result of multiple internal and third-party audits that occurred periodically at locations across the country.  They also knew of them because numerous state boards of pharmacy conducted investigations that found that Omnicare facilities were not in compliance with state law regarding dispensations.  Nevertheless, Omnicare—and CVS after it took over—continued submitting claims knowing that their dispensations were illegal.

*Id.* at \*11.

211.    The *Bassan* court sustained claims against both Omnicare and CVS.  In a section of its opinion denying CVS's motion to dismiss and rejecting CVS's arguments that it did not directly participate in the illegal rollover practices, the court concluded that "[t]he government specifically alleged CVS's involvement in the scheme after it took over Omnicare's operations and compliance," which was "enough to state a claim that CVS is liable."  *Id*. at \*14.

212.    The *Bassan* matter has proceeded into discovery, which has included ample documents and testimonial evidence apparently relevant to Defendants' illegal prescription rollover practices.  According to a September 30, 2022 letter to the Court from Omnicare's counsel at the law firm Williams & Connolly, the *Bassan* defendants produced 162,116 pages of documents and deposition testimony from ten witnesses to the government during the course of the government's investigation, and in discovery, defendants "produced another 919,217 pages of documents to date and have agreed to review the emails of 30 custodians, produce local-pharmacy

documents from 10 pharmacies, and give corporate testimony on behalf of 3 more pharmacies." *United States ex rel. Bassan v. Omnicare, Inc.*, No. 1:15-cv-04179-CM (S.D.N.Y.), ECF No. 134.

213.    The reports of former employees corroborate the facts set forth in the *Bassan* complaint.  Former Employee 2 reported that Omnicare was rolling over and auto-renewing expired prescriptions or prescriptions that ran out of refills.  Former Employee 2 first saw that happening around 2015.  It was occurring in New Mexico, and the Pharmacist in Charge there, Uri Bassan—the relator who went on to file the *qui tam* action discussed above—spoke to Former Employee 2 about his concerns.  In New Mexico, the instruction to engage in the practice came from higher-ups in the Company, and the directive was given to Bassan when he posed his concerns to his immediate supervisor.  His immediate supervisor escalated it, and it came back down that Bassan needed to continue filling those prescriptions.  Former Employee 2 told Bassan to escalate it up his chain of command.  Bassan went to the New Mexico Board of Pharmacy with his complaints.

214.    Former Employee 2 said that this practice was happening at Omnicare of Phoenix as well.  In Phoenix, Former Employee 2 had heard from some of the technicians that when they had a customer on the line, and a patient had run out of medication but Omnicare could not get ahold of the doctor, they would just go ahead and fill the prescription.  The practice of improperly rolling over or auto-renewing prescriptions continued after the Omnicare acquisition.

215.    Former Employee 20, a Pharmacist in Charge at an Omnicare pharmacy in Kansas from 2015 until February 2017, also recounted that Omnicare was systematically rolling over or auto-renewing expired prescriptions or prescriptions that had run out of refills.  Former Employee 20 described that when a customer placed an order, CVS's system, a DOS-based system (*i.e.*, Disk Operating System) called DX onsite, would tell the person filling the prescription that the

prescription had expired, but there was a way for the employee to override the expiration date. When the system would pop up a warning, saying that the prescription was expired and asking if the employee was sure they wanted to continue, the employee would confirm yes. Then the system would make a copy of that prescription with a new prescription number. Former Employee 20 explained that it would be more or less the same as having two prescriptions of the same order, which was not legal. "A very large number" of prescriptions were approved in that improper manner, said Former Employee 20.

216.    Across Former Employee 20's entire tenure with the Company, that practice was going on at all Omnicare pharmacies. It was a unified system across the entire company, he explained, and it was in place both before and after the Omnicare acquisition. He had spoken with the Pharmacist in Charge at the Kansas City site and with Jake Kramer, the General Manager at an Oklahoma site, so Former Employee 20 knew it was occurring at those locations as well. Former Employee 20 had also spoken out against that practice in meetings with his general manager, Kathleen Best, and others. He presented the practice as an issue because he did not believe it was a correct interpretation of the law.

217.    Former Employee 24 further confirmed the Company's illegal and improper prescription rollover practices. From 2015 through November 2019, Former Employee 24 was the Director of Operations for half of Omnicare's Senior Living book of business, which included assisted living and hospice facilities. Former Employee 24 was responsible for the eastern half of the country and oversaw six dispensing locations. Former Employee 24's review of documents from his time at CVS validated that the two IT systems utilized by Omnicare in connection with prescription refills each had a flag inappropriately set that treated assisting living communities like skilled nursing facilities.

218.    As the district court discussed in its order sustaining the *Bassan* complaint's claims, many states do not require drug quantities and numbers of refills to be specified for prescriptions in skilled nursing facilities "because they are made with the understanding that there will be a physician available 24-7 to monitor a patient's intake of the drug." But "individuals living in unskilled residential facilities," including assisted-living facilities and independent living facilities, "are treated like individuals who reside at home—they must schedule visits with their own doctors to obtain prescriptions. For the most part, such prescriptions are limited, either by time or by quantity, and must be re-upped if they expire." *Omnicare*, 2021 WL 1063784, at *4 (citing several applicable state regulations).

219.    Former Employee 24 reported that "there were over 1,500 assisted living communities that broke state and federal laws by refilling prescriptions without legitimate physician prescription orders and billed Medicare and Medicaid hundreds of millions of dollars."

220.    The illegal rollover practices at Omnicare and CVS represented a substantial part of the Company's long-term care business. The assisted living facilities throughout which the improper Medicare and Medicaid billing practices were endemic represented 24% of Omnicare's prescription volume as of January 2017. The audits discussed above concluded that improperly billed prescriptions often approached or exceeded 50% of all prescriptions filled. Accordingly, the financial hit of correcting Omnicare's faulty prescription record-keeping systems was significant, in addition to the attendant regulatory and litigation exposure that the Company faced. The material loss in income and financial exposure that the Company faced were additional red flags that demonstrated the Omnicare goodwill's significant impairment.

c.    **CVS's Long-Term Care Business Faced Significant Industry Headwinds, Which Further Indicated That the Omnicare Goodwill Was Impaired**

221.    At the same time that CVS's Long-Term Care business was losing material amounts of customers (including many of its largest customers) and engaging in illegal rollover practices, it also faced significant industry pressures.  Those market pressures were additional red flags demonstrating that the Omnicare goodwill was impaired.

222.    Many skilled nursing facility operators struggled to stay financially afloat in 2016 and 2017 due to several severe adverse pressures, including: (i) reimbursement pressure from long-term care payors, especially Medicaid and Medicare; (ii) declining reimbursements from long-term care pharmacies due to declining generic drug prices; (iii) increased regulatory oversight; (iv)  decreasing nursing home occupancy rates; and (v) increasing costs, including nurses' wages.

223.    Industry observers reported that, by no later than 2016, the long-term care industry was under immense strain.  According to a November 21, 2016 article titled "[Skilled Nursing Facility] Companies Exiting a 'Deteriorating Industry'" from *Senior Housing News*, 2016 had been "a tumultuous year for some of the biggest real estate owners and operators in skilled nursing," with "[p]unishing skilled nursing headwinds . . . creating a 'deteriorating industry,' with few attractive prospects for the largest companies for at least five years, according to recent report from S&P Global Ratings."  Owners and operators were being forced out of the long-term care industry, including Kindred Healthcare, a former Omnicare client and "one of the largest post-acute care providers in the country, [which] said it would exit the skilled nursing space entirely."  Former Employee 1 reported that he believed Kindred was one of Omnicare's largest skilled nursing accounts.

224.    According to the National Investment Center for Seniors Housing & Care ("National Investment Center") Skilled Nursing Data Report on Key Occupancy & Revenue

Trends, which was based on data from January 2012 through December 2016, by the fourth quarter of 2016, occupancy rates at skilled nursing facilities had fallen to a new low, the third consecutive quarter in a row of new benchmark lows.  The year-over-year decline in occupancy rates was the largest historical decline in the same five-year period.  According to an updated National Investment Center study based on data from January 2012 through September 2019, occupancy rates in skilled nursing facilities continued to plummet from the time of the Omnicare acquisition forward.  By the first quarter of 2017, senior housing occupancy rates had fallen to the lowest rate since mid-2013, according to National Investment Center data.

225.    As a *MarketWatch* article published on August 23, 2017 explained, "the grim economic reality is that many nursing homes are facing extinction" based on the predicted "confluence of a number of trends—demographics, competition from nursing home alternatives, federal and state health-care policy and even technology."  The article explained that "nursing homes, including those branded as skilled nursing facilities" were underutilized, while the number of skilled nursing facilities had been steady for a decade.  The article noted that although "median-aged boomers" were reaching retirement age in droves, boomers were living and staying healthier longer than earlier generations, leaving nursing homes "populated mostly with residents in their 80s and older."  According to 2017 Centers for Medicare and Medicaid Services data, the median operating margin of skilled nursing facilities had fallen from 1.3% in 2014 to 0.0% in 2017.

226.    In 2018, *Skilled Nursing News*, "an independent source for breaking news and up-to-date information on the skilled nursing industry," described the state of the skilled nursing industry in 2017 and 2018 as having been "dominated" by trends like "[r]eimbursement pressures, closures and bankruptcies."  For example, HCR ManorCare, the second-largest United States nursing home operator with more than 500 skilled nursing and assisted living facilities, faced

imminent risk of bankruptcy.  On June 14, 2017, Healthcare Finance reported that The Carlyle Group, which owned HCR ManorCare, would transfer ownership of HCR ManorCare to Quality Care Properties, Inc., HCR ManorCare's landlord and creditor, "after learning that the nursing home chain defaulted on $380 million in senior loans."  Despite those plans, Quality Care Properties filed for receivership in August 2017.  Although HCR ManorCare and Quality Care Properties continued to negotiate debt payment extensions, HCR ManorCare ultimately filed for bankruptcy in March 2018.  In addition, in July 2017, Fortis Management Group, the operator of 60 skilled nursing facilities in the Midwest and Pacific Northwest, filed for receivership.

227.    On September 11, 2017, the Massachusetts Senior Care Association declared to state lawmakers that "there has never been more urgency," as approximately three quarters of the state's nursing facilities had a combined negative margin of 4.4%.  As reimbursement rates under Medicaid stagnated, reimbursements fell below the costs of care, including $37 per day below the cost of care in Massachusetts.  The Massachusetts Senior Care Association further reported that "this translates to an average annual loss of roughly $900,000 per facility for a total of more than $350 million across the entire provider community."  The factors driving those problems in the industry are described in greater detail below.

