**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| IN RE CVS HEALTH CORPORATION SECURITIES ACT LITIGATION | Master File No. 1:19-cv-00434-MSM-LDA<br><br>CLASS ACTION<br><br>**LEAD PLAINTIFF'S OPPOSITION TO CVS DEFENDANTS' MOTION TO DISMISS** |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 8

    A.    CVS Purchased Omnicare To Enter The LTC Business, A Supposed "Substantial Growth Opportunity" ...................................................................... 8

    B.    Under Pressure To Transform Its Business Through A Strategic Acquisition, CVS Announced The Aetna Acquisition ......................................... 10

    C.    The Statements Incorporated Into The Offering Documents Portrayed The LTC Business As A Growth Driver With A Positive Goodwill Balance ............. 11

    D.    The Offering Documents Concealed Known Facts About The Impaired Condition Of The LTC Business ........................................................................ 13

        1.    The LTC Business Suffered A Cascade Of Business Losses Prior To The Offering Documents Becoming Effective. ................................... 13

        2.    Omnicare Engaged In Illegal Prescription Rollover Practices. ............... 18

        3.    The LTC Business Faced Significant Industry Headwinds And Macroeconomic Trends. ........................................................................ 21

    E.    The Statements Made In The Offering Documents Contrasted With The Reality Of The LTC Business. .............................................................................. 22

    F.    CVS Belatedly Revealed The Impaired Value Of The LTC Business ................. 23

ARGUMENT ..................................................................................................................... 25

I.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTIONS 11 AND 12 OF THE SECURITIES ACT .......................................................................... 25

    A.    The Complaint Adequately Pleads Materially Untrue Statements And Omissions In The Offering Documents ............................................................... 26

        1.    CVS Misled Investors About The Value Of The LTC Goodwill. ............ 26

            a.    Defendants' goodwill statements contained material omissions that failed to align with what reasonable investors understood the statements to represent. .......................................................... 27

            b.    Defendants' goodwill statements contained materially false and misleading embedded facts. .......................................................... 32

c.  CVS's executives could not have reasonably believed the statements about the LTC Business and the value of Omnicare's goodwill................................................................ 34

d.  The CVS Defendants' remaining arguments as to the LTC goodwill fail. ........................................................................ 36

i.  The Complaint's allegations do not violate the "fraud-by-hindsight" doctrine. ............................................. 36

ii.  The material incorporated into the offering documents did not disclose the state of the LTC business or the red flags identified in the Complaint........ 43

iii.  The Complaint adequately pleads that the rollover practices were material and should have contributed to a finding of goodwill impairment. ................................. 48

2.  CVS Failed To Disclose Material Trends As Required Under Items 303 and 105 of Regulation S-K. ............................................... 51

3.  Materially Untrue Statements Concerning Purported Risks..................... 54

4.  CVS Made Materially Untrue Statements Concerning Its Compliance with GAAP. ....................................................... 57

B.  Defendants' Additional Challenges Should Be Rejected ...................................... 58

1.  The PSLRA "Safe Harbor" Is Inapplicable. .......................................... 58

2.  The CVS Defendants' "Puffery" Argument Fails. .................................. 60

3.  The Individual Securities Act Defendants Solicited Aetna Shareholders Under Section 12(a). ........................................... 62

II.  THE COMPLAINT ADEQUATELY ALLEGES SECTION 14(A) CLAIMS ............... 63

A.  Section 14(a) Claims Require Only Negligence, And Need Not Meet Heightened Pleading Standards ............................................................. 64

B.  Lead Plaintiff's Exchange Act Claims Are Timely ............................................. 65

C.  The Complaint Adequately Pleads False Statements And Omissions In Connection With Proxy Solicitations For The Aetna Acquisition....................... 69

III.  THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY... 71

CONCLUSION................................................................................................................ 72

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020).........................................................................6, 27, 28

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)...................................................................................37

*Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.*,
2009 WL 3255225 (D.N.H. Oct. 7, 2009) .......................................44, 54, 55, 59, 60

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................25

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................................................................42

*Bank of Guam v. Pangilinan*,
902 F.2d 38, 1990 WL 56840 (9th Cir. 1990) .......................................................70

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012)....................................................................68

*In re Biogen Inc., Securities Litigation*,
193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017)...................61

*In re Biogen, Inc. Sec. Litig.*,
857 F.3d 34 (1st Cir. 2017)...................................................................................37

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) .............................................................31

*Bond Opportunity Fund II, LLC v. Heffernan*,
340 F. Supp. 2d 146 (D.R.I. 2004)........................................................................68

*In re Brooks Automation, Inc. Sec. Litig.*,
2007 WL 4754051 (D. Mass. Nov. 6, 2007) ..........................................................71

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) ...............................................................60, 61

*Burstein v. Applied Extrusion Techs., Inc.*,
150 F.R.D. 433 (D. Mass. 1993)...........................................................................55

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002)..............................................................................64, 72

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...................................................28, 58

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*,
  46 F.4th 22 (1st Cir. 2022), *aff'd*, 46 F.4th 22 (1st Cir. 2022) ......................... passim

*City of Miami Fire Fighters' & Police Officers' Retirement Trust v. CVS Health Corp.*,
  519 F. Supp. 3d 80 (D.R.I. 2021) .................................................................. passim

*City of Omaha Police & Fire Ret. Sys. v. Timberland Co.*,
  2013 WL 1314426 (D.N.H. Mar. 28, 2013) ..........................................................49

*In re Complete Mgmt. Inc. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001) ...................................................................68

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
  22 F.4th 1 (1st Cir. 2021) ....................................................................................28

*In re Credit Suisse-AOL Sec. Litig.*,
  465 F. Supp. 2d 34 (D. Mass. 2006) ...............................................................56, 72

*Dahhan v. OvaScience, Inc.*,
  321 F. Supp. 3d 247 (D. Mass. 2018) ...................................................................59

*Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
  2022 WL 2073826 (E.D. Pa. June 9, 2022) ...........................................................31

*Dudley v. Haub*,
  2013 WL 1845519 (D.N.J. Apr. 30, 2013) .......................................................42, 45

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)............................................................................49, 50

*EP Henry Corp. v. Cambridge Pavers, Inc.*,
  2017 WL 4948064 (D.N.J. Oct. 31, 2017)..............................................................61

*In re Eros Int'l PLC Sec. Litig.*,
  2021 WL 1560728 (D.N.J. Apr. 20, 2021) .............................................................28

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013).........................................................5, 52, 54

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011).................................................................................27

*In re ForceField Energy Inc. Sec. Litig.*,
  2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) .......................................................43

iv

*In re Ford Motor Co. Securities Litigation*,
    381 F.3d 563 (6th Cir. 2004) ........................................................................61, 62

*Frederick v. New Hampshire*,
    2016 WL 4382692 (D.N.H. Aug. 16, 2016) ..............................................67, 68

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000).....................................................................................56

*Gerneth v. Chiasma, Inc.*,
    2018 WL 935418 (D. Mass. Feb. 15, 2018) .................................................. *passim*

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019)........................................................................63

*Hedrick v. The Kraft Heinz Co.*,
    2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .........................................................57

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).....................................................................................................26

*In re Ibis Tech. Sec. Litig.*,
    422 F. Supp. 2d 294 (D. Mass. 2006) ......................................................................58

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)..........................................................................................52

*Jaroslawicz v. M&T Bank Corp.*,
    962 F.3d 701 (3d Cir. 2020), cert. denied, 141 S.Ct. 1284 (2021) ..................53, 63

*In re Juno Therapeutics, Inc.*,
    2017 WL 2574009 (W.D. Wash. June 14, 2017)......................................................45

*Karth v. Keryx Biopharm., Inc.*,
    6 F.4th 123,135 (1st Cir. 2021)..................................................................................37

*Kirkland v. Wideopenwest, Inc.*,
    No. 653248/2018, 2020 WL 2526982 (N.Y. Sup. Ct. May 18, 2020)........26, 28, 29, 32

*Kusnier v. Virgin Galactic Holdings, Inc.*,
    2022 WL 16745512 (E.D.N.Y. Nov. 7, 2022)....................................................30, 31

*Labourers' Pension Fund of Cent. & E. Canada v. CVS Health Corp.*,
    192 A.D.3d 424 (1st Dept. 2021)........................................................................31, 33

*Lenartz v. Am. Superconductor Corp.*,
    879 F. Supp. 2d 167 (D. Mass. 2012) ......................................................................26

*Levy v. Gutierrez*,
    2017 WL 2191592 (D.N.H. May 4, 2017).........................................................................6, 28

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)........................................................................4, 50, 52

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)......................................................................72

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
    238 F.3d 363 (5th Cir. 2001) ............................................................................25, 26

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010).....................................................................57

*Merck & Co., Inc. v. Reynolds*,
    559 U.S. 633 (2010)....................................................................................65, 66

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)................................................................35, 36

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)....................................................................................63, 64

*Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008)................................................................................42

*Neely v. Bar Harbor Bankshares*,
    270 F. Supp. 2d 50 (D. Me. 2003) .........................................................................71

*Ngomba v. Olee*,
    2020 WL 107969 (D. Mass. Jan. 9, 2020)..........................................................67, 69

*Ocasio-Hernandez v. Fortuno-Burset*,
    640 F.3d 1 (1st Cir. 2011)..................................................................................25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................... passim

*Or. Laborers Emps. Pension Tr. Fund v. Maxar Techs. Inc.*,
    2020 WL 5500458 (D. Colo. Sept. 11, 2020)............................................................42

*Padilla v. Cmty. Health Sys., Inc.*,
    2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) .........................................................31

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)....................................................51, 52, 53

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    681 F.3d 114 (2d Cir. 2012)......................................................................52, 53

*Pirani v. Slack Techs., Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021), cert.
    granted, 143 S.Ct. 542 (2022)..............................................................6, 45, 55

*In re PLC Sys., Inc. Sec. Litig.*,
    41 F. Supp. 2d 106 (D. Mass. 1999) ...........................................................45, 55

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
    2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017)......................................................53

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011) ..............................................................62, 63, 72

*Quaak v. Dexia, S.A.*,
    445 F. Supp. 2d 130 (D. Mass. 2006) ........................................................67, 69

*Ramirez v. Exxon Mobil Corp.*,
    334 F. Supp. 3d 832 (N.D. Tex. 2018) .......................................................27, 33

*Roeder v. Alpha Indus., Inc.*,
    814 F.2d 22 (1st Cir. 1987).....................................................................50

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).....................................................................55

*S.E.C. v. Das*,
    2010 WL 4615336 (D. Neb. Nov. 4, 2010) .......................................................70

*S.E.C. v. Sequential Brands Grp., Inc.*,
    2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021).....................................................29

*Schaffer v. Timberland Co.*,
    924 F. Supp. 1298 (D.N.H. 1996)................................................................56

*Scritchfield v. Paolo*,
    274 F. Supp. 2d 163 (D.R.I. 2003)..........................................................60, 61

*Shaw v. Dig. Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)..............................................................35, 43, 60

*Shuli Chiu v. Dipp*,
    2018 WL 3455402 (D. Mass. Apr. 13, 2018) .....................................................63

*Silverstrand Invs. v. AMAG Pharm., Inc.*,
    12 F. Supp. 3d 241 (D. Mass. 2014) ......................................................25, 36, 63, 71

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
   707 F.3d 95 (1st Cir. 2013) ................................................................. passim

*Simon v. Am. Power Conversion Corp.*,
   945 F. Supp. 416 (D.R.I. 1996) .......................................................................52

*St. John v. Cloopen Grp. Holding Ltd.*,
   75 Misc. 3d 1234(A), 171 N.Y.S.3d 893 (N.Y. Sup. Ct. 2022) ......................31

*Stadnick v. Vivint Solar, Inc.*,
   861 F.3d 31 (2d Cir. 2017) ..............................................................................53

*In re Stone & Webster, Inc., Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005) ...........................................................49, 58, 59, 64

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ........................................................................51, 52

*Strougo v. Tivity Health, Inc.*,
   551 F. Supp. 3d 839 (M.D. Tenn. 2021) ........................................................28

*Suna v. Bailey Corp.*,
   107 F.3d 64 (1st Cir. 1997) ..............................................................................37

*Swack v. Credit Suisse First Bos.*,
   383 F. Supp. 2d 223 (D. Mass. 2004) .............................................................56

*Thant v. Karyopharm Therapeutics Inc.*,
   43 F.4th 214 (1st Cir. 2022) .......................................................................61, 62

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
   319 F. Supp. 2d 152 (D. Mass. 2004) .............................................................54

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) .........................................................................................64

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*,
   842 F.3d 71 (1st Cir. 2016) .......................................................................44, 45, 55

*In re Tyco Int'l, Ltd.*,
   2004 WL 2348315 (D.N.H. Oct. 14, 2004) .....................................................66

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
   985 F.2d 1190 (2d Cir. 1993) .....................................................................63, 64

*In re Willis Towers Watson plc Proxy Litig.*,
   937 F.3d 297 (4th Cir. 2019) ..........................................................................65

*In re WorldCom, Inc. Sec. Litig.*,
     294 F. Supp. 2d 392 (S.D.N.Y. 2003)....................................................................72

*Zwick Partners, LP v. Quorum Health Corp.*,
     2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018)........................................... passim


**STATUTES & RULES**

<u>17 C.F.R.</u>
     § 229.105 ...........................................................................................51, 52
     § 229.303 ...................................................................................3, 4, 51, 52, 53
     § 240.14 ......................................................................................................69

64 Fed. Reg. 45150 at 45152 No. 99 .......................................................................49

84 Fed. Reg. 12674 (Apr. 2, 2019) ...........................................................................51

<u>Federal Rules of Civil Procedure</u>
     Rule 8(a) ..............................................................................................2, 26
     Rule 9(b) .............................................................................................26, 37
     Rule 12(b)(6) ............................................................................................25
     Rule 15(c) ................................................................................................67
     Rule 59(e) ................................................................................................41

Private Securities Litigation Reform Act (15 U.S.C. § 78u-4).........................26, 58

<u>Securities Act of 1933 (15 U.S.C. § 77a et seq.)</u>
     § 77k .........................................................................................................25
     § 77l ...................................................................................................25, 26
     § 77o .........................................................................................................71

<u>Securities & Exchange Act of 1934 (15 U.S.C. § 78a et seq.)</u>
     § 78i ....................................................................................................65, 66
     § 78j (§ 10(b))................................................................................... passim
     § 78n (§ 14(a)) ................................................................................... passim
     § 78t .........................................................................................................71

Lead Plaintiff Los Angeles Fire and Police Pensions ("Lead Plaintiff") submits this Opposition to the Motion to Dismiss the Amended Consolidated Class Action Complaint (the "Motion to Dismiss") filed by Defendants CVS Health Corporation ("CVS"), Larry J. Merlo, David M. Denton, Eva C. Boratto, Richard M. Bracken, C. David Brown II, Alecia A. DeCoudreaux, Nancy-Ann M. DeParle, David W. Dorman, Anne M. Finucane, Jean-Pierre Millon, Mary L. Schapiro, Richard J. Swift, William C. Weldon, and Tony L. White (ECF 52) (the "CVS Defendants' Brief" or "CVS Br.").

## PRELIMINARY STATEMENT

The CVS Defendants principally contend that this Court is required to dismiss this action based on rulings concerning *different* allegations in different complaints about the CVS-Aetna merger, filed by different plaintiffs, and asserting different claims under different legal standards. To the contrary, every complaint must be carefully considered based upon the specific facts that it alleges and the particular legal standards that apply to the claims that it asserts. Carefully considered on its own merit, this Complaint adequately states a claim based on its uniquely robust factual allegations.[1]

Unlike the Section 10(b) case previously before this Court, *City of Miami Fire Fighters' & Police Officers' Retirement Trust v. CVS Health Corp.*, 519 F. Supp. 3d 80 (D.R.I. 2021) (the "Section 10(b) complaint"), this Complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act and Sections 14(a) and 20 of the Exchange Act. It is well established that, particularly compared to the claims asserted in the Section 10(b) complaint, (i) the pleading

---

[1] All capitalized terms not defined in this brief have the meanings assigned to them in the Amended Consolidated Class Action Complaint (the "Complaint") (ECF No. 51). Paragraph (¶) references are to the Complaint. "Pl. Ex. _" refers to exhibits attached to the declaration of John Rizio-Hamilton, filed concurrently herewith, and "CVS Ex." and "Aetna Ex. _" refers to the exhibits attached to the CVS and Aetna Defendants' Motions to Dismiss. Unless otherwise stated, all emphasis is added, and internal quotation marks and citations are omitted.

standards applicable to Plaintiff's claims here are extremely low; and (ii) the elements that are required to state the claims asserted by Plaintiff here are extremely limited. For the Securities Act claims under Sections 11 and 12(a)(2), Lead Plaintiff need only allege a materially misleading statement or omission in a registration statement or prospectus to state a claim; no scienter, reliance, or loss causation is required. *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 101-02 (1st Cir. 2013) (collecting cases). Further, these Securities Act claims require a plaintiff to meet only the "minimal" "notice-pleading standard of Fed. R. Civ. P. 8(a)." *Id.* Likewise, Lead Plaintiff's Exchange Act Section 14(a) claims do not require scienter.

