```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF RHODE ISLAND
 2


 3


 4    * * * * * * * * * * * * * * * * * 19-CV-434-MSM
      WATERFORD TOWNSHIP POLICE & FIRE  *
 5    RETIREMENT SYSTEM, Individually   *
      and on Behalf of All Others       *
 6    Similarly Situated,               *
                          Plaintiff     *
 7                                       *
                      vs.               *MAY 6, 2024
 8                                       *
      CVS HEALTH CORPORATION,           *
 9    et als,                           *
                          Defendants    *
10    * * * * * * * * * * * * * * * * * *VIA VIDEO CONFERENCE

11


12


13
                  BEFORE THE HONORABLE MARY S. McELROY
14
                          DISTRICT JUDGE
15
                       (MOTIONS TO DISMISS)
16


17


18    APPEARANCES:

19    FOR THE PLAINTIFF:        K. JOSEPH SHEKARCHI ESQ.
                                Shekarchi Law
20                              240 Chestnut Street
                                Warwick, RI  02888
21
                                JOHN RIZIO-HAMILTON, ESQ.
22                              JESSE L. JENSEN, ESQ.
                                Bernstein Litowitz Berger
23                              & Grossmann LLP
                                1251 Avenue of the Americas
24                              Floor 44
                                New York, NY  10020
25
```

```
1

2   FOR THE DEFENDANTS:          MELISSA COLLINS, ESQ.
    CVS DEFENDANTS               Williams & Connolly LLP
3                                680 Maine Avenue SW
                                 Washington, DC 20024
4
                                 GEOFFREY R. CHEPIGA, ESQ.
5   AETNA DIRECTOR               Paul Weiss Rifkind Wharton &
    DEFENDANTS:                  Garrison LLP
6                                1285 Avenue of the Americas
                                 New York NY  10019-6064
7

8   Court Reporter:              Denise P. Veitch, RPR
                                 One Exchange Terrace
9                                Providence, RI  02903

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   <u>Via Video Conference</u>

2   6 MAY 2024 -- 10:00 A.M.

3           THE COURT:  Good morning.  I'm just waiting for

4   everybody to connect.

5           Are we ready to proceed on motions to dismiss

6   which are at ECF 52 and 53?

7           MS. COLLINS:  Yes, your Honor.

8           THE COURT:  Okay.  I'll ask counsel to identify

9   themselves and the parties that they're representing

10  for the record, please.

11          MS. COLLINS:  Good morning.  Melissa Collins of

12  Williams & Connolly on behalf of the CVS Defendants.

13          THE COURT:  Good morning.

14          MR. SHEKARCHI:  Good morning, your Honor.

15  Joe Shekarchi and John Rizio-Hamilton representing the

16  Plaintiffs; and with permission of the Court I will

17  turn over to John Rizio-Hamilton to make the formal

18  argument.  I wanted to just make the introduction.

19          THE COURT:  Okay.  Thank you, Mr. Shekarchi.

20          MR. DAWSON:  Good morning, your Honor.

21  Christopher Dawson also on behalf of the CVS

22  Defendants.  I will not be arguing this morning.

23          THE COURT:  Okay.

24          MR. CHEPIGA:  Good morning, your Honor.

25  Geoffrey Chepiga for Paul Weiss on behalf of the Aetna

1    Director Defendants.

2              THE COURT:  Okay.

3              MR. RIZIO-HAMILTON:  And your Honor, this is

4    John Rizio-Hamilton on behalf of the lead Plaintiff.  I

5    should note that my partner, Mr. Jesse Jensen, is also

6    present, and I'm prepared to argue the CVS Defendants'

7    motion, and Mr. Jensen is prepared to handle the Aetna

8    Director Defendants' motion.

9              THE COURT:  Okay.

10             MR. JENSEN:  Good morning, your Honor.

11             THE COURT:  Good morning.

12             Okay.  So sort of for ease of argument and

13   organization, I just want to sort of let you know that

14   the reason that I asked for a hearing and that we're

15   having this hearing is I'm interested in your take on

16   the impact of the *City of Miami Fire Fighters v. CVS* on

17   the Amended Complaint because that opinion affirmed our

18   grant of motions to dismiss in the companion

19   litigation, as you know.

20             Why don't we start with the argument of the CVS

21   Defendants regarding motion to dismiss.

22             MS. COLLINS:  Yes, your Honor.  And as you just

23   mentioned, this case and the disclosures at issue have

24   a bit of history.  I'm sure your Honor is familiar with

25   some of that and so I will try to be brief with the

1    background; and then I'm going to turn to the two

2    aspects of the current Complaint that Plaintiff

3    contends are different from the prior cases, so,

4    different from *Fire Fighters*, but -- and the *LPF* case

5    that I will also discuss.  Those are customer loss

6    allegations and its prescription rollover allegations.

7    As I'll explain, those allegations have been considered

8    and rejected by prior courts and do not state a claim

9    here either.

10         This case is primarily about the goodwill of

11   CVS's Long-Term Care, or LTC unit.  I'll be very quick

12   with the summary of the underlying disclosures, but I'm

13   happy to go into more detail if the Court would like.

14         The first time that the LTC unit goodwill was

15   broken up specifically was in the third quarter of

16   2016 10-K.  There, CVS disclosed that the LTC unit's

17   value exceeded its carrying amount by 7 percent.  That

18   7 percent was repeated, was repeated in the 2016 10-K,

19   which is incorporated into the offering documents at

20   issue in this case.  By the 2017 10-K, which is also

21   part of the offering documents here, CVS disclosed that

22   the fair value of the LTC unit had exceeded the

23   carrying amount by only 1 percent, which was a decline

24   from the prior 7 percent.  In connection with this

25   change, CVS disclosed that our multi year cash flow

1    projections for our LTC recording unit had declined

2    from the prior year due to customer reimbursement

3    pressures, industry trends such as lower occupancy in

4    skilled nursing facilities, and client retention rates.

5    The disclosure went on to warn that if CVS didn't

6    achieve its forecast, quote, It is reasonably possible

7    that the operational performance of the LTC reporting

8    unit could be below our current expectations in the

9    near term and the LTC reporting unit could be deemed to

10   be impaired by a material amount.

11           In the subsequent months those challenges did

12   continue.  CVS did not meet its forecast, so it took a

13   series of two goodwill write-downs; first in August of

14   2018 and then in February of 2019.  That second

15   goodwill write-down spurred a series of lawsuits, all

16   arguing that CVS's disclosures were misleading because

17   CVS should have written down the goodwill of its

18   Long-Term Care unit earlier.  Two of those cases wound

19   up in front of your Honor; this case, and the 1934 Act

20   case *Fire Fighters*, which you've mentioned.  Another

21   case, *Labourers' Pension Fund, LPF*, was proceeding in

22   New York state court, and yet another in Rhode Island

23   state court.  Both are 1933 cases, like this one.  All

24   of those other cases have been dismissed with

25   prejudice.