228.    ***Declining reimbursements from long-term care payors.***    Declining reimbursements from Medicaid—the largest payor in the long-term care industry—and Medicare were a key driver of the long-term care industry's problems before the Aetna acquisition.  Costs of providing care rose during the 2016-to-2017 time period.  Genworth reported that the 2017 median cost of a private nursing home room in the United States had increased to $97,455 a year, up 5.5% from 2016, and that the 2017 median cost of a semi-private room in a nursing home was $85,775, up 4.44% from 2016.  But Medicaid rates did not keep pace, and reimbursements

frequently were for less than the cost of providing care.  According to the National Investment Center's Skilled Nursing Report for the fourth quarter of 2017, Medicaid reimbursed skilled nursing properties at an average national rate of $206 a day, less than half the rate paid by Medicare and Managed Medicare, or $503 and $433, respectively.

229.    In addition to Medicaid, other key revenue sources for CVS's long-term care business—including Medicare, Medicare Advantage, and private insurers—were drying up. Medicare median occupancy percentage fell over 10% from 2014 to 2017, and as the National Investment Center reported, Medicare Advantage (or "Managed Medicare") had a negative revenue-per-patient-day growth rate from 2013 to 2017.  Private insurers were also looking for ways to minimize the costs associated with paying for effective long-term care.

230.    ***Declining reimbursements from long-term care pharmacies.***  The pharmaceutical industry was also suffering as generic drug prices fell.  According to the American Association of Retired Persons Public Policy Institute's annual Rx Watch Report detailing "Trends in Retail Prices of Generic Prescription Drugs Widely Used by Older Americans: 2017 Year-End Update," generic drug prices, which by 2017 accounted for over 85% of all retail prescriptions filled, had fallen 9.3% in 2017, after even larger decreases in 2015 (19.3%) and 2016 (17.7%).  As generic drug prices fell, reimbursement to long-term care pharmacies—including CVS's long-term care pharmacies—fell, which reduced CVS's revenue accordingly.

231.    ***Increased regulatory oversight.***  Increased regulatory oversight also materially affected profitability across the long-term care industry.  The Centers for Medicare & Medicaid Services issued a proposed rule titled the "Reform of Requirements for Long-term Care Facilities" in July 2015.  The final rule was published on October 4, 2016, with the three phases of the final rule going into effect on November 28, 2016, November 28, 2017, and November 28, 2019,

respectively. According to the Centers for Medicare & Medicaid Services, this reform was the first significant overhaul of the rules regulating long-term care facilities since 1991. The regulatory changes were immense, and compliance with the new rules was going to be expensive; the Centers for Medicare & Medicaid Services estimated that compliance would cost each long-term care facility $62,900 for the first year (2016) and $55,000 in each subsequent year (2017 and 2019).

232.    ***Decreasing occupancy rates***. In addition, between the Omnicare acquisition and the Aetna acquisition, nursing home occupancy rates across the industry continued to fall to historic lows. Occupancy rates for skilled nursing facilities fell 2% from 2014 to 2017, and for the first time dipped below 85%, even as a significant number of nursing homes closed. For a market like the long-term care industry with tight margins, even incremental losses in occupancy rates can threaten operational stability, as higher occupancy levels help skilled-nursing facilities increase revenue to cover annual fixed costs. Between 2015 and 2018, according to National Investors Center data, occupancy rates at skilled nursing facilities steadily declined.[3]

---

[3] Information excerpted from Skilled Nursing Data Report, Key Occupancy & Revenue Trends, Based on Data from January 2012 through September 2019, National Investment Center for Seniors Housing & Care, available at https://info.nic.org/hubfs/3Q19_SNF%20Report.pdf.



233. ***Increasing costs, including nurses' wages.*** Rapidly and steeply increasing costs throughout the industry placed additional strain on the long-term care business prior to the Aetna acquisition. Here, one of the largest costs for skilled nursing facilities is nurses' wages, as nurses constitute the largest single portion of the facilities' workforces. Nursing wages are critical to long-term care facilities' bottom line. According to the Bureau of Labor Statistics, the average annual salary growth rate for nurses was 1.3% from 2008 to 2014. Because of increasing demand for their services, however, that rate doubled to 2.6% per year by 2017. According to Centers for Medicare & Medicaid Services data, from 2016 to 2017 alone, median nursing costs per resident per day increased 4.3%. The rising costs of employing large numbers of nurses further plagued the distressed long-term care market at the time the Offering Documents were issued and through the Aetna acquisition.

\*     \*     \*

234.    The confluence of market forces described above severely impaired the financial condition of skilled nursing providers, which made up the majority of Omnicare-related revenues for CVS, including 76% of Omnicare revenue as of December 2016.  As CVS's long-term care provider clients increasingly struggled to maintain profitability, many approached or entered insolvency, further impairing CVS's Long-Term Care business because the Company was unable to collect on substantial outstanding receivables.

235.    Former Employee 17 confirmed that, by the end of 2017, it became really noticeable that Long-Term Care facilities were not able to pay and were going bankrupt.  He worked in the Company's revenue department, dealing with long-term care companies that could not pay their accounts receivables and handling the Company's notes receivable process.  In that role, Former Employee 17 saw the total monthly revenue numbers for the Long-Term Care business in reports that looked at income statements, revenue, and margins, and explained that those reports went to Defendant Boratto.

236.    By way of background, Former Employee 17 explained that each month there was a process by which the Company looked at the top ten accounts receivable balances for long-term care chains.  Each month, Michael Kaufman from Former Employee 17's department created a report that showed the top ten customers that had the largest accounts receivable balance.  That monthly report showed the growth of the balance, how fast it was growing, if the customer was paying, if there was anything CVS should know about, the year-over-year changes, and the status to make sure the accounts receivable would still be collectible.  Former Employee 17 also reported that the top ten accounts receivable reports went to his bosses, Andrew Scott, a senior manager, and Tom Lehmann, Director of Accounting since 2015, and that if anything stood out, the report would go up to the Company's Vice Presidents.

237.    CVS also had a process to put customers on a payment plan when the customer could not pay its existing accounts receivable balance.  Former Employee 17 detailed that when customers were put on a note receivable, that meant that the customer was not going to pay the accounts receivable that they owed and were going to go bankrupt.  Former Employee 17 detailed that the notes receivable was a payment plan with set parameters, such as how long the plan would be, the interest amounts, the total balance, and what the customer was agreeing to pay.  Setting up a new payment plan was a long process that would take a couple of months with a lot of signatures.  Specifically, when a new notes receivable's payment plan needed to be set up, it would go to the legal department, and Defendant Boratto and the Vice Presidents had to sign off on it.  Former Employee 17 further explained that instead of shutting down a customer, CVS continued to provide customers in the notes receivable process with drugs, and kept doing business with them with that payment plan in place.  Once an account was 60 days delinquent on the new payment plan, CVS would be notified about the delinquency and would start reserving for that balance.  If the customer already had a note with CVS and CVS could not collect on that note, the Company would reserve more money.

238.    Former Employee 17 explained the magnitude of the accounts receivable and notes receivable process in 2017 and 2018.  The top ten accounts receivable balances averaged between $7-20 million each.  Genesis, for example, was always at the top of the top ten accounts receivable list with a balance of approximately $20 million.  Corroborating Former Employee 17's account, Genesis took a massive $532 million write-down (on $1.3 billion in revenues) in June 2017, and warned of a possible bankruptcy in 2018, blaming "[t]he negative impact of continued reductions in skilled patients admissions, shortening lengths of stay, escalating wage inflation and

professional liability losses, combined with the increased cost of capital through escalating lease payments accelerated in the third quarter of 2017."

239.    Similarly, the United States' largest long-term care provider, Brookdale Senior Living, Inc., had so much outstanding debt and had such a poor year in 2016 that the first question fielded in its fourth-quarter 2016 earnings call was whether the Company was exploring a sale. By the third quarter of 2017, Brookdale reported a net loss of $413.9 million, and adjusted its 2017 cash-flow guidance down by $60-70 million.  In fact, from the time that CVS announced the Omnicare acquisition until CVS disclosed the final Omnicare goodwill impairment in February 2019, Brookdale Senior Living stock lost 81% of its value.  As reported by multiple Former Employees, Brookdale was one of Omnicare's largest customers.

### d.    Macroeconomic Conditions Also Severely Threatened the Carrying Value of CVS's Long-Term Care Business

240.    Certain negative macroeconomic conditions, "such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets," may provide a basis to determine that the fair value of an asset has fallen below its historical carrying value.  Here, the primary relevant macroeconomic trend in the leadup to the Aetna acquisition was the exponential increase in interest rates from 2015 through 2017.

241.    Many long-term care facilities heavily depend on debt to fund their month-in and month-out operations.  The federal funds rate is the interest rate at which banks lend reserve balances to other depository banks on an overnight basis, and influences short-term interest rates and the prime lending rate, which is the rate that banks charge their most creditworthy borrowers. At the time of the Omnicare acquisition, and for much of 2015, the federal funds rate was below 0.15%.  By the end of 2017, however, the federal funds interest rate had risen to over 1.4%, or a

900% increase over that period.  The concomitant increase in interest rates substantially increased the cost of raising capital and borrowing for skilled nursing facility operators, which often were highly leveraged and relied heavily on cheap borrowing to cover debt and other expenses.

**H.    CVS Stock Declines Significantly as the True Facts Emerge, Damaging Former Aetna Shareholders**

242.    As noted above, Aetna shareholders voted to approve the Aetna acquisition on March 13, 2018, ignorant of the material negative trends in the legacy Omnicare business and the materially overstated Omnicare goodwill on CVS's balance sheet.  The deal was scheduled to close on November 28, 2018.  Shortly after the shareholder vote approving the merger, information concerning the negative trends in the Long-Term Care business and the overvalued Omnicare goodwill was belatedly disclosed.

**1.    August 8, 2018: CVS Reports a $3.9 Billion Impairment of the Omnicare Goodwill**

243.    On August 8, 2018, before the market opened, CVS issued its second-quarter 2018 earnings release, in which it announced a $3.9 billion pre-tax charge to the Omnicare goodwill— wiping out 59% of the Omnicare goodwill.

244.    In the Company's Form 10-Q for the second quarter of 2018 issued the same day, Defendants attributed that impairment to challenges that the Long-Term Care business "continued to experience," including "lower client retention rates, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and continued facility reimbursement pressures."  During that day's earnings call, Defendant Denton likewise attributed the impairment to a long list of longstanding problems: "Higher levels of bad debt and longer collection times on receivables; a faster decline of facility reimbursement rates than we originally forecasted; and lower client retention rates.  Additionally, bed census at skilled nursing facilities continue to track lower, resulting in fewer prescriptions across our platform."

Denton also admitted that "industry-wide financial challenges have created unexpected financial pressures on [CVS's] facility clients."