This Complaint more than adequately satisfies that standard. First, this Complaint alleges that Defendants made material misstatements and omissions when they stated in the Offering Documents that the Omnicare goodwill showed "no impairment" and had retained its full value at $6.5 billion when, in reality, the goodwill was significantly impaired and required a massive write down. The Complaint here supports these allegations with numerous contemporaneous facts provided by the accounts of 24 well-placed former employees—uniquely covered in Lead Plaintiff's investigation—that conflicted with Defendants' statements that the business had retained its full value, including:

i.   By the time the Offering Documents became effective on February 9, 2018, CVS had lost 25-33% of its LTC business. *See* ¶114; *see also* ¶¶102-90. The Complaint quantifies the extent of the business loss; explains why the losses occurred; specifies the timeframe they occurred; identifies reports that described the business loss, including "quarterly-outlook" reports that were updated for the C-Suite weekly and calls during which the business loss was discussed, including "State of the Company" conference calls, and weekly and monthly executive team calls; and specific facilities that were hit particularly hard with "bed losses." *See id.*

ii.  The LTC business loss was so severe that by no later than Thanksgiving 2016, the Company held a "come to Jesus" meeting because the LTC segment was "losing business hand over foot." *See* ¶¶103-04; *see also* ¶¶102-06. The Complaint specifies that the meeting occurred at CVS's corporate headquarters in Woonsocket, Rhode Island; was attended by senior executives, including Omnicare President Rocky Kraft and the Vice President of Sales for Omnicare, Jeremie Trochu, and that the executives discussed the

continuing and worsening business loss. *See id.*

iii.   CVS had launched a strategy in 2016, communicated to employees as a way "to stop the bleed," of attempting to cover up the LTC business losses by acquiring other LTC providers, but this strategy had failed spectacularly because, shortly after each acquisition, CVS lost the business it just purchased. *See* ¶¶182-83; *see also* ¶¶173-90. The Complaint identifies nine witnesses who specified when and why this strategy was implemented; specific names of the pharmacies purchased; and the expected revenue retention versus the actual revenue retention from the acquisitions. *See id.*

iv.   At the same time CVS was losing approximately one third of its LTC business, it engaged in widespread illegal rollover practices through which CVS billed and recorded hundreds of millions of dollars of revenue from the federal health care programs to which the Company was not entitled. *See* ¶¶191-220. Again, the Complaint identifies the reasons for the rollovers; how long they occurred; the number of facilities affected; the name of the whistleblower who brought the practices to public light; the extreme nature of the rollovers such that the DOJ and 29 states and the District of Columbia intervened in whistleblower actions to address the issue; and specific reports and internal communications documenting the illegal practices and describing their scope as "huge." *See id.*

In stark contrast, the Section 10(b) complaint contained virtually none of these specific factual allegations as to the timing and extent of the business loss prior to the vote on the Aetna Merger or the timing of specific information that went to CVS's executives, and no allegations whatsoever concerning the illegal rollover practice. Likewise, the bare-bones Section 11 complaint filed in the New York state court action included *none* of these specific and well-pled facts, instead containing just seven paragraphs of allegations purportedly from inadequately described former employees. *See* Pl. Ex 1 at ¶¶39-45.

The detailed, contemporaneous facts in this Complaint more than adequately state a claim under Rule 8 that Defendants' statements that the value of the Omnicare goodwill was intact were misleading because they omitted contrary facts that "conflict with what a reasonable investor would take from the statement[s]." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).

Second, Defendants failed to disclose information required by Regulation S-K, including the requirement under Item 303 that issuers disclose known trends and their actual or anticipated

impact. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718-19 (2d Cir. 2011). Here, this Complaint more than adequately alleges that Defendants failed to disclose two known trends and their impact: (i) material customer losses, amounting to between 25-33% of the LTC business that had been worsening and was expected to continue to worsen over time; and (ii) widespread illegal prescription rollover practices. A failure to disclose "known trends or uncertainties" as required under Item 303 gives rise to liability under the Securities Act ***regardless*** of whether such omissions make affirmative statements false or misleading. *E.g., Silverstrand*, 707 F.3d at 102-03. The Section 10(b) Complaint did not (and could not) allege this basis for liability, and thus the Court never considered whether CVS's Offering Documents omitted these disclosures required by Regulation S-K—a question fundamentally different than—and independent of—whether defendants made affirmative false or misleading statements, as the Court considered in the 10(b) Order.

Third, this Complaint also states a claim based on Defendants' misleading risk warnings. Contrary to the CVS Defendants' contentions, they issued no more than a series of risk warnings that were both generic and conditional. For example, while the CVS Defendants contend that they adequately disclosed the LTC goodwill impairment, they disclosed nothing of the sort. What they said was, "***if***" the Company did not achieve its forecasts, it was "***reasonably possible***" that the LTC business "could" underperform at some future point and then the "LTC reporting unit ***could be*** deemed to be impaired." ¶278. By this time, however, the Omnicare goodwill already was impaired, as CVS had lost approximately one third of the LTC business and was engaged in illegal rollover practices that generated hundreds of millions of dollars in ill-gotten revenue. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re*

*Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013) (collecting cases).

In response to the uniquely well pled facts in this Complaint, the CVS Defendants make a series of arguments in which they either ignore and mischaracterize this Complaint's allegations, misstate controlling law or, at most, raise questions of fact that cannot be decided in their favor now.

The CVS Defendants first contend that this Complaint merely alleges "fraud by hindsight." But this contention ignores that this Complaint alleges numerous undisclosed material facts that existed prior to when the Offering Documents became effective and Aetna shareholders voted to approve the transaction. For example, this Complaint alleges that (i) the 25-33% LTC business loss occurred no later than 2017 and had grown through 2015 and 2016—prior to when the Offering Documents became effective; (i) the "come to Jesus" meeting occurred in late 2016— prior to when the Offering Documents became effective; and (iii) the illegal rollover practices occurred from before CVS's acquisition of Omnicare and continued into 2018—prior to when the Offering Documents became effective.

The CVS Defendants next contend that their disclosures were adequate as a matter of law. In making this argument, the CVS Defendants suggest that the First Circuit held as much in *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22 (1st Cir. 2022). This mischaracterizes the First Circuit's holding. During the appeal, the CVS Defendants repeatedly urged the First Circuit to conclude that their disclosures were sufficient as a matter of law. Significantly, however, the First Circuit never embraced this argument. Rather, the First Circuit held the Section 10(b) complaint failed to plead "sufficiently specific ***facts*** about the state of the LTC business at particular points in time" to assess the timeliness of the goodwill write-

downs under the heightened pleading standards of the PSLRA. *Id*. at 31. But those standards do not apply here, and this Complaint suffers from no such factual defect. At a bare minimum, whether a reasonable investor would have divined the omitted facts from the CVS Defendants' conditional disclosures is a question of fact that cannot be decided in favor of the CVS Defendants now. *See Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 387 (N.D. Cal. 2020).

Tacitly recognizing the errors in their contention that the disclosures were adequate as a matter of law, the CVS Defendants next assert that this Complaint does not demonstrate that the concealed facts were "directly inconsistent" with their disclosures. To start, whether disclosures were "directly inconsistent" is not the appropriate legal test. Even independent of the disclosure obligations under Regulation S-K, statements, including opinion statements, are actionable for being materially misleading when they omit facts that "substantially undermine the conclusion a reasonable investor would reach from [the] statement of opinion." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020); *Levy v. Gutierrez*, 2017 WL 2191592, at *20 (D.N.H. May 4, 2017) (motion to dismiss denied where omitted facts "ma[de] the opinion statement at issue misleading to a reasonable investor reading the statement fairly and in context"). As noted above and detailed throughout this brief, that is exactly what this Complaint alleges.

In any event, the concealed facts **were** "directly inconsistent" with what a reasonable investor would understand the disclosures to mean. For instance, the fact that the LTC business had lost approximately one-third of its business by the time the Offering Documents became effective is indeed "directly inconsistent" with the CVS Defendants' statement that the business had retained its full value and was unimpaired. Similarly, the CVS Defendants warned of the theoretical risks "relating to the Company's participation in Medicare, Medicaid and other federal and state government-funded programs" and "related to compliance with" laws and regulations—

when CVS **was already** violating laws and regulations due to its illegal prescription rollover practices. Suggesting that these risks were merely theoretical is directly inconsistent with the fact that they **had** occurred.

The CVS Defendants make a handful of additional arguments regarding their failure to disclose CVS's rollover practices. They contend their disclosures on this practice were adequate as a matter of law simply because they disclosed that CVS had received a Civil Investigation Demand. This argument makes no sense. Nowhere does the disclosure state that CVS was engaged in illegal rollover practices, much less that this practice was widespread or had resulted in CVS's revenues being inflated by hundreds of millions of dollars to which the Company was not actually entitled. The CVS Defendants next assert that rollovers were immaterial. This Complaint pleads ample facts, however, to support an inference of materiality, including, for example, that the illegal rollover practices: (i) occurred across thousands of facilities; (ii) spanned almost a decade; (iii) were internally acknowledged to be "huge" in "scope"; (iv) generated "hundreds of millions of dollars" in illegal revenue; (v) affected facilities that accounted for 24% of the Omnicare's prescription volume as of January 2017 and approached or exceeded 50% of all prescriptions fills; and (vi) caused the DOJ and 29 states plus the District of Columbia to intervene in *qui tam* whistleblower cases concerning the practice. All of this demonstrates the significance of the practices; at a bare minimum, such allegations suffice to raise a fact question as to materiality. Lastly, the CVS Defendants assert that there is no connection between the rollover practices and the LTC goodwill. Like the others, this argument fails because separate and apart from goodwill, this Complaint pleads actionable statements about the rollover practices. ¶¶291-93. Moreover, this Complaint alleges that there **was** a direct connection between the illegal rollover practice and

goodwill: legal liability is one of the signs of impairment that is a triggering event under GAAP for goodwill impairment. ¶¶95, 220.

For all the reasons set forth herein, the CVS Defendants' motion should be denied.

## STATEMENT OF FACTS

### A. CVS Purchased Omnicare To Enter The LTC Business, A Supposed "Substantial Growth Opportunity"

On May 21, 2015, CVS announced that it acquired Omnicare in order to obtain Omnicare's Long-Term Care business, which provides pharmacy services to skilled nursing facilities, assisted living facilities, and independent living facilities. ¶¶37, 42. To purchase Omnicare, CVS paid $9.6 billion, plus the assumption of $3 billion in Omnicare debt, which represented a 28% premium to Omnicare's stock price. ¶¶42, 44, 48.

CVS immediately trumpeted the supposed opportunity to enter a growing market that the purchase offered. Then-Chief Executive Officer Larry Merlo stated that the acquisition was "a substantial growth opportunity for us." ¶43. Defendant David Denton, then CVS's Chief Financial Officer, told the market that the Omnicare acquisition had "positive financial implications for CVS Health in 2016 and well beyond into the future." ¶45. Denton highlighted CVS's supposed capacity to "grow [LTC] revenue by applying many of our best practices to the Omnicare model." *Id.*

Following the acquisition, most of Omnicare's carrying value was recorded as goodwill. Under GAAP, goodwill is the difference between the purchase price and the fair value of the assets and liabilities of the acquired company. ¶49. After the closing of a transaction, the ongoing status of goodwill indicates to the market how the target's assets are performing, how the integration of those assets is progressing, and whether the acquiring company is recognizing the upside it initially expected in the transaction. ¶94.

GAAP also provides a methodology for testing whether goodwill is "impaired," meaning that the fair value of the reporting unit is lower than its carrying value. ¶95. Impairment testing must be performed at least once a year, and interim testing must be performed when "circumstances change[] that would more likely than not reduce the fair value of a reporting unit below its carrying amount," such as "negative or declining cash flows," "changes in management, key personnel, strategy, or customers," and "industry and market considerations such as . . . an increased competitive environment . . . or a change in the market for an entity's products or services." ¶59 (quoting U.S. Generally Accepted Accounting Principles ("GAAP")). CVS represented that it performed its required annual testing in the third quarter of each year. ¶59.

In its first periodic filing after acquiring Omnicare, CVS recorded $9 billion in goodwill, representing more than 94% of the $9.6 billion purchase price. ¶¶48, 50. In that first and subsequent filings, instead of separately reporting the financial results of the newly acquired LTC business, CVS folded that business into its much larger Retail Pharmacy Segment, to create a new Retail/LTC Segment. ¶51. It allocated the vast majority of the $9 billion in goodwill, a total of $8.6 billion, to the Retail/LTC segment, while allocating the remaining $0.4 billion in goodwill to the Pharmacy Services segment. *Id.*

In the year following the Omnicare acquisition, CVS did not disclose any interim impairment testing related to the LTC business, and in its periodic report for the third quarter of 2016 reported that its annual impairment testing in the third quarter of 2016 "indicated that there was no impairment of goodwill." ¶54. In that report, CVS disclosed for the first time that $6.3 billion of the goodwill resulting from the Omnicare acquisition had been allocated specifically to the LTC business (this goodwill is referred to herein as the Omnicare goodwill), with the remaining $2.3 billion allocated to the broader Retail/LTC segment. ¶¶52-55.

Because the Retail Pharmacy Segment had revenue many times greater than the LTC business, investors had no way of separately tracking the financial performance of the LTC business. ¶56. When investors asked about the LTC business's performance, Defendants refused to answer. ¶57. Thus, investors could not independently assess the value and performance of the LTC business, and were left to rely on Defendants' purportedly accurate valuation of the Omnicare goodwill. ¶58.

### B.    Under Pressure To Transform Its Business Through A Strategic Acquisition, CVS Announced The Aetna Acquisition

On December 3, 2017, CVS announced that it would acquire Aetna for $77 billion. ¶71. The merger agreement provided that Aetna shareholders would receive $145 in cash and 0.8378 shares of CVS common stock for each share of Aetna stock. *Id*. This exchange rate was based on CVS stock's then-prevailing price of $74.21 per share. ¶80.

The Aetna acquisition was vital for CVS. ¶¶60-77. Acquiring Aetna was CVS's answer to several mounting—and potentially catastrophic—industry pressures. *Id*. Most significantly, acquiring Aetna would fortify CVS against competition from Amazon's entry into the pharmacy business, which was a potentially existential threat. ¶¶65-77. Analysts and financial press reported that the deal was "critical" for CVS to seriously compete with Amazon, explaining that through the deal CVS would "gain[] access to a comprehensive end-to-end offering (plan design to care delivery) and [be] more defensible." ¶77.

To successfully close the Aetna acquisition, however, CVS had to obtain approval from Aetna shareholders. ¶78. This approval was far from guaranteed, as some analysts had questioned whether Aetna should have obtained greater consideration. ¶79. Thus, in the leadup to the shareholder vote, it was imperative that CVS project financial strength. ¶78. Had CVS reported large write-downs or material negative business trends, it would have caused CVS's stock price to

decline, and the value of the consideration that Aetna shareholders were to receive would have declined. ¶¶82-83. This would have pushed Aetna shareholders toward a no vote or required CVS to increase the consideration being paid to Aetna shareholders. *Id.*

To solicit shareholders to vote in favor of the Aetna acquisition, CVS and Aetna issued Offering Documents, including a joint Proxy, which the Securities and Exchange Commission declared effective as of February 9, 2018. ¶86. The Offering Documents incorporated by reference several of CVS's public filings with the SEC from the preceding year, including the Form 10-Q for the third quarter of 2017 (the "3Q17 10-Q"), which contained CVS's goodwill impairment testing, as well as "any additional documents that [CVS or Aetna] may file with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act between the date of this joint proxy statement/prospectus and the respective dates of the Aetna and CVS Health special meetings," which Defendants further represented "contain important information about CVS Health and Aetna and their respective financial performance." ¶265-66, 271. On February 14, 2018, CVS filed one such document, its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). *Id.* Around one month after the 2017 10-K's filing, Aetna shareholders voted to approve the transaction on March 13, 2018. ¶91.

### C.   The Statements Incorporated Into The Offering Documents Portrayed The LTC Business As A Growth Driver With A Positive Goodwill Balance

The documents that CVS and Aetna instructed investors to rely on in support of the transaction painted a positive picture of the LTC business. CVS's annual goodwill impairment testing, which was the best indicator available to investors about the LTC business's overall performance (¶¶57-58), represented that Omnicare's fair value continued to exceed its carrying amount and was not impaired. (¶¶271-72). Specifically, the Form 10-Q for the Third Quarter of 2017 (the "3Q17 10-Q") reported that "during the three months ended September 30, 2017, [CVS]

performed [its] required annual impairment tests of goodwill," and found that "[t]he results of the impairment tests indicated that there was no impairment of goodwill," finding a total goodwill balance for the Retail/LTC segment of $16.532 billion. ¶271. The 3Q17 10-Q reported that "the results of our annual goodwill impairment test resulted in the fair value of our LTC reporting unit exceeding its carrying value by approximately 1%." ¶278. The filing referenced only hypothetical future risks to the segment's goodwill, stating that "[i]f" CVS did not achieve its forecast, it was "reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term and the LTC reporting unit could be deemed to be impaired by a material amount." ¶278. However, as noted directly below, in the last relevant public filing before shareholders approved the transaction, CVS's public statements indicated to investors that these risks had not been realized.

CVS's statements about the LTC segment's goodwill balance at the end of 2017 betrayed no change from the impairment testing results reported in the 3Q17 10-Q. The 2017 10-K again reported that the fair value of the LTC reporting unit exceeded its carrying value "by approximately 1%," and that the "balance of goodwill" for the unit "was approximately $6.5 billion," a slight increase from the goodwill balance first reported following the third quarter of 2016. ¶¶52, 274. The 2017 10-K contained the boilerplate warning that goodwill "could, *in the future*, become impaired," and later clarified that "*[i]f* we do not achieve our forecasts . . . it is reasonably *possible* that . . . the LTC reporting unit *could* be deemed to be impaired by a material amount." ¶¶274.