1          So this Court looked at the same disclosures and

2     dismissed *Fire Fighters*.  It was a 1934 Act case, but

3     your Honor dismissed because there were no false or

4     misleading statements, which is the same inquiry that

5     is at issue here for the same disclosures.  This Court

6     concluded even assuming significant customer loss,

7     quote, CVS did publicly disclose to investors the

8     challenges plaguing the LTC business that could lead to

9     a goodwill impairment; and, quote, No reasonable

10    investor could have believed that the issues the

11    plaintiff claimed were omitted did not exist.

12         The First Circuit then affirmed, concluding that

13    your Honor's, quote, assessment was on the mark.

14    Alleging customer losses was not enough.  To state a

15    claim those allegations would have had to have been,

16    quote, inconsistent with the company's goodwill

17    disclosures, and they were not.

18         Importantly, the First Circuit also looked at a

19    proposal for an amended complaint in *Fire Fighters* and

20    concluded that the new allegations that the Plaintiffs

21    relied on there still did not contradict CVS's

22    disclosures.

23         In the other two cases, in *LPF* the New York

24    Appellate Division dismissed 1933 Act claims identical

25    to the ones at issue here, holding as to the goodwill

1    claims that there were no actionable statements under

2    any prong of Omnicare and that CVS's risk warnings were

3    not misleading in light of the, quote, total mix of

4    information.  The Rhode Island Superior Court also

5    dismissed the same 1933 Act claims, adopting the

6    persuasive reasoning and findings of this Court, the

7    First Circuit, the New York Appellate Division, and

8    agreeing, quote, that plaintiffs failed as a matter of

9    law to show that CVS made actionable false or

10   misleading statements.  So --

11       THE COURT:  Can I interrupt you there.  So are

12   you arguing that it doesn't make a difference that this

13   case isn't pled in fraud, that the difference is

14   immaterial because there are no false or misleading

15   statements so they don't get to the, whether the

16   heightened pleading standard has been met?

17       MS. COLLINS:  Correct.  I think it doesn't make

18   a difference that this case is not pled in fraud

19   because you can accept all of their allegations as they

20   were pled as true, and you look at the disclosures in

21   context and they're not misleading to a reasonable

22   investor.  I also think it's important when you're

23   thinking about the sort of what needs to be pled here,

24   to look back at Omnicare, which is a Section 11 case, a

25   1933 Act case which talks at length about what a

1   plaintiff needs to plead to show an omission of a fact

2   to state a claim that an opinion statement, like the

3   goodwill statements here, would be misleading.  And

4   they say that's no small task for an investor; you have

5   to actually lay out the things that would not, cannot

6   be squared with what a reasonable investor would take

7   from the opinion.  So the fact that this is not pled in

8   fraud I think does not make a difference in the

9   outcome.

10          Okay.  And so Plaintiff here does not argue that

11  your Honor or the First Circuit misapplied federal

12  securities law; instead, it's trying to distinguish its

13  complaint from others.  It focuses in its opposition on

14  sort of two groups of factual allegations that it says

15  are different.  The first is the allegations about

16  customer losses, and the second are the allegations

17  about rollover practices.  As I'll explain, those

18  allegations not different from what has been looked at

19  from prior courts, and they don't change the outcome

20  that this complaint should be dismissed.  And while I

21  do think it's helpful to know why this is not different

22  from the other cases, I also want to be clear that this

23  case should be dismissed even if it were the first case

24  filed, dismissed on the merits, as this Court and the

25  prior courts have all reached the same conclusion,

1    applying the same federal securities laws to the same

2    disclosures and the same underlying events, we think

3    it's the right conclusion because CVS's disclosures

4    were not misleading.

5         So -- did you have a question?  Sorry.

6         THE COURT:  No.

7         MS. COLLINS:  Okay.  I'll start with the

8    customer losses.  So Plaintiff contends that its

9    Complaint pleads new and different facts that haven't

10   been considered by any other court about the customer

11   losses that the LTC business was experiencing, and that

12   also those facts they plead are sufficient to state a

13   claim about CVS's goodwill disclosures.  Plaintiff is

14   incorrect on both accounts.

15        So first, in its briefing Plaintiff emphasizes

16   three ways in which it says its customer loss

17   allegations are more robust than the other complaints.

18   The first is an allegation that CVS lost 25 to

19   33 percent of the LTC business; the second is an

20   allegation that CVS held a "come to Jesus" meeting in

21   2016; and the third is an allegation that CVS acquired

22   other pharmacies but lost many of those customers.

23   These are repeated over and over throughout Plaintiffs'

24   brief as reasons why its complaint is different.  But

25   these are not new allegations.  These same allegations

1  were in the proposed amended complaint in *Fire Fighters*

2  that the First Circuit considered and rejected.  Those

3  plaintiffs in *Fire Fighters* lifted the exact same 25 to

4  33 percent and come to Jesus allegations directly from

5  this Complaint, explicitly relying on this Complaint

6  and its confidential witnesses for those allegations.

7  And that complaint also copied allegations about failed

8  acquisitions that relied on this case's confidential

9  witnesses.

10      But none of that moved the needle for the First

11  Circuit, which looked at the allegations the plaintiff

12  there relied on as saying that they now would overcome

13  the deficiencies in *Fire Fighters,* and the

14  First Circuit concluded that even those allegations did

15  not, quote, connect defendants' public statements with

16  contradictory contemporaneous facts, or, quote,

17  demonstrate that the further anecdotal losses described

18  by the new CWs materially exceeded the losses

19  recognized by CVS.

20      And the First Circuit wasn't alone in that.  The

21  *LPF* court considered and rejected a substantially

22  similar allegation that the LTC business had lost up to

23  25 percent of its customers.  And your Honor in

24  *Fire Fighters* credited significant customer losses and

25  in concluding that the disclosures were not misleading.

1    So they're not new allegations, and they don't state a

2    claim here any more than they do elsewhere.

3            Plaintiffs' main theory is that its complaint

4    shows that the LTC business's goodwill was already

5    impaired at the time of the offering documents, but

6    that's just a disagreement with CVS's accounting

7    judgment and it's not actionable, as this Court

8    recognized in *Fire Fighters*.  The statements about

9    goodwill are subjective statements of opinion evaluated

10   under the Supreme Court's *Omnicare* decision; and I can

11   walk through that in great detail if you'd like, but

12   I'll try to keep it brief.  The bottom line is that

13   *Omnicare* does not allow a plaintiff to state a claim

14   just by disagreeing with how CVS assessed the facts

15   that went into its goodwill analysis.  *Omnicare*

16   recognizes that opinions rest on competing facts and

17   only provides for liability or omission of fact when

18   that fact, quote, cannot be squared with the fair

19   reading of the disclosures ans context.

20           And we cite numerous cases in our brief,

21   including *GE*, *Ascena Retail Corporation* and, of course,

22   *Fire Fighters*, all dismissing where plaintiffs raise

23   the same sorts of allegations as here, that a company

24   should have recognized goodwill impairment earlier

25   because the plaintiff can point to signs of trouble in

1    the business.