245.    That goodwill write-down represented a $3.85 U.S. Generally Accepted Accounting Principles earnings-per-share loss from continuing operations.  Defendant Denton reported on the earnings call that "approximately 1/3 of the impairment charge is due to rising interest rates and challenged market multiples of our peer group.  The remaining 2/3 of the charge resulted from lower-than-expected financial performance within the Omnicare business."

246.    The challenges that Defendants disclosed on August 8, 2018 were not new.  Rather, they existed and were known or knowable by no later than the third quarter of 2017.  As Defendant Denton admitted during the second-quarter 2018 earnings call, Defendants had been "closely monitoring the performance of the [Omnicare Long-Term Care] business for potential indicators of impairment."  Wells Fargo likewise noted in an August 8, 2018 report, "Bottom Line: Omnicare underperformance has been a suspected source of some of CVS' problems in 2017 (since we were never able to reconcile the earnings pressure to the lost scripts from Prime and TRICARE/ESRX)."

247.    Nonetheless, in its Form 10-Q for the second quarter of 2018, CVS attributed the belated impairment charge only to updated budgets submitted in June of 2018 that suggested "a deterioration in the financial results" for the Omnicare Long-Term Care business:

> In June 2018, LTC management submitted their initial budget for 2019 and updated their 2018 annual forecast which showed a deterioration in the financial results for the remainder of 2018 and in 2019, which also caused management to update their long term forecast beyond 2019.  Based on these updated projections, management determined that there were indicators that the LTC reporting unit's goodwill may be impaired and, accordingly, an interim goodwill impairment test was performed as of June 30, 2018.  The results of the impairment test showed that the fair value of the LTC reporting unit was lower than the carrying value, resulting in a $3.9 billion pre-tax goodwill impairment charge.

248.    During the earnings call, in response to an analyst question about "longer-term growth and profit prospects for the long-term care business and how those expectations changed,"

CVS's Executive Vice President and Chief Operating Officer, John Roberts, responded that the assisted living space was growing, but acknowledged the "service model" problems at Omnicare that the Former Employees discussed above have confirmed had existed for years: "I'll focus on where we see a lot of the growth opportunity, which is assisted living and not only growing new beds, but growing penetration. So as we have been working to grow this business, what we found is that the Omnicare service model was not optimal for assisted living."

249.    Defendant Denton reassured investors by outlining four steps CVS had purportedly taken "to put the business performance back on track," including that it had "recently installed a new leadership team to manage Omnicare's day-to-day operations"; initiated efforts to "enhance client retention rates"; "embark[ed] upon a system wide cost improvement effort"; and "innovate[ed] solutions" to grow market share in the assisted and independent living markets.

250.    Those assurances worked, and the market viewed the impairment charge as a temporary setback, focusing instead on positive financial results in other aspects of the business and the promise of the Aetna acquisition. For example, on August 8, 2018, Credit Suisse published a report titled "EPS ahead, Guide bumps higher; AET on track," with an outperform rating, echoing Defendants' assurances: "Shares may rise; Aetna on track: CVS shares may trend higher on the respectable operational performance, despite an incremental $3.9 billion impairment charge for lackluster financial performance at Omnicare (LTC), where it is undertaking broader efficiency initiatives." Deutsche Bank reiterated its "Buy" rating in a report titled "Strong Organic 2Q Beat – Focus Shifts to 2H Growth and Aetna Close," and reported that "[t]he company also commented that the Aetna transaction remains on track." J.P. Morgan reiterated its "overweight" rating and touted "Strong Competitive Positioning and Aetna Opportunity." Oppenheimer also reiterated its rating of outperform, noting "increasing confidence on the [Aetna] deal closure."

251.    The market also credited Defendant Denton's assurances that the Long-Term Care business would not materially decline further.  J.P. Morgan reiterated that "CVS is taking several actions, including enhancing service levels to drive better retention, a cost savings initiative (targeting $100-150M in savings over the next few years) and innovating new solutions in the [assisted living facility] market."  Analyst SunTrust Robinson Humphrey similarly noted that "the company has added new leadership, launched an initiative to improve retention and grow penetration rates, and implemented a cost improvement program, targeting $100M-$150M of savings over the next few years.  With inherent demographics tailwinds, we continue to see attractive value in the Omnicare business, as management looks for improved operations and to better position Omnicare within the market."  And Leerink reported that "CVS put in a new leadership team for Omnicare and is pursuing several initiatives to increase retention rates."

252.    Due to Defendants' reassuring statements, CVS's stock price rose 4.2% in response to the Company's second quarter results and the forthcoming Aetna acquisition, closing at $68.17 per share on August 8, 2018.

253.    Investors remained unaware, however, that CVS's Long-Term Care business was far more impaired than disclosed, and that the reported goodwill impairment did not represent the full extent of the financial deterioration in the Omnicare Long-Term Care segment.

254.    On November 6, 2018, the Company released its third-quarter 2018 financial results.  CVS represented that it had performed the Company's required annual impairment tests in the third quarter of 2018, and concluded that the Omnicare goodwill was not further impaired.

255.    Less than one month later, on November 28, 2018, with investors still unaware of the true extent of the Omnicare Long-Term Care business's impairment, the Aetna acquisition

closed.  Aetna shareholders received $48.1 billion in cash and almost 274.4 million shares of CVS common stock, which closed at $80.27 per share on that date.

### 2. February 20, 2019: CVS Reports an Additional $2.2 Billion Impairment of the Omnicare Goodwill

256.    Before the market opened on February 20, 2019, less than 90 days after the Aetna acquisition closed, CVS issued a press release announcing its fourth-quarter and full-year 2018 financial results and providing 2019 full-year guidance.  Defendants reported another massive Omnicare goodwill impairment of $2.2 billion—almost the entire amount of the remaining Omnicare goodwill.  This charge resulted in a quarterly loss of $421 million, a $3.6 billion swing, compared to its profit of over $3.2 billion in the prior year's fourth quarter.  Further, CVS reported lower-than-expected 2019 guidance due in significant part to the deteriorating Long-Term Care business.  Once again, CVS admitted that "[t]he LTC business has continued to experience industry wide challenges."  Those challenges again included "lower occupancy rates in skilled nursing facilities, significant deterioration in the financial health of numerous skilled nursing facility customers which resulted in a number of customer bankruptcies in 2018, and continued facility reimbursement pressures."

257.    CVS also admitted that its previous budgets had been drastically and repeatedly inaccurate:

> During the fourth quarter of 2018, the LTC reporting unit missed its forecast primarily due to operational issues and customer liquidity issues, including one significant customer bankruptcy.  Additionally, LTC management submitted an updated final budget for 2019 which showed significant additional deterioration in the reporting unit's projected financial results for 2019 compared to the analysis performed in the second quarter of 2018, primarily due to continued industry and operational challenges, which also caused management to make further updates to their long term forecast beyond 2019.  Based on these updated financial projections, management determined that there were indicators that the goodwill of the LTC business may be further impaired, and accordingly, an interim goodwill impairment test was performed as of December 31, 2018.  The results of the impairment test showed that the fair value of the LTC business was lower than the carrying value

resulting in a $2.2 billion goodwill impairment charge. In addition to the lower financial projections, lower market multiples of the peer group companies contributed to the amount of the goodwill impairment charge.

258.    After CVS reported the second large impairment charge, the remaining balance of Omnicare goodwill was a mere $431 million. In only six months, CVS reported impairment charges of $6.1 billion, representing 93% of the Omnicare goodwill that CVS had previously reported, including in the Offering Documents.

259.    Defendants held a conference call with investors on February 20, 2019 to discuss the results released that day. Analysts expressed surprise and disappointment at the additional Omnicare goodwill impairment charge, indicative of the severe deterioration of the Long-Term Care business. For example, analyst Cowen & Co. expressed shock that "[y]ou've kind of written off maybe upwards of half of the value of what you've kind of put into [the Omnicare Long-Term Care business] initially when you consider the debt you took on as well," and noted that "a lot of the issues that you're discussing here are actually issues probably that Omnicare dealt with years ago as well. And so it kind of points to more of a structural issue, particularly in the [skilled nursing facility] market." J.P. Morgan questioned what value the Omnicare Long-Term Care business still had, asking sharply, "Is Omnicare strategic to the company going forward? I mean, if I listen to you, Omnicare has been a headwind last year. Eva [Boratto], you just talked about it being half of the headwinds for 2019. Is this a strategic asset for CVS going forward?"

260.    In addition, analysts downgraded CVS's stock and expressed surprise at the announcement. For instance, Wells Fargo downgraded CVS "based on its continued failure to stabilize its existing businesses, particularly the LTC (Long-term care) business," and emphasized that "CVS has failed to improve operations after two years of pressure and continues to struggle with its Omnicare LTC acquisition, setting up 2019 as a weaker than expected year."

261.    On February 20, 2019, Evercore called the announcement a "Major Disappointment," noting, "CVS' 2019 initial guide was highly anticipated and unfortunately it fell well short of expectations.  The main issues appear to be pharmacy reimbursement pressure, lower brand inflation, questions around rebates and long-term care challenges."  And *Fortune* published an article on February 20, 2019 titled "CVS Stock Plummets as 2019 Looks Like It Will Be a 'Major Disappointment' for Investors," reporting that the two impairment charges, taken less than six months apart, "add up to half of what the company paid for Omnicare three years ago."

262.    Analysts and financial commentators also immediately connected CVS's inability to integrate Omnicare with CVS's inability to successfully integrate Aetna.  In a report titled "The Sum of All Fears," analyst Evercore reported that:

> There is no way to sugarcoat this quarter and guide.  This was the worst case scenario in terms of initial impressions, as core CVS faced a perfect storm of headwinds and will now decline (profit wise) in 2019.  This will help to stoke fears of the AET transaction being a defensive maneuver, aimed at plugging holes in a leaky CVS bucket . . . . Management must now focus on rebuilding confidence that the base will not be in perpetual decline, while executing on a sensible but challenging integration plan.

263.    In response to CVS's disclosures, on February 20, 2019, CVS's stock plummeted by $5.66 per share, or 8.8%, to close at $64.22 per share, on unusually high trading volume.  CVS's stock price continued to decline over the ensuing weeks, closing at $52.36 on March 7, 2019.  That was $21.85—or nearly 30%—lower than the $74.21 price of CVS shares that the exchange rate for the Aetna acquisition was based on.

## V.    MATERIALLY INACCURATE STATEMENTS AND OMISSIONS

264.    In addition to the substantive allegations above, and misrepresentations and omissions set forth in this section, attached as Appendix A to this complaint is a timeline summarizing key factual allegations and placing them in the context of Defendants' materially inaccurate statements and omissions.