The filings incorporated into the Offering Documents consistently represented that CVS complied with GAAP in general, and in particular with regard to their particular requirements for goodwill impairment testing. ¶¶282-83.

The Offering Documents referenced purported risks to the LTC business, but treated them as both generic and hypothetical future events. ¶¶286-302. For example, they purported to warn investors of [t]he possibility of PBM and LTC client loss and/or the failure to win new . . . LTC business," of risks "relating to the health of the economy in general and in the markets we serve, which ***could*** impact . . . the financial health of our . . . LTC clients," of "[r]isks and uncertainties related to the timing and scope of reimbursement from Medicare, Medicaid and other government-funded programs," and of a theoretical risk of "sanctions and remedial actions" "relating to the Company's participation in Medicare, Medicaid and other federal and state government-funded programs" and "related to compliance with" laws and regulations. *Id.*

The mix of information incorporated into the Offering Documents showed an LTC segment that, like any business, faced generic theoretical risks that had not actually materialized, and one that CVS, in accordance with GAAP, determined had a fair value in excess of its carrying value. This picture, however, concealed enormous decay in the business which was evident to Defendants—but not evident to investors—by the time that: (i) the Offering Documents became effective; (ii) the 2017 10-K, the last relevant filing incorporated into the Offering Documents, was filed; and (iii) Aetna shareholders voted on the transaction.

> **D.    The Offering Documents Concealed Known Facts About The Impaired Condition Of The LTC Business**
>
> **1.    The LTC Business Suffered A Cascade Of Business Losses Prior To The Offering Documents Becoming Effective.**

The LTC business's struggles predated Omnicare's acquisition by CVS and escalated as a result of practices CVS instituted, leading to years of consistent bed loss that ultimately amounted to approximately ***a third*** of Omnicare's business by the time the Offering Documents became effective—highly material facts that were not disclosed to investors.

The former Vice President for Senior Living at CVS (Former Employee 1) reported that CVS bought Omnicare for more than it was worth, characterizing the acquisition as buying "a Cavalier at a Cadillac price." ¶107. Indeed, a former Senior Director of Account Management and Senior Director of Assisted Living (Former Employee 22) noted that before the acquisition of Omnicare was publicly announced, Amit Jain—who was the Senior Vice President, Head of Business Operations at Omnicare—held a "punishing" conference call for the purpose of establishing a new department to combat the bed losses. ¶¶139-40.

After acquiring Omnicare, CVS instituted massive and widespread staff cuts. Former employees corroborated that between the Omnicare acquisition and the Aetna acquisition, CVS significantly reduced its long-term care workforce to save costs and appear more profitable. ¶169. Due in part to these staffing cuts, CVS repeatedly failed to perform one of its core functions in the Long-Term Care business—delivering prescriptions to customers in a timely and accurate fashion. ¶¶143-72. Former Employee 9, a Back-End Pharmacy Manager of CVS/Omnicare from September 2003 to August 2017 for a hub pharmacy in Missouri, reported that following the staffing cuts CVS was seeing a lot more errors, people were rushing and overworked, and there were fewer and fewer pharmacists. *Id.* Former Employee 10 reported that the accuracy of medications delivered worsened over the course of his tenure because employees were being pressured to rush to perform, and to get things out. ¶148. Former Employee 11, an Operations Manager, Long-Term Care Logistics from 2016 to 2017, specified that during those years the accuracy rate was "very low" and "sometimes less than 70%," even though the company claimed to have 100% accuracy. ¶¶152, 154.

In the two years leading up to the Offering Documents becoming effective, the LTC business suffered unsustainable bed loss. Former Employee 8, at various times a Senior Living

Specialist and subsequently a Regional Manager of Senior Living, reported that Omnicare's skilled nursing facility lost 100,000 beds in 2016 *and again* in 2017. ¶¶133, 136. Former Employee 12, a Pharmacy Manager for Omnicare in Massachusetts, reported that prior to spring 2017, when the "bleeding" began, his pharmacy serviced 155 facilities; by the time he left in May 2017, he estimated that CVS had lost 25% of that business. ¶¶155-57. Likewise, a Department Manager at CVS/Omnicare in Connecticut reported that by June 2017, Omnicare had lost 10,000 beds in that state alone. ¶128. Former Employee 22 observed that the situation was "really going south" by the summer of 2017. ¶¶139, 142.

This bed loss was catastrophic to the business, closely tracked, and widely known. Former Employee 2, a former regional clinical manager at CVS/Omnicare, reported that internal CVS reports documented that, in the 2016-2017 timeframe –i.e., the two years *before* the Offering Documents became effective—*the LTC segment lost 25-33% of Omnicare's overall business*. ¶114. These reports came both via email and via company phone calls, called "State of the Company" conference calls, some of which were company-wide. *Id.* Sometimes Omnicare's president led the calls and sometimes the Vice President of Clinical Services, Gary Erwin, would lead them. *Id.* In addition, middle and upper management at the company received the detailed reports, which included a spreadsheet that showed potential new business, potential loss of business, facilities at risk, and loss of business. *Id.* Throughout the entire period of the losses, executives at CVS and Omnicare received extensive reports about the issues facing the business. Former Employee 22 reported that following the "punishing" conference call prior to the Omnicare acquisition's announcement, the company instituted a system of weekly action plans developed for any Omnicare facilities deemed at risk of leaving, with weekly calls to go over the action plans for each region. ¶141. Former Employee 8 likewise reported that reports came out weekly at the

Company that were accessible by all director-level employees and above, and that were broadcast out to the organization. ¶137. In addition, according to Former Employee 8, there were also monthly volume reports and financial impact reports, and all of the numbers were in red or had parentheses around them (i.e., were negative). ¶137. Former Employee 21, Manager of Long-Term-Care Strategy at Omnicare, led a team which recorded which Omnicare facilities were at risk of leaving and calculated what that would mean for Omnicare in terms of revenue loss, bed loss, and script loss. ¶117. He reported that these reports went "all the way to the top of house" and there was "no way" that Omnicare executives did not see the reports. ¶118.

In addition to the various reports, the LTC business held multiple large-scale meetings that raised the alarm about the bed losses at the highest levels of the Company. As one example, Former Employee 1, at the time a Senior Consultant of Senior Living, reported that around Thanksgiving 2016, with the LTC business "losing business hand over foot," the company had a "come to Jesus" meeting to address the fact that the business was declining. ¶¶103-06. The meeting, held at CVS's Rhode Island headquarters, featured Omnicare and CVS executives, including Omnicare President Rocky Kraft and Jeremie Trochu, the President of Sales for Omnicare from 2015 to 2016 and then Vice President for Senior Living at CVS from 2016 to 2017. *Id.*

The meeting failed to achieve its purpose, however, and Former Employee 13, a General Manager for the company in Maryland from 2014 through August 2017, reported that in 2017 there was a new increase in the frequency of conference calls, and increased reporting tied to finances and expenses of staffing; this increase was particularly evident from May 2017 to when Former Employee 13 left that August. ¶164. By May 2017, Former Employee 13 reported, there was a "nonstop sense of intensity" and a "sense of impending doom that was coming all the time." ¶165.

The efforts made by CVS to counter the loss of business proved woefully inadequate. Former Employee 1 reported that the company set unachievably high growth goals for senior living, and a CVS executive explained to Former Employee 1 that the senior living initiatives were an effort to head off goodwill impairment. ¶106. Former Employee 1 described the growth goals as impossible, saying "it was a pie in the sky goal." *Id.*

Former Employee 2 reported that, about 1.5 years after the Omnicare acquisition, CVS realized it was losing customers and money; it went into acquisition mode and started buying long-term care pharmacies in an effort to cover up the losses. ¶ 182. This strategy was itself disastrous. Former Employee 2 reported, for example, that CVS purchased a large pharmacy in California, most likely in the first half of 2017, but lost 80% of its business within six months. *Id.* Former Employee 2 reported being on calls where "the word disaster was used" to describe the "disastrous acquisition." *Id.*

Other employees report similar losses following acquisitions. Former Employee 3, the Operations/General Manager who was responsible for all long-term care pharmacy operations in Florida, reported that CVS acquired one pharmacy in 2017 and lost 90% of that pharmacy's business in the three to six months following the acquisition. ¶186. Similarly, in the 2016-2017 time-frame Omnicare acquired a pharmacy in the North Chicago suburbs and acquired all of its patients, Former Employee 18, a CVS/Omnicare Long-Term Care Pharmacist Consultant from 2007-2018, reported. ¶185. However, as Former Employee 18 noted, within a few months CVS lost all of the patients for Aperion Care, a large customer of the acquired pharmacy. *Id.* Former Employee 2 explained why CVS/Omnicare continued to acquire pharmacies when the acquisitions were not successful: "It was communicated to us that we were losing so much business that they were trying to save grace, ***just trying to stop the bleed***." ¶183.

17

## 2.    Omnicare Engaged In Illegal Prescription Rollover Practices.

In addition to the fact that the LTC business had lost a third of its business, a material portion of the LTC business's revenues were traced to illegal prescription drug practices. ¶¶192-220. As detailed by complaints from 29 states and the District of Columbia, former Omnicare pharmacist and whistleblower Uri Bassan, and the Department of Justice (the "DOJ"), from 2010 to 2018 Omnicare illegally billed federal health care programs for drug sales not authorized by a medical professional, which violated federal and state regulations. ¶192-95. Rather than obtaining a new prescription after an old one had expired or run out of refills, Omnicare would assign a new number to the old prescription and keep on dispensing the medication as if a new prescription had been obtained. ¶194. The two IT systems utilized by Omnicare (OmniDX and Oasis) in connection with prescription refills both had internal issues that led to the inappropriate prescriptions. ¶217.

These illegal rollover practices had a material impact on Omnicare's business. According to the DOJ complaint, these rollover practices impacted at least 3,200 residential facilities that Omnicare/CVS serviced, and exhibits to a complaint filed by the state attorneys general and Bassan detailed (by way of example only) over 4,000 specific false claims submitted from various Omnicare facilities. ¶196. Former Employee 24 reported that "there were over 1,500 assisted living communities that broke state and federal laws by refilling prescriptions without legitimate physician prescription orders and billed Medicare and Medicaid hundreds of millions of dollars." ¶219. The assisted living facilities throughout which the improper Medicare and Medicaid billing practices were endemic represented 24% of Omnicare's prescription volume as of January 2017. ¶220. While Defendants baldly claim that the rollover practices were immaterial, their claim is belied by all these facts—as well as the fact that in December 2019 the Department of Justice intervened in the matter. ¶ 193.

Omnicare and later CVS had extensive knowledge of the illegal rollover practices. In 2012, a draft report summarizing an Omnicare audit of pharmacy processes and controls in South Carolina noted a "recurring issue" identified in multiple operational audits that year. Specifically, the draft report found that "[r]enewal physician orders are not consistently obtained due to the lack of an automated process to prevent the pharmacy from dispensing an order beyond 12 months." ¶199. Also in 2012, the Utah Division of Occupational and Professional Licensing investigated Omnicare for its prescription drug practices. ¶198. The next year, a Pennsylvania audit, which was forwarded by Omnicare's Chief Audit Officer to its Chief Compliance Officer, discussed the same illegal and improper prescription drug practices that a separate audit had discovered a year prior. ¶199.

The same issues continued into 2014-2015. Omnicare was subjected to investigations by the Missouri Board of Pharmacy in 2014 and the New Mexico Board of Pharmacy in 2015. ¶198. Between August 2014 and August 2015, a third-party audit found that 55% of Medicare D claims made by Omnicare of Albuquerque contained deficiencies, and an audit from July 2015 found that Omnicare of Atlanta "failed to provide valid, signed Physician Orders for 43% of the claims requested in the sample." ¶205. That number was even worse in a separate audit which concluded a few months after the acquisition, in December 2015; that audit found that Omnicare of Nacogdoches, Texas failed to provide valid orders for more than half of the claims requested. *Id.*

Also in 2015, Uri Bassan, who would later file a whistleblower action against the company, first raised the issue with superiors, but was told to keep filling prescriptions. ¶213. In October of that year, an internal email from Omnicare's Senior Director of Operations noted the need to modify Omnicare's system to avoid rollovers, and a Maryland pharmacy manager alerted a Senior Manager in Omnicare's Operations Department that "refills [for assisted living facility residents]

are going through without available refills and the [internal prescriptions number] is changed"; the Senior Manager responded that the scope of the rollover issue would be "huge." ¶203.

The issues continued after CVS acquired and took control of Omnicare's LTC business. In February 2016, a draft sales memorandum acknowledged that Omnicare's internal systems had "significant gaps in automatically detecting and reviewing expiring [prescriptions] in the variety of processing areas where the last fill can be detected." ¶202. That same month, an assisted living facility in Utah complained when it learned that every month Omnicare of Salt Lake City was dispensing approximately 200 drugs using the cycle fill program even though the prescriptions for the 200 drugs had expired. ¶204. When a pharmacy technician inquired how that had occurred, his supervisor acknowledged that Omnicare's computer systems did not track prescription expiration dates, and subsequently pharmacy management refused to query the OmniDX system to identify other prescriptions that were being filled based on stale prescriptions. *Id.*

The issues continued up through around the time the Offering Documents were issued. ¶¶207-08. In September 2017, CVS's Senior Director of Internal Operations-Long-Term-Care sent an internal email to an Information Technology Director asking what it would "take to repeat the process" of preventing assisted living facility rollovers for Oasis. ¶208. A January 2018 email describing an internal review reported that "[a]udits have identified facility set up issues which are allowing orders to continue in perpetuity." *Id.*

On March 19, 2021, the U.S. District Court for the Southern District of New York denied Omnicare's and CVS's motions to dismiss both complaints. ¶210. The court rejected defendants' argument that the *Bassan* complaint failed to plead that defendants "knowingly" submitted false claims for reimbursement, given that "[t]he complaint states numerous times that Omnicare and CVS executives knew that they could not dispense drugs without valid prescriptions, that they

knew many of their facilities did so anyway[], [and] that this conduct continued even after they were alerted to that fact." ¶210.

CVS did not disclose any impairment testing conducted in relation to the rollover practices, even though "litigation" is one of the events that should trigger interim testing, and the practices exposed the company to litigation from dozens of states and the federal government. ¶¶95-96, 193. In addition, testing should have been conducted given that the errors occurred at thousands of facilities representing 24% of Omnicare's prescription volume. ¶¶196, 220.

### 3. The LTC Business Faced Significant Industry Headwinds And Macroeconomic Trends.

The issues the LTC business faced were compounded by problems impacting the industry. ¶¶221-41. *Skilled Nursing News* reported that in 2017 and 2018, the industry was "dominated" by trends like "[r]eimbursement pressures, closures and bankruptcies." ¶226. In terms of industry trends, while costs of LTC care skyrocketed during 2016-2017, reimbursements declined from Medicaid (the largest payor in the LTC industry) and Medicare. ¶¶228-29. Moreover, generic drug prices, accounting for over 85% of all retail prescriptions filled, fell 9.3% after even larger drops in 2015 (19.3%) and 2016 (17.7%). ¶230. Additionally, the Centers for Medicare & Medicaid Services significantly overhauled the rules regulating LTC facilities beginning on November 28, 2016. ¶231. Compliance measures were estimated to cost each LTC facility tens of thousands of dollars in each of three consecutive years. *Id*. Nursing home occupancy rates fell to historic lows in 2017, below 85%, despite significant closures. ¶¶224, 232. As falling occupancy rates (and thus shrinking revenue) threatened LTC providers, costs were steeply rising. ¶233. From 2016 to 2017, median nursing costs per resident per day increased 4.3%. *Id*.

The LTC business was also battered by negative macroeconomic trends. Rising interest rates exacerbated the financial distress of LTC providers. ¶¶240-41. Between the Omnicare

acquisition and the end of 2017, the federal funds rate increased 900%. ¶241. With many LTC facilities dependent on debt, higher interest rates substantially increased their costs. *Id.*

### E.     The Statements Made In The Offering Documents Contrasted With The Reality Of The LTC Business

CVS failed to account for any of the difficulties facing its business in its last periodic filing before the Offering Documents became effective. CVS did not disclose any interim testing in 2016, and instead conducted its required annual test "during the three months ended September 30, 2017" to be disclosed in the 3Q17 10-Q, long after the "bleeding" of pharmacies began and the company had lost approximately 25-33% of the LTC business. ¶¶114, 155-57, 271.

As discussed above in Section C *supra*, the test purportedly found "no impairment of goodwill," and that the unit exceeded its carrying value by approximately 1%. ¶271. The 3Q17 10-Q did acknowledge that cash flow projections for the LTC reporting unit "declined from the prior year due to customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates," but also noted that its "projected discounted cash flow model assumes *future script growth from our senior living initiative and the impact of acquisitions*"—precisely the opposite of the reality. ¶278. The 3Q17 10-Q portrayed the risk of goodwill impairment as a hypothetical possibility, stating it was "reasonably *possible* that the operational performance of the LTC reporting unit *could be* below our current expectations in the near term and the LTC reporting unit *could be* deemed to be impaired by a material amount"— when in fact that unit had lost a third of its business and was, in fact, already deeply impaired. *I*

The 2017 10-K, which purportedly encompassed the entire fiscal year ended December 31, 2017, parroted CVS's statements about the LTC business from the previous quarter. Despite the fact that all of the trends discussed above continued or worsened throughout the year, including the failed acquisition strategy, CVS did not disclose any goodwill impairment, stating again that

the LTC unit's "fair value" exceeded its carrying value by "approximately 1%," and reporting the "balance of goodwill" for the unit at $6.5 billion. ¶274. Aetna shareholders therefore believed that the multi-billion-dollar business still exceeded its carrying value when they voted to approve the transaction on March 13, 2018. ¶271. The 2017 10-K repeated the rote disclosure that revenues "may" be impacted by changes in the LTC business from the 3Q17 10-Q (CVS Ex. 2 at 54), but did not disclose the damaging trend of 33% business loss that had already occurred. (*Id.*) Only several months later, after the Aetna transaction had been approved, did CVS disclose the truth about the LTC business.