2         That dismissal is even more appropriate here in

3    light of CVS's disclosures.  Far from the rosy picture

4    that Plaintiff tries to imply, there's no dispute that

5    CVS disclosed declining fair value in the LTC unit,

6    lowered financial projections for a number of reasons,

7    including client retention rates and a near term

8    possibility of impairment.

9         This Court already looked at those disclosures

10   in *Fire Fighters*, and that same analysis applies here.

11   You credited customer loss, even assumed for the sake

12   of argument that there were omissions about customer

13   loss, and still concluded that CVS had disclosed the

14   relevant challenges and no reasonable investor could

15   have believed the issues did not exist.

16        These Plaintiffs, the Plaintiff here does not

17   raise any new issues, (indecipherable) but the same

18   types of issues that were addressed in *Fire Fighters*,

19   and so the same analysis applies.

20        To the extent that Plaintiff argues that

21   referencing customer retention rates is somehow

22   insufficient in the face of its allegations of

23   significant customer loss, that's incorrect.  In the

24   disclosures it was not just a stray reference of

25   customer retention rates being an issue; it was in the

1    context of explaining that financial projections had

2    decreased, fair value had gone from 7 percent above

3    carrying value to only 1 percent above carrying value,

4    so it's directly tied to negative financial impact on

5    the LTC business.

6         A securities plaintiff is not entitled to its

7    preferred wording in disclosures, and, as this Court

8    said, quote, CVS was under no obligation to spell out

9    the extent of customer retention difficulties simply

10   because it mentioned them.  The same remains true today

11   as it was in the *Fire Fighters* decision.

12        So that's customer losses.  There's no basis in

13   the Complaint to conclude, even crediting all about

14   Plaintiffs' allegations that they rendered CVS's

15   statements misleading.

16        The other supposed difference is rollover

17   allegations.

18        THE COURT:  Excuse me; I apologize.

19        MS. COLLINS:  Do you want a minute?

20        THE COURT:  You can proceed.

21        MS. COLLINS:  I'll also take a drink.

22        Plaintiffs' theory here on rollover allegations

23   relies on allegations about prescription filing

24   practices that are lifted wholesale from an entirely

25   different lawsuit, a false claims act case called

1      *Bassan*.  It's referenced in the Complaint by that name.

2      That case was sealed until December 2019, long after

3      the disclosures and the write-down at issue here, after

4      even this case started.  It's still going on in the

5      Southern District of New York.  It's in discovery;

6      there's been no finding of any misconduct by CVS.

7           Unlike the other customer loss allegations that

8      we were just discussing, these are not unique to

9      Plaintiffs' complaint.  They've already been dismissed

10     in other cases.  The *Fire Fighters* plaintiffs literally

11     copied and pasted rollover allegations from this

12     Complaint into their proposed second amended complaint,

13     and that made no difference in the First Circuit.  The

14     rollover allegations were referenced in the

15     First Circuit briefing and still the First Circuit

16     concluded there were no contradictory contemporaneous

17     facts in the new allegations compared to CVS's

18     disclosures.

19          And these rollover allegations were also in the

20     Rhode Island state court, which was dismissed.  And

21     those dismissals, again, are with good reason.  CVS

22     disclosed it was being investigated, which is what it

23     knew.  The complaint does not allege that CVS knew of

24     the litigation before it was unsealed in December 2019,

25     but Plaintiff nonetheless argues that CVS's prior

disclosures were somehow misleading because they didn't
disclose the later allegation.  The theory goes nowhere
for a couple of reasons, and first and foremost courts
recognize that securities disclosure is not, quote, a
rite of confession.  Securities law is very clear that
companies do not have to accuse themselves of
uncharged, unadjudicated misconduct.  The same goes
with financial statements.  They don't automatically
become misleading just because a company does not
disclose some possible misconduct may have contributed
to the results.  We cite the case law in our briefs.
I'm happy to discuss further if you'd like, but this is
not a controversial proposition.  Plaintiffs don't
dispute it or try to distinguish our cases.  They don't
in their briefing point to any cases that apply their
theory. They just ignore this legal point which is
dispositive.

        Under Plaintiffs' theory, CVS would have been
required to assume that an investigation was ultimately
going to result in a lawsuit, assume that they would be
found at fault in the lawsuit, which still hasn't
happened, and then somehow account for that in their
financial statements.  And that's not the law, so your
Honor can stop there because that's what Plaintiffs'
theory of the case would require.

1          But even if the Court were to go further, their

2     particular theory makes no sense in the context of

3     Plaintiffs' case.  This case arises out of a goodwill

4     impairment.  Plaintiff is supposedly pouring out facts

5     that in its view would show that goodwill was impaired.

6     But the rollover allegations have nothing to do with

7     the goodwill calculation.  Plaintiff does not allege

8     that anything related to the rollover actually factored

9     into the goodwill impairment that CVS announced.

10          The only supposed connection that Plaintiff

11     attempts to make in its briefing to goodwill is the

12     argument that the potential for litigation would be a

13     trigger for goodwill impairment testing.  But that also

14     failed.  First, the portion of the accounting guidance

15     that Plaintiff relies on in its Complaint refers to

16     actual litigation, not hypothetical, unknown

17     litigation, as one of the events and circumstances that

18     a company assesses when determining whether to test for

19     goodwill impairment; and, second, once you're even

20     considering those factors, that's back to a

21     disagreement with CVS's accounting judgment regarding

22     how to assess what necessitates goodwill testing.  It's

23     just not the case that you have to test for goodwill

24     impairment every time there's even the potential for a

25     lawsuit; and that's all there was here.

1          So one final note on rollovers.  Plaintiff also

2     likes to use in its Complaint and its briefing the

3     phrase "inflated revenue" to say that goodwill was

4     impaired.  It's not, it's not entirely clear to me what

5     Plaintiff means by that.  CVS booked revenue for sales

6     that it actually made to real customers.  There are no

7     allegations those numbers were recorded incorrectly.

8     And if Plaintiff is trying to say that CVS made sales

9     that it shouldn't have, that's back to assuming

10    misconduct and those legal principles that you don't

11    have to, companies don't have to accuse themselves of

12    misconduct or alter their financial statements because

13    some suspectible (phonetic) misconduct may contribute

14    to the numbers.

15         Very briefly, my last point, I've been focusing

16    mostly on the goodwill disclosures.  That's the focus

17    of the briefing, and I think that's the core of the

18    case here.  Plaintiff also tries to claim that CVS's

19    risk warnings were misleading and the disclosures

20    violated Regulation S-K, so I'm just going to briefly

21    address those.

22         Both theories are grounded in the notion that

23    CVS's disclosures did not adequately indicate the risks

24    that were affecting the business.  These theories were

25    dealt with and dismissed in other cases:  The *LPF* in

1    Rhode Island state court, plaintiffs alleged both.  The

2    *Fire Fighters* case involved the risk warnings.