265.    As noted above, the Securities and Exchange Commission declared the Offering Documents effective on February 9, 2018.  In the Offering Documents, Defendants incorporated by reference, among others, the following filings:

a.  CVS's Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K");

b.  CVS's Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2017 (the "1Q17 10-Q"), June 30, 2017 (the "2Q17 10-Q"), and September 30, 2017 (the "3Q17 10-Q");

c.  CVS's Proxy Statement on Schedule 14A filed on March 31, 2017; and

d.  CVS's Current Reports on Form 8-K filed on March 2, 2017, May 12, 2017, December 4, 2017, December 5, 2017, December 19, 2017, February 1, 2018, and February 6, 2018.

266.    The Registration Statement also expressly incorporated by reference "any additional documents that [CVS or Aetna] may file with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act between the date of this joint proxy statement/prospectus and the respective dates of the Aetna and CVS Health special meetings," which Defendants further represented "contain important information about CVS Health and Aetna and their respective financial performance."  Accordingly, the Offering Documents also incorporated by reference, among other filings, CVS's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"), filed on February 14, 2018.

267.    The Offering Documents also instructed Aetna investors to rely only on the statements in the Joint Proxy/Prospectus and the documents incorporated therein, and to disregard outside sources.  The Offering Documents stated:

You should rely only on the information contained in or incorporated by reference into this joint proxy statement/prospectus to vote on the approval and adoption of the merger agreement, the Aetna adjournment proposal, the Aetna compensation advisory approval, the approval of the stock issuance and the CVS Health adjournment proposal.  Neither CVS Health nor Aetna has authorized anyone to

95

provide you with information that is different from what is contained in this joint
proxy statement/prospectus.

268.    As detailed below, the Offering Documents contained untrue statements of material

fact, and omitted material facts required to be disclosed.  Among other things:

    a.  the Offering Documents included materially untrue statements, and omitted material
information, concerning the value of CVS's Long-Term Care business and the
Omnicare goodwill;

    b.  the Offering Documents included materially untrue statements representing that
Defendants' accounting for CVS's Long-Term Care business and Omnicare goodwill
complied with U.S. Generally Accepted Accounting Principles;

    c.  the Offering Documents included materially misleading statements purporting to warn
investors of potential risks that CVS's Long-Term Care business may face in the future,
when, in fact, those risks had already materialized; and

    d.  the Offering Documents failed to disclose known material trends, demands,
commitments, events, and uncertainties that were reasonably likely to impact the
Company's liquidity, financial condition, or operating results, as well as set forth their
estimated impact, as required by Item 303 and Item 105 of Regulation S-K; and

    e.  Defendants issued additional materially misleading statements to solicit votes in favor
of the merger from Aetna shareholders.

**A.    Materially Untrue Statements Concerning the Value of CVS's Long-Term
Care Business and Omnicare Goodwill**

269.    The Offering Documents incorporated by reference the 2016 10-K, which stated

that Omnicare was a material driver of the Company's financial success.  For example, CVS stated

that for the Retail/LTC segment, "[n]et revenues increased approximately $9.1 billion, or 12.6%,

to $81.1 billion for the year ended December 31, 2016, as compared to the prior year . . . . primarily

driven by," among other things, "the acquisition of Omnicare's LTC operations."

270.    These statements were materially untrue, and omitted material facts necessary to

make them not misleading.  It was misleading to represent that Omnicare's Long-Term Care

business was a primary driver of CVS's net revenue growth for 2016 when, in fact, (a) the

Omnicare Long-Term Care business was suffering material customer losses and revenue shortfalls

due to failures in customer service, prescription delivery accuracy and timeliness, staffing problems, customers' severe financial distress, and competition from businesses started by former employees, as set forth above at Section IV.G.2.a; (b) the financial results of the Omnicare Long-Term Care business were artificially inflated by illegal prescription rollover practices, and were subject to material financial strain from correcting those illegal prescription rollover practices, as well as the regulatory scrutiny and litigation caused thereby, as set forth above at Section IV.G.2.b; (c) significant industry headwinds, including negative government-related reimbursement pressures, declining drug prices, decreasing nursing home occupancy rates, rapidly increasing labor costs, and increased regulatory oversight had a material negative impact on the Omnicare Long-Term Care business, as set forth above at Section IV.G.2.c; and (d) negative macroeconomic factors, including a significant increase in interest rates, had a material negative impact on the Omnicare Long-Term Care business and its customers, as set forth above at Section IV.G.2.d.

271.    The 3Q17 10-Q reported that "during the three months ended September 30, 2017, [CVS] performed [its] required annual impairment tests of goodwill," and found that "[t]he results of the impairment tests indicated that there was no impairment of goodwill," finding a total goodwill balance for the Retail/LTC segment of $16.532 billion. Similarly, in the 2017 10-K, the Company's most recent periodic financial report at the time of the March 13, 2018 shareholder votes on the Aetna acquisition, Defendants reported that the value of the Omnicare goodwill was $6.5 billion; the Company-wide goodwill balance was $38.5 billion; and CVS's 2017 annual net income was $6.62 billion.

272.    These statements were materially untrue, and omitted material facts necessary to make them not misleading. As of the time that the 3Q17 10-Q and 2017 10-K were issued, and at the time that the latter document was incorporated into the Offering Documents, information

known by CVS and available to Defendants demonstrated that CVS's Omnicare goodwill was severely impaired. As set forth more fully above at Section IV.G.2, that information included: (a) material customer losses and revenue shortfalls due to failures in customer service, prescription delivery accuracy and timeliness, staffing problems, customers' severe financial distress, and competition from businesses started by former employees; (b) illegal billing practices that were material in scope; (c) significant industry headwinds, including negative government-related reimbursement pressures, declining drug prices, decreasing nursing home occupancy rates, rapidly increasing labor costs, and increased regulatory oversight; and (d) negative macroeconomic conditions, including a significant increase in interest rates, had a material negative impact on the Omnicare's Long-Term Care business. At a minimum, it was misleading for Defendants to assert that CVS's Omnicare goodwill was unimpaired, which signaled to the market that the Long-Term Care business was still performing well and was continuing to achieve the upside initially expected at the time of the Omnicare acquisition, without disclosing these material adverse facts.

273. For the same reasons, the Company-wide goodwill balance (of which 16% was the severely impaired Omnicare goodwill) was overstated by billions of dollars. In addition, the Company's 2017 annual net income—against which the goodwill write-down should have been charged—was overstated by billions of dollars.

274. In the Offering Documents, Defendants also made additional representations concerning the Company's Omnicare goodwill and the purported analyses performed to ascertain whether the goodwill was in fact impaired. In the 2017 10-K, Defendants stated:

> **Goodwill and other intangible assets could, in the future, become impaired.**
>
> **As of December 31, 2017, we had $52.1 billion of goodwill and other intangible assets**. Goodwill and indefinitely-lived intangible assets are subject to annual impairment reviews, or more frequent reviews if events or circumstances indicate that the carrying value may not be recoverable. When evaluating goodwill for potential impairment, we first compare the fair value of our reporting units to their

respective carrying amounts.  We estimate the fair value of our reporting units using a combination of a discounted cash flow model and a comparable market multiple model. ***If the estimated fair value of the reporting unit is less than its carrying amount, an impairment loss calculation is prepared***.  The impairment loss calculation compares the fair value of a reporting unit to its carrying amount.  ***If the carrying amount of the reporting unit exceeds the fair value, a goodwill impairment loss is recognized in an amount equal to the excess to the extent of the goodwill balance***.  Estimated fair values could change if, for example, there are changes in the business climate, changes in the competitive environment, adverse legal or regulatory actions or developments, changes in capital structure, cost of debt, interest rates, capital expenditure levels, operating cash flows, or market capitalization.  ***Because of the significance of our goodwill and intangible assets, any future impairment of these assets could require material noncash charges to our results of operations, which could have a material adverse effect on our financial condition and results of operations***.

Defendants also stated in the 2017 10-K:

> ***The carrying value of goodwill and other intangible assets covered by this critical accounting policy was $38.5 billion and $13.5 billion as of December 31, 2017, respectively***.  We recorded $181 million in goodwill impairments in 2017 related to our RxCrossroads reporting unit, see Note 3 "Goodwill and Other Intangibles" to our consolidated financial statements.  We did not record any impairment losses related to goodwill or other intangible assets during 2016 or 2015. During the third quarter of 2017, we performed our required annual impairment tests of goodwill and indefinitely-lived trademarks. The goodwill impairment tests resulted in the fair values of our Pharmacy Services and Retail Pharmacy reporting units exceeding their carrying values by significant margins ***The fair values of our LTC and RxC reporting units exceeded their carrying values by approximately 1% and 6%, respectively. The balance of goodwill for our LTC and RxCrossroads reporting units at December 31, 2017 was approximately $6.5 billion*** and $0.4 billion, respectively.  . . .

> Although we believe we have sufficient current and historical information available to us to test for impairment, it is possible that actual results could differ from the estimates used in our impairment tests.

275.    These statements were materially untrue, and omitted material facts necessary to make them not misleading.  Specifically, it was untrue to state that the fair value of the Long-Term Care reporting unit exceeded its carrying value as of December 31, 2017 in the 2017 10-K, when, in fact, information known by CVS and available to Defendants demonstrated that the fair value of the Long-Term Care reporting unit had already fallen significantly below its carrying value,

including that: (a) the Omnicare Long-Term Care business was suffering material customer losses and revenue shortfalls due to failures in customer service, prescription delivery accuracy and timeliness, staffing problems, customers' severe financial distress, and competition from businesses started by former employees, as set forth above at Section IV.G.2.a; (b) the financial results of the Omnicare Long-Term Care business were artificially inflated by illegal prescription rollover practices, and were subject to material financial strain from correcting those illegal prescription rollover practices, as well as the regulatory scrutiny and litigation caused thereby, as set forth above at Section IV.G.2.b; (c) significant industry headwinds, including negative government-related reimbursement pressures, declining drug prices, decreasing nursing home occupancy rates, rapidly increasing labor costs, and increased regulatory oversight, had a material negative impact on the Omnicare Long-Term Care business, as set forth above at Section IV.G.2.c; and (d) negative macroeconomic factors, including a significant increase in interest rates, had a material negative impact on the Omnicare Long-Term Care business and its customers, as set forth above at Section IV.G.2.d.  At a minimum, it was misleading for Defendants to represent that CVS's Omnicare goodwill was unimpaired, which signaled to the market that the Long-Term Care business was still performing well and continuing to achieve the upside initially expected at the time of the Omnicare acquisition, without disclosing these facts.