        **F.**      <u>**CVS Belatedly Revealed The Impaired Value Of The LTC Business**</u>

Investors voted to approve the merger on March 13, 2018. ¶91. In the months thereafter, investors learned that the Omnicare goodwill was worth $6.1 billion less than CVS had previously reported, and the LTC business would negatively impact CVS's financial performance for the forthcoming year. ¶¶243-63.

First, on August 8, 2018, approximately 5 months *after* the shareholder vote, CVS announced a $3.9 billion impairment charge to the Omnicare goodwill. ¶243. CVS acknowledged that this write-down was based on challenges to the LTC business that were anything but new. ¶¶244-46. CVS admitted that it had "continued to experience," among other things, "lower client retention rates, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and continued facility reimbursement pressures." ¶244. Defendant Denton further admitted that Defendants had been aware of these issues, as they had been "closely monitoring the performance of the [Omnicare LTC] business for potential indicators of impairment." ¶246.

Nevertheless, Defendants tried to put a positive spin on the news, assuring investors that CVS had a plan to put its LTC business "back on track" and that no further impairment existed,

leaving approximately $2.6 billion of goodwill intact. ¶249. The market credited Defendants' reassuring statements, with analysts touting announced "initiatives" to fix the LTC business and reporting that they "continue[d] to see attractive value in the Omnicare business." ¶¶250-52.

Defendants buttressed these assurances when, on November 6, 2018, CVS reported that it had performed the required annual goodwill impairment test in the third quarter of 2018 and found no further impairment. ¶254. Less than one month later, on November 28, 2018, with investors unaware that further impairment was long overdue, the Aetna acquisition closed. ¶255.

Then, on February 20, 2019—the first reporting period after the acquisition closed—CVS reported another massive, $2.2 billion write-down of the Omnicare goodwill. ¶256. Further, CVS reported lower-than-expected 2019 guidance due in significant part to the deteriorated LTC business. ¶¶256-57. With this charge, CVS wrote down 93% of the Omnicare goodwill reported in the Offering Documents in less than six months. ¶258. These disclosures surprised and disappointed the market. ¶¶259-62. Analysts called the announcements a "Major Disappointment," "the sum of all fears," "the worst case scenario," and a signal that the Aetna acquisition was "a defensive maneuver, aimed at plugging holes in a leaky CVS bucket." *Id.* Wells Fargo downgraded CVS "based on its continued failure to stabilize its existing businesses, particularly the LTC (Long-term care) business," and JP Morgan went so far as to question what value the LTC business had, asking CVS executives "Is this a strategic asset for CVS going forward?" ¶¶259-60 (quoting analyst reports).

CVS's stock price plummeted 8.8% in a day, closing at $64.22 per share on February 20, 2019. ¶263. That was nearly $10 per share less than the price of CVS stock used to calculate the exchange rate that Aetna shareholders approved. *Id*. CVS's stock price collapsed even further in the ensuing days, falling to just $52.36 on March 7, nearly 30% less than the exchange rate. *Id*.

## ARGUMENT

On a Rule 12(b)(6) motion to dismiss, the court must "view the well-pleaded facts in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor." *Silverstrand*, 707 at 101. The Court must deny a Rule 12(b)(6) motion if the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All that is required is "fair notice to the defendants and . . . a facially plausible legal claim." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). The Complaint meets this standard.

## I.     THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER SECTIONS 11 AND 12 OF THE SECURITIES ACT

Counts I and II of the Complaint assert claims under Sections 11 and 12(a)(2) of the Securities Act against CVS and the Securities Act Individual Defendants for their materially inaccurate statements and omissions in the Offering Documents. The required elements of claims under Sections 11 and 12(a)(2) are minimal. Lead Plaintiff need only allege a materially misleading statement or omission in a registration statement or prospectus to state a claim under both Sections 11 and 12(a)(2). *Silverstrand*, 707 F.3d at 107 (collecting cases); *see also Silverstrand Invs. v. AMAG Pharm., Inc.*, 12 F. Supp. 3d 241, 251 (D. Mass. 2014) ("[I]f § 11 claims survive, § 12 claims do as well."). Once a material misstatement or omission is shown, Section 11 "imposes strict liability on issuers of a security." *Silverstrand*, 707 F.3d at 102; 15 U.S.C. § 77k(b)(3)(A). Lead Plaintiff need ***not*** allege any fraudulent intent, reliance, or loss causation. *See, e.g.*, *Omnicare*, 575 U.S. at 179 (Section 11 does not require "any intent to deceive or defraud"); *Silverstrand*, 707 F.3d at 102 (neither Section 11 nor 12 "have a scienter or reliance requirement"). "The lower threshold of liability under section 11 and 12 of the 1933 Act as compared to the [Exchange] Act here matters a great deal." *Lone Star Ladies Inv. Club v.*

25

*Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001). Under Sections 11 and 12, liability "is virtually absolute." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

Moreover, Securities Act claims "*place[] relatively minimal burden on a plaintiff, who need only satisfy the notice-pleading standard of Fed. R. Civ. P. 8(a).*" *Silverstrand*, 707 F.3d at 102. "[U]nlike § 10(b) of the Securities and Exchange Act, . . . neither the heightened pleading standard of Fed. R. Civ. P. 9(b) nor of the Private Securities Litigation Reform Act [("PSLRA")] applies unless a § 11 [or § 12] claim sounds in fraud," which the Complaint here does not do and expressly disclaims. *Id.*; *see also Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 188, 192 (D. Mass. 2012) (same); *Kirkland v. Wideopenwest, Inc.*, 2020 WL 2526982, at *2-3 (N.Y. Sup. Ct. May 18, 2020) (complaint did not "sound in fraud" where "plaintiffs [did] not assert a single allegation of scienter or alliance and" "expressly disclaim[ed] any allegation of fraud or intentional or reckless misconduct").

### A.    The Complaint Adequately Pleads Materially Untrue Statements And Omissions In The Offering Documents

Lead Plaintiff adequately alleges that Defendants made materially untrue statements and omissions in the Offering Documents, including about (i) the value of the LTC business and the Omnicare goodwill; (ii) known material trends and uncertainties that had or were reasonably likely to impact the Company's financial performance; (iii) the risks facing the LTC business; and (iv) whether CVS's accounting for the goodwill complied with GAAP.

#### 1.    CVS Misled Investors About The Value Of The LTC Goodwill.

The Offering Documents misled investors by falsely stating that the LTC business's goodwill was unimpaired. In CVS's 3Q17 10-Q, the most recent filing at the time the Offering Documents became effective, CVS claimed that "during the three months ended September 30, 2017, [CVS] performed [its] required annual impairment tests of goodwill," and found that "[t]he

results of the impairment tests indicated that there was no impairment of goodwill." ¶271. In the 2017 10-K, while warning that goodwill "could, *in the future*, become impaired," CVS repeated that the fair value of the reporting unit exceeded its carrying value and that the value of the LTC business's goodwill was $6.5 billion, which was *more* than the amount disclosed in CVS's Form 10-Q for the third quarter of 2016. ¶¶52, 274.

While courts have held that goodwill statements are ones of fact, not opinion, *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 848 (N.D. Tex. 2018) (defendants' "alleged GAAP violation and . . . failure to recognize the impairment of the [asset] are not opinion statements but create a fact question"), this Court held in *Fire Fighters* that "[g]oodwill assessments are . . . opinion statements" and are therefore evaluated under the standard announced in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). 519 F. Supp. 3d at 95.[2] Under *Omnicare* and its progeny, opinion statements can be actionable if: (i) "omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from [the] statement of opinion," *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020); (ii) the opinion contained "embedded statements of fact" that "were untrue," *Omnicare*, 575 U.S. at 186, or (iii) "the speaker did not hold the belief she professed," *id*. at 185-86. The Complaint pleads actionable Securities Act claims under all three pathways.

### a.    Defendants' goodwill statements contained material omissions that failed to align with what reasonable investors understood the statements to represent.

As courts applying *Omnicare* have explained, "[w]hen omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that

---

[2] The First Circuit opinion in *Fire Fighters* does not appear to have reached this issue. Lead Plaintiff notes that this Court relied on *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011), a pre-*Omnicare* Second Circuit case, and reserve the right to question whether *Fait*'s conclusion remains good law post-*Omnicare*.

statement is misleading and actionable." *Newlink*, 965 F.3d at 177; *see also Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 7 (1st Cir. 2021) (facts potentially conveyed by opinion statement included that the speaker's "opinion fairly aligned with the information [the speaker] possessed at the time"); *Levy v. Gutierrez*, 2017 WL 2191592, at *20 (denying motion to dismiss Section 11 claim where that "plaintiffs [had] met their obligation to identify particular . . . facts . . . whose omission makes the opinion statement at issue misleading to a reasonable investor reading the statement fairly and in context"); *In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *8-9 (D.N.J. Apr. 20, 2021) (finding that opinion statements can be actionable if "the omitted information conflicts with what a reasonable investor would understand the opinions to mean" and that plaintiff sufficiently pled "that Defendants made actionable opinions about the value of Eros intangible assets"). Courts routinely hold that goodwill statements are actionable when the goodwill valuation did not "fairly align with the information in [defendants'] possession at the time." *Zwick Partners, LP v. Quorum Health Corp*., 2018 WL 2933406, at *1, 5 (M.D. Tenn. Apr. 19, 2018) ("important indicators . . . should have alerted, or did in fact alert, [d]efendants to test for such [goodwill] impairments," including "a dramatic decline in overall financial performance," "increased competition," and "deterioration in the entire healthcare industry"); *Strougo v. Tivity Health, Inc.*, 551 F. Supp. 3d 839, 849 (M.D. Tenn. 2021) (goodwill statements actionable where plaintiff "adequately alleged various impairment triggers"); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (allegations sufficient where "goodwill was not written down until the sale . . . despite known delays [and] cost overruns"); *Kirkland*, 2020 WL 2526982, at *12 (in Securities Act case, finding plaintiffs alleged "sufficient facts to state a claim that the goodwill projections here did not align with the information in WOW's possession concerning its credit practices, its ability to force

28

collection from non-paying customers, and its products"); *S.E.C. v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *7 (S.D.N.Y. Sept. 30, 2021) (finding that the complaint "raise[d] an inference that Sequential's determination not to recognize a goodwill impairment did not fairly align with the information it had in its possession at the time," including by alleging "that Sequential had a biased qualitative assessment that omitted multiple relevant factors").

In the Offering Documents, Defendants stated that the value of the Omnicare goodwill was $6.5 billion and no impairment existed. ¶¶88, 271, 274. Based on these representations, investors reasonably understood that the LTC business had retained its full value from the time of the Omnicare acquisition, and was still performing up to original expectations. A reasonable investor would have also understood these representations to mean that the LTC business was not presently experiencing material adverse trends that were impacting its business—indeed, the fact that Defendants did not disclose any such trends under Item 303 is important context that would have buttressed this understanding. That these statements were made in formal documents filed with the SEC after a purportedly rigorous analysis assessing the goodwill (*e.g.*, ¶274) only reinforces these reasonable takeaways. *See Omnicare*, 575 U.S. at 190 ("Registration statements . . . are formal documents, filed with the SEC as a legal prerequisite for selling securities to the public. Investors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life.").

The above takeaways, however, conflicted with facts available to CVS that were not disclosed to investors. As an initial matter, the materials incorporated into the Offering Documents did not disclose that the LTC segment was "bleeding" customers, such that CVS had lost approximately 33% of its LTC business in the 2016-2017 timeframe, and that other pharmacies acquired in order to "stop the bleed" quickly shed the customers they brought in. ¶¶102-91. Indeed,

the Offering Documents did not disclose that CVS's assessment of the LTC business was so dire that, in addition to regular calls and reports (*see, e.g.*, ¶165) the company held an unprecedented sales meeting in Denver in May 2016 to rally everyone to improve sales (¶172) followed by what one former employee described as a "come to Jesus" meeting around Thanksgiving 2016 aimed at addressing the fact that the LTC segment was "losing business hand over foot" (¶¶103-04).

Nor did the Offering Documents disclose that the financial results of the LTC business were inflated by widespread prescription drug rollover practices that illegally billed Medicaid and Medicare "hundreds of millions of dollars." ¶¶192-220. None of this information, which by May 2017 led to a "sense of impending doom" in the LTC business (¶165), "fairly align[ed]" with the statements that the LTC business's goodwill was unimpaired up through the date of the Offering Documents. *Zwick*, 2018 WL 2933406, at *5-6.

The CVS Defendants' motion to dismiss fails to argue how the goodwill statements, and the conclusions investors would draw from them, were consistent with these adverse facts. Rather, the CVS Defendants ignore the relevant standard entirely. Instead, the CVS Defendants argue that "plaintiff has alleged no particular (and material) facts going to the basis for the issuer's opinion that were omitted under *Omnicare's* third prong," asserting that none of the former employees discussed in the complaint "is alleged to have had any connection to or knowledge of CVS's accounting judgments, let alone how CVS incorporated these factors into its goodwill assessment, the propriety of its accounting judgments, or the adequacy of CVS's disclosures." CVS Br. at 33-34. In making this argument, the CVS Defendants ask this Court to disregard its own prior understanding of *Omnicare* and its progeny and follow instead the ruling of the New York State Appellate Division, First Department in *LPF*, which rejected omissions "because the nature of the inquiry in forming the opinion was disclosed and plaintiff does not allege that the stated

methodology was not followed." *Labourers' Pension Fund of Cent. & E. Canada v. CVS Health Corp.*, 192 A.D.3d 424, 424 (1st Dept. 2021). Respectfully, *LPF* ignored the rule put forward in *Omnicare* and its progeny (*see supra* at 27-29)—unlike *this Court*, in *Fire Fighters*, which acknowledged the correct ways that opinions are actionable. 519 F. Supp. 3d at 95 (stating that opinions "may . . . be actionable if the speaker omits information making the statement misleading to a reasonable investor").

Decisions in the years since have further affirmed that this Court's understanding of *Omnicare* was correct—and that *LPF*'s was in error. *See, e.g.*, *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *9 (S.D.N.Y. Jan. 5, 2023) ("A statement of belief or opinion is actionably false if the speaker omits information that makes the statement misleading to a reasonable investor."); *Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at *22 (M.D. Tenn. Aug. 17, 2022) ("An opinion can successfully form the basis for an alleged misrepresentation in a securities fraud claim (that is, it is 'actionable') if . . . the opinion is paired with a sufficiently material omission that makes the statement misleading"); *Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 2022 WL 2073826, at *12 (E.D. Pa. June 9, 2022) (finding that the complaint sufficiently alleged that the defendant "made materially misleading statements touting the company's leadership and experience as crucial to its success" where plaintiffs "provided ample facts as to what the registration statement left out"); *Kusnier v. Virgin Galactic Holdings, Inc.*, 2022 WL 16745512, at *9 (E.D.N.Y. Nov. 7, 2022) (holding description of test flight as "safe" was materially misleading given undisclosed "serious structural failure of the spacecraft" during the flight); *St. John v. Cloopen Grp. Holding Ltd.*, 75 Misc. 3d 1234(A), 171 N.Y.S.3d 893 (N.Y. Sup. Ct. 2022) ("1933 Act liability may be imposed . . . where an opinion is expressed in the offering documents

that . . . omits information in a way that makes the statement misleading to a reasonable investor"). This Court should not here depart from its well-founded understanding of this rule.

The Court should also reject the CVS Defendants' argument that their disclosures were not "false or misleading[] because '[t]here is nothing directly inconsistent, at least not in a substantial way, between the statements [CVS] made and the loss of customers sustained.'" CVS Br. at 20 (quoting *Fire Fighters*, 519 F. Supp. 3d at 94). This argument fails for two reasons. First, the appropriate standard for an opinion statement is not whether the statement was "directly inconsistent" with the existing facts, but rather with whether the disclosures "fairly align" with the facts available to the issuer. *Zwick*, 2018 WL 2933406, at *6; *Kirkland*, 2020 WL 2526982, at *12; *see also* authorities cited *supra* at 27-29. Second, CVS's statements that the LTC business's goodwill retained its $6.5 billion value and was not impaired, among others, **were** "directly inconsistent" with the facts, including that the LTC segment had lost up to 33% of Omnicare's total business and was engaged in widespread illegal prescription drug rollover practices. *See* ¶¶102-220.

> **b.     Defendants' goodwill statements contained materially false and misleading embedded facts.**

Defendants' statements are also actionable for the independent reason that they contained untrue embedded facts, such as that: (i) there had been no "changes in the business climate, changes in the competitive environment, [or] adverse legal or regulatory actions or developments" that would have impaired the Omnicare goodwill or required an interim test (¶¶274, 277); and (ii) the risks that "could" "possibly" occur "in the future" were not "occurring" at the time (*id*.).