3         Plaintiffs don't contend their arguments are

4    different here; they just go back to the same customer

5    loss allegations and rollover allegations that they

6    relied on for their other arguments, and they're no

7    more successful here than elsewhere.  Plaintiffs'

8    approach is to cherry-pick statements from the CVS

9    disclosures as a whole, but ignore the context of CVS's

10   LTC-specific disclosures and then complain that the

11   impact of the risks on LTC unit weren't disclosed the

12   way the Plaintiff wanted.  But putting a Reg S-K or a

13   risk warning on the Complaint doesn't fundamentally

14   change Plaintiffs' theories or the reasons why they

15   fail.  Fatal to all of these theories is that CVS did

16   disclose customer losses negatively affecting the LTC

17   unit.  Plaintiffs' insistence on an earlier goodwill

18   write-down is still just a disagreement with CVS's

19   accounting judgment, and CVS is under no obligation to

20   accuse itself of misconduct.  When you look at the

21   disclosures in context from your Honor's *Fire Fighters*

22   opinion, no reasonable investor could have believed

23   that the issues Plaintiff claims were omitted, did not

24   exist.  The same is true here.

25        So for all of those reasons and the reasons in

1    our brief, we respectfully request that the Court

2    dismiss the Complaint with prejudice.

3            THE COURT:  Okay.  Thank you, Ms. Collins.

4            I don't know if you guys can hear the drumbeat

5    in the background, but there's a protest going on

6    across the street, so if it disturbs you let me know.

7            MS. COLLINS:  I cannot hear anything.

8            THE COURT:  There's nothing I can do about it,

9    but at least you'll know.

10            Mr. Rizio-Hamilton, would you like to respond

11    before we then get to the Aetna Defendants' motion, or

12    would you like to hear both motions first?

13            MR. RIZIO-HAMILTON:  I would like to respond, if

14    that's okay with you, your Honor.

15            THE COURT:  Fine with me.

16            MR. RIZIO-HAMILTON:  Thank you so much.

17            Let me begin where your Honor began, which is,

18    how does the First Circuit's decision in the 10(b) case

19    affect this one; and I think that the theme of

20    Ms. Collins' presentation is that it requires dismissal

21    of this case, and I respectfully very much disagree

22    with that, and I'd like to explain why.

23            So I think first it's important to understand

24    exactly what the First Circuit held, and what the

25    First Circuit held is set forth on page 31 of that

1    opinion.  And it says, (Reading) Close review of the

2    complaint reveals that despite its length it fails to

3    allege sufficiently specific facts about the state of

4    the LTC business and particular point in time to enable

5    us to conclude that any of the goodwill write-downs

6    were too late or that any of defendants' alleged

7    misstatements contradicted the state of the business as

8    it then stood.

9         So the principal failing of the complaint in the

10    10(b) case that the First Circuit honed in on was a

11    factual one.  The First Circuit did not say that these

12    disclosures were inactionable as a matter of law.  Even

13    though the defendants had argued for that vociferously

14    in their papers, the First Circuit rejected that

15    concept and said that the complaint failed on its

16    facts.

17         Now, our Complaint succeeds on the facts where

18    the 10(b) complaint failed, and that's because we do

19    allege specific facts about the state of the business

20    at particular points in time.  In our case the key

21    moment in time legally is when the offering documents

22    became effective on February 9th, 2018.  That's when

23    the false or misleading or incomplete nature of those

24    documents is judged in a securities act case.  And what

25    we allege is that by that time, and particularly by the

1   end of 2017, the long-term care business had lost

2   between 25 and 33 percent of its customers, which is an

3   allegation that wasn't present in the 10(b) case.  And

4   so we give a very specific and detailed allegation, and

5   that's paragraph 114 of the Complaint, about the extent

6   of the business loss and precisely when it occurred.

7   So that's big picture, point one.

8          The other set of allegations that we have that

9   was not present in the 10(b) case does concern the

10  rollovers, and we allege from the time Omnicare was

11  purchased, up until early 2018, it was engaged in

12  inappropriate rollover practices pursuant to which it

13  was dispensing hundreds of millions of dollars worth of

14  prescriptions a year without a valid prescription

15  because they had expired.  That too is an allegation

16  that we situate very specifically as of a point in time

17  prior to when the offering documents became effective.

18  It was lacking in the 10(b) case.

19         Another big picture point I want to make here,

20  your Honor, is that because the principal failing that

21  the First Circuit identified in the 10(b) was a factual

22  one, the fact that our allegations are judged under

23  Rule 8 does matter.  You know, Rule 8 controls here.

24  It's not the heightened pleading standards of the PSLRA

25  which requires a degree of factual specificity we're

1    not held to.  And so when you couple those very

2    specific factual allegations with the fact that we're

3    judged under a Rule 8 standard, that solves the main

4    problem that the First Circuit identified.

5         Now, there's something else which is very

6    important.  This case presents a particular species of

7    legal claim that was not and could not have been an

8    issue in the 10(b) case, that your Honor has never

9    assessed in this case, and that the First Circuit

10   didn't rule on in this case, and it's fundamentally

11   different from the things that your Honor and the

12   First Circuit considered; and that's the Item 303

13   claim.

14        The reason it's fundamentally different is that

15   the Item 303 claim does not require us to show that a

16   statement was false or even misleading.  It is what's

17   called a pure omissions claim, and this is demonstrated

18   by the First Circuit's decision in the *Silverstrand*

19   case, which is the First Circuit's seminal decision on

20   Item 303.  And it was most recently reaffirmed about

21   six weeks ago by the United States Supreme Court in the

22   *MacQuarie* decision.  Since that hasn't been cited in

23   the briefing, I'll just read the cite into the record.

24   It's 144 S.Ct. 885 at page 891, and it's a pure

25   omissions claim that is uniquely available under

1    Section 11 of the Securities Act that, as the Supreme

2    Court held in *MacQuarie,* is not available under

3    Section 10(b) of the Exchange Act.

4           The reason that fundamentally changes the

5    analysis is because you do not have to show that a

6    statement was misleading to plead an Item 303 claim.

7    All you have to show is that the specific information

8    that Item 303 requires to be disclosed was not fully

9    and explicitly disclosed in the offering materials; and

10   here, that information that was required to be

11   disclosed under Item 303 absolutely was not, and that's

12   quite separate and apart from whether the disclosures

13   that were made were misleading.

14          What wasn't disclosed specifically that Item 303

15   requires?  Two things.  One was the known material

16   trend of highly significant adverse business loss on

17   the order of 25 to 33 percent in the Long-Term Care

18   unit.  That was a trend that was obviously known.  It

19   was reported internally repeatedly and actually

20   addressed in the state of the company conference calls,

21   as we allege in paragraph 114 and others in that

22   section of the Complaint.  It was the subject, in fact,

23   of that November 2016 come to Jesus meeting that

24   involved some of the most senior executives of the

25   company, including --

1           THE COURT:  Can I stop you for a second.  Can

2      you give me that cite again because I don't think I got

3      it correctly.