276.    Further, it was misleading to represent that, "although we believe we have sufficient current and historical information available to us to test for impairment, it is possible that actual results could differ from the estimates."  Contrary to this statement, the "current and historical information" known by CVS and available to Defendants demonstrated that the fair value of the Long-Term Care reporting unit had fallen below its carrying value.  Thus, an impairment of the Omnicare goodwill was not merely "possible" in the future, but had already occurred.

277.    In addition, Defendants' statements contained embedded statements of untrue facts. Defendants represented that there had been no "changes in the business climate, changes in the competitive environment, adverse legal or regulatory actions or developments, changes in capital structure, cost of debt, interest rates, capital expenditure levels, operating cash flows, or market capitalization" that would have impaired the Omnicare goodwill or that would have required an interim test.  Contrary to this statement, there had been such changes, including (a) adverse legal or regulatory actions or developments related to the illegal prescription rollover practices, as set forth above at Section IV.G.2.b; (b) changes in the business climate, including negative government-related reimbursement pressures, declining drug prices, decreasing nursing home occupancy rates, rapidly increasing labor costs, and increased regulatory oversight, as set forth above at Section IV.G.2.c; (c) a significant increase in interest rates that had a material negative impact on the Omnicare Long-Term Care business, as set forth above at Section IV.G.2.d; and (d) changes in the competitive environment as customers were increasingly turning to competitors run by former Omnicare and CVS employees, as set forth above at Section IV.G.2.a.(4).

278.    In both the 3Q17 10-Q and 2017 10-K, Defendants reported:

[T]he results of our annual goodwill impairment test resulted in the fair value of our LTC reporting unit exceeding its carrying value by approximately 1%.  Our multi-year cash flow projections for our LTC reporting unit have declined from the prior year due to customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates.  Our projected discounted cash flow model assumes future script growth from our senior living initiative and the impact of acquisitions.  Such projections also include expected cost savings from labor productivity and other initiatives.  Our market multiple method is heavily dependent on earnings multiples of market participants in the pharmacy industry, including certain competitors and suppliers.  **If** we do not achieve our forecasts, given the small excess of fair value over the related carrying value, as well as current market conditions in the healthcare industry, ***it is reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term and the LTC reporting unit could be deemed to be impaired by a material amount***.

279.    Likewise, in the 3Q17 10-Q and the 2017 10-K, Defendants purported to warn investors that the "possibility of lower than expected valuations at the Company's reporting units could result in goodwill impairment charges at those reporting units."

280.    These statements were materially untrue, and omitted material facts necessary to make them not misleading.  It was misleading to represent that "if" the Long-Term Care business failed to achieve its forecasts, then it was "reasonably possible" that operational performance of the Long-Term Care reporting unit "could" be below current expectations, and that the Long-Term Care reporting unit "could be deemed to be impaired by a material amount," when the Long-Term Care reporting unit already was impaired by a material amount.  Information known by CVS and available to Defendants demonstrated that (a) the Omnicare Long-Term Care business was suffering material customer losses and revenue shortfalls due to failures in customer service, prescription delivery accuracy and timeliness, staffing problems, customers' severe financial distress, and competition from businesses started by former employees, as set forth above at Section IV.G.2.a; (b) the financial results of the Omnicare Long-Term Care business were artificially inflated by illegal prescription rollover practices, and were subject to material financial strain from correcting those illegal prescription rollover practices, as well as the regulatory scrutiny and litigation caused thereby, as set forth above at Section IV.G.2.b; (c) significant industry headwinds, including negative government-related reimbursement pressures, declining drug prices, decreasing nursing home occupancy rates, rapidly increasing labor costs, and increased regulatory oversight, had a material negative impact on the Omnicare Long-Term Care business, as set forth above at Section IV.G.2.c; and (d) negative macroeconomic factors, including a significant increase in interest rates, had a material negative impact on the Omnicare Long-Term Care business and its customers, as set forth above at Section IV.G.2.d.  Moreover, the Company's

assumptions about "future script growth from our senior living initiative and the impact of
acquisitions" were without a reasonable basis and not reasonably achievable, because, as set forth
above at Section IV.G.2.a: (a) the Company's acquisitions swiftly resulted in lost business, and (b)
the Company was consistently losing business and failing to meet its targets, including in the
Company's Long-Term Care business's senior living initiative, as detailed by Former Employee
1 (*see* ¶¶ 103-06).

**B.     Materially Untrue Statements Concerning Compliance with U.S. Generally
Accepted Accounting Principles**

281.     In the Offering Documents, Defendants represented that the Company had prepared
its consolidated financial statements, including the results of its annual goodwill impairment
testing and goodwill asset values, in conformity with U.S. Generally Accepted Accounting
Principles.  Specifically, in the 2017 10-K, Defendants stated:

> We prepare our consolidated financial statements in conformity with generally
> accepted accounting principles, which require management to make certain
> estimates and apply judgment. We base our estimates and judgments on historical
> experience, current trends and other factors that management believes to be
> important at the time the consolidated financial statements are prepared.

282.     These statements were materially untrue, and omitted material facts necessary to
make them not misleading.  It was untrue to state that CVS "prepare[s] our consolidated financial
statements in conformity with generally accepted accounting principles," using "historical
experience" and "current trends," when the historical experience and current trends in the
Omnicare Long-Term Care business demonstrated various triggering events or "red flags,"
including that: (a) the Omnicare Long-Term Care business was suffering material customer losses
and revenue shortfalls due to failures in customer service, prescription delivery accuracy and
timeliness, staffing problems, customers' severe financial distress, and competition from
businesses started by former employees, as set forth above at Section IV.G.2.a; (b) the financial

results of the Omnicare Long-Term Care business were artificially inflated by illegal prescription rollover practices, and were subject to material financial strain from correcting those illegal prescription rollover practices, as well as the regulatory scrutiny and litigation caused thereby, as set forth above at Section IV.G.2.b; (c) significant industry headwinds, including negative government-related reimbursement pressures, declining drug prices, decreasing nursing home occupancy rates, rapidly increasing labor costs, and increased regulatory oversight, had a material negative impact on the Omnicare Long-Term Care business, as set forth above at Section IV.G.2.c; and (d) negative macroeconomic factors, including a significant increase in interest rates, had a material negative impact on the Omnicare Long-Term Care business and its customers, as set forth above at Section IV.G.2.d.  In the face of these various triggering events or "red flags," Defendants failed to conduct interim impairment testing or properly write down the Omnicare goodwill during its annual testing, as required by U.S. Generally Accepted Accounting Principles.

283.    Defendants further stated in the 1Q17 10-Q, 2Q17 10-Q, 3Q17 10-Q, and 2017 10-K, which were all incorporated into the Offering Documents, that the Company complied with U.S. Generally Accepted Accounting Principles' particular requirements for goodwill testing, stating:

> New Accounting Pronouncements Recently Adopted . . . In January 2017, the FASB issued ASU 2017-04, *Simplifying the Test for Goodwill Impairment*, which amends ASC Topic 350, Intangibles – Goodwill and Other.  This ASU requires the Company to perform its annual, or applicable interim, goodwill impairment test by comparing the fair value of each reporting unit with its carrying amount.  An impairment charge must be recognized at the amount by which the carrying amount exceeds the fair value of the reporting unit; however, the charge recognized should not exceed the total amount of goodwill allocated to that reporting unit. Income tax effects resulting from any tax-deductible goodwill should be considered when measuring a goodwill impairment loss, if applicable.  The guidance in ASU 2017-04 is effective for annual or interim goodwill impairment tests in fiscal years beginning after December 15, 2019. The Company elected to early adopt this standard as of January 1, 2017.

284.     These statements were materially untrue, and omitted material facts necessary to make them not misleading.  As set forth above at Section IV.G.1, U.S. Generally Accepted Accounting Principles, and specifically ASC 350-20-35, require companies to review their recorded value of goodwill at least annually to determine whether there is evidence that the reporting unit no longer demonstrates the anticipated financial results that were expected at the time of purchase (*i.e.*, its fair value has fallen beneath its carrying value), and on an interim basis if a triggering event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount.  The company must then perform a goodwill impairment test, including consideration of "red flags," to determine the existence and extent of the impairment.

285.     In violation of these requirements under U.S. Generally Accepted Accounting Principles, Defendants failed to conduct interim impairment testing or properly write down the Omnicare goodwill during its annual testing based on the occurrence of various triggering events or "red flags," including that: (a) the Omnicare Long-Term Care business was suffering material customer losses and revenue shortfalls due to failures in customer service, prescription delivery accuracy and timeliness, staffing problems, customers' severe financial distress, and competition from businesses started by former employees, as set forth above at Section IV.G.2.a; (b) the financial results of the Omnicare Long-Term Care business were artificially inflated by illegal prescription rollover practices, and were subject to material financial strain from correcting those illegal prescription rollover practices, as well as the regulatory scrutiny and litigation caused thereby, as set forth above at Section IV.G.2.b; (c) significant industry headwinds, including negative government-related reimbursement pressures, declining drug prices, decreasing nursing home occupancy rates, rapidly increasing labor costs, and increased regulatory oversight, had a

material negative impact on the Omnicare Long-Term Care business, as set forth above at Section IV.G.2.c; and (d) negative macroeconomic factors, including a significant increase in interest rates, had a material negative impact on the Omnicare Long-Term Care business and its customers, as set forth above at Section IV.G.2.

C.    **Materially Untrue Statements Concerning Purported Risks to CVS's Long-Term Care Business**

286.    In the Offering Materials, Defendants purported to warn investors of risks facing CVS's Long-Term Care business, including the statements set forth below.

287.    In the Company's 2016 10-K, 1Q17 10-Q, 2Q17 10-Q, 3Q17 10-Q, and 2017 10-K, Defendants purported to warn investors of "[t]he possibility of PBM and LTC client loss and/or the failure to win new PBM and LTC business, including as a result of failure to win renewal of expiring contracts, contract termination rights that may permit clients to terminate a contract prior to expiration and early or periodic renegotiation of pricing by clients prior to expiration of a contract."

288.    These statements were materially untrue, and omitted material facts necessary to make them not misleading. It was misleading for Defendants to purport to warn investors of the "possibility" of "LTC client losses and/or failure to win new" long-term care business, when CVS was already losing material amounts of business and failing to win new business, including for customers terminating their contracts early or failing to renew their contracts, as set forth above at Section IV.G.2.a.

289.    In those same documents, Defendants purported to warn investors of "[r]isks relating to the health of the economy in general and in the markets we serve, which could impact consumer purchasing power, preferences and/or spending patterns, drug utilization trends, the financial health of our PBM and LTC clients, retail and specialty pharmacy payors or other payors

doing business with the Company and our ability to secure necessary financing, suitable store locations and sale-leaseback transactions on acceptable terms."