Contrary to these embedded facts, there **had** been adverse legal developments—namely, that CVS had engaged in widespread illegal rollover practices. ¶¶192-220. Similarly, the business climate **had** materially deteriorated; due to a combination of internal and external factors, CVS's

LTC business shed 25-33% of the former Omnicare business. ¶¶114, 221-41. The LTC business *had* experienced adverse changes in its competitive environment which resulted in Omnicare suffering material customer losses, as former employees released by CVS formed competing businesses. ¶¶173-77. Such statements and others (*see* ¶277) represented an untrue embedded fact that these risks had not materialized at the time the statements were made. *See Ramirez*, 334 F. Supp. 3d at 848 (goodwill opinion actionable where it contained untrue "embedded statement of fact").

In response, the CVS Defendants first claim that the court in *LPF* "found no embedded facts in CVS's goodwill opinion." CVS Br. at 33. That is *not* what the *LPF* court found. Rather, the court only criticized that the scant factual allegations made in the *LPF* complaint "*did not identify* any embedded facts in the opinion on goodwill." 192 A.D.3d at 424. In sharp contrast, as explained above, *this* Complaint *does* identify embedded facts.

The CVS Defendants next argue baselessly that Lead Plaintiff "selectively misquot[es] CVS's disclosure—which explained that these factors *can* impact fair market value, not that they had *not* affected fair market value." CVS Br. at 33. The CVS Defendants cannot re-write their own disclosures. The disclosures were highly conditional and misleadingly "warned" only that something might happen "in the future" "if" certain adverse developments were to occur—without disclosing that these adverse developments had, in fact, already materialized. Even crediting the CVS Defendants' reading, stating that these factors "could" impact fair market value while simultaneously assuring that goodwill was *not* impaired falsely put forward the embedded fact that no such "changes" sufficient to impair the goodwill had occurred. That representation was misleading. *See supra* at Section I.A.1.a.

c.    **CVS's executives could not have reasonably believed the statements about the LTC Business and the value of Omnicare's goodwill.**

The CVS Defendants cannot simultaneously contend that they disclosed the omitted facts and that they did not know about them. *See* CVS Br. at 23-29. Based on the allegations of the Complaint, the Defendants could not have reasonably believed their goodwill statements given their knowledge of the "red flags" that should have triggered an interim impairment test and a disclosure that the goodwill was impaired. The CVS Defendants cannot credibly deny that they knew about these facts; indeed, they (wrongly) contend that they disclosed them. In any event, the Complaint contains ample factual allegations to raise a plausible inference that the issuer—*i.e.*, CVS—and other Defendants were aware of these undisclosed material facts before the Offering Documents became effective. Former employees' accounts describe the extensive meetings held and reports circulated that detailed the reasons that the LTC business was failing. For example, the Company held a "come to Jesus" meeting, attended by high-level executives, including Omnicare's then-President and CVS's then-Vice President for Senior Living, at CVS's headquarters just before Thanksgiving 2016 to discuss that, "holy sh**," the LTC business was declining. ¶104. CVS also held "State of the Company" conference calls (again including Omnicare's President) to discuss that the LTC business had lost 25% to 33% of its business in 2016 and 2017. ¶114. The customer losses and revenue declines were also (i) shown in "quarterly outlook" reports and monthly volume reports accessible to all director-level and C-Suite employees (¶137) and in profit and loss statements created by the CFO's office for each book of business (¶127); (ii) discussed during weekly and monthly executive meetings (¶132) and during "Risk Calls" starting in 2017 to address loss forecast (¶137); and (iii) contained in a client database accessible to employees (¶130).

34

To address these known issues, the Company started initiatives to forestall goodwill impairment, including pursuing more senior living business, lowering prices, overinflating forecasts, and drastically reducing staffing. ¶¶104-08, 115, 156-62, 170-72. CVS also purchased additional LTC pharmacies to simulate growth. ¶¶178-91. This acquisition strategy—a collaborative process that involved the company's "legal team, deal team, acquisition team, and pricing analysis team" (¶180) and therefore could have been approved only by high-ranking officials—was put in place *precisely because the severe customer losses were known*.

The Complaint also alleges that the illegal rollover practices were widespread and widely discussed. ¶¶192-220; *see supra* at 18-21. Such facts plead subjective falsity. *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 314 (S.D.N.Y. 2013) ("The Court also finds that the CAC plausibly alleges that the Officer Defendants did not honestly believe their stated opinions . . . Plaintiffs are entitled to a reasonable inference that the Officers subjectively believed that MF Global should take a valuation allowance against its DTA, despite their public statements to the contrary . . . . [A]t this stage of the proceedings, Plaintiffs need only allege facts giving rise to a reasonable inference of liability. The Court finds that Plaintiffs plausibly allege subjective falsity; a fact finder can later determine whether the evidence sufficiently proves subjective falsity.").

Defendants wrongly contend that disclaiming fraud—as Plaintiff does here—categorically forecloses pleading subjective disbelief (*see* CVS Br. at 33); to the contrary, the standards are legally distinct. Where, as here, a complaint asserts "that defendants actually possessed the information that they failed to disclose," these allegations are not "'averments of fraud,' absent any claim of scienter and reliance." *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996) (noting absurd result that, "[o]therwise, any allegation of nondisclosure of material information would be transformed into a claim of fraud"). The Complaint alleges that CVS, as the issuer, and

the other Defendants possessed the undisclosed information contradicting their statements, *not* that they withheld that information with the specific intent to deceive investors. Such allegations, while not averring fraud, are sufficient to allege the falsity of an opinion.

The CVS Defendants wrongly suggest that the Court can ignore *Omnicare's* subjective falsity prong on the basis that Lead Plaintiff "has disclaimed fraud." CVS Br. at 32-33. Defendants' reliance on *LPF* to support this position is misplaced because respectfully, the *LPF* decision does not correctly apply the law, which is correctly described above. Moreover, the portion of *Omnicare* on which the CVS Defendants rely (CVS Br. at 33 (citing *Omnicare*, 575 U.S. at 186)) has not been understood by courts to require fraudulent intent. For example, in *MF Global*, the district court held that "to require proof that an opinion was subjectively disbelieved does not also require proof of fraudulent intent." 982 F. Supp. 2d at 311. This is consistent with the proposition that "one can underreport, understate, minimize and make deceptive statements negligently and without nefarious purpose." *Silverstrand*, 12 F. Supp. 3d at 251-52. That is what Lead Plaintiff alleges here.

> **d.    The CVS Defendants' remaining arguments as to the LTC goodwill fail.**
>
> > i.    The Complaint's allegations do not violate the "fraud-by-hindsight" doctrine.

The CVS Defendants characterize the allegations of the Complaint as a "hindsight-driven attack on CVS's opinions of the goodwill value of its LTC business unit," argue that "[t]he law does not permit . . . claims of fraud by hindsight," and insist that this "foundational requirement" should prove "fatal" to Lead Plaintiff's claims, as they argue it was in *Fire Fighters* and *LPF*. CVS Br. at 2, 12, 19. The CVS Defendants are wrong for several reasons.

As an initial matter, this is not the typical case in which the "fraud by hindsight" doctrine even applies. Consideration of the "fraud by hindsight" doctrine in *Fire Fighters* and every First

Circuit decision cited by the CVS Defendants occurred only in evaluating securities fraud claims brought under Section 10(b) that were thus subject to Rule 9(b) pleading standards. *E.g.*, *Fire Fighters*, 46 F.4th at 30–31 ("a complaint may not simply contrast a defendant's past optimism with less favorable actual results *in support of a claim of securities fraud*"); *Karth v. Keryx Biopharm., Inc.*, 6 F.4th 123, 135 (1st Cir. 2021); *In re Biogen, Inc. Sec. Litig.*, 857 F.3d 34, 37 (1st Cir. 2017); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008); *Suna v. Bailey Corp.*, 107 F.3d 64, 71 (1st Cir. 1997). However, Lead Plaintiff here is *not* asserting fraud claims and Rule 9(b) does *not* apply, and the "fraud by hindsight" doctrine has no application.

Even if the doctrine does apply, however, the Complaint differs materially from those in *Fire Fighters* and *LPF* and succeeds where courts found those complaints failed. The First Circuit in *Fire Fighters* found that the complaint in that action failed to state securities fraud claims because it did not "allege sufficiently specific facts about the state of the LTC business at particular points in time to enable us to conclude that any of the goodwill write-downs were too late or that any of defendants' alleged misstatements contradicted the state of that business as it then stood." 46 F.4th at 31. The *Fire Fighters* complaint, the First Circuit explained, provided "no meaningful way to compare defendants' disclosures and statements about the LTC business with the contemporaneous state of the business." *Id.* For two reasons, this Complaint does what other securities complaints regarding the LTC business did not.

First, the Complaint contains specific allegations showing why the statements that goodwill was not impaired were inconsistent with the true state of the LTC business at CVS and Omnicare. Only this Complaint alleges that in the 2016-2017 time frame, before the Offering Documents became effective, internal reports stated that Omnicare as a whole had lost 25-33% of its business. ¶114. This Complaint alleges that even as the statements incorporated into the Offering Documents

continued to insist goodwill was not impaired, and the risks facing CVS/Omnicare were located somewhere in a possible future, Omnicare and CVS executives had already held panicked, unprecedented meetings and calls in a vain effort to stem the tide. Unlike the complaints in other actions, the Complaint here details: (i) a "punishing" conference call led by Omnicare's Senior Vice President, Head of Business Operations in early-to-mid 2015, before the Omnicare transaction was even announced, where a new department was established to address the bed loss issues, a conference call that one former employee believed was occasioned by Omnicare executives believing they could not justify the company's $12 billion purchase price due to bed loss issues (¶¶140-41); (ii) an all-hands sales meeting, which had never occurred before, in May 2016 designed to rally the sales team to improve sales (¶172); and (iii) a "come to Jesus" meeting around Thanksgiving 2016 at CVS's Rhode Island headquarters to discuss the severe attrition in the LTC business and the failure of that business to meet expectations (¶¶14, 104-05). Unlike the other complaints, this Complaint also alleges that the initiatives put in place by CVS to stem the bleeding were inadequate, and their inadequacies were evident long before the statements were incorporated into the Offering Documents.

Both the 3Q17 10-Q and 2017 10-K announced that their projections "assume[] future script growth from our senior living initiative and the impact of acquisitions." ¶278. However, Former Employee 1, who in 2016-2017 was first a Senior Consultant of Senior Living then a Manager of Senior Living Commercial Operations, reported that growth targets for the senior living initiative, which an executive admitted were designed to head off goodwill impairment, were a "pie-in-the-sky goal," for example estimating that senior living would add approximately 45,000 beds a year when, in reality, it was bringing in about 10,000-13,000. ¶106.

As to acquisitions, unique to this Complaint are detailed allegations of how the strategy was a desperate attempt to make up for organic losses, with one former employee saying that "[i]t was communicated to us that we were losing so much business that they were trying to save grace, just trying to stop the bleed." ¶183. And the Complaint here, unlike the complaints in *Fire Fighters* and *LPF*, contains detailed allegations that this last-ditch strategy was a proven failure, as the smaller long-term-pharmacies CVS acquired consistently lost the majority of their customers within a few months to a year after CVS acquired them. ¶¶178-91.

And only this Complaint contains detailed facts from publicly-available documents *and* Former Employees about how Omnicare and CVS engaged in illegal rollover practices; how Omnicare and CVS had notice of the practices from regulators, internal and third party audits, and other internal sources; and how the practices led to artificially inflated revenue as improperly-filled prescriptions billed Medicare and Medicaid "hundreds of millions of dollars," but nevertheless the practice continued until 2018, when the Offering Documents became effective. ¶¶192-220. All of these allegations, absent from the other complaints, demonstrate how CVS could not justify its statements in the 3Q17 10-Q and 2017 10-K that goodwill was not impaired.

Second, this Complaint and Appendix do not suffer from the *Fire Fighters* complaint's failure to "juxtapose the proffered reports of lost customers with what CVS was disclosing." 46 F.4th at 31. Rather, they situate not only the losses, but the "come to Jesus" meetings, the doomed senior living initiative, the failed acquisitions, and the existence of the illegal rollover practices at specific points in time from mid-2015 to early-2018—all *before* when the last of the documents incorporated by reference into the Offering Documents was filed. *See generally* Appendix A. Reviewing the pleadings shows, by way of example, that Omnicare lost 100,000 beds in 2016 and again in 2017; that Omnicare in Massachusetts bled 25% of its business by May 2017; that by June

2017, Omnicare lost 10,000 beds in Connecticut alone"; and that in the 2016-2017 time frame, entirely **before** the Offering Documents became effective, Omnicare as a whole had lost 25-33% of its business. ¶¶114, 128, 136, 138-39, 155-57.

The CVS Defendants insist that "the Complaint here and in *LPF* both allege a loss of approximately 25% of the LTC business overall by the time of the Offering Documents." CVS Br. at 22. However, the cited paragraph of the *LPF* complaint does not concern the LTC business at CVS at all, instead quoting "several industry leaders" that the skilled nursing facility industry "could witness a 25 percent decline in the number of beds." Pl. Ex. 1 (*LPF* Complaint) ¶5. The *LPF* complaint does quote a "former employee" as saying Omnicare lost 10 to 25 percent of customers, but unlike the Complaint in this action the *LPF* complaint did not include any details about the former employee's position, the basis for the estimation, or allegations that the loss was reported at the company prior to the issuance of the Offering Documents. Such an unsupported and barebones allegation bears no resemblance to the factual allegations in this Complaint. *Compare id.* ¶¶3, 13 *with* Complaint ¶114.

The CVS Defendants try to minimize the impact of Lead Plaintiff's pleadings by insisting that the Appendix "merely repeats allegations from [the] complaint that CVS lost some customers in 2016 and 2017," and "[t]hat decline was reflected in CVS's goodwill disclosures during that same time period." CVS Br. at 25-26. As an initial matter, the pleadings do not merely allege that CVS "lost some customers," but that by the time the Offering Documents became effective, the LTC business had lost approximately a third of Omnicare's business, and even more in some areas. ¶¶114, 130-31. Moreover, the pleadings establish that it was after the Thanksgiving 2016 "come to Jesus" meeting that CVS adopted a senior living growth strategy with "pie in the sky goals" that far exceeded what the business was actually accomplishing, and that by the end of 2017 a series

40

of "disaster[s]" showed that the acquisitions strategy was doomed to fail, as the company lost the business of new acquisitions within a few months to a year after acquiring them—again, all ***before*** the Offering Documents became effective and ***well before*** the shareholder vote. ¶¶106, 192-220.

This timeline of events is one of the several factors that distinguishes Lead Plaintiff's pleadings here from the proposed amendment to the Section 10(b) complaint. As the Court will recall, the Court denied the proposed amendment of the Section 10(b) complaint under Rule 59(e) on the ground that the proposed allegations were not newly discovered, and the First Circuit affirmed on that basis.  In so holding, the First Circuit had no occasion to—and did not—examine whether the allegations in Lead Plaintiff's Complaint here plead a Securities Act claim under Rule 8. It is not clear the First Circuit even examined the proposed amended *Fire Fighters* complaint. *See* 46 F.4th at 37 (discussing only "new allegations" that were "in plaintiffs' briefs on appeal"). Instead, the First Circuit agreed with this Court that the proposed additions of certain allegations from this Complaint were not "newly discovered evidence" to plaintiffs there under Rule 59(e). *Id*. at 36-38.  In reaching this conclusion, the First Circuit noted that the "plaintiff's briefing on appeal" failed to demonstrate "manifest injustice" under Rule 59(e) because it "point[ed] to no new allegations in the [proposed complaint] that would connect defendants' public statements with contradictory contemporaneous facts or would demonstrate that the further anecdotal losses described by the new CWs materially exceeded the losses recognized by CVS Health itself in the pertinent time frames." *Id*. As explained above, those deficiencies are not present in this Complaint, which directly "juxtapose[s]" the relevant events with the statements Defendants made in the Offering Documents, both at the time the Offering Documents became effective on February 9, 2018 and February 14, 2018 (when the 2017 10-K was filed) and at the time of the vote on March 13, 2018.

In summary, unlike what the CVS Defendants claim the courts in *Fire Fighters* and *LPF* found, the allegations in this case do not present "the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly." *Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008). Courts routinely reject the "fraud by hindsight" argument where allegations set forth indicators of impairment that existed during the relevant reporting period, or where the complaint alleges that the corporate defendant had a basis for knowing that the challenged statement was false when made. *See Or. Laborers Emps. Pension Tr. Fund v. Maxar Techs. Inc.*, 2020 WL 5500458, at *12 (D. Colo. Sept. 11, 2020) (crediting allegations of "specific facts concerning . . . underlying financial conditions, . . . industry trends, and other red flags suggesting that [company] should have taken an impairment [earlier], which renders its earlier financial statements false"); *Zwick*, 2018 WL 2933406, at *7 (allegations of "specific facts concerning the underlying financial conditions, industry trends . . . and other 'red flags'. . . sufficiently state a claim that Defendants' statements concerning impairments were false when made, rather than merely erroneous in hindsight"); *Dudley v. Haub*, 2013 WL 1845519, at *12 (D.N.J. Apr. 30, 2013) (no "fraud-by-hindsight" where "contemporaneous circumstances" show "goodwill was impaired"); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491-92, 494, 502-03 (S.D.N.Y. 2004) (motion to dismiss denied where plaintiffs alleged that the defendant "had to make drastic adjustments to its reported financials for 2000 and 2001 because the company failed to take into account information that was available to it when those results were issued"); *Shaw*, 82 F.3d at 1224 (rejecting fraud by hindsight argument where the complaint "provide[d] a series of factual allegations relating to a combination of developments known to the company . . . that could have

42

provided a basis for advance knowledge of the information disclosed" following the misleading statement). This is precisely the case here.