4           MR. RIZIO-HAMILTON:  The cite from the Supreme

5      Court case?

6           THE COURT:  Yes.

7           MR. RIZIO-HAMILTON:  Yes, your Honor.  It is

8      144 S.Ct. 885 and the pincite is 891.  The name of the

9      case is *MacQuarie v. Moab.*

10          THE COURT:  Okay.  Thank you.

11          MR. RIZIO-HAMILTON:  And, you know, what

12     *MacQuarie* held, and I think this is really significant

13     for the purposes of our discussion and particularly

14     your starting point, your Honor, is that this Item 303

15     pure omissions claim is not available under

16     Section 10(b).  That's what the Supreme Court said.

17     And the Supreme Court said it's uniquely available

18     under Section 11 and Section 11 only.  So it's a

19     pathway to liability that's unique; and as I'll talk

20     about in a moment, under prevailing First Circuit law,

21     which is set forth in that *Silverstrand* case that I

22     mentioned, it's a really rigorous disclosure

23     requirement.

24          THE COURT:  Okay.  I just want to, so that we're

25     clear here, this case was only issued April 12th of

1   this year, so I intend to let the parties address it in

2   no more than three pages post-hearing if they wish to,

3   all of the parties, okay?  No more than three pages.

4           MR. RIZIO-HAMILTON:  Okay.

5           THE COURT:  All right.  Go ahead.  Keep going.

6   I didn't mean to interrupt you.

7           MR. RIZIO-HAMILTON:  No, not at all, and we

8   thank you for the opportunity.

9           So what wasn't disclosed here that Item 303

10  required?  Two things principally, although the

11  Complaint lists others, but I'd like to focus our

12  discussion on the main two.

13          THE COURT:  Okay.

14          MR. RIZIO-HAMILTON:  And these are set forth in

15  paragraphs 307 and 308 of the Complaint.  Number one,

16  the known material adverse trend of business loss

17  within the Long-Term Care unit on the order of 25 to

18  33 percent of total customers as of year-end 2017

19  before the offering documents became effective.  Number

20  two, the known uncertainty -- and this is significant.

21  Item 303 does not require that you must have certainty

22  as to whether you've done something illegal to trigger

23  disclosure.  You are required to disclose known

24  uncertainties under Item 303.  So with respect to the

25  rollovers, the known uncertainty that the company had

1    engaged in these practices to a material degree, and

2    then it called into serious question their ability to

3    generate the hundreds of millions of dollars that they

4    had been generating pursuant to these practices.  And I

5    know Ms. Collins said there's been no adjudication of

6    wrongdoing, but the fact of the matter is it doesn't

7    take much thought to understand that you can't dispense

8    regulated medications without a prescription.

9         So those are the two disclosures that were

10   required under Item 303.  Neither were made.  And the

11   First Circuit's decision in the *Silverstrand* case tells

12   us a lot of really important things, and it's really

13   the most important decision to this branch of our claim

14   because, again, this hasn't been passed upon by either

15   your Honor or the First Circuit yet.

16        And what *Silverstrand* tells is, number one,

17   Item 303 is a pure omissions claim.  It does not

18   require there be any misleading statement, and, in

19   fact, in *Silverstrand* there was no misleading

20   statement.  Number two, in *Silverstrand,* much like the

21   Defendants are trying to do here, the defendants argued

22   that the disclosures they had made in the offering

23   documents were more than adequate to satisfy the

24   Item 303 obligation.  And they were able to point to

25   some very what the First Circuit called detailed

1    disclosures about what had been going on there.  They

2    were developing an iron replacement drug, and the

3    plaintiffs claim that they failed to disclose that

4    there had been 23 serious adverse events since the time

5    the drug had received FDA approval, and they pointed to

6    disclosures in the registration statement to the effect

7    that -- which the FDA approved, by the way -- to the

8    effect that during testing there had been associated

9    serious adverse events with the drug, including really,

10   really dangerous ones like anaphylaxis that could cause

11   death, as well as other very detailed disclosures about

12   the issues they had encountered during the process of

13   testing the drug and obtaining FDA approval; and the

14   First Circuit said that's not enough to satisfy your

15   303 obligation.  It's not enough to disclose some

16   degree of problem to satisfy Item 303.  What you have

17   to disclose is the actual full trend that you are

18   encountering at the time.

19        And so here, while Defendants' disclosures may

20   have touched upon some problems, they actually didn't

21   go as far as the disclosures that the First Circuit

22   rejected in *Silverstrand*, which explicitly said that

23   the product is tied to some serious adverse events

24   including very dangerous ones like anaphylaxis; and

25   they did not disclose in all events fully and

1    explicitly, as Item 303 requires, that the long-term

2    care business had lost between 25 and 33 percent of its

3    customers and that there was a known material

4    uncertainty as to the rollovers.

5         Now, Ms. Collins said that the essence of the

6    rollover claim is that we allege that they didn't

7    disclose the allegations in the *qui tam* complaints,

8    which weren't unsealed until after the vote in this

9    case.  That's not so.  That fundamentally misconstrues

10   the essence of our allegation.

11        The essence of our allegations is that they did

12   not disclose underlying practice which they knew was

13   improper.  How do we know that they knew it was

14   improper?  Well, at paragraphs 193 through 220 of the

15   Complaint we set forth in great detail a series of

16   internal communications at Omnicare and CVS through

17   which they recognized over the course of years that

18   their systems had this failing where they continued to

19   dispense medication after the prescription has expired.

20   In fact, we cite multiple and quote multiple internal

21   audits that Omnicare and later CVS conducted, and we

22   quote employees from e-mails saying that the scope of

23   the issue is huge.  And we allege quite specifically in

24   paragraphs 219 and 220 that not only was this problem

25   known, but it was known to affect approximately

1    24 percent of the facilities through which they

2    dispense prescriptions.  So it was a significant and

3    known issue, just like the business loss was a

4    significant and known trend.

5          And so this is something that neither you nor

6    the First Circuit has passed upon yet, and it's

7    something that you have to consider anew and you have

8    to consider it under the really relaxed pleading

9    standard of Rule 8, which in *Silverstrand* the

10   First Circuit said imposes a relatively minimum burden.

11   And you have to consider it under the instruction of

12   the First Circuit's opinion in *Silverstrand*, which

13   confirms that no misleading statement is required to

14   state this claim and that half-measured disclosures or

15   disclosures that touch upon some problems but don't

16   fully disclose the known tend and uncertainties are not

17   enough to win dismissal at the pleadings stage.

18         Now, Ms. Collins mentioned that the Item 303

19   claims were presented in the New York state court case

20   and the Rhode Island state court case, and while that

21   much is technically true, the fact of the matter is

22   that the New York state court complaint was severely

23   deficient in two factual respects: (1) is that it

24   didn't include any allegations about the rollovers at

25   all, and, (2) is that the sole allegation it included

1    about the loss of business was a completely

2    unsubstantiated, unadorned allegation that the company

3    had lost between 10 and 25 percent of its business.