290.    These statements were materially untrue, and omitted material facts necessary to make them not misleading.  It was misleading for Defendants to purport to warn investors of the "health of the economy in general and in the markets we serve, which could impact . . . the financial health of our . . . LTC clients," when CVS's long-term care clients were already experiencing severe financial distress due to negative government-related reimbursement pressures, declining drug prices, decreasing nursing home occupancy rates, rapidly increasing labor costs, increased regulatory oversight, as set forth above at Section IV.G.2.c, and serious negative macroeconomic conditions, including an increase in interest rates that negatively impacted long-term care facilities' ability to fund their month-in and month-out operations, as set forth above at Section IV.G.2.d.

291.    In these same documents, Defendants purported to warn investors of "[r]isks and uncertainties related to the timing and scope of reimbursement from Medicare, Medicaid and other government-funded programs."  These statements were materially untrue, and omitted material facts necessary to make them not misleading.  It was misleading for Defendants to purport to warn investors of the "risks and uncertainties related to the timing and scope of reimbursement" from these sources, when CVS was already facing material legal and financial exposure from its illegal prescription rollover practices, as set forth above at Section IV.G.2.b.

292.    In these same documents, Defendants purported to warn investors about "management's then-current views and assumptions regarding future events and operating performance," which included the risks of potential "sanctions and remedial actions" stemming from CVS's participation in Medicare, Medicaid and other federal and state government-funded

programs; risks related to compliance with governing laws and regulations; and other changes imposed on the business by governing legal and regulatory frameworks, as follows:

> Regulatory changes, business changes and compliance requirements and restrictions that may be imposed by Centers for Medicare and Medicaid Services ("CMS"), Office of Inspector General or other government agencies relating to the Company's participation in Medicare, Medicaid and other federal and state government-funded programs, including sanctions and remedial actions that may be imposed by CMS on our Medicare Part D business.

> \*\*\*

> Risks related to compliance with a broad and complex regulatory framework, including compliance with new and existing federal, state and local laws and regulations relating to health care, network pharmacy reimbursement and auditing, accounting standards, corporate securities, tax, environmental and other laws and regulations affecting our business.

293.    These statements were materially untrue, and omitted material facts necessary to make them not misleading.  It was misleading for Defendants to purport to warn investors of the theoretical risk of "sanctions and remedial actions" "relating to the Company's participation in Medicare, Medicaid and other federal and state government-funded programs" or of risks "related to compliance with" laws and regulations, when CVS was already violating laws and regulations due to its illegal prescription rollover practices, as set forth above at Section IV.G.2.b; and was already facing material financial exposure from those illegal practices.

294.    In addition, in the 3Q17 10-Q, Defendants told investors that "[p]harmacy revenue growth ***may be*** impacted by industry changes in the LTC business, such as lower occupancy rates at skilled nursing facilities."  The 2017 10-K likewise included the statement that "[p]harmacy revenue growth ***may be*** impacted by industry changes in the LTC business, such as continuing lower occupancy rates at skilled nursing facilities."  These statements were materially untrue, and omitted material facts necessary to make them not misleading.  It was misleading to represent that pharmacy revenue growth "may be" impacted by industry changes in the Long-Term Care business

when the Long-Term Care business was already suffering from (a) significant industry headwinds, including decreasing nursing home occupancy rates, negative government-related reimbursement pressures, declining drug prices, rapidly increasing labor costs, and increased regulatory oversight, as set forth above at Section IV.G.2.c; and (b) negative macroeconomic factors, including a significant increase in interest rates, as set forth above at Section IV.G.2.d.

295.    In the Company's 2016 10-K and 2017 10-K, both incorporated into the Offering Documents, Defendants further purported to warn investors of the possibility of client losses and failure to win new business:

> The possibility of client losses and/or the failure to win new business . . . With respect to our LTC business, reimbursement from skilled nursing facilities for prescriptions we dispense is determined pursuant to our agreements with those skilled nursing facilities. The termination of these agreements generally causes our ability to provide services to any of the residents of that facility to cease, resulting in the loss of revenue from any source for those residents. There can be no assurance that we will be able to win new business or secure renewal business on terms as favorable to us as the present terms.

296.    These statements were materially untrue, and omitted material facts necessary to make them not misleading. It was misleading for Defendants to purport to warn investors of the "*possibility* of client losses and/or failure to win new business," when CVS was already losing material amounts of business and failing to win new business throughout 2016 and 2017, as set forth above at Section IV.G.2.a. It was also misleading for Defendants to purport to warn investors that "[t]here can be no assurance that we will be able to win new business or secure renewal business on terms as favorable to us as the present terms," when the Company was already failing to win new business or secure renewal business, as set forth above at Section IV.G.2.a.

297.    In the Company's 2016 10-K and 2017 10-K, both incorporated into the Offering Documents, Defendants also purported to warn investors of the risk that CVS may not be able integrate companies that it acquired:

We *may* be unable to successfully integrate companies acquired by us.

Upon the closing of any acquisition we complete, we will need to successfully integrate the products, services and related assets, as well as internal controls into our business operations. If an acquisition is consummated, the integration of the acquired business, its products, services and related assets into our company may also be complex and time-consuming and, if the integration is not fully successful, we may not achieve the anticipated benefits, operating and cost synergies or growth opportunities of an acquisition. Potential difficulties that may be encountered in the integration process include the following:

>   Integrating personnel, operations and systems, while maintaining focus on producing and delivering consistent, high quality products and services;

>   Coordinating geographically dispersed organizations;

>   Disruption of management's attention from our ongoing business operations

>   Retaining existing customers and attracting new customers; and

>   Managing inefficiencies associated with integrating our operations.

An inability to realize the full extent of the anticipated benefits, operating and cost synergies, innovations and operations efficiencies or growth opportunities of an acquisition, as well as any delays encountered in the integration process, could have a material adverse effect on our business and results of operation. Furthermore, these acquisitions, even if successfully integrated, may fail to further our business strategy as anticipated, expose us to increased competition or challenges with respect to our products, services or geographic markets, and expose us to additional liabilities associated with an acquired business including risks and liabilities associated with litigation involving the acquired business. Any one of these challenges or risks could impair our ability to realize any benefit from our acquisitions after we have expended resources on them.

298.    Further, each of the Forms 10-K and 10-Q incorporated into the Offering Documents warned investors of "*[t]he possibility* that the anticipated synergies and other benefits from any acquisition by us will not be realized, or will not be realized within the expected time periods," as well as "*risks and uncertainties related to our ability to integrate the operations, products, services and employees of any entities acquired by us* and the effect of the potential disruption of management's attention from ongoing business operations due to any pending acquisitions."

110

299.    These statements were materially untrue, and omitted material facts necessary to make them not misleading.  It was misleading for Defendants to purport to warn investors that the Company "***may*** be unable to successfully integrate companies acquired by" it, when the Company had already failed to successfully integrate the Long-Term Care business it acquired from Omnicare or the subsequent long-term care pharmacies that it acquired, as set forth above at Section IV.G.2.a.  It was also misleading for Defendants to purport to warn investors that "we may not achieve the anticipated benefits, operating and cost synergies or growth opportunities of an acquisition," when information already known by CVS and available to Defendants demonstrated that its Long-Term Care business acquired from Omnicare was not achieving the anticipated benefits, operating and cost synergies, or growth opportunities, as set forth above at Section IV.G.2.a.  It was also misleading for Defendants to purport to warn investors of "potential difficulties" of "integrating personnel" or "[r]etaining existing customers and attracting new customers," when the Company had lost or fired a material number of the Omnicare personnel and was experiencing material customer losses and difficulties attracting new customers, as set forth above at Section IV.G.2.a.  Further, it was misleading for Defendants to purport to warn investors that integration difficulties "could have a material adverse effect on our business and results of operation," when the failure to successfully integrate the Omnicare Long-Term Care business had already materially diminished the value of that business, as set forth above at Section IV.G.2.a.  Finally, it was misleading for Defendants to purport to warn investors that acquired businesses might "expose us to additional liabilities associated with an acquired business including risks and liabilities associated with litigation involving the acquired business," when the Company had already been exposed to business risks and liabilities associated with Omnicare's illegal prescription rollover practices, as set forth above at Section IV.G.2.b.

300.   In the Company's 2017 10-K, incorporated into the Offering Documents, Defendants further purported to warn about potential customer insolvency:

> ***Solvency of our customers.***  In the event that our customers' operating and financial performance deteriorates, or they are unable to make scheduled payments or obtain adequate financing, our customers may not be able to pay timely, or may delay payment of, amounts owed to us.  Any inability of our customers to pay us for our products and services may adversely affect our business, financial condition and results of operations.  In addition, both state and federal government sponsored payers, as a result of budget deficits or reductions, may suspend payments or seek to reduce their healthcare expenditures resulting in our customers delaying payments to us or renegotiating their contracts with us.  Any delay or reduction in payments by such government sponsored payers may adversely affect our business, financial condition and results of operations.

301.   These statements were materially untrue, and omitted material facts necessary to make them not misleading.  It was misleading for Defendants to purport to warn investors that the Company faced a risk of "solvency of our customers," and the possibility "that our customers' operating and financial performance deteriorates, or they are unable to make scheduled payments or obtain adequate financing, our customers may not be able to pay timely, or may delay payment of, amounts owed to us," when the Company's long-term care customers were already facing severe financial distress from deteriorating financial performance, and were unable to make scheduled payments under the Company's accounts receivable or notes receivable processes, including some of the Company's largest customers, as set forth above at Sections IV.G.2.a & c.

302.   In addition, the current reports on Form 8-Ks that CVS filed on March 2, 2017, May 12, 2017, December 4, 2017, December 5, 2017, December 19, 2017, February 1, 2018, and February 6, 2018, each incorporated into the Offering Documents, also incorporated the Company's untrue statements from the then-most recent Form 10-K or 10-Q.  Specifically, the March 2, 2017 8-K incorporated the 2016 Form 10-K risk factors, which were materially untrue, and omitted material facts necessary to make them not misleading, as set forth above at ¶¶ 287-93, 295-99.  The May 12, 2017 Form 8-K incorporated both the 2016 10-K and 1Q17 10-Q risk factors,

which were materially untrue, and omitted material facts necessary to make them not misleading,

as set forth above at ¶¶ 287-93, 295-99.  The December 4, 2017, December 5, 2017, December 19,

2017, February 1, 2018, and February 6, 2018 Form 8-Ks incorporated the risk factors from the

3Q17 10-Q and the 2016 10-K, which were materially untrue, and omitted material facts necessary

to make them not misleading, as set forth above at ¶¶ 287-99.

### D.     Materially Inaccurate Omissions Under Items 105 and 303

303.     Under applicable Securities and Exchange Commission rules and regulations

governing the Offering Documents, including Securities and Exchange Commission Regulation

C, the Offering Documents were required to (but failed to) disclose additional material

information.