At a bare minimum, given the specificity as to the timing of the business losses and rollovers, the Complaint at least creates a fact issue which is inappropriate for resolution on a motion to dismiss. *See In re ForceField Energy Inc. Sec. Litig.*, 2017 WL 1319802, at *13 (S.D.N.Y. Mar. 29, 2017) ("According to plaintiffs, ForceField should have reassessed its goodwill in mid-2013 when it knew that it was no longer funding TPE's operations. Whether such circumstances are sufficient to trigger a duty to reassess goodwill is a factual question that should not be resolved on a motion to dismiss").

ii.     The material incorporated into the offering documents did not disclose the state of the LTC business or the red flags identified in the Complaint.

The CVS Defendants assert that each of the issues facing the business "was adequately disclosed." CVS Br. at 23-24. This argument is incorrect, and at a minimum cannot be accepted as a matter of law on these facts.

The CVS Defendants assert that the prior complaints held that the "various plaintiffs' claims that CVS's disclosures were false or misleading—the same disclosures at issue in this case—are not actionable under black-letter securities law." CVS Br. at 2. To the extent that the CVS Defendants suggest that the prior courts have held that CVS's statements are unactionable as a matter of law, the CVS Defendants are wrong. Rather, the other complaints, as alleged, failed to plead sufficient facts to show that CVS's statements were false or misleading. *See, e.g.*, *Fire Fighters*, 46 F.4th at 31 ("the ***complaint provides us*** with no meaningful way to compare defendants' disclosures and statements about the LTC business with the contemporaneous state of the business"). This Court must consider whether the allegations of ***this*** Complaint sufficiently

permit the Court to compare the statements "with the contemporaneous state of the [LTC] business."

Significantly, the CVS Defendants do not point to a single disclosure in the Offering Documents that actually disclosed the existence of severe client losses in the LTC business to the magnitude of 33% (*see, e.g.*, ¶¶102-42), CVS's unsuccessful acquisition strategy to cover up the failing LTC business (¶¶178-91), an actual impairment of goodwill, or CVS's widespread illegal rollover practices (¶¶192-220).

Regarding impairment, the statements that the CVS Defendants rely on are merely conditional warnings about risks that "***could***" come to pass "***if***" things happened "in the future." The CVS Defendants claim that the company "explicitly warned" about the risk of impairment, CVS Br. at 20 (citing ¶278), but that conditional disclosure merely stated that "*[i]f* we do not achieve our forecasts . . . it is reasonably ***possible*** that . . . the LTC reporting unit ***could*** be deemed to be impaired by a material amount." ¶278. This highly qualified disclosure: (i) said ***nothing*** of the existing facts of material customer losses, failed acquisition strategy, and illegal prescription rollovers; (ii) instead, actually asserted that the Omnicare goodwill had, at that time, ***maintained its full value***; and (iii) stated that "if" certain events occurred, it was "possible" that the goodwill "could" be impaired—a far cry from disclosing that the impairment had already happened.

Such disclosures are "not necessarily sufficient as a matter of law to purge the statements at issue of their claimed tendency to mislead." *Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.*, 2009 WL 3255225, at *9 (D.N.H. Oct. 7, 2009); *see also Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 842 F.3d 71, 91 (1st Cir. 2016) ("statement of risk does not insulate the speaker from liability" when "so understated as to be misleading"); *Gerneth v. Chiasma, Inc.*, 2018 WL 935418,

at *4 (D. Mass. Feb. 15, 2018) ("[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Courts have rejected the sorts of language in the Offering Documents cited by Defendants—that it was merely "*possible* that . . . the LTC reporting unit *could* be deemed to be impaired by a material amount" (¶278)—ruling that "warnings that an impairment charge might be taken in the future did not relieve the Company from recording the impairment at the appropriate time." *Dudley*, 2013 WL 1845519, at *13; *see also Zwick*, 2018 WL 2933406, at *7 (rejecting disclosure of "risk of a future impairment to goodwill and long-lived assets" where plaintiffs allege that defendants "knew at the time those cautionary statements were made that the impairments should be made"). To the contrary, as explained *infra* at Section I(A)(3), far from immunizing the CVS Defendants, such misleading "warnings" provide additional bases for liability. *See, e.g.*, *Tutor Perini*, 842 F.3d at 92 (risk disclosure misleading when defendant "hoping to escape liability, now plays up boilerplate disclosures that did not jibe with then-existing market facts").

At the least, the allegations of the Complaint raise factual questions about the sufficiency of the disclosure that cannot be resolved on a motion to dismiss. Indeed, courts widely recognize that how a reasonable investor would understand a disclosure raises fact issues—and that is particularly true where, as here, the disclosures indisputably omitted specific facts pleaded in the Complaint. *See In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 116 (D. Mass. 1999) ("[w]hether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact"); *Slack*, 445 F. Supp. 3d at 387 (same); *In re Juno Therapeutics, Inc.*, 2017 WL 2574009, at *3 (W.D. Wash. June 14, 2017) (same).

The CVS Defendants also assert that a risk warning using the word "generally" and the present tense somehow disclosed the key omitted fact of severe customer losses. *See* CVS Br. at

24. Not true. This risk disclosure concerned the mere "*possibility* of client losses and/or the failure to win new business." ¶295. The word "generally" simply described what "generally" happens to the LTC business's revenue from a skilled nursing facility terminating an agreement. An abstract discussion of what the risk would be is not a disclosure that the LTC business "already was experiencing customer loss and the attendant loss of revenue"—and certainly not to the tune of 33%. CVS Br. at 24. The same flaw dooms CVS's inadequate disclosures related to negative industry trends. Indeed, this Court already recognized in *Fire Fighters* that Defendants' scant warnings that "client loss 'could' occur is a far cry from acknowledging that it was occurring." 519 F. Supp. 3d at 93 & n.5. Instead, this Court said that "CVS told investors that client loss 'could' occur . . . [b]ut this pronouncement simply warned of the lack of guarantees; it did not, again, even hint that *at that time* customer retention had become a problem." *Id*. at 93.

The CVS Defendants make much of the fact that CVS reported that the fair value of the LTC business exceeded its carrying value by a lesser percentage in 2017 than in 2016 and stated that "multi-year projections had declined" based on negative pressures, including "customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates." CVS Br. at 20. This single disclosure, however, was inadequate, as it did not disclose that: (i) the LTC business had, according to internal reports, lost approximately 25-33% of Omnicare's business as a whole in the 2016-2017 time frame, and the acquisition strategy designed to cover up the losses had failed; and (ii) the business's goodwill was further impaired as a result of the material illegal rollover practices. *See supra* at 13-21.

Significantly, the disclosure was in the middle of a paragraph that falsely reassured investors that the goodwill was *not* impaired, that CVS's forecasts "assume[d] future script *growth* from our senior living initiative and the impact of acquisitions," and that it was only "possible that

the . . . performance of the LTC reporting unit . . . could be deemed to be impaired" *if* additional developments occurred—which, again, was itself misleading. Given the location and nature of the purported disclosure, whether the true adverse facts were adequately disclosed is a question of fact inappropriate for resolution on this motion to dismiss. *PLC*, 41 F. Supp. 2d at 116.

The CVS Defendants also cherry pick statements in the Complaint to estimate that "the number of beds the LTC unit served had decreased by approximately 5 to 6% net, year-over-year," which was "entirely consistent" with what CVS reported. CVS Br. at 25. This ignores former employee estimates that CVS lost a significantly greater portion of the Omnicare business than that (25-33% of Omnicare's business as a whole) (*see, e.g.*, ¶114) and makes no attempt to explain how CVS's statement that its cash flow model "*assumes future script growth* from our senior living initiative and the impact of acquisitions" can be squared with allegations that the senior living initiative was based on inflated goals and the acquisition strategy, by February 2018, had failed miserably, as the acquisition of any long-term-care pharmacy was swiftly followed by a shedding of that pharmacy's customers. *See supra* at 17. Taken together, these allegations "undermine the assumptions CVS used when it made its goodwill assessments" (*Fire Fighters*, 519 F. Supp. 3d at 97), and were inconsistent with CVS's statements that, whatever issues the LTC business faced, its goodwill was unimpaired.

While the CVS Defendants similarly contend that they adequately disclosed the illegal rollover practices (CVS Br. at 26), this argument severely misconstrues the facts. The limited disclosure on which they rely stated only that "[i]n October 2015, Omnicare received a Civil Investigative Demand from the United States Attorney's Office for the Southern District of New York requesting information and documents concerning Omnicare's cycle fill process for assisted living facilities. The Company has been cooperating with the government and providing

documents and information . . . ." CVS Ex. 2 at 74. That scant, vague disclosure does not even mention the illegal rollovers. It in no way informed investors that: (i) the illegal rollovers continued for nearly a decade on a widespread basis, occurring at facilities that made up a quarter of Omnicare's prescription volume and billing Medicare and Medicaid "hundreds of millions of dollars"; (ii) internal audits, reports, and communications at Omnicare and CVS demonstrated a detailed awareness of the issue, with communications referring to the problem as "huge" and questioning when it could be resolved; and (iii) the practices were clearly illegal, as CVS received notices that they were being investigated by multiple states, including Utah, Missouri, Ohio, and New Mexico. ¶¶192-220. Notably, the Offering Documents did not disclose that CVS concluded in "early 2018," at around the same time the Offering Documents themselves became effective, that the illegal practices were still ongoing. ¶209.

The CVS Defendants also seek to minimize the rollover practices by stating that the practices were remedied for most pharmacies "well before the Offering Documents." CVS Br. at 28. But the Complaint alleges that issues continued far beyond the time period that the CVS Defendants suggest. The company did not reconfigure Oasis, one of the systems causing the issue, until early 2018, and CVS knew it. ¶208. A September 2017 email from CVS's Senior Director of Internal Operations-Long-Term Care demonstrated that the company was in the early stages of remedying the Oasis issue, asking "what will it take" to solve the problem. *Id.* And a January 2018 email describing an internal report concluded that "'[a]udits have identified facility set up issues which are allowing orders to continue in perpetuity.'" *Id.* (quoting email).

        iii.      The Complaint adequately pleads that the rollover practices were material and should have contributed to a finding of goodwill impairment.

The CVS Defendants assert that the Complaint fails to plead that the rollover practices "actually affected the fair value of the LTC unit at the time of the Offering Documents." CVS Br.

at 26-28. This argument should not be credited given the plausible inference that the illegal rollover practice had a material impact on the LTC segment's finances and legal exposure, and was a triggering factor for testing goodwill impairment.

As an initial matter, materiality is a factual question that should not be resolved on the pleadings. *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 209 (1st Cir. 2005) ("The falsity of a statement and the materiality of a false statement are questions for the jury"). Moreover, the complaint contains ample allegations of materiality.

The practices were both quantitatively and qualitatively material. CVS's illegal rollover practices were quantitatively material because they were widespread throughout several thousand of Omnicare's assisted living facilities (¶196), which made up 24% of Omnicare's total prescription volume, and affected many locations at rates approaching 50% of all prescriptions (¶220). The inference of materiality is buttressed by the reaction of former employees, who stated that "the scope of [the rollover issue] is huge" and estimated that facilities "billed Medicare and Medicaid hundreds of millions of dollars" through the practices (¶¶203, 219); internal memoranda stating that CVS's systems had "significant gaps" in detecting the improper automatic renewals (¶202) and that the failure to obtain proper prescriptions was a "recurring issue" (¶199); and the fact that the U.S. government, 29 states, and Washington, D.C. have joined suits concerning the practice (¶193).

Courts often look at qualitative factors "in addition to the cold numbers." *City of Omaha Police & Fire Ret. Sys. v. Timberland Co.*, 2013 WL 1314426, at *7 (D.N.H. Mar. 28, 2013). Qualitatively material misstatements include those that: (i) mask a change in earnings or other trends; (ii) hide a failure to meet analysts' consensus expectations; or (iii) involve concealment of an unlawful transaction. *See* SAB No. 99, 64 Fed. Reg. 45150 at 45152; *see also ECA, Local 134*

*IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, F.3d 187, 198 (2d Cir. 2009). CVS's illegal rollover practices were qualitatively material because they included myriad illegal transactions (¶¶192-220); would have further indicated the LTC business's poor performance and CVS's inability to integrate acquisitions (*e.g.*, ¶¶81, 192-220); and exposed Omnicare to potential fines, penalties, reputational harm, and material compliance costs (¶220). *See Roeder v. Alpha Indus., Inc.*, F.2d 22, 25 (1st Cir. 1987) ("Management's willingness to engage in practices that probably or obviously are illegal . . . may be critically important factors to investors.").

Contrary to what Defendants contend, the Complaint also alleges a link between goodwill valuation and the illegal rollovers. As the Complaint alleges, GAAP requires interim goodwill testing if "an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value," and regulatory or litigation exposure are among those triggering events. ¶¶95-96, 220. The practices exposed CVS to litigation from dozens of states and the Department of Justice. ¶308. *See Litwin*, 634 F.3d at 721 (rejecting argument that plaintiff did not establish "link" between "the declining residential real estate market and Blackstone's heavy investments in commercial real estate" where it was "plausible," "drawing all reasonable inferences in plaintiff's favor," "that a collapse in the residential real estate market . . . might reasonably be expected to adversely affect commercial real estate investments").

The Complaint also alleges the effect that the various negative industry-wide and macroeconomic conditions had on the LTC business, including the financial distress of its largest clients, and the substantial growth in accounts receivables. ¶¶221-241. The CVS Defendants' argument otherwise now is at odds with statements made by Defendant Denton himself, who blamed these industry-wide conditions for the underperformance of the LTC business and the accompanying $3.9 billion goodwill impairment in CVS's second-quarter 2018 earnings call,

noting that "industry-wide financial challenges have created unexpected financial pressures on our facility clients." ¶244. These facts support the inference that these conditions were material to the value of the LTC business.

### 2. CVS Failed To Disclose Material Trends As Required Under Items 303 and 105 of Regulation S-K.

The Offering Documents omitted disclosures required by Items 303 and 105 of SEC Regulation S-K, which are actionable as "[Section] 11 omission[s]." *Silverstrand*, 707 F.3d at 102.[3] Item 303 is designed "to give the investor an opportunity to look at the company through the eyes of management, so that they may assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future." *Id*. Thus, Item 303 requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Due to its obligatory nature, the absence of an Item 303 disclosure implies the nonexistence of such trends. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015).

Item 105 "is intended to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Silverstrand*, 707 F.3d at 103. Item 105 requires a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.105; *see Chiasma*, 2018 WL 935418, at *4 (same). The discussion "should explain how the risk affects the . . . securities . . . . Generic or boilerplate discussions do not tell the investors how the risks may affect their investment." *Silverstrand*, 707 F.3d at 103. "The same facts underlying

---

[3] On April 2, 2019, the SEC relocated Item 503(c) to Item 105 of Regulation S-K. FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12674, 12688–89 (Apr. 2, 2019); 17 C.F.R. § 229.105.

an Item 303 violation may also support an Item [105] violation[.]" *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *7 (S.D.N.Y. Sept. 27, 2020) (collecting cases).

Item 303 requires disclosure of: (i) the trend and (ii) "whether, and to what extent," the trend had already impacted or was expected to "impact . . . future revenues." *Litwin*, 634 F.3d at 718-19. Here, in violation of Item 303, Defendants failed to disclose the following trends and to quantify their impact on the LTC segment: (i) material customer losses, amounting to between 25-33% of Omnicare's business as a whole, that only worsened over time, with one former employee noting the situation was "really going south" by the summer of 2017; (ii) widespread illegal prescription rollover practices, (iii) significant industry headwinds, and (iv) negative macroeconomic factors. *See* ¶¶102-241; 303-12. Moreover, in violation of Item 105, in addition to the omissions just listed, nowhere in the Offering Documents did Defendants disclose the then-known effect on the LTC business of the severe financial distress of many of CVS's largest clients. *See id*. Such omissions are actionable. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94-95 (2d Cir. 2016) (omission of "overbilling practices" and resulting "monetary risks" actionable); *Stratte-McClure*, 776 F.3d at 108 (omissions of deteriorating market conditions actionable); *Panther Partners Inc. v. Jianpu Tech. Inc.*, 681 F.3d 114, 121 (2d Cir. 2012) (omission of product defect actionable); *Litwin*, 634 F.3d at 716 (omission of downward trend in market actionable); *Facebook*, 986 F. Supp. 2d at 511-12 (impact on revenue caused by change in mobile usage); *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 432 (D.R.I. 1996) (complaint stated nondisclosure under Item 303 where the defendant corporation "had knowledge of hard information about a known trend or uncertainty that would have a material impact on its current operations, and consequently was under an obligation to disclose this information").

Additionally, while "plaintiffs need not plead defendants' knowledge" under Items 303 or 105, *Panther Partners*, 2020 WL 5757628, at \*10, they have done so here. The CVS Defendants cannot credibly contend they did not know about these trends, yet simultaneously assert (incorrectly) that they disclosed them. *See supra* at Section I.A.1.d.ii. Moreover, as explained above, the Complaint contains ample factual allegations to raise a plausible inference that the issuer (CVS) and other Defendants were aware of these facts. *See supra* at Section I.A.1.c.