4         That allegation is not only less than what we

5    allege, but it is totally unsupported.  We submitted

6    the complaint to your Honor as an exhibit to my

7    declaration, and I implore you to take a look at it,

8    because when you look at that complaint and compare it

9    to ours, and particularly compare our paragraph 114 to

10   the completely naked assertion in the New York state

11   court complaint, you will see that our Complaint is

12   head and shoulders above that one in terms of factual

13   specificity and the numbers themselves.

14        With respect to the Rhode Island complaint, the

15   court didn't grapple with the factual allegations in

16   that case, and the factual allegations were far less

17   specific than ours.  I mean, I've looked at the

18   complaint and I don't see that it contains any real

19   allegation, much less a substantiated one, about how

20   much business was lost and when.  And with respect to

21   the rollovers, I don't see that it contains any real

22   allegations about the materiality of the rollovers that

23   we set forth in great detail.  But more than that, the

24   Rhode Island state court didn't even assess it on the

25   merits.  It held that the complaint was barred by

1    collateral estoppel.  So it's not a judgment on the

2    merits that your Honor can really take guidance from.

3    And the Defendants here don't argue collateral

4    estoppel.  They kind of hint at it, but they don't

5    really argue it, and they couldn't because under

6    federal law it's not available to them.

7         We get our own fresh look under federal law, and

8    that's really what we're asking your Honor to do here;

9    and we don't think the First Circuit decision precludes

10   it, particularly with respect to this Item 303 claim

11   which the First Circuit has never passed on.

12        Now, there's just a couple more points that

13   Ms. Collins made that I want to touch on, and I'll do

14   it briefly, as briefly as I can.  So Ms. Collins

15   mentioned that the First Circuit effectively considered

16   our allegations by way of its review of your Honor's

17   denial of the 10(b) plaintiffs' motion to amend the

18   judgment.  So I think it's important to understand

19   first things first, which is what your Honor held on

20   that motion.

21        What your Honor held on that motion wasn't that

22   those allegations failed to state a claim.  Your Honor

23   held that the 10(b) plaintiffs unduly delayed at

24   seeking leave to amend.  Your Honor didn't consider

25   those allegations on the merits.  So your Honor has

1   never passed on the allegations that were lifted from

2   our Complaint, much less under the Rule 8 standard for

3   a securities act claim, much less under Item 303.

4           On appeal, the First Circuit merely found that

5   there was no clear error or manifest injustice in your

6   Honor's decision.  The suggestion that the

7   First Circuit substantively evaluated, much less deeply

8   analyzed the merits of our factual allegations, is not

9   true.  Nowhere in the First Circuit's opinion did it

10  analyze whether our allegations were sufficient to

11  state the securities act claim for an Item 303 omission

12  or a misstatement under a Rule 8 standard.  That

13  analysis does not appear in the First Circuit's

14  opinion.

15          Now, with respect to the disclosure itself, I've

16  already made the point multiple times that we can plead

17  the Item 303 claim without showing a misleading

18  statement, and I think we've done that.  I think,

19  respectfully, we've also shown that the statements were

20  misleading in light of our enhanced factual

21  allegations.  There's a big difference between what

22  Defendants disclosed and what we allege was actually

23  happening based on our detailed factual allegations at

24  points in time.

25          In sum and substance, what Defendants disclosed

1    was that the goodwill impairment was like at the line,

2    like by the time the 2017 10-K is filed Defendants are

3    saying we're like at the line of a goodwill impairment

4    and if things don't go as well as we expect it's

5    reasonably possible there could be a goodwill

6    impairment.  It's one thing to say that the impairment

7    is at the line.  It's another thing to say that you

8    crossed over it.  And we allege sufficiently that they

9    had crossed over it because by the time that disclosure

10   was made, 25 to 33 percent of the business had been

11   gone.  That's more than --

12        THE COURT:  Were there offsets, though?  That's

13   one of the criticisms that the First Circuit had in the

14   *City of Miami* is that the complaint didn't give

15   absolute numbers, it gave, you know, losses without

16   offset gains being noted.

17        MR. RIZIO-HAMILTON:  So we do give in

18   paragraph 114 the absolute number, and we use the

19   phrase as a whole, okay?  Our paragraph 114 is the one

20   place in our Complaint or in any complaint that's been

21   filed in these cases where any plaintiff has given a

22   number that is all in net, okay, that as a whole; and

23   in our paragraph 114 we say that it was widely reported

24   that throughout the company that by 2017 the company

25   had lost between 25 to 33 percent of the Omnicare

1    business as a whole.

2         THE COURT:  As a whole, okay.

3         MR. RIZIO-HAMILTON:  Yes.  And so that's why I

4    think our Complaint is fundamentally different.  And,

5    you know, Ms. Collins noted that the company disclosed

6    that it had lowered its multi-year projections.  This

7    much is true; they did say that.  But what is a

8    reasonable investor to take from that?  And a

9    reasonable investor, to my way of thinking, wouldn't

10   take from that that between 25 and 33 percent of the

11   business had evaporated because they don't know what

12   the projections had been lowered from and to.  For all

13   they know CVS could have had a really highly profitable

14   projection that they lowered to a mid-level profitable

15   projection, or CVS could have a mid-level profit

16   projection originally that they lowered to flat.

17        And, you know, further sort of cementing the

18   point, your Honor, later in the disclosure CVS says two

19   things that would give a reasonable investor no reason

20   to believe that 25 to 33 percent of the business had

21   been gone.  They said that the goodwill remained

22   intact.  All the goodwill that they originally

23   reported, they said, remained intact.  They did say

24   we're at the line, but they didn't say we crossed it.

25   And they further say later in that same disclosure, and

1   this is in paragraph 278 of our Complaint, they say

2   that they're actually assuming future script growth

3   from senior living initiatives and the impact of

4   acquisitions.  And so they're making positive

5   representations in the same disclosure -- which, by the

6   way, we allege are directly contradicted by the report

7   of former employee Ron, in paragraphs 103 to 106, who

8   said that those assumptions were completely baseless

9   and made, in fact, for the express purpose of handing

10  off a goodwill impairment.

11          So when you look at that disclosure as a whole,

12  I agree that it for a reasonable investor that the

13  goodwill was at the line.  But we allege that it was

14  far worse than that.  It crossed the line, because 25

15  to 33 percent of the business had been lost to Omnicare

16  as a whole and that wasn't disclosed.