304.     Specifically, pursuant to Securities and Exchange Commission Form S-4

instructions, Defendants were required to include information in accordance with Item 303 of

Regulation S-K.  Item 303 of Regulation S-K, Management's Discussion & Analysis ("MD&A")

of financial condition and results of operation, 17 C.F.R. § 229.303, and the Securities and

Exchange Commission's related interpretive releases, require disclosure of "any known trends or

uncertainties that have had or that the registrant reasonably expects will have a material favorable

or unfavorable impact on net sales or revenues or income from continuing operations." In addition

to the identification of such "known trends," Item 303 requires disclosure of (i) whether those

trends have had or are reasonably expected to have a material unfavorable impact on revenue; and

(ii) the extent of any such impact on revenue.

305.     Moreover, pursuant to SEC Regulation C, registrants have an overarching duty to

disclose material information necessary to ensure that representations in a registration statement

are not misleading.  Specifically, Rule 408 states, "In addition to the information expressly

required to be included in a registration statement, there shall be added such further material

information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408(a).

306. In violation of these requirements, the Offering Documents failed to disclose known materially adverse trends and uncertainties that did have or that CVS reasonably expected would have a material unfavorable impact on net sales or revenues or income from continuing operations, as well as their impact. CVS's Long-Term Care business suffered from a series of known negative trends.

307. *First*, in the nearly 3 years since the Omnicare acquisition in 2015, CVS's Long-Term Care business was suffering material customer losses and revenue shortfalls due to failures in customer service, prescription delivery accuracy and timeliness, staffing problems, customers' severe financial distress, and competition from businesses started by former employees, as set forth above at Section IV.G.2.a. As demonstrated by the facts reported by numerous former employees, this trend of business loss was consistent, long-running and highly material. For instance, as discussed above at Section IV.G.2.a.(1), former employees reported that during 2016-2017, the Long-Term Care business lost about one third and as much as approximately one half of its business. There is also no question that this trend was known – the trend was widely discussed in multiple meetings with high-level executives, and was documented in numerous internal reports, as set forth above at Section IV.G.2.a.(1). In fact, this material adverse trend was so well-known and so significant that CVS attempted to offset these losses through acquisitions, but failed, as often CVS would quickly shed the business of the acquired pharmacies. However, CVS did not disclose this material adverse trend or its impact, as Item 303 required.

308. *Second*, the financial results of the Long-Term Care business were artificially inflated by illegal prescription rollover practices, and were subject to material financial strain from

correcting those illegal prescription rollover practices, as well as the regulatory scrutiny and litigation caused thereby, as set forth above at Section IV.G.2.b.  The trend of illegal rollovers was both longstanding and material in scope.  As set forth above, it impacted thousands of facilities, had been ongoing since at least 2012, and generated hundreds of millions of dollars in illegal revenue per year.  This material adverse trend was also well-known within Omnicare and CVS.  Since 2012, Omnicare and CVS received repeated warnings about the rollover issue, including from state regulators, internal and third-party audits, employees, and customers.  On June 1, 2015, 29 states and the District of Columbia, along with whistleblower Uri Bassan, filed claims in a *qui tam* action for violating the Federal False Claims Act.  Nevertheless, as alleged in the *Bassan* action (which has been sustained by the district court), the illegal practices continued until 2018, and the negative trend and its impact were not disclosed.

309.    *Third*, significant industry headwinds, including negative government-related reimbursement pressures, declining drug prices, decreasing nursing home occupancy rates, rapidly increasing labor costs, and increased regulatory oversight, had a material negative impact on the Long-Term Care business, as set forth above at Section IV.G.2.c.

310.    *Fourth*, CVS's Long-Term Care business faced negative macroeconomic factors, including a significant increase in interest rates, as set forth above at Section IV.G.2.d.

311.    Item 105 of Regulation S-K, Risk Factors, 17 C.F.R. § 229.105, requires in the "Risk Factors" section of registration statements and prospectuses "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  Item 105 further requires that the discussion "adequately describe[] the risk" and not present "risks that could apply generically to any registrant or any offering."

312.    The Offering Documents failed to disclose, as set forth above at Section IV.G.2: (a) the material adverse trend of customer losses; (b) that the financial results of the Long-Term Care business were artificially inflated by the material adverse trend of the illegal prescription rollover practices; (c) the then-known severe financial distress of many of CVS's largest clients, including Genesis, which fundamentally downgraded the Long-Term Care business's financial outlook; and (d) that long-term care industry-wide factors had materially harmed the Long-Term Care business's bottom line and impaired its value.

### E.    Additional Materially Untrue Statements Made in Connection With Proxy Solicitations for Votes in Favor of the Aetna Acquisition

313.    To solicit votes in favor of the Aetna acquisition from Aetna shareholders, Defendants issued a series of statements between the announcement of the merger on December 3, 2017 and the date of the shareholder vote on March 13, 2018, in addition to the statements in the Offering Materials set forth above.

314.    On December 4, 2017, CVS and Aetna issued an investor relations presentation titled, "CVS Health + Aetna: Revolutionizing the Consumer Healthcare Experience," which it filed with the Securities and Exchange Commission as a prospectus and communication in connection with the Aetna acquisition.  In this presentation, CVS described its Long-Term Care business as a "[l]eading provider of pharmacy services in long-term care" and part of the "integrated healthcare platform [that] offers better care and convenience at a lower cost."  CVS and Aetna also stated that CVS's Long-Term Care business, one of CVS's and Aetna's soon to be "integrated assets," would "enable [the combined company] to deliver superior outcomes at lower cost."

315.    The next day, CVS and Aetna issued a PowerPoint presentation titled "Company Town Hall," which it filed with the Securities and Exchange Commission as a prospectus and communication in connection with the Aetna acquisition, stating again that CVS's Long-Term

Care business, one of CVS's and Aetna's soon to be "integrated assets," would "enable [the combined company] to deliver superior outcomes at a lower cost."

316.    In the Registration Statement and Joint Proxy/Prospectus, CVS and Aetna stated that "CVS Health is delivering break-through products and services," including "improving pharmacy care for the senior community through Omnicare . . . ."  In the 1Q17 10-Q, 2Q17 10-Q, 3Q17 10-Q, and 2017 10-K, which were all incorporated by reference into the Offering Documents, CVS said, "We are delivering break-through products and services," including "improving pharmacy care for the senior community through Omnicare . . . ."

317.    These statements were materially untrue, and omitted material facts necessary to make them not misleading.  It was misleading for Defendants to tout the services and performance of the Long-Term Care business—including that it was offering "break-through products and services," "improving pharmacy care for the senior community," was a "leading provider of pharmacy services in long-term care," "offers better care and convenience," and "deliver[ed] superior outcomes"—when CVS's Long-Term Care business was losing customers at a rapid rate precisely because of its customer service failures and prescription mismanagement, as set forth above at Section IV.G.2.a.

318.    One month later, on January 4, 2018, during the CVS Health 2018 Guidance Call, Defendant Denton stated, "[W]e expect solid script growth driven by new initiatives tailored toward assisted living facilities and benefits from acquisition activity.  As a result, for the entire Retail/Long-Term Care segment, we expect revenue growth of 2.5% to 4%."  The same day, CVS and Aetna filed a presentation titled "2018 Guidance Conference Call" that included a slide reiterating this statement, repeating that "[s]olid script growth in long-term care business driven

by new initiatives tailored towards assisted living facilities and benefits from acquisition activity" was one of the "Drivers of Growth."

319.    These statements were materially untrue, and omitted material facts necessary to make them not misleading. It was materially misleading to state that the Long-Term Care business was a driver of growth, because that business was suffering material customer losses and revenue shortfalls due to failures in customer service, prescription delivery accuracy and timeliness, staffing problems, customers' severe financial distress, and competition from businesses started by former employees, as set forth above at Sections IV.G.2.a & c. Moreover, CVS's "acquisition activity" of rapidly acquiring smaller, local long-term care pharmacies was not driving growth, but instead, CVS was losing a majority of the pharmacies' customer bases soon after CVS acquired them, as set forth above at Section IV.G.2.a.(5). Lastly, the Company's expectations about "solid script growth driven by new initiatives tailored toward assisted living facilities and benefits from acquisition activity" were without a reasonable basis, because, as set forth above at Section IV.G.2.a: (a) the Company's acquisitions swiftly resulted in lost business, and (b) the Company was consistently losing business and failing to meet its targets, including those in its senior living initiative, as detailed by Former Employee 1 (*see* ¶¶ 103-06).

## VI.    CLASS ACTION ALLEGATIONS

320.    Lead Plaintiff brings this action on behalf of itself and as a class action pursuant to Rules 23(a) and 23(b)(3) on behalf of all former Aetna shareholders who (a) acquired shares of CVS common stock in exchange for their Aetna shares in connection with CVS's acquisition of Aetna on November 28, 2018, or (b) held Aetna common stock as of the record date (February 5, 2018) and were entitled to vote on the Aetna acquisition, and (c) were damaged thereby (defined above as the "Class"). Excluded from the Class are CVS; Aetna; the Individual Defendants and their immediate family members, legal representatives, heirs, successors, or assigns, and any entity

in which defendants have or had a controlling interest; and CVS and Aetna's respective officers, directors, and affiliates, as well as any of their respective immediate family members, legal representatives, heirs, successors, or assigns, and any entity in which those officers, directors, and affiliates have or had a controlling interest.

321.    The members of the Class are so numerous that joinder of all members is impracticable.  Before the Aetna acquisition, Aetna common stock was actively traded on the New York Stock Exchange.  Aetna reported 327.4 million shares of common stock outstanding in its final Form 10-Q filed with the Securities and Exchange Commission for the quarter ended September 30, 2018.  While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that Class members number in the thousands.

322.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that is complained of herein.

323.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests that are adverse or antagonistic to the Class.

324.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether Defendants violated the federal securities laws as alleged herein;

b.    whether the Registration Statement, including the Joint Proxy/Prospectus, or documents incorporated by reference therein, contained materially untrue statements or failed to disclose material facts in violation of the federal securities laws; and

c.    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

325.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to individually redress the wrongs alleged herein.  There will be no difficulty in the management of this action as a class action.

326.    Record owners and other members of the Class may be identified from records maintained by CVS's or Aetna's transfer agent(s) or other sources, and may be notified of the pendency of this action by mail using techniques and a form of notice similar to those customarily used in securities class actions.

## VII.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

327.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue and misleading statements pleaded in this Complaint.

328.    *First*, none of the misstatements complained of herein were forward-looking statements.  Rather, they were misstatements concerning current facts and conditions existing at the time or prior to when the statements were made.