The CVS Defendants contend, wrongly, that they satisfied Items 303 and 105 with the same misleading disclosures (CVS Br. at 40-43) discussed above. However, as discussed above, these disclosures were inadequate to satisfy Item 303 because none stated that the risks had in fact come to pass and impaired the value of the goodwill, and none of the disclosures quantified that impairment. *See supra* at Section I.A.1. While the CVS Defendants assert that they disclosed lowered multi-year projections as a result of industry pressures, they nowhere disclosed that the trends of customer losses had reached the magnitude of 33%, nowhere disclosed illegal rollover practices at all, nowhere disclosed that these two trends ***had already*** materially impaired the goodwill, and nowhere quantified the impairment. *See Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 713-15 (3d Cir. 2020) (disclosure lacked "description and context of its compliance risks"); *Panther Partners*, 681 F.3d at 122 ("cautionary language . . . [was] incomplete and, consequently, did not fulfill Ikanos's duty to inform the investing public of the particular, factually-based uncertainties of which it was aware").[4]

---

[4] The CVS Defendants' inapposite authority addresses risks that had not come to pass. *See, e.g.*, *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (operations had not yet been negatively affected); *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, 2017 WL 4403314, at \*19 (S.D.N.Y. Sept. 30, 2017) (risk had not come "to pass" and could not be quantified).

### 3. Materially Untrue Statements Concerning Purported Risks.

In the Offering Documents, Defendants stated that certain purported potential risks "*may*" have posed a "*possibility*" of impacting the LTC business "*if*" certain events occurred. *See* ¶¶286-302. For example, Defendants stated that there was a "*possibility*" of client losses and other risks related to the general economy or industry, such as lower occupancy rates at LTC facilities, that "*may*" or "*could* impact" the financial health of "LTC clients" and pharmacy revenue. ¶¶287-90; 294-96. CVS also warned only that "future" "sanctions and remedial actions" "*may* be imposed" in connection with CVS's participation in government-funded programs. ¶¶291-93.

It was misleading to state that these risks were merely possible or potential when they had already materialized. It was misleading to say that CVS faced the "possibility" of client losses when, by at least the third quarter of 2017, CVS's LTC business had *already* experienced material customer losses of up to a third of Omnicare's total business and, as a former employee noted, a "level of intensity" and "sense of impending doom" pervaded the company. ¶¶114, 165. And it was misleading to suggest that sanctions "may" be imposed when the Company had been engaging in widespread illegal rollover practices that it knew had been ongoing for years at thousands of facilities and had illegally billed Medicare and Medicaid "hundreds of millions of dollars." ¶¶192-220.

Such misleadingly incomplete risk disclosures are actionable. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is [misleading]." *Facebook, Inc.*, 986 F. Supp. 2d at 515 (collecting cases); *see also Chiasma*, 2018 WL 935418, at *4 (statements actionable where "couched as possibilities of risk, rather than certainties that had already come to pass"); *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 161 & n.10 (D. Mass. 2004) (same); *GT Solar*, 2009 WL 3255225, at *10 ("generalized statements about potential lost

customers and sales did not specifically warn against [known risk]"); *Burstein v. Applied Extrusion Techs., Inc.*, 150 F.R.D. 433, 443 (D. Mass. 1993) (where recent acquisition was discussed as a risk factor, disclosures not sufficient as a matter of law where "what was not disclosed were specific circumstances and problems that existed"). Nor can CVS escape liability through its vague statement that the LTC business's operations were impacted by "margin pressures . . . including client demands for lower prices . . . and network reimbursement pressure." *See* CVS Br. at 7 (quoting disclosures). These rote disclosures, which said nothing about the scale of the losses or the specific issues hammering the LTC business, are inadequate. *See Tutor Perini*, 842 F.3d at 92 ("boilerplate disclosures . . . did not jibe with then-existing market facts"). At the least, the disclosure's adequacy is a question of fact. *PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d at 116; *Slack*, 445 F. Supp. 3d at 387.

The CVS Defendants make two principal arguments to disclaim liability for the Offering Documents' risk disclosures: (i) "cautionary statements of potential risk" are rarely actionable, and (ii) investors were informed of the "state of the business," whether through disclosures or because the risks were "market-wide phenomena." CVS Br. at 28-29, 38-39. Both arguments fail.

First, the CVS Defendants' assertion that "cautionary statements of potential risk" are rarely actionable (CVS Br. at 38) mischaracterizes applicable law and relies solely on out-of-Circuit case law. As discussed above, courts routinely hold cautionary statements actionable when they omit adverse events that have already come to pass.[5]

Second, contrary to the CVS Defendants' contention (CVS Br. at 38-39), investors were not sufficiently informed of the problems plaguing the LTC business or its impairment for all the

---

[5] Each of the CVS Defendants' cited cases also recognize that such risk disclosures are actionable. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

reasons set forth above. *See supra* at 22-23, 29-30. Indeed, the CVS Defendants' own brief acknowledges that the purported disclosures couched the risks facing the company as hypotheticals that "may," or "could," occur. *See, e.g.*, CVS Br. at 7 ("CVS explained that it *may* lose clients or fail to win new business, including among the skilled-nursing facilities upon which it relied"); *id.* ("CVS cautioned that its business *could* be adversely affected by the financial health of its customers"); *id.* at 7-8 ("[i]t explained that reductions, deficits, or delays in reimbursement from state- or federal-sponsored payors *could* adversely affect its business, and warned that its business *could* be affected by customers' financial health or inability to pay").

The CVS Defendants' assertions that investors knew of the "state of the business" and that the macroeconomic conditions were "market-wide phenomena" are nothing more than a premature "truth on the market" defense. The "truth on the market" defense is an affirmative defense that "is intensely fact-specific" and, thus, inappropriate at the pleading stage. *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 51 (D. Mass. 2006); *see also Swack v. Credit Suisse First Bos.*, 383 F. Supp. 2d 223, 238 (D. Mass. 2004) (rejecting truth on the market defense where the market knew of only "general problems, but not the nature or extent of the conflict," because "the extent of the market's knowledge" is a "fact-specific question that is rarely an appropriate basis for dismissal"); *Schaffer v. Timberland Co.*, 924 F. Supp. 1298, 1309 (D.N.H. 1996) (truth on the market defense "involve[d] a fact-intensive inquiry which [was] ill-suited to a motion to dismiss" and thus "premature").

To merit the truth on the market defense, the purportedly corrective information must be conveyed with a "degree of intensity and credibility sufficient to counter-balance effectively" any misleading information. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Again, the disclosures that the CVS Defendants claim informed investors of the LTC business's problems

were inadequate. It cannot be said as a matter of law, at the pleading stage, that such vague and conditional disclosures communicated the omitted facts with sufficient intensity and credibility to counterbalance the misstatements and omissions. *See id*. at 168 ("we cannot decide on the present record whether those disclosures were conveyed with sufficient 'intensity and credibility'").

Further, the CVS Defendants ignore facts demonstrating that the market was unaware of the truth until February 20, 2019. Contrary to Defendants' arguments, the market's surprised reaction and CVS's stock price decline following the February 2019 disclosure confirms that investors had not known the true state and value of the LTC business. ¶¶259-62; *see In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) (concluding "that there are sufficient facts pled to question whether Defendants provided the 'truth-on-the-market'" where defendants' stock price dropped immediately after corrective disclosure). At a minimum, whether a "reasonable investor" would have understood Defendants' conditional disclosures about potential future risk to fully reveal the adverse facts plaguing the LTC business presents a fact question.

### 4. CVS Made Materially Untrue Statements Concerning Its Compliance with GAAP.

Although the Company represented to investors that its financial reporting complied with GAAP, CVS violated GAAP by failing to write down the Omnicare goodwill or perform necessary interim impairment testing despite several existing red flags. ¶¶93-100, 258-62. The CVS Defendants argue that the Complaint pleads no misstatements regarding GAAP because "[t]he application of GAAP to goodwill is itself an opinion" and the "[a]ssertion that CVS violated GAAP is premised on its post hoc belief that the LTC unit's goodwill was impaired earlier than CVS believed," which was itself "only a disagreement with CVS's judgment." CVS Br. at 35. However, as an initial matter, courts have found statements that a company "prepared its financial statements in accordance with GAAP are best taken as statements of fact, not opinion." *Hedrick v. The Kraft*

*Heinz Co.*, 2021 WL 3566602, at *9 (N.D. Ill. Aug. 11, 2021). Even if the GAAP statements are taken as statements of opinion, Lead Plaintiff adequately alleges that these GAAP compliance statements were inaccurate for many of the same underlying reasons as CVS's goodwill statements—*i.e.*, that the statements omitted material information required to make them not misleading to a reasonable investor. *See supra* at Section I(A)(1)(a). Courts regularly sustain claims alleging untrue statements of GAAP compliance based on similar facts. *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 315 (D. Mass. 2006) (GAAP violation adequately pled where "facts allege more than a dispute simply about the timing of a write-off based on wholly subjective criteria"); *Chi. Bridge & Iron*, 2018 WL 2382600, at *8 (statements actionable where Defendants "failed to write down their goodwill" because "GAAP requires a company to assess goodwill at least annually and whenever 'an event occurs or circumstances change that would more likely than not'" result in an impairment).

### B.    Defendants' Additional Challenges Should Be Rejected

#### 1.    The PSLRA "Safe Harbor" Is Inapplicable.

The CVS Defendants contend that many of their alleged false statements are protected by the PSLRA's "safe harbor" for forward-looking statements. CVS Br. at 36-37. The CVS Defendants are wrong.

The safe harbor provides protection only for a narrow subset of statements that are both purely "forward-looking" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* 15 U.S.C. § 78u–5(c)(1)(A)(i); *Stone & Webster*, 414 F.3d at 195. Here, several of the statements at issue are not forward looking but, rather, statements of present fact, and accordingly are not protected by the safe harbor—including the statements setting forth the value of the goodwill as of a specific reporting period. *See, e.g.*, ¶¶274, 256 ("we ***have*** sufficient

current and historical information available to us to test for impairment"); ¶¶281-82 ("We **prepare** our consolidated financial statements in conformity with [GAAP]" and "[w]e **base** our estimates and judgments on historical experience, current trends and other factors that management believes to be important *at the time the consolidated financial statements are prepared*"); ¶¶283-85 ("The Company **elected** to early adopt this standard *as of January 1, 2017*.").

Even the arguably mixed present- and forward-looking statements—*e.g.*, that the goodwill valuation "could change if" a number of changes or developments occurred in the future (¶274)— merit no safe-harbor protection because they were misleading for their failure to disclose then-existing facts. *See supra* at Sections I(A)(1)(d)(ii), (2) and (3); *see also Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 254 (D. Mass. 2018) ("Omissions of existing facts are not forward-looking statements, and are not protected by the PSLRA safe harbor."). As the First Circuit has held, "[t]he mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement." *Stone & Webster*, 414 F.3d at 213. Here, the Offering Documents represented that the Omnicare goodwill was **not** impaired and no facts required interim testing, and therefore represented to investors that the "possible" risks had no present material impact on the LTC business. Because these representations were themselves misleading, they do not insulate Defendants' statements from liability. *See, e.g.*, *GT Solar*, 2009 WL 3255225, at *10 ("While these remarks allude to the chance of discontinued customer relationships and decreased sales, their lack of specificity as to the seriousness and immediacy of such threats prevents them from cloaking the prospectus in the bespeaks caution doctrine as a matter of law."); *Zwick*, 2018 WL 2933406, at *7 ("risk of a future impairment to goodwill" was insufficient when defendants "knew at the time those cautionary statements were made that the

impairments should be made"). At most, on these facts, whether the cautionary language is sufficient is a question of fact that should not be resolved at this stage. *Shaw*, 82 F.3d at 1213 (collecting cases); *GT Solar*, 2009 WL 3255225, at *9 ("bespeaks [caution] doctrine provides [the] basis for dismissal as a matter of law only when reasonable minds could not disagree as to whether the mix of information in the allegedly actionable document is misleading").

Finally, the safe harbor is inapplicable because the allegations support an inference of "actual knowledge." *See, e.g.*, ¶275 ("information known by CVS and available to Defendants demonstrated that the fair value of the [LTC] reporting unit had already fallen significantly below its carrying value"). Defendants' argument to the contrary ignores that the safe harbor concerns "what a plaintiff must 'prove' in order for a defendant to be found 'liable,'" not what is required to be alleged in a complaint. *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 252 (D. Mass. 2006). The First Circuit has taken a "consistent position" that the applicable standards "do not require a plaintiff to plead evidence." *Id*. (collecting cases).

### 2. The CVS Defendants' "Puffery" Argument Fails.

The CVS Defendants incorrectly argue that their statements that the Company was "delivering break-through products and services," including "improving pharmacy care for the senior community through Omnicare," constitute inactionable puffery. *See* CVS Br. at 37-38. "[I]nterposing the puffery defense is tantamount to conceding that the offending statements were technically inaccurate; the puffery defense is a challenge to the materiality of those misstatements." *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 172 & n.13 (D.R.I. 2003). To be protected as puffery, a statement must be "so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information,"—*i.e.*, it must be ***immaterial as a matter of law***. *Brumbaugh*, 416 F. Supp. 2d at 250-51. This "is a mixed question of law and fact," and thus "will rarely be dispositive in a motion to dismiss unless the statements

are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Chiasma*, 2018 WL 935418, at *3; *see also Brumbaugh*, 416 F. Supp. 2d at 250 n.11 ("dismissals on this ground are increasingly rare"). Defendants do not meet this standard.

Context is critical in assessing a puffery defense. *Scritchfield*, 274 F. Supp. 2d at 172-76. Defendants' statement is material given the context that (i) the LTC business was experiencing material customer losses and impairment in value; and (ii) the statement was made to obtain investor approval of a massive merger. ¶316. *See Talbots*, 2013 WL 5348569, at *29-30 (touting "improved regular price selling" was material when company "was in fact experiencing at that time widespread inventory management difficulties"); *Scritchfield*, 274 F. Supp. 2d at 175-76 (representation that company was "premier" provider of high speed internet not puffery in context); *EP Henry Corp. v. Cambridge Pavers, Inc.*, 2017 WL 4948064, at *3-4 (D.N.J. Oct. 31, 2017) (statements about results possible with new technology not puffery when viewed in their full context, where defendant touted the "uniqueness" of the technology).

The CVS Defendants' reliance on *In re Biogen Inc., Securities Litigation*, 193 F. Supp. 3d 5 (D. Mass. 2016), *Thant v. Karyopharm Therapeutics Inc.,* 43 F.4th 214 (1st Cir. 2022), and *In re Ford Motor Co. Securities Litigation*, 381 F.3d 563 (6th Cir. 2004), is misplaced. From *Biogen*, the CVS Defendants pluck phrases from investor calls like "***we think*** Tecfidera is a terrific product that is going to perform very well." 193 F. Supp. 3d at 41-42. These entirely subjective and impromptu opinions are a far cry from statements in Offering Documents touting a specific business line to solicit investors to agree to a $77 billion acquisition, when, in reality, that business was materially failing and the goodwill essentially worthless. In *Ford*, the court found that the statement "Ford is a worldwide leader in automotive safety," in the context of touting Ford's

61

"commitment to quality, safety, and corporate citizenship," was mere "praise [for] their products and their objectives." 381 F.3d at 570. In *Thant*, the company simply expressed optimism about a product based on the results of a single study. 43 F.4th at 223. By contrast, here, the Offering Documents secured investor approval of a $77 billion merger after emphasizing CVS's purported "break-through products and services" in the context of touting its "improv[ed] pharmacy care for senior community through Omnicare," which misled investors about the success of its LTC business. ¶316.

### 3. The Individual Securities Act Defendants Solicited Aetna Shareholders Under Section 12(a).

Section 12(a) liability applies not only to those who directly sold stock to investors, but also to those who solicited purchasers. *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 776 (1st Cir. 2011). Here, by definition, CVS (as the issuer) is the seller, and is statutorily liable. The Individual Securities Act Defendants were solicitors: (i) the CVS officers and directors signed the Offering Documents (¶¶28-31); (ii) each Individual Securities Act Defendant "promoted, solicited and/or sold CVS common stock to Lead Plaintiff and the Class for the benefit of them and their associates" (¶346); (iii) Defendants Merlo, Dorman, and Bertolini signed the joint letter in the Offering Documents soliciting investors to approve the Aetna acquisition on behalf of the full Aetna and CVS boards of directors (¶¶28, 32-33); (iv) Bertolini also consented to being named in the Offering Documents as about to become a director of CVS (¶32); and (v) Denton, Merlo, and Bertolini spoke to investors to solicit votes during conference calls, media interviews, and in additional materials provided to investors (¶¶84-85, 90, 318).

Contrary to the CVS Defendants' assertion that the CVS Individual Defendants cannot be "statutory sellers" (CVS Br. at 43-44), these allegations are more than sufficient to plead

solicitation, which is all that is required. *See, e.g.*, *Nomura*, 632 F.3d at 776 (sufficient that defendants "*promoted* and *sold* the [c]ertificates to [the p]laintiffs and the members of the [c]lass"); *Silverstrand*, 12 F. Supp. 3d at 254 ("participation in producing the [p]rospectus and in activities related to the promotion of the sale of stock" sufficient); *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 857 (S.D.N.Y. 2019) (participation in preparing registration statement and in road shows promoting the IPO sufficient to constitute solicitation).