17          Now, the last two points I want to address that

18  Ms. Collins made were, you know, she mentioned this

19  case law that there's no duty to disclose uncharged

20  criminal conduct.  And, you know, as a legal principle

21  I think that's kind of okay as far as it goes; but it

22  again sort of misses the basis for our claim, which is

23  that Item 303 requires you to disclose a material trend

24  or uncertainty, and that's true quite regardless of

25  whether the conduct is criminal and whether it's

1   charged or uncharged.  The case, the principal case

2   that they cite for their legal principle is a Second

3   Circuit case that actually didn't involve an Item 303

4   claim, it's *City of Pontiac*.  And the trends and

5   uncertainties that you see in the Item 303 cases quite

6   often don't involve potentially criminal conduct,

7   whether charged or uncharged, but they're required to

8   be disclosed anyway.  That was true in *Silverstrand*, it

9   was true in the *Litwin v. Blackstone* case that we cite

10  from the Second Circuit, and it's true in the *Ikanos v.*

11  *Panther Partners* case from the Second Circuit that we

12  cite, the Panther Part -- that *Silverstrand* cited with

13  approval.  So there is a disclosure duty here, it's

14  under Item 303, and it doesn't turn on whether the

15  conduct is criminal or charged or uncharged.

16         The last point I want to make on this issue is

17  that in the *City of Pontiac* case, if you drill down to

18  the district court decision that they're affirming

19  there, you can see the disclosure at issue that was

20  made there that insulated the company from liability;

21  and now I'm talking about 2012 Westlaw 4471265 at page

22  Star 29.  The disclosure there is so much more

23  extensive and robust than what CVS said here.  CVS said

24  here, you know, we got a document demand from the

25  Department of Justice related to our cycle fill

1    process.  That was it.

2         If you look at the disclosure that provided a

3    safety in the *City of Pontiac* case, you will see that

4    it discloses that the DOJ and SEC are examining the

5    conduct of UBS in relation to cross-border services and

6    in particular examining whether clients sought to evade

7    their U.S. tax obligations from 2000 to 2007, and it

8    goes on.  It's like a giant paragraph that discloses

9    far more specific and robust facts about the nature of

10   the potential misconduct; it's stoked, and it's time

11   frame than was ever disclosed here.

12        And now, the last point I want to make is that

13   Ms. Collins asserted that there was no connection

14   between the rollovers and goodwill.  That's untrue.

15   There are two pled connections between rollovers and

16   goodwill.  The first is that the rollovers, as we

17   allege in paragraphs 219 and 220, accounted for

18   hundreds of millions of dollars of revenue a year, and

19   that is a significant piece of revenue that is at

20   minimum uncertain, okay?  Second, in paragraph 274 in

21   the Complaint we quote CVS's own statement drawing the

22   connection, and they say that their goodwill values

23   could change if, for example, there are adverse legal

24   or regulatory actions or developed.  And so CVS itself

25   acknowledged a connection between practices that

1    potentially violate regulations and the goodwill

2    valuation.

3         So with that, your Honor, unless you have any

4    other particular questions for me, I'm happy to

5    conclude.

6         THE COURT:  No.

7         I'd like to hear briefly from the Aetna

8    Defendants, and then if you have response to that; but

9    we're an hour into our hour hearing, so.

10        Mr. Chepiga.

11        MR. CHEPIGA:  Yes, your Honor.  Thank you, your

12   Honor.  Geoffrey Chepiga from Paul Weiss for the Aetna

13   Director Defendants.

14        As we submitted in our briefing, your Honor, the

15   Aetna Director Defendants are not proper defendants and

16   do not belong in this case.  I'd like to just start

17   with the key point is that we agree with everything

18   that Ms. Collins said and argued, that there are no

19   misstatements or omissions in this case, just as your

20   Honor found and just as the First Circuit affirmed.

21   And because there are no misstatements or omissions,

22   the Complaint should be dismissed in its entirety on

23   that ground.  If you agree with that, you don't need to

24   reach any of the claims against the Aetna Directors.

25   Ms. Collins' arguments on misstatements and omissions

1    dispose of the entire case.  But in all events there

2    are additional infirmities in the claims against the

3    Aetna Directors that require dismissal at the pleadings

4    stage.

5           As we set forth in our papers, your Honor, the

6    Aetna Director or former directors of a separate

7    publicly-traded company, Aetna, that was acquired by

8    CVS in 2018.  The alleged misstatements in this case

9    concern disclosures that CVS made in its SEC filings

10   regarding its acquisition of Omnicare back in 2015, so

11   prior to the CVS acquisition of Aetna and not having to

12   do with the CVS acquisition of Aetna.

13          Crucially, Plaintiff does not name that the

14   Aetna Directors knew about any of the alleged

15   misrepresentations.  In fact, Plaintiff pleads at

16   paragraph 101 of their Complaint that the truth was

17   known within CVS.  It doesn't say the truth was known

18   within Aetna, you know, and for this reason, your

19   Honor, in the *Fire Fighters* case the plaintiffs didn't

20   even try to bring claims against the Aetna Directors

21   and for good reason.

22          I will say that we made these arguments on a

23   motion to dismiss before the Plaintiffs here tried to

24   replead and didn't add any substantive allegations

25   against the Aetna Directors.  The suggestion that the

1    Aetna Directors should be responsible for any of the

2    alleged misstatements or omissions is just wrong, and

3    Plaintiffs have not put forward any facts to suggest

4    that they should be.

5         So just quickly, your Honor, to go through the

6    buckets of claims, the first claim against the Aetna

7    Directors is a Section 14(a) claim.  That claim, in

8    addition to the argument that there are no

9    misstatements or omissions, that claim, your Honor,

10   should be dismissed because there's no allegation that

11   the Aetna Directors knew or should have known.  And

12   there's a debate in the briefing about whether the

13   standard for a Section 14(a) claim under the Exchange

14   Act is scienter or negligence.  We submit that scienter

15   is the better reading.  Circuit courts have held that,

16   and more consistent with the trend of the Supreme Court

17   to construe implied private rights of action very

18   narrowly; so we think scienter should be the standard

19   here, in which case the Plaintiffs have pled themselves

20   out of court because they allege that there's no fraud.

21        But even if the standard is lower in negligence,

22   this Complaint just doesn't get there.  There are no

23   particularized allegations about what the Aetna

24   Directors knew or should have known that would at all

25   satisfy at the pleadings stage an allegation that they

1     acted negligently in connection with the disclosures

2     here.  They're directors of a separate publicly-traded

3     company; not CVS, not Omnicare.

4             In addition to the Section 14(a) claim, there's

5     also a Section 20(a) claim for control-person liability

6     against all of the Aetna Directors.  That claim is

7     premised on the idea that the Aetna Directors somehow

8     controlled the disclosures or controlled CVS.  We think

9     that's facially implausible in this case.  Aetna was

10    being acquired by CVS.  There's no possible way that

11    the directors of Aetna would have controlled CVS or

12    controlled its disclosures.  So we think that the

13    14(a)claim and a 20(a) claim under the Exchange Act

14    should be dismissed as against the Aetna Directors

15    under any set of circumstances.

16            And then finally, your Honor, there's some

17    additional 33 Act, Securities Act claims against just

18    one of the Aetna Directors.  That is Mr. Bertolini, who

19    is the former CEO of Aetna.  We think those are

20    facially deficient as well.  There's a Section 1282

21    claim against Mr. Bertolini, but there's no allegation

22    that he actually passed title or directly participated

23    in the solicitation in connection with the sale of CVS

24    securities.