329.    *Second*, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by Defendants was not sufficient to insulate Defendants from liability for their materially untrue and misleading statements.  Further, any cautionary language identifying

that goodwill impairment could change were themselves materially false and misleading because such impairment already existed.

## VIII. <u>CAUSES OF ACTION</u>

<u>Count I</u>
<u>For Violations of Section 11 of the Securities Act</u>
<u>(Against CVS and the Securities Act Individual Defendants)</u>

330. This claim does not sound in fraud. Lead Plaintiff does not allege that any Defendant acted with fraudulent intent. This claim is based on strict liability and negligence.

331. Lead Plaintiff repeats and realleges the allegations above as if fully set forth herein.

332. This claim is brought against CVS and the Securities Act Individual Defendants pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all former Aetna shareholders who acquired CVS shares in exchange for their Aetna shares in connection with CVS's acquisition of Aetna on November 28, 2018.

333. At the time of their issuance and through the Aetna acquisition, the Offering Documents, including the Registration Statement, the Joint Proxy/Prospectus, and the documents incorporated therein, contained untrue statements of material fact, omitted to state facts necessary to make the statements made therein not misleading, and failed to disclose required material information.

334. Defendant CVS is the registrant for the shares issued pursuant to the Registration Statement. As the issuer of the shares, CVS is strictly liable to Lead Plaintiff and the Class for the materially untrue statements and omissions that appeared in or were omitted from the Offering Documents.

335. As signatories of the Offering Documents, the Securities Act Individual Defendants are liable to Lead Plaintiff and the Class for the materially untrue statements and omissions that appeared in or were omitted from the Offering Documents.

336.   The Defendants named in this Count were required to but did not accurately update these statements before the Offering Documents became effective.

337.   The Securities Act Individual Defendants were responsible for the contents and dissemination of the Offering Documents.  The Securities Act Individual Defendants are unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Offering Documents.  These Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Documents were true, without omissions of any material facts, or not misleading.  Accordingly, the Securities Act Individual Defendants acted negligently, and are liable to Lead Plaintiff and the Class for the materially untrue statements and omissions that appeared in or were omitted from the Offering Documents.

338.   Lead Plaintiff and members of the Class exchanged Aetna shares for CVS shares in connection with the Aetna acquisition pursuant to the Offering Documents.

339.   At the time of the exchange, Lead Plaintiff and the other members of the Class did not know, or in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions contained in the Offering Documents.

340.   Lead Plaintiff and the Class have sustained damages in that the value of CVS shares has declined substantially.

341.   This claim is brought within the applicable statute of limitations.

342.   By reason of the foregoing, the Defendants named in this Count have violated Section 11 of the Securities Act.

**Count II**
**For Violations of Section 12(a)(2) of the Securities Act**
**(Against CVS and the Securities Act Individual Defendants)**

343.    This claim does not sound in fraud.  Lead Plaintiff does not allege that any Defendant acted with fraudulent intent.

344.    Lead Plaintiff repeats and realleges the allegations above as if fully set forth herein.

345.    This claim is brought against CVS and the Securities Act Individual Defendants pursuant to Section 12(a) of the Securities Act, 15 U.S.C. § 771(a)(2), on behalf of all former Aetna shareholders who acquired CVS shares in exchange for their Aetna shares in connection with CVS's acquisition of Aetna on November 28, 2018.

346.    By means of the defective Offering Documents, each Defendant named in this count promoted, solicited, and/or sold CVS common stock to Lead Plaintiff and the Class for the benefit of them and their associates.

347.    The Offering Documents contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

348.    The Defendants named in this Count were required to but did not accurately update these statements before the Offering Documents became effective.

349.    The Securities Act Individual Defendants were responsible for the contents and dissemination of the Offering Documents.  The Securities Act Individual Defendants are unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Offering Documents.  The Securities Act Individual Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Documents were true, without omissions of any material facts, or not misleading.  Accordingly, the Securities Act Individual Defendants acted negligently, and are

liable to Lead Plaintiff and the Class for the materially untrue statements and omissions that appeared in or were omitted from the Offering Documents.

350.    Lead Plaintiff and members of the Class exchanged Aetna shares for CVS shares in connection with the Aetna acquisition pursuant to the Offering Documents.

351.    At the time of the exchange, Lead Plaintiff and other members of the Class did not know, or in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions contained in the Offering Documents.

352.    Lead Plaintiff and the Class have sustained damages in that the value of CVS shares declined substantially.

353.    This claim is brought within the applicable statute of limitations.

354.    By reason of the foregoing, the Defendants named in this Count have violated Section 12(a)(2) of the Securities Act.

### Count III
### For Violations of Section 15 of the Securities Act
### (Against The Securities Act Individual Defendants)

355.    This claim does not sound in fraud. Lead Plaintiff does not allege that any Defendant acted with fraudulent intent.

356.    This claim is brought against the Securities Act Individual Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all former Aetna shareholders who acquired CVS shares in exchange for their Aetna shares in connection with CVS's acquisition of Aetna on November 28, 2018.

357.    As set forth above, CVS violated Sections 11 and 12(a)(2) of the Securities Act. At all relevant times, the Securities Act Individual Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. The Securities Act Individual

Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

358.    The Securities Act Individual Defendants each signed or authorized the signing of the Registration Statement or Joint Proxy/Prospectus, and otherwise participated in the process that allowed the Offering Documents to be issued and the Aetna acquisition to be successfully completed.

359.    By reason of the aforementioned conduct, the Securities Act Individual Defendants are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as CVS is liable under Sections 11 and 12(a)(2) of the Securities Act, to Lead Plaintiff and members of the Class.

### Count IV
### For Violations of Section 14(a) of the Exchange Act
### (Against All Defendants)

360.    This claim does not sound in fraud.  Lead Plaintiff does not allege that any Defendant acted with fraudulent intent.

361.    Lead Plaintiff repeats and realleges the allegations above as if fully set forth herein.

362.    This claim is brought against all Defendants pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 77o, on behalf of all former Aetna shareholders who held Aetna shares as of the record date and were entitled to vote at the Aetna special meeting on March 13, 2018 with respect to the Aetna acquisition.

363.    Defendants' statements issued to solicit shareholder approval of the Aetna acquisition, including the Joint Proxy, and the documents incorporated therein, and other proxy solicitations, contained statements that, at the time and in light of the circumstances under which they were made, were untrue with respect to a material fact and/or omitted material facts.

364.    Defendants named in this Count were required to but did not accurately update these statements between dissemination of these documents and the shareholder vote on March 13, 2018.

365.    Defendants named in this count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Joint Proxy and other proxy solicitations.

366.    CVS was an issuer of the Joint Proxy.  CVS permitted the use of its name in the Joint Proxy.

367.    The remaining Defendants signed the Joint Proxy or otherwise permitted the use of their names in the Joint Proxy or other proxy solicitations, respectively.

368.    By means of the Joint Proxy and documents attached thereto or incorporated by reference therein and other proxy solicitations, Defendants sought to secure Lead Plaintiff's and other Class members' approval of the Aetna acquisition and solicited proxies from Lead Plaintiff and other members of the Class.

369.    Each Defendant named in this Count acted negligently in making inaccurate statements of material facts, and/or omitting material facts required to be stated in order to make their statements not misleading.  Defendants were required to ensure that the Joint Proxy and all other proxy solicitations fully and fairly disclosed all material facts to allow an investor to make an informed investment decision.  These Defendants also acted negligently in failing to update the Joint Proxy.

370.    The solicitations described herein were essential links in the accomplishment of the Aetna acquisition.

371.    Lead Plaintiff and Class members eligible to vote on the Aetna acquisition were denied the opportunity to make an informed decision in voting on the Aetna acquisition and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

372.    The untrue statements and omissions as set forth above proximately caused foreseeable losses to Lead Plaintiff and members of the Class.

373.    This claim is timely.

374.    By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

**Count V**
**For Violations of Section 20(a) of the Exchange Act**
**(Against All Individual Defendants)**

375.    This claim does not sound in fraud.  For the purposes of this claim, Lead Plaintiff does not allege that any Defendant acted with fraudulent intent.

376.    Lead Plaintiff repeats and realleges the allegations above as if fully set forth herein.

377.    Defendants' statements issued to solicit shareholder approval of the Aetna acquisition, including the Joint Proxy and the documents incorporated into the Joint Proxy, and other proxy solicitations, contained statements that, at the time and in light of the circumstances under which they were made, were untrue with respect to a material fact and/or omitted material facts.

378.    At all relevant times, the Individual Defendants were controlling persons of CVS or Aetna within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of CVS or Aetna or signatories to the Joint Proxy, these Defendants had the power and authority to cause CVS and Aetna to engage in the conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the Joint Proxy and the other solicitations described herein made by CVS

and Aetna, thereby causing the dissemination of the untrue statements and omissions of material facts as alleged herein.

379.    The Individual Defendants participated in CVS and/or Aetna Board meetings and conference calls, reviewed the merger agreement and voted to approve the Aetna acquisition, signed the Joint Proxy and/or Registration Statement, and solicited approval of the Aetna acquisition through the CVS Board's recommendation and/or the Aetna Board's recommendation to vote in favor of the Aetna acquisition, which repeatedly appeared throughout the Joint Proxy. The Individual Defendants also signed numerous other filings with the SEC.  As a result of the foregoing, the Individual Defendants, as a group and individually, were control persons within the meaning of Section 20(a) of the Exchange Act.

380.    This claim is timely.

381.    By virtue of the aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as CVS is liable under Section 14(a) of the Exchange Act, to Lead Plaintiff and the other members of the Class.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a.    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding all damages and other remedies available under the Securities Act and Sections 14(a) and 20 of the Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.

DATED: November 23, 2022

*/s/ K. Joseph Shekarchi*

**SHEKARCHI LAW OFFICES**
K. Joseph Shekarchi (Bar No. 4493)
33 College Hill Road
Warwick, Rhode Island  02866
Tel: (401) 827-0100
Fax: (401) 823-1400
joe@shekarchilaw.com

*Liaison Counsel for Lead Plaintiff*
*Los Angeles Fire and Police Pensions*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Hannah Ross (*pro hac vice*)
John J. Rizio-Hamilton (*pro hac vice*)
Adam D. Hollander (*pro hac vice*)
Jai Chandrasekhar (*pro hac vice*)
Timothy Fleming (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
hannah@blbglaw.com
johnr@blbglaw.com
adam.hollander@blbglaw.com
jai@blbglaw.com
timothy.fleming@blbglaw.com

*-and-*

Lauren M. Cruz (*pro hac vice*)
2121 Avenue of the Stars
Suite 2575
Los Angeles, California  90067
Tel: (310) 819-3480
lauren.cruz@blbglaw.com

*Lead Counsel for Lead Plaintiff*
*Los Angeles Fire and Police Pensions*