## II.    THE COMPLAINT ADEQUATELY ALLEGES SECTION 14(A) CLAIMS

Count IV of the Complaint asserts a claim under Section 14(a) of the Exchange Act and Rule 14a-9 against all Defendants. Section 14(a) gives rise to liability where defendants make materially false or misleading statements or omissions in connection with the solicitation of shareholder votes. Lead Plaintiff's Section 14(a) claim arises from: (i) the same materially misleading statements and omissions in the Offering Documents addressed above (¶¶242-84); and (ii) additional materially misleading statements made outside the Offering Documents—including by the Aetna Defendants—to solicit Aetna shareholders (¶¶286-91).

Section 14(a) "ensur[es] full and fair disclosure to shareholders" so that they are "able to make an informed choice when they are consulted on corporate transactions." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 381-385 (1970). Section 14(a) "seeks to prevent management or others from obtaining authorization for corporate actions by means of deceptive or inadequate disclosures in proxy solicitations." *M&T Bank*, 962 F.3d at 709-10. Through Rule 14a-9, the SEC prohibits proxy solicitations that are "false or misleading with respect to any material fact, or which omit . . . any material fact necessary in order to make the statements therein not false or misleading." *Shuli Chiu v. Dipp*, 2018 WL 3455402, at *3 (D. Mass. Apr. 13, 2018). Rule 14a-9 aims to "preserv[e] for all shareholders who are entitled to vote . . . the right to make decisions based on information

that is not false or misleading." *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1197-98 (2d Cir. 1993).

A plaintiff pleads a violation of Section 14(a) and Rule 14a-9 by alleging that: (i) a proxy solicitation contained a material misrepresentation or omission, which (ii) caused plaintiffs' injury, and (iii) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. *Mills*, 396 U.S. at 385. In the proxy solicitation context, a statement or omission is material when "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Because materiality is a mixed question of law and fact that is ordinarily entrusted to a jury, *id*. at 450, a court will review the complaint on a motion to dismiss "only to determine that it pleads the existence of [misleading] statements and presents a plausible jury question of materiality." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 34 (1st Cir. 2002); *see also Stone & Webster*, 414 F.3d at 209 ("The falsity of a statement and the materiality of a false statement are questions for the jury."). "[P]articularly in view of the prophylactic purpose of the Rule and the fact that the content of the proxy statement is within management's control, ***it is appropriate that . . . doubts be resolved in favor of those the statute is designed to protect***." *TSC*, 426 U.S. at 448.

### A.    Section 14(a) Claims Require Only Negligence, And Need Not Meet Heightened Pleading Standards

For reasons explained in further detail in Lead Plaintiff's Opposition to the Aetna Defendants' Motion to Dismiss at 8-10, Defendants misstate the law when they contend that to state a claim under Section 14(a), Lead Plaintiff must plead that "the defendant acted with the requisite state of mind," and further, that the required state of mind is "scienter." CVS Br. at 48-49.

### B.    <u>Lead Plaintiff's Exchange Act Claims Are Timely</u>

The CVS Defendants argue that a one-year statute of limitations applies to claims under Section 14(a), and Lead Plaintiff's Exchange Act claims are time-barred. CVS Br. at 45-46. The CVS Defendants argue that the one-year limitations period began to run on August 8, 2018, when CVS disclosed the first write-down of the Omnicare goodwill, and that the Exchange Act claims are untimely because they were first asserted on September 16, 2020. *Id*. The CVS Defendants' argument fails for three independent reasons: (i) Defendants are incorrect about when the limitations period began to run because investors could not have discovered their claims until the second goodwill write down occurred in February 2019; (ii) Defendants' argument about when investors' claims accrued is a factual questions unfit for resolution on this motion; and (iii) in any event, Lead Plaintiff's Exchange Act claims relate back to earlier-filed complaints that were timely.

First, the limitations period did not begin to run until at least February 20, 2019. Although the First Circuit has not held what the applicable limitations period is under Section 14(a), even assuming that a one-year limitations period applies, it is well-established that it does not begin to run until "the discovery of the facts constituting the violation." 15 U.S.C. § 78i(f). In *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010), the Supreme Court held that the "discovery rule" requires "discovery of the facts constituting the violation" before the limitations period can run, and rejected an "inquiry notice" standard that would run from "the point where the facts would lead a reasonably diligent plaintiff to investigate further." *Id*. at 648-51 (the "statute . . . contains no indication that the limitations period should occur at some earlier moment before 'discovery'"). *See also In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 303 (4th Cir. 2019) (under *Merck*, Section 14(a) limitations period began to run when complete information was disclosed).

Here, as the Complaint alleges, the "facts constituting the violation[s]" (15 U.S.C. § 78i(f)) were not discovered until at the earliest February 20, 2019, when CVS reported a second write-down of the Omnicare goodwill of $2.2 billion (almost the entire balance of that goodwill) and finally disclosed the extent of the problems plaguing the LTC business. ¶¶256-63.

Although Defendants assert that the August 8, 2018 disclosure put investors on sufficient notice (CVS Br. at 45-46), the information disclosed on August 8, 2018 fell well short of disclosing the facts constituting the violation. On August 8, 2018, CVS announced a write-down of $3.9 billion, but reassured investors that the LTC business was a "growth opportunity," the Company had taken steps "to put the business performance back on track," and the remaining goodwill was not impaired. ¶¶243-49. Following these disclosures, analysts reported that the LTC business still had "attractive value," noting that "[s]hares may rise; Aetna on track: CVS shares may trend higher on the respectable operational performance, despite an incremental $3.9 billion impairment charge for lackluster financial performance at Omnicare (LTC), where it is undertaking broader efficiency initiatives," and "CVS is taking several actions . . . to drive better retention . . . and innovating new solutions in the [assisted living facility] market." ¶¶250-51. This would not have occurred if the truth had been disclosed. Accordingly, the August 8 disclosure "would not have produced enough information to permit [plaintiffs] to earlier file legally sufficient [claims]." *In re Tyco Int'l, Ltd.*, 2004 WL 2348315, at *18 (D.N.H. Oct. 14, 2004).

Moreover, Defendants' argument that the incomplete and misleading August 8, 2018 disclosure triggered the statute of limitations posits that Lead Plaintiff had sufficient information as of that date to be on inquiry notice of a ***potential*** violation. However, the inquiry-notice standard does not apply. *See, e.g.*, *Merck*, 559 U.S. at 650-52; *Towers Watson*, 937 F.3d at 303.

66

Investors did not learn the full truth, and that they had viable claims, until at the earliest February 20, 2019, as noted above. ¶¶256-57. In contrast to the reassured market reaction on August 8, 2018, the reaction to the disclosure of these new facts was sharply negative surprise, including that the announcement was a "Major Disappointment" that "fell well short of expectations," and was the "sum of all fears." ¶¶250-62. In response to these disclosures, on February 20, 2019, CVS's stock price plummeted. ¶263. *See Towers Watson*, 937 F.3d at 303-04 (reversing dismissal of Section 14(a) claim on statute of limitations grounds, and holding that under *Merck*, limitations period does not begin to run until complete information is disclosed). Accordingly, the statute of limitations for Lead Plaintiff's Exchange Act claims did not expire until February 20, 2020 at the earliest.

Lead Plaintiff brought timely brought its Exchange Act claims because they relate back to the initial complaint in this action, which was filed on August 15, 2019 (*see* ECF No. 1), well within the limitations period. Rule 15(c) of the Federal Rules of Civil Procedure provides that an amended pleading relates back to the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading." Fed. R. Civ. P. 15(c). "[T]he critical inquiry is whether adequate notice of the matters raised in the amended pleading" has timely "been given to the opposing party . . . ***by the general fact situation*** alleged in the original pleading." *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 136 (D. Mass. 2006).

"The rule is generally construed liberally." *Id*. at 136-37. "This analysis is directed to conduct rather than causes of action, and new legal theories may relate back to the original filing where—as here—there is ***a shared basis in factual circumstances***." *Ngomba v. Olee*, 2020 WL 107969, at *3 (D. Mass. Jan. 9, 2020) (collecting cases); *see also, e.g.*, *Frederick v. New*

*Hampshire*, 2016 WL 4382692, at *7-8 (D.N.H. Aug. 16, 2016) (holding new claims related back to claims in earlier complaint arising out of same circumstances). In securities cases, courts have also looked to "whether the new allegations relate to the same statements and/or documents referenced in the original complaint." *Bond Opportunity Fund II, LLC v. Heffernan*, 340 F. Supp. 2d 146, 155 (D.R.I. 2004) (collecting cases); *see also In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 336 (S.D.N.Y. 2001) (amendment related back where "[n]o defendant can credibly complain of surprise that the complaint was amended to include § 11 claims based on the 1996 statements, when the original complaint included § 10(b) claims based on those facts").

Here, the claims in the initial complaint and the Section 14(a) claim have a shared basis in factual circumstances. Like the claims in the initial complaint, the Section 14(a) claim includes misstatements and omissions in the Offering Documents (including the Proxy), concerned the same corporate transaction, and were made by some of the same defendants. *See* ECF No. 1 ¶¶44-72. That initial complaint expressly alleged that "Aetna shareholders approved the Acquisition . . . not knowing that CVS's reporting of its goodwill asset was not GAAP-compliant, [or] that the Omnicare-related goodwill was materially impaired." *Id.* ¶8. Given this "shared basis in factual circumstances"—including the same misstatements and omissions in the Proxy—the initial complaint provided adequate notice of potential Exchange Act claims.

Second, at most, Defendants raise factual questions regarding when investors learned of their claims, which cannot be resolved at this stage of the litigation. Resolving a statute of limitations issue is "a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012). Given the well-pleaded allegations here concerning: (i) Defendants' misleading reassuring statements on August 8, 2018; (ii) the reassured market reaction crediting

those statements; (iii) the new facts disclosed on February 20, 2019; and (iv) the sharply negative market reaction to these new disclosures, the Court cannot rule as a matter of law at the pleading stage that the statute of limitations started running before February 20, 2019.

Finally, even if the CVS Defendants were correct that the one-year limitations period began to run on August 8, 2018 and expired on August 8, 2019 (and they are not), the Exchange Act claims would still be timely. This is because those claims would relate back to the filing of the New York state action. The New York state action was filed on March 22, 2019, less than one year after August 8, 2018. Just as the Exchange Act claims relate back to the initial complaint in this action, so too do they relate back to the complaint in the New York state action, which has "a shared basis in factual circumstances," *Ngomba*, 2020 WL 107969, at *3, because it was likewise brought on behalf of certain Aetna investors alleging misrepresentations and omissions made in the Offering Documents in connection with the acquisition, and thus "provided [Defendants] with adequate notice of the potential new claims." *Quaak*, 445 F. Supp. 2d at 136-37.

### C. The Complaint Adequately Pleads False Statements And Omissions In Connection With Proxy Solicitations For The Aetna Acquisition

Proxy solicitations are defined broadly in Rule 14a-1 to include any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(l)(iii). There is no dispute that Section 14(a) applies to the alleged misstatements and omissions in the Offering Documents.

Defendants—including CVS's and Aetna's directors—are also liable under Section 14(a) for other statements, outside the Offering Documents, made to solicit shareholders' votes in favor of the acquisition. Those included (i) statements made during a joint conference call on December 4, 2017 and a presentation the next day pointing to the LTC business as a source of the combined company's growth that would "enable [the combined company] to deliver superior outcomes at

69

lower cost" (¶¶314-15); and (ii) statements made during a January 4, 2018 conference call identifying "[s]olid script growth" in the LTC business as one of the combined company's "Drivers of Growth" (¶318). Those statements were made between the announcement of the acquisition and the March 2018 shareholder vote, highlighted the LTC business as a source of value and growth for the combined company, and as such were "reasonably calculated to result in the procurement . . . of a proxy." *Bank of Guam v. Pangilinan*, 902 F.2d 38, 1990 WL 56840, at *1 (9th Cir. 1990) ("[T]he question in every case is whether the challenged communication, seen in the totality of the circumstances, is reasonably calculated to influence the shareholders' votes."); *see also S.E.C. v. Das*, 2010 WL 4615336, at *9 (D. Neb. Nov. 4, 2010) ("'solicitation' is construed broadly").

The CVS Defendants cast baseless aspersions that "[t]hese additional statements were tacked on." CVS Br. at 47. Not so. These communications were made in the weeks leading up to the shareholder vote on the Aetna acquisition, contained misrepresentations about the LTC business and goodwill, and were reasonably calculated to result in shareholders' votes in favor of the deal.

With regard to the January 4, 2018 investor call and presentation, the CVS Defendants assert that the self-serving disclaimer that they were not a proxy solicitation should insulate those statements from liability. *See* CVS Br. at 47. Given the presentation's statement that "CVS Health, Aetna, their respective directors and certain of their respective officers may be considered participants in the solicitation of proxies in connection with the proposed transaction" (CVS Ex. 7 at 3), it is at least plausible that the presentation constituted a proxy solicitation. Any factual dispute (or mixed question of law and fact) as to whether the presentation was a proxy solicitation cannot be determined on the pleadings as a matter of law.

Lastly, the CVS Defendants' arguments that the misstatements not included in the Offering Documents are either inactionable "puffery" (CVS Br. at 47-48) fail for many of the same reasons discussed above at Section I.B.2. The statements to which the CVS Defendants point, including that the LTC business would "enable [the combined company] to deliver superior outcomes at a lower cost," and growth in prescriptions and revenues for the LTC business would be "driven by new initiatives tailored towards assisted living facilities" (¶¶314-15, 318), were factual statements ostensibly based on present information. At most, the CVS Defendants' arguments that these statements are immaterial "puffery" or entitled to the PSLRA "safe harbor" raise factual arguments that should not be resolved until a later stage of litigation.

## III.    THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Section 15 of the Securities Act provides for joint and several liability for persons who "control" an entity liable under Sections 11 or 12(a)(2). 15 U.S.C. § 77o. Section 20(a) of the Exchange Act provides for joint and several liability for "[e]very person who, directly or indirectly, controls any person liable" under Section 14(a). 15 U.S.C. § 78t(a). The standard for Section 15 and 20(a) is the same. *See, e.g.*, *In re Brooks Automation, Inc. Sec. Litig.*, 2007 WL 4754051, at *15 (D. Mass. Nov. 6, 2007). In order to plead control person liability under either section, a plaintiff need allege only (i) an underlying violation by the controlled person or entity, and (ii) that the defendants controlled the violator. *Silverstrand*, 12 F. Supp. 3d at 248. The Complaint more than meets that standard.

First, the Complaint pleads primary violations of Sections 11 and 12 of the Securities Act and Section 14(a) of the Exchange Act. *See supra* at Sections I-II. Second, the Complaint sufficiently alleges that the CVS Defendants were controlling persons. *See, e.g.*, ¶¶355-59, 375-380. Control exists whenever (i) the person exercised control over the general operations of the

company; and (ii) the person possessed (even if she did not exercise) the power to determine the specific acts or omissions upon which the underlying violation is predicated. *See Credit Suisse-AOL*, 465 F. Supp. 2d at 59. Officers and directors are presumed to be control persons. *See Neely v. Bar Harbor Bankshares*, 270 F. Supp. 2d 50, 53 (D. Me. 2003); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 437 (S.D.N.Y. 2001) (directors "can be presumed to have the power to direct or cause the direction of the management and policies of the corporation").

The Complaint adequately alleges control for the CVS Defendants because, as the officers and directors of CVS, they personally had—and exercised—the power to direct the companies' actions: they approved the merger. *See* CVS Ex. 1 at 3-5 (Registration Statement detailing directors' exercise of authority over the merger). Further, they had control over the content of the alleged misleading statements because they either signed the Offering Documents, made statements to investors, or authorized the Offering Documents to be issued to shareholders containing their recommendation to approve the merger. ¶¶28-33, 84-85, 90, 314-19, 330-81. In addition, by signing the Offering Documents and authorizing their dissemination, the CVS Defendants "accepted responsibility for [their] contents." *Cabletron*, 311 F.3d at 41; *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003) (the "very fact that a director is required to sign these critical documents charges the director with power over the documents"). In any event, "[g]iven the 'highly factual nature' of the control person inquiry, resolving that issue on a motion to dismiss is often inappropriate." *Nomura*, 632 F.3d at 776; *see also Cabletron*, 311 F.3d at 41 ("[c]ontrol is a question of fact that will not ordinarily be resolved summarily at the pleading stage").

## CONCLUSION

The Court should deny the CVS Defendants' motion to dismiss.

DATED: February 27, 2023

*/s/ John J. Rizio-Hamilton*

John J. Rizio-Hamilton (*pro hac vice*)

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Hannah Ross (*pro hac vice*)
John J. Rizio-Hamilton (*pro hac vice*)
Jai Chandrasekhar (*pro hac vice*)
Timothy G. Fleming (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
hannah@blbglaw.com
johnr@blbglaw.com
jai@blbglaw.com
timothy.fleming@blbglaw.com

*-and-*

Lauren M. Cruz (*pro hac vice*)
2121 Avenue of the Stars
Suite 2575
Los Angeles, California 90067
Tel: (310) 819-3480
lauren.cruz@blbglaw.com

*Lead Counsel for Lead Plaintiff*
*Los Angeles Fire and Police Pensions*
*and for the Class*

**SHEKARCHI LAW OFFICES**

K. Joseph Shekarchi (Bar No. 4493)
33 College Hill Road
Warwick, Rhode Island 02866
Tel: (401) 827-0100
Fax: (401) 823-1400
joe@shekarchilaw.com

*Liaison Counsel for Lead Plaintiff*
*Los Angeles Fire and Police Pensions*
*and for the Class*