25            There's a Section 11 claim against

1    Mr. Bertolini.  That's pled against Mr. Bertolini on

2    the allegation that he signed the registration

3    statement, which he did not.  That allegation is just

4    wrong in the Complaint.  Plaintiffs tried to amend it

5    in their briefing, but they can't do that.  They've had

6    multiple chances to amend.  We pointed out this

7    weakness in their Complaint, and the Complaint only

8    alleges that he signed the registration statement,

9    which he did not.

10          And finally, there's a control-person claim

11   against Mr. Bertolini, and again, the same argument as

12   to the control-person argument under the Exchange Act.

13   He did not control CVS.  He was a director of a

14   separate publicly-traded company and he's not a proper

15   defendant on that claim either.

16          So unless your Honor has any questions, we

17   submit that the Complaint should be dismissed in its

18   entirety but certainly as against the Aetna Directors

19   who do not belong in this case.

20          THE COURT:  Thank you.

21          Mr. Jensen, what do you say to that?

22          (Overlapping speech)

23          MR. JENSEN:  I apologize, your Honor.  I think

24   we covered all of these points well in our briefing and

25   respectfully refer the Court to that.  Given the hour,

1    I did want to respond very, very briefly to a few

2    things that opposing counsel said, if that's okay with

3    your Honor.

4          THE COURT:  Sure.

5          MR. JENSEN:  The first, your Honor, is on the

6    question of scienter as a standard for Section 14.

7    Defense counsel's position is quite radical; it's not

8    in the statute.  The vast majority of courts to have

9    looked at the question have concluded that the standard

10   is not scienter, and there's really no basis to impose

11   that standard where it's not present in the text, and

12   they haven't --

13         THE COURT:  So does the First Circuit have

14   anything that is instructive on this?

15         MR. JENSEN:  No, it does not, your Honor.

16         THE COURT:  Okay.

17         MR. JENSEN:  And so there's no basis to impose a

18   scienter requirement.  This isn't a case where the

19   statutory language matches any of the other statutes

20   that have been found to have imposed the scienter

21   requirements, such as Section 10(b).  There's just

22   nothing of the sort in Section 14.  So I'll refer to

23   our papers for more on that, including some numerous

24   cases holding the same way.

25         I think stepping back for a second, counsel

1       started with the discussion of why are the Aetna

2       Defendants in the case.  Your Honor, this is an action

3       brought on behalf of a class of Aetna investors, and

4       the Aetna Directors and former Aetna CEO signed,

5       authorized and permitted the use of their names in

6       connection with proxy solicitations for the CVS-Aetna

7       acquisition.  Under Section 14(a) that is all that is

8       required.  This is squarely within Section 14(a).

9            But I think that there's maybe even more facts

10      that really emphasize why they are appropriate

11      defendants here, including that they represented that

12      they conducted extensive due diligence in connection

13      with this acquisition and they put that out there in

14      the proxy solicitation that had their names and their

15      unanimous endorsement.  This is -- these

16      representations mattered to the Aetna investors.  They

17      were counting on these directors who had the nonpublic

18      due diligence to enable them to have an informed vote.

19      And as my colleague Mr. Rizio-Hamilton explained, there

20      were misstatements in those proxy solicitation

21      documents and thus they were deprived the right to or

22      vote.

23           With respect to the control-person claims, your

24      Honor, I think that there's just a mistake in the

25      premise of opposing counsel's argument here.  The

1    premise of his argument seems to be that a

2    control-person needed to control the, I guess the

3    underlying, underlying bad act, the rollover practices

4    or whatnot.  That's not correct.  The violation here

5    was the transmission of the false and misleading proxy

6    solicitation, and on that it's undisputable that the

7    Aetna Directors and Aetna Defendants had the control of

8    Aetna's authorization and issuance of the proxy

9    containing the misrepresentations at issue.  There's

10   just no requirement that the Aetna Directors have

11   control of CVS.  They controled Aetna, who put forward

12   the authorization for the misleading proxy

13   solicitation.

14        And I guess unless your Honor has any other

15   questions, I respectfully submit that every other point

16   was addressed in our briefing; and just given the time,

17   I won't rehash them.

18        THE COURT:  Okay.  Thank you.

19        Ms. Collins, I'll give you briefly the last word

20   if you need it.

21        MS. COLLINS:  Very briefly, your Honor.  We will

22   address the recent Supreme Court case in briefing as

23   you say, but just to set off the bat, it didn't change

24   the law on Regulation S-K as to Section 11.  It was a

25   10(b) case.  So the New York Appellate Division and the

1    Rhode Island court that looked at the Regulation S-K

2    claims in this case with these disclosures and

3    dismissed them, that's all still good law.

4             THE COURT:  Okay.

5             MS. COLLINS:  And I submit far more persuasive

6    and instructive than the *Silverstrand* case which

7    involved FDA adverse events where they disclosed

8    adverse events, but not that there were deaths.  I

9    think that's a little bit different than here we

10   disclosed customer losses and Plaintiffs say we should

11   have put a number on it.  I think they don't point to

12   any, any law under Regulation S-K or otherwise

13   indicating a duty to disclose it in the way that they

14   now think that it should have been disclosed.

15            Similarly on rollovers, again, they don't point

16   to any law under Regulation S-K saying that you would

17   have needed to have disclosed -- accused yourself of

18   misconduct to disclose some trend when there's, there

19   was no known litigation; and very different from the

20   *City of Pontiac* disclosures where they were disclosing

21   that the DOJ was looking into all of this stuff because

22   they knew that.  We didn't disclose it because we knew

23   of the subpoena, that's what we disclosed; that's all

24   the law requires.

25            And the very last point, Mr. Rizio-Hamilton

1    pointed to a couple of specific paragraphs in the

2    Complaint about net, purported net losses or purported

3    amounts billed to Medicare and Medicaid for the

4    rollovers.  I'd just ask your Honor if you think that

5    that level of difference in the factual allegations

6    would make a difference, that looking at what they

7    actually pled in the Complaint in paragraphs 114 and

8    219 is not precisely how it was portrayed here, and so

9    I just direct your Honor to the pleading.  And I'm

10   happy to go into more detail if you'd like, but also I

11   know that you're ready to end.

12          THE COURT:  All right.

13          So I'm going to allow you two weeks to submit no

14   more than three pages on the recent Supreme Court case

15   if you wish to, nobody is requiring you to, and we'll

16   take the rest of it under advisement and get something

17   out to you soon, okay?

18          MS. COLLINS:  Thank you.

19          MR. RIZIO-HAMILTON:  Thank you very much, your

20   Honor.

21          MR. CHEPIGA:  Thank you, your Honor.

22          THE COURT:  Have a good day.

23          (Adjourned)

24

25

C E R T I F I C A T I O N

        I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


                        /s/ Denise P. Veitch
                        Denise P. Veitch, RPR
                        Federal Official Court Reporter


                        May 9, 2024
                        